IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CHAMMA K. BRANDON,

              Plaintiff,

     v.

DR. GLEN SCHROYER, *et al.*,

              Defendants.

_____

Civil Action No.
9:13-CV-0939 (TJM/DEP)

APPEARANCES:                         OF COUNSEL:

FOR PLAINTIFF:

CHAMMA K. BRANDON, *Pro se*
12-A-5715
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

FOR DEFENDANT SCHROYER:

THUILLEZ, FORD, GOLD, BUTLER     KELLY M. MONROE, ESQ.
MONROE, LLP                     MOLLY C. CASEY, ESQ.
20 Corporate Woods Blvd., 3rd Floor
Albany, NY 12211

FOR REMAINING DEFENDANTS:

LEMIRE, JOHNSON & HIGGINGS, LLC  BRADLEY J. STEVENS, ESQ.
P.O. Box 2485
2534 Route 9
Malta, NY 12020

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is an action brought by *pro se* plaintiff Chamma K. Brandon, a prison inmate formerly confined in the Clinton County Jail ("CCJ"), pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, against several individuals working at the facility alleging that they deprived him of his civil rights during his period of incarceration there. Plaintiff's claims fall into three groups, complaining of (1) a one-month hiatus in a low-fat, low-cholesterol ("heart-healthy") diet; (2) the failure to honor his religious diet by serving him pork products; and (3) the failure to otherwise accommodate his religious beliefs as a Muslim. Plaintiff contends that, by their actions, defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of the defendants, including Dr. Glen Schroyer, who is separately represented, have moved for the entry of summary judgment dismissing plaintiff's claims. For the reasons set forth below, I recommend that the motions be granted in part but otherwise denied.

I.    BACKGROUND

Plaintiff was confined in the CCJ beginning on January 14, 2012, and again following his re-arrest on March 2, 2012, until December 28, 2012, when he was transferred into the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 17 at 3, 12-, 3. Upon his entry into the CCJ for the first time in January 2012, Brandon was five-feet, eleven-inches in height, weighed 250 pounds, and was considered clinically obese.[1] Dkt. No. 77-6 at 2; Dkt. No. 77-10 at 4. Plaintiff alleges that, while he was incarcerated at the CCJ, the defendants (1) deprived him of constitutionally adequate medical care by removing him from a heart-healthy diet for one month; (2) deprived him of his rights under the First Amendment and RLUIPA to freely exercise his Muslim religion by (a) repeatedly providing him with meals that contained pork products, (b) denying him the opportunity to participate in Ramadan, and (c) denying him access to worship space and congregate religious services; and (3) retaliated against him by denying him adequate medical care and depriving him of his right to freely exercise his religion in

---

[1]    In his amended complaint, plaintiff alleges that he weighed 275 pounds upon his initial entry into the CCJ, and 225 pounds upon his transfer into the custody of the DOCCS. Dkt. No. 17 at 11. In a memorandum submitted in opposition to defendants' motions, however, plaintiff claims to have lost "about 175 lbs to 130 lbs" while confined in the CCJ due to the deprivation of meals. Dkt. No. 93-2 at 62.

response to grievances and complaints he filed against them during his incarceration at the CCJ.[2] *See generally* Dkt. No. 17. Additionally, plaintiff's amended complaint asserts a failure-to-protect claim against defendants Clancy and Blaise, a corrections sergeant and a corrections officer, respectively, at the CCJ. *Id.*

A.    Plaintiff's Diet

When he first arrived at the CCJ, Brandon reported that he was allergic to shellfish. Dkt. No. 17 at 4; Dkt. No. 75-6 at 2. A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen.[3] *See* Dkt. No. 17 at 47; Dkt. No. 75-1 at 37. In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. Dkt. No. 17 at 4; Dkt. No. 75-6 at 2. As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." Dkt. No. 17 at 48; Dkt. No. 75-1 at 38.

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. Dkt. No. 17 at 4-5, 49; Dkt. No. 75-1 at 39; Dkt. No. 75-6 at 2.

---

[2]    A more precise description of the claims asserted against the defendants is included below in Part II. of this report.

[3]    The order was later reiterated on July 5, 2012. Dkt. No. 17 at 50; Dkt. No. 75-1 at 40.

Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012,

after a review of plaintiff's commissary purchases, which were being

monitored by medical staff, revealed the purchase of many items that were

inconsistent with plaintiff's dietary restrictions, including products that were

high in fat and cholesterol.[4] Dkt. No. 17 at 8-9, 52; Dkt. No. 75-1 at 41;

Dkt. No. 75-6 at 3. For example, the record reveals that, during the

relevant period, plaintiff's commissary purchases included a wide array of

---

[4]     In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled
by medical staff concerning his non-compliance with his restrictive diets, and was
warned, prior to October 16, 2012, that continued non-compliance would result in
removal of the dietary restrictions. Dkt. No. 75-6 at 3. This assertion is sharply
contested by plaintiff, who contends that the restrictions were lifted without warning.
Dkt. No. 83 at 3-4. Plaintiff notes, moreover, that defendant Schroyer responded as
follows to one of his interrogatories:

> Interrogatory No. 15:
>
>      Did Dr. Schroyer or anyone else within the Medical-
> Staff notify Plaintiff that purchasing or consuming certain
> items from commissary would result in the removal
> (cancellation) of his dietary restriction at anytime [sic] on or
> before October 16, 2012?
>
> Answer to Interrogatory No. 15:
>
>      The applicable medical records indicate that a
> discussion was held between the defendant and plaintiff on
> October 16, 2012 regarding plaintiff's non-compliance with
> his low fat/low cholesterol diet. The records further indicate
> that the proposed plan discussed in response to such non-
> compliance and plaintiff's assertion that he would, 'not be
> compliant with any diet' was the removal of such diet.

Dkt. No. 83-3 at 25. While this presents a disputed question of fact, as will be
discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate
medical indifference claims against defendant Schroyer.

candy, cookies, snacks, and sugared drinks. Dkt. No. 75-1 at 60-62. Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. Dkt. No. 17 at 10, 53, 188; Dkt. No. 75-1 at 42. Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. Dkt. No. 17 at 10.

In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. Dkt. No. 17 at 12-13; Dkt. No. 83 at 6. According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions . Dkt. No. 17 at 17-18, 20-22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his

religious beliefs. Dkt. No. 17 at 13, 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. Dkt. No. 17 at 13, 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse[6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for pork medical does not do religious diets." *Id.* at 67 (emphasis in original).

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. Dkt. No. 93-4 at 82-82. The next two instances occurred on October 9 and 10, 2012. *Id.* at 94-99. On October

---

[5]    Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. Dkt. No. 17 at 13. Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at Dkt. No. 83-3 at 2 and Dkt. No. 93-4 at 68, and again, half of the document cannot be deciphered.

[6]    Plaintiff alleges that defendant Kinter authored the response to this sick-call request. Dkt. No. 17 at 14. It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. Dkt. No. 17 at 18; Dkt. No. 93-4 at 116-17. Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." Dkt. No. 17 at 20. Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. Dkt. No. 17 at 21. The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. Dkt. No. 17 at 22; Dkt. No. 93-4 at 164-65.

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. Dkt. No. 77-14 at 2. Although plaintiff disputes this, Dkt. No. 17 at 12; Dkt. No. 83 at 6, his initial booking intake record does not reflect any religious designation.[7] Dkt. No. 77-6 at 2. There is no dispute, however, that when plaintiff was

---

[7]    The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet.[8] Dkt. No. 17 at 210; Dkt. No. 83-3 at 36.

Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." Dkt. No. 77-14 at 2. Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. Dkt. No. 77-14 at 3. In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. Dkt. No. 77-3 at 7. Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's

---

[8]     Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary:     Muslim Diet." Dkt. No. 17 at 210.

handwriting. Dkt. No. 17 at 51; Dkt. No. 83-3 at 42. Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified . . . by removing the date written on the notification[.]"[9] Dkt. No. 93-3 at 11.

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff was notified of plaintiff's religious dietary restrictions. *See, e.g.*, Dkt. No. 77-5 at 21 (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet . . . and that you are Muslim"); Dkt. No. 93-4 at 81 (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen . . . did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected

---

[9]    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." Dkt. No. 95-3 at 6. While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

10/5/12").

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012.[10] Dkt. No. 17 at 18, 20, 21, 22; Dkt. No. 93-4 at 94-99, 116-17, 164-65.

B.     Other Religious Accommodation

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19, 2012. Dkt. No. 17 at 14-15, 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to

_____

[10]     Defendants contest whether some of those meals included pork or pork products. *See, e.g.,* Dkt. No. 77-19 at 9.

staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15-16.

     C.    <u>Assault by a Fellow Inmate</u>

On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. [Dkt. No. 17 at 31](#). Defendant Clancy apparently could be heard by plaintiff to say, "'[L]ets [sic] see if he tries that shit on Brandon!'" *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, "'[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.'" *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant

Blaise responded by laughing at plaintiff. *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| Defendant | Position |
|---|---|
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ  Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |

County of Clinton.[11]

---

[11]     Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. Dkt. No. 16.

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
| --- | --- |
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |

Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

| | |
|---|---|
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |

| | |
|---|---|
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. Dkt. No. 75. On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. Dkt. No. 77. The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    <u>DISCUSSION</u>

    A.    <u>Summary Judgment Standard</u>

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial

burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Defendant Schroyer's Motion

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the

First and Eighth Amendments.

### 1.     Deliberate Medical Indifference

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy

both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. Dkt. No. 17 at 25-26, 62, 63; Dkt. No. 83 at 5. According to defendant

Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." Dkt. No. 75-6 at 4. The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. Dkt. No. 17 at 36; Dkt. No. 83 at 5. While plaintiff's high cholesterol may constitute a serious medical need – an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions. Dkt. No. 75-6 at 4. Although the parties dispute whether plaintiff was warned ahead of time that his

commissary purchases could result in his removal from the diet, *compare* Dkt. No. 17 at 27 *with* Dkt. No. 75-6 at 3, there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. Dkt. No. 17 at 25-27. Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

2.    Free Exercise

In addition to claiming deliberate medical indifference, plaintiff

contends that defendant Schroyer is responsible for denying him an

appropriate religious diet, and specifically, one that conformed to his

Muslim faith and did not include pork or pork products.[12] Undeniably,

plaintiff was entitled to receive a diet that was consistent with his sincerely

held religious beliefs. *See, e.g., Johnson v. Guiffere*, No. 04-CV-0057,

2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (Hurd, J., *adopting

report and recommendation by* Peebles, M.J.).[13] The record, however,

demonstrates that at the CCJ, accommodating diet restrictions in

accordance with an inmate's religious beliefs is the responsibility of

security staff, rather than medical personnel. *See, e.g.*, Dkt. No. 75-6 at 2;

*see also* Dkt. No. 75-1 at 44, 50. To counter this, and in an attempt to

implicate defendant Schroyer, plaintiff offers only his speculation based

upon the fact that, at one point, in response to a sick-call complaint by

plaintiff that he was being served pork, defendant Kinter, a nurse at the

---

[12]    Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I have not analyzed that claim in the context of defendant Schroyer's motion.

[13]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. Dkt. No. 83 at 3; Dkt. No. 83-3 at 11. Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

### 3. Retaliation

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

4. Conspiracy

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

C. County Defendants' Motion

1. RLUIPA[14]

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. Dkt. No. 17 at 42-44. It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or

---

[14]    While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g.,* Dkt. No. 17 at 16, 36-42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013), I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014).

While plaintiff ordinarily could pursue a claim for injunctive and declaratory

relief under the RLUIPA against defendants in their official capacities,

*Williams v. Fisher*, No. 11-CV-0379, 2015 WL 1137644, at *17 (N.D.N.Y.

Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by*

Dancks, M.J.), such claims are now moot based upon plaintiff's transfer

out of the CCJ. *See Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011)

("In this circuit, an inmate's transfer from a prison facility generally moots

claims for declaratory and injunctive relief against officials of that facility.").

Accordingly, I recommend that plaintiff's RLUIPA claim asserted against

the county defendants be dismissed.

> ### 2.   Conspiracy

Plaintiff alleges that there was a "meeting of the minds" among some

of the defendants to deprive him of his civil rights. *See, e.g.*, [Dkt. No. 17 at

25](#), 27-29. Specifically, he contends that defendant Laurin evaluated

plaintiff's commissary purchases on or about October 15, 2012, and

decided that plaintiff's purchases were inconsistent with his heart-healthy

diet. *See* [Dkt. No. 17 at 24](#) ("Said conspiracy was initiated on October 15,

2012, as Laurin made a medical assessment stating my commissary buys

is a form of non-compliance to my special diet."). Defendant Laurin

thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect . . . . Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously issued diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clancy furthered the conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the

kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer.[15] *Id.*

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and

---

[15] To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g,* Dkt. No. 17 at 31, I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason aside from plaintiff's commissary purchases. Dkt. No. 77-10 at 3-4. According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. Dkt. No. 77-4 at 2-5. Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ

kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." Dkt. No. 77-11 at 4. Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. Dkt. No. 17 at 28. Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate plaintiff's rights,

defendant Clancy immediately provided him with a new meal. Dkt. No. 77-5 at 26.

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. Dkt. No. 17 at 29. According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21-22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides

"the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together."[16] *Little v. City of N.Y.*, 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007). Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

Although plaintiff's amended complaint mentions, in passing, 42 U.S.C. § 1985, there is no record evidence to support a conspiracy claim against the defendants under section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 835 (1983); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). "To establish such intentional or purposeful discrimination, it is axiomatic that a

---

[16] The doctrine is rooted in the Sherman Antitrust Act, 15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.*, 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002)

plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi*, 18 F.3d at 193. A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (quotation marks omitted).

In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

3.   Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services;

and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-

0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[17]

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. [Dkt. No. 77-14 at 3](). In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint

---

[17]   While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ.[18] Dkt. No. 17 at 78-161; Dkt. No. 77-5 at 2-47; Dkt. No. 93-4 at 76-170. None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivaties [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." Dkt. No. 93-2 at 40. The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access

---

[18]    Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g.,* Dkt. No. 17 at 20.

to religious services, the right to participate in Ramadan, or retaliation. Dkt. No. 93-4 at 167-171. Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See*, *e.g.*, *Hemphill v. N.Y.*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias*, 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense

survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. Dkt. No. 93-2 at 40. There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." Dkt. No. 17 at 19. This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified

individual, cannot serve as a basis for finding an inmate excused from the

PLRA exhaustion requirement. *See Singh v. Lynch*, 460 F. App'x 45, 47-

48 (2d Cir. 2012) ("The test for determining the availability of grievance

procedures to a prisoner is objective . . . . Singh's subjective fear of

retaliatory physical harm derives from two facts: the unreported June 6,

2005 assault and other inmates' warnings that Lynch was out to get him.

The former fact cannot, by itself, support an objective finding that

grievance procedures were unavailable . . . . As for the alleged inmate

warnings, in the absence of any particulars indicating that Lynch was

looking to do more than harass Singh . . ., this fact cannot support a

finding that grievance procedures for an assault claim were effectively

unavailable."); *Harrison v. Stallone*, No. 06-CV-0902, 2007 WL 2789473,

at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and*

*recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not

excused from exhausting available administrative remedies even where

the plaintiff alleged in his complaint that he did not file a grievance

because he was "'afraid of retaliation'" and he stated in opposition to the

defendants' motion for summary judgment that "he had a 'legitimate fear'

of retaliation because his substantive claim is one for retaliation"). To hold

otherwise would permit an exception that would be easily and often

incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison*, 2007 WL 2789473, at *6.

    4.    <u>Personal Involvement</u>

Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the

law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g.,* Dkt. No. 77-19 at 24 ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

### a.    Defendant Bedard

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. Dkt. No. 77-11 at 4. In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

### b.    Defendant Blaise

There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time.[19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See* Dkt. No. 93-2 at 54 ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

### c.    Defendant Clancy

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record

---

[19]    Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff may be assaulted by the inmate. Dkt. No. 17 at 31-32; *see also* Dkt. No. 93-2 at 54-56. Those allegations will be addressed in Part III.C.5.c. of this report.

confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. Dkt. No. 17 at 18-19; Dkt. No. 93-4 at 116-17. As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. Defendant Perry

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled.

Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." Dkt. No. 17 at 22-23. Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. Dkt. No. 93-4 at 164. Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

e.     Defendant Web

Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint

alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. Dkt. No. 17 at 21. In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21-22. Although plaintiff alleges that he field a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; Dkt. No. 93-4 at 76-171. In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." Dkt. No. 77-16 at 2. In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

f.    Defendant Wingler

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary

restrictions. Dkt. No. 17 at 7; Dkt. No. 93-2 at 58. The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. Dkt. No. 93-4 at 92, 139. Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

5.    Remaining Claims/Defendants

      a.    Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton*, No. 14-CV-2444, 2015 WL 8919463, at *5 (D. S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim, I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

b.     Plaintiff's Free Exercise Claim (Regarding his
       Religious Dietary Restrictions) Asserted Against
       Defendants Laurin, Kinter, Bedard, Clancy, Perry,
       and Web

While inmates confined within prison facilities are by no means

entitled to the full gamut of rights guaranteed under the United States

Constitution, including its First Amendment, the free exercise clause of

that provision does afford them at least some measure of constitutional

protection, including their right to "a diet consistent with [their] religious

scruples." *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell

v. Procunier*, 417 U.S. 817, 822 (1974) ("In the First Amendment context .

. . a prison inmate retains those First Amendment rights that are not

inconsistent with his status as a prisoner or with the legitimate penological

objectives of the corrections system."). That right, however, is not without

limits, and the task of defining the contours of that right in a prison setting

requires striking a delicate balance between the rights of prison inmates

and the legitimate interests of prison officials tasked with maintaining

prison security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49

(1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v.

Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show . . . that the

disputed conduct substantially burdens his sincerely held religious

beliefs."[20] *Salahuddin*, 467 F.3d at 274-75. In evaluating this factor, the court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

In this case, there is evidence in the record to support a factfinder's

---

[20]     The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.'" *Ford v. McGinnis*, 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.*, 494 U.S. at 887); *see also Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. Dkt. No. 17 at 13, 18, 20, 21, 22, 66, 67; Dkt. No. 93-4 at 82-85, 94-99, 116-17, 164-65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v.*

*Strada*, 249 F. App'x 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify*, 968 F. Supp. 2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do not give rise to a First Amendment claim." (citing cases)); *Evans v. Albany Cnty. Corr. Facility*, No. 05-CV-1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally *de minimis*); *Odom v. Dixion*, No. 04-CV-0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

c.    Plaintiff's Failure-to-Protect Claim Asserted Against Defendants Blaise and Clancy

The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an

opportunity to file a second motion for summary judgment specific to this remaining claim.

IV.   SUMMARY AND RECOMMENDATION

A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend that cause of action survive defendant Schroyer's motion but he be permitted to file a second motion for summary judgment addressing it. Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants

Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (Dkt. No. 75) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (Dkt. No. 77) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     February 26, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2007 WL 3046703
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John Earl JOHNSON, Plaintiff,

v.

Joseph GUIFFERE [1] and John
Pecora, Administrator, Defendants.

No. 9:04-CV-57.
|
Oct. 17, 2007.

**Attorneys and Law Firms**

John Earl Johnson, Albany, NY, pro se.

Donohue Sabo, Fred Hutchison, Esq., Kenneth G. Varlely, Esq., of Counsel, Albany, NY, for Defendant Guiffere.

### ORDER

DAVID N. HURD, United States District Judge.

*1 Plaintiff, John Earl Johnson, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated August 10, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendant Sergeant Guiffere's motion for summary judgment be granted and the plaintiff's complaint be dismissed in all respects, with prejudice regarding defendant Guiffere, but without prejudice as to defendant Pecora. Objections to the Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendant Sergeant Guiffere's motion for summary judgment is GRANTED;

2. The complaint is DISMISSED in all respects, with prejudice with regard to defendant Guiffere;

3. The complaint is DISMISSED in all respects, without prejudice as to defendant Pecora; and

4. The Clerk shall file judgment accordingly.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff John Earl Johnson, who is now a federal prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights during a one and one-half month period while confined as a federal detainee within the Montgomery County Jail ("MCJ"). Johnson, a practicing Muslim, claims that jail officials at the MCJ violated his constitutional rights by depriving him of a diet consistent with his religious beliefs.

Currently pending before the court is a motion by Sergeant Guiffere, the lone remaining defendant appearing in the action, seeking the entry of summary judgment dismissing plaintiff's claims against him. Defendant's motion is predicated upon his assertion that the policy in place at the MCJ, requiring only that Islamic inmates be provided a "no pork" diet but that requests for vegetarian or other religious alternative meals be denied, is constitutional under existing law. Defendant Guiffere further contends that if a constitutional violation occurred, he is nonetheless entitled to qualified immunity from suit based upon the legal uncertainties surrounding plaintiff's claims. For the reasons set forth below, I recommend that Guiffere's summary judgment motion be granted and that plaintiff's claims against him be dismissed on the basis of qualified immunity.

### I. BACKGROUND

At the times relevant to his complaint the plaintiff, who subscribes to strict Islamic religious tenets, was a federal detainee held in the custody of the United States Marshals Service, and incarcerated within the MCJ pursuant to an apparent arrangement between that agency and officials operating the facility for the housing of federal prisoners awaiting trial and/or sentencing. Complaint (Dkt. No. 1) ¶ 3, Facts ¶¶ 1, 20; see also Defendant's Motion for Summary

Judgment (Dkt. No. 62) Exh. B, at 37. On June 13, 2003, following his transfer into the MCJ, plaintiff informed jail officials that his religion required he be fed meals consistent with his Islamic beliefs, though without providing elaboration regarding the diet being requested. [2] Complaint (Dkt. No. 1), Facts ¶¶ 1, 2; Johnson Aff. (Dkt. No. 30) ¶ 1. After an ensuing series of discussions with various prison officials at the MCJ regarding the issue, plaintiff formalized his dietary request on June 16, 2003 through the submission of a special diet request form asking that he not be served any meats "such as beef, chicken, turkey etc." because of his religious affiliation. Johnson Aff. (Dkt. No. 30) ¶¶ 1-2; Complaint (Dkt. No. 1), Facts ¶¶ 2-9; *see also* Guiffere Aff. (Dkt. No. 33-4) Exh. B. That request was denied on June 18, 2003 by defendant Guiffere, who responded that the MCJ is a "no pork facility" which does "not honor vegetarian diets." Guiffere Aff. (Dkt. No. 33-4) Exh. B; Complaint (Dkt. No. 1), Facts ¶ 12.

**\*2** Plaintiff filed a formal grievance regarding the denial of his special dietary request on June 18, 2003. Complaint (Dkt. No. 1), Facts ¶ 13; Johnson Aff. (Dkt. No. 30) ¶ 3. That grievance was denied by the facility's grievance coordinator, Candus M. Kwiatkowski, on June 25, 2003, based upon her finding that the facility's policy of reasonably accommodating prisoners' religious dietary beliefs had been followed. Complaint (Dkt. No. 1), Facts ¶ 14; Johnson Aff. (Dkt. No. 30) ¶ 5. That grievance denial was later upheld on appeal to John F. Pecora, the facility's chief administrative officer, on June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 7.

Plaintiff appealed the matter further to the Citizens' Policy and Complaint Review Council (the "CPCR Council") on or about June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 8. While plaintiff, who was transferred out of the MCJ on July 29, 2003, *see* Complaint (Dkt. No. 1), Facts ¶ 20, maintains that he never received a response with respect to that appeal, defendants assert that the CPCR Council voted on November 19, 2003 to deny the grievance, and notified both the Montgomery County Sheriff and the plaintiff of that determination by letter dated November 25, 2003 from Daniel B. Reardon, Commissioner and Chair of the New York Commission of Correction. Guiffere Aff. (Dkt. No. 33) ¶ 10.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 16, 2004. Complaint (Dkt. No. 1). In his complaint, plaintiff named as defendants the CPCR Council as an entity, as well as John F. Pecora, the Administrator of the MCJ, and Sergeant Guiffere, a corrections employee at the facility. [3] *Id.* Plaintiff's complaint asserts various constitutional claims stemming from the denial of his dietary request, including interference with the free exercise of his religious beliefs, procedural and substantive due process violations, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. *Id.*

On July 15, 2004, in lieu of answering, the CPCR Council moved seeking dismissal of plaintiff's claims against it for failure to state a cause of action upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 10, 11. In a report dated May 17, 2005, I recommended that all claims against the CPCR Council as an entity be dismissed as barred by absolute immunity under the Eleventh Amendment, with leave for plaintiff to replead to assert claims against individual members of the council, and further urged the court to deny plaintiff's cross-motion for summary judgment on the merits of his claims. [4] Dkt. No. 48. Those recommendations were adopted by order issued by U.S. District Judge David N. Hurd on December 7, 2005. Dkt. No. 51.

On October 31, 2006 defendant Guiffere, the only other defendant served in the action, filed a summary judgment motion with the court, arguing both that the denial of plaintiff's dietary request did not violate a constitutional right because it was reasonably related to a legitimate penological interest, and that in any event he is protected from suit under the doctrine of qualified immunity. Dkt. No. 62. Plaintiff responded in opposition to Guiffere's motion by submission filed on January 22, 2007, Dkt. No. 67, and defendant Guiffere has since countered with the filing on February 1, 2007 of a reply memorandum in response to plaintiff's opposition. Dkt. No. 69. Defendant Guiffere's summary judgment motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
**\*3** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary

judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (citations omitted); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only

when "there can be but one reasonable conclusion as to the verdict").

B. First Amendment Free Exercise Claim[5]

*4 In his summary judgment motion, Guiffere initially argues that plaintiff's First Amendment rights were not abridged while being held in the MCJ, since New York State guidelines for religious dietary needs and the facility's local practices, providing that a "pork-free" meal satisfies the constitutional dietary requirements for Muslim inmates, are reasonably related to legitimate penological interests. Defendant's Motion for Summary Judgment (Dkt. No. 62-6) at 2. Plaintiff counters that the budgetary concerns implicitly advanced by the defendant in defense of the relevant dietary practices at the MCJ do not support their position, since all that he asked was that his meals consist only of fish and vegetables, not that prison officials incur the expense of preparing Halal meals.

The First Amendment to the United States Constitution guarantees the right to the free exercise of religion.[6] Cutter v. Wilkinson, 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). That clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003) ( "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. See, e.g., Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); Salahuddin, 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' "

*Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).

**\*5** Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. [7] *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at \*4 (W.D.N.Y. Mar. 30, 2007). Importantly, in evaluating this factor the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds [,]' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at \*4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate

penological purpose justifying the decision under scrutiny. [8] *Salahuddin,* 467 F.3d at 274-75; *Livingston v. Griffen,* No. 04-CV-00607, 2007 WL 1500382, at \*15 (W.D.N.Y. May 21, 2007). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254 (1987). *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Livingston,* 2007 WL 1500382, at \*15.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* has clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at \*5 (W.D.N.Y. Mar. 14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

In his motion, defendant does not question the sincerity of plaintiff's Islamic religious beliefs. Plaintiff maintains that by providing him with meals containing meat other than pork, defendants have interfered with free exercise of his religion, the beliefs associated with which require him to observe a vegetarian diet-with the exception of fish, which he is permitted to eat. While plaintiff offers nothing, aside from his naked assertions in this regard, as evidence that his sincerely held religious beliefs require such a dietary accommodation, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." [9] *McEachin,* 357 F.3d at 201. Accordingly, the plaintiff has satisfied his burden at step one of the inquiry.

**\*6** It would ordinarily be incumbent at this juncture for the defendant to articulate palpably legitimate penological concerns to justify his refusal to provide the plaintiff with a vegetarian-plus-fish diet. Typically, defendants in similar cases offer up the financial burden associated with affording inmates particular diets, including those involving preparation and serving of Halal meals. *See, e.g., Williams*

*v. Morton,* 343 F.3d 212, 217-18 (3d Cir.2003); *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *4 (S.D.N.Y. Feb. 27, 1997). With the articulation of such a justification, the focus would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *Ford,* 352 F.3d at 595-96. Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment. *See generally Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (holding that fact issues existed as to whether DOCS' ban on literature and assembly of religious group was reasonably related to legitimate penological interests; *Show v. Patterson,* 955 F.Supp. 182, 190-91 (S.D.N.Y.1997) (finding fact issues precluding summary judgment regarding whether strip search of Muslim inmates was reasonably related to legitimate penological interests).

In this instance the defendant has not offered any justification for his refusal to provide the plaintiff with the requested, vegetarian-plus-fish diet, the reasonableness of which could then be examined under *Turner,* instead arguing only his belief that plaintiff's non-pork diet should satisfy the requirements of mainstream Islamic religious tenets. Since this represents little more than an invitation for the court to examine the bonafides of plaintiff's religious beliefs-an invitation which, the Second Circuit has counseled, should be firmly resisted-I find defendant's failure to offer justification for his denial of plaintiff's dieting request to be fatal to his motion, and that accordingly he is not entitled to summary judgment in connection with the merits of plaintiff's First Amendment free exercise claim.

### C. *Equal Protection*

In addition to raising concerns under the free exercise clause of the First Amendment, plaintiff's complaint asserts a cause of action under the equal protection clause of the Fourteenth Amendment. The essence of that claim, however, is not well-defined in plaintiff's complaint, and his response in opposition to defendant's summary judgment motion fails to illuminate the claim.

The equal protection clause directs state actors to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the equal protection clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an

identifiable or suspect class. *See Giano,* 54 F.3d at 1057 (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 1477 (2001)) (internal quotation marks omitted).

**\*7** It may be that plaintiff asserts an equal protection violation stemming from the failure of prison officials to provide him with a diet consistent with his religious beliefs, while members of other religions are accommodated. In such a case plaintiff's equal protection claim is properly analyzed under the framework articulated by the Supreme Court in *Turner. Smith,* 2007 WL 837111, at *5.

As is the case with regard to plaintiff's First Amendment claim, defendant has offered little of value to assist in determining whether it can be said, as a matter of law, that plaintiff's dietary request could not be accommodated consistent with legitimate penological concerns, and that the disparate treatment afforded to plaintiff, based upon his religious beliefs, thus did not abridge his rights to equal protection under the Fourteenth Amendment. Accordingly, defendant Guiffere is not entitled to summary judgment at this juncture with regard to the merits of plaintiff's equal protection claim.

### D. *Procedural Due Process* [10]

In his complaint plaintiff also asserts a claim for deprivation of his procedural due process rights. Plaintiff's procedural due process claim contains two elements.

The first component of that claim derives from plaintiff's contention that in denying his request for a vegetarian-plus-fish diet, prison officials at the MCJ failed to follow their own internal regulations. This element of plaintiff's due process claim is easily discounted. It is well-established that no due process claims arise from the failure of prison officials to follow internal prison regulations. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citing *Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001)).

The second portion of plaintiff's due process claim stems from the failure of prison officials to provide a hearing before denying his request for a religious meal. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In his papers plaintiff has cited no provision under which New York has created a liberty interest guarantying prisoners meals including only vegetables and fish, as requested by him. Consequently, in order to prevail on his due process claim plaintiff must establish that the denial of his request in that regard imposed upon him "atypical and significant hardship" in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300 (1995); *see also McEachin,* 357 F.3d at 202-03; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Because plaintiff's complaint, even when most generously construed, fails to contain any such allegation, his procedural due process claim is subject to dismissal as a matter of law.

E. *Qualified Immunity*

**\*8** In addition to seeking dismissal of plaintiff's claims on the merits, defendant now presses qualified immunity as an alternative basis for dismissal of plaintiff's claims against him.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at \*20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Analysis of a claim of qualified immunity entails a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

**\*9** The first two elements, as they apply to the facts of this case, are not controversial. Addressing the merits of the plaintiff's free exercise and equal protection claims, I have found at least the existence of genuinely disputed material facts precluding a finding, as a matter of law, that no substantive violation occurred. Moreover, the right at stake, including of a prison inmate to receive meals consonant with their religious beliefs, subject only to the constraints of legitimate penological concerns, was clearly established at the times in dispute. *See, e.g., Ford,* 352 F.3d at 507; *Bass,* 976 F.2d at 99; *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975).

It is the third element, addressing on Sergeant Guiffere's state of mind, that is the focus of his application for immunity from suit. In this instance, Sergeant Guiffere asserts and plaintiff does not contest-that it was his belief at the relevant times that the prescribed pork-free diet was in conformance with Johnson's Islamic dietary restrictions. *See, e.g.,* Guiffere Aff. (Dkt. No. 33-3) ¶ 6. Guiffere's belief in this regard was apparently influenced in large part by an advisory chart maintained at the MCJ reflecting that the dietary beliefs of the Islamic (Muslim) religion require consumption of Kosher meals, to include "meat, but no pork or pork by-products." Hutchinson Aff. (Dkt. No. 33) ¶ 5 and Exh. A. It also should be noted that at the time in question the provision of pork-free diets to Islamic inmates had been approved by the New York courts as "satisf[ying] the constitutional requirement." *See Malik v. Coughlin,* 158 A.D.2d 833, 834, 551 N.Y.S.2d 418, 418 (3d Dep't 1990) (citing *O'Lone,* 482 U.S. at 352, 107 S.Ct. at 2406); *see also Majid v. Leonardo,* 172 A.D.2d 914, 914, 568 N.Y.S.2d 200, 201 (3d Dep't 1991). Under these circumstances I find that it was objectively reasonable for the defendant to believe that his actions in denying plaintiff's request for a vegetarian-plus-fish diet did not violate Johnson's clearly established constitutional rights. [11] *See generally Kind v. Frank,* 329 F.3d 979 (8th Cir.2003).

IV. *SUMMARY AND RECOMMENDATION*
Analysis of plaintiff's substantive free exercise and equal protection claims turn upon resolution by the factfinder of critical issues of fact, including whether his sincerely held religious beliefs require the diet which he requested, and whether legitimate penological concerns preclude providing him with the meals sought by him. I find, however,

that a reasonable person in the defendant's circumstances, denying plaintiff's meal request based upon an established facility policy and a practice which has passed state court scrutiny, would not have appreciated that he or she was violating plaintiff's clearly established constitutional rights. Accordingly, I recommend a finding that defendant Guiffere is entitled to dismissal of plaintiff's claims against him on the ground of qualified immunity.

**\*10** Based upon the foregoing, it is therefor hereby

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and the plaintiff's complaint be DISMISSED in all respects, with prejudice with respect to defendant Guiffere, but without prejudice as to defendant Pecora.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the plaintiff by regular mail and the defendant electronically.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3046703

Footnotes

1   Defendant Joseph A. Guiffere, who is alleged to have been a corrections sergeant at the Montgomery County Jail during the times relevant to plaintiff's claims, was mistakenly named by the plaintiff in his complaint as Sergeant Guiffery. In my earlier report and recommendation, dated May 17, 2005, I directed the clerk to revise his records to reflect that defendant's name as Sergeant Guiffrie. *See* Dkt. No. 48. Because it now appears that the proper spelling of this defendant's name is Guiffere, I will once again ask the clerk's office to adjust its records accordingly.

2   Plaintiff apparently adheres to a strict Islamic diet, which has been described by one court as follows:
    [p]racticing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner.... Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle.... Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual.
    *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997); *see also Smith v. Nuttal,* No. 04-CV-0200, 2007 WL 837111, at *1 n. 3 (W.D.N.Y. Mar. 14, 2007). During his deposition, plaintiff explained the four

mandatory characteristics of properly prepared Halal food at length by quoting a translation of the relevant sections of the Koran (Quran). *See* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 18-22.

3    Defendant Pecora has neither been served, nor has he appeared in the action. *See* Dkt. Nos. 13, 16, 22. In light of plaintiff's failure to serve him within the allotted 120 days under Rule 4(m) of the Federal Rules of Civil Procedure, and in the absence of anything which would constitute good cause to extend that period, plaintiff's claims against defendant Pecora are subject to dismissal, without prejudice. Fed.R.Civ.P. 4(m); *see Shuster v.. Nassau County,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publ'g Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

4    Plaintiff has not availed himself of this limited opportunity to replead.

5    Although my complaint does not contain such a cause of action, plaintiff's factual allegations could support a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Because the principles which inform analysis of plaintiff's free exercise claim are similar to those applicable to his potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks, *see Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), and my finding of defendant's entitlement to qualified immunity applies equally to this potential claim, it is unnecessary to separately determine whether plaintiff's *pro se* complaint should be liberally construed as asserting such a cause of action.

6    That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

7    Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 04-CV-00607, 2007 WL 1500382, at *15 (N .D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to take a stance regarding this issue.

8    While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate. *Salahuddin,* 467 F.3d at 274, n. 4.

9    The Second Circuit had occasion to address this element-the bonafides of a plaintiff's sincerely held religious beliefs-in the context of a religious dietary restriction request made by an inmate in *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003). While noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

10    Plaintiff's complaint also alleges deprivation of substantive due process. Because plaintiff's complaint adequately alleges a violation of the First Amendment free exercise clause and the denial of equal protection as guaranteed by the Fourteenth Amendment, there is no need to resort to the more generic substantive due process provision for an analysis of those claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). In any event, it cannot be said that plaintiff's allegations arise to a level sufficient to offend notions of substantive due process. *See id.* (noting alternatively that plaintiff's substantive due process claim must fail because alleged actions of defendants were not sufficiently shocking to create substantive due process violation).

11    Undeniably, the Second Circuit has been less than generous in finding qualified immunity in settings such as that now presented. *See Ford,* 352 F.3d at 596-98. In *Ford,* for example, the Second Circuit rejected a finding of qualified immunity based upon the failure of prison officials to provide an Islamic inmate with the Eid ul Fitr meal to celebrate the close of Ramadan, in reliance upon advice from religious authorities that postponement of the feast meal was not religiously

significant. *Id.* at 597-98. The instant case, however, presents a far more compelling argument for invocation of qualified immunity, based upon facts which are strikingly similar to those involved in *Kind,* in which the Eighth Circuit endorsed a finding of qualified immunity under analogous circumstances to those now presented. 329 F.3d at 980-81.

KeyCite Blue Flag – Appeal Notification

**Appeal Filed by** WILLIAMS v. FISCHER, 2nd Cir., April 3, 2015

2015 WL 1137644
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Deandre WILLIAMS, Plaintiff,

v.

Brian FISHER, Cheryl V. Morris, Omega
B. Albton, D. Rock, M. Lira, J. Hawk,
Don Haug, Karen Bellamy, Kenneth S.
Perlman, Alec H. Friedmann, Defendants.

No. 9:11–CV–379 (NAM/TWD).
|
Signed March 10, 2015.
|
Filed March 11, 2015.

**Attorneys and Law Firms**

DeAndre Williams, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Keith J. Starlin, Esq., Assistant New York State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** In this *pro se* action pursuant to 42 U.S.C. § 1983, plaintiff alleges violations of his First Amendment right to practice his chosen religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth amendment right to equal protection under the law. In addition, the Court reads his complaint as alleging violations of the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Plaintiff bases his claims on defendants' alleged refusal to acknowledge his faith as a Nazarite Jew and failure to provide him with a sufficiently nutritious alternative diet in accordance with the dietary laws of his faith.

Defendants move (Dkt. No. 113) to revoke plaintiff's preliminary *in forma pauperis* status under 28 U.S.C. § 1915(g) and for summary judgment under Fed.R.Civ.P. 56. Upon referral, United States Magistrate Judge Therese Wiley Dancks issued a thorough Order and Report and Recommendation recommending summary judgment dismissing the action in its entirety. Defendant objects. Therefore, the Court reviews the matter *de novo. See* 28 U.S.C. § 636(b)(1). Defendant also requests appointed counsel.

Appointment of counsel is not warranted. There is no requirement that the Court appoint counsel for an indigent litigant in a civil matter. *See Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994); 28 U.S.C. § 1915(e). In deciding whether to exercise its discretion to appoint counsel, a court must first determine "whether the indigent's position seems likely to be of substance." *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). If the case appears to have some merit, the court should consider other factors including "the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). Here, this Court agrees with Magistrate Judge Dancks that the case lacks merit. In addition, plaintiff has adequately advanced his claims, and there is no reason to believe that if counsel were appointed the outcome of defendants' summary judgment motion would be different. Appointment of counsel is denied.

Upon *de novo* review of the substantive issues, the Court agrees with Magistrate Judge Dancks that, affording plaintiff all the solicitude to which he is entitled as a *pro se* litigant, resolving all ambiguities and drawing all factual inferences in his favor, and interpreting his submissions to raise the strongest arguments that they suggest, there is no genuine issue of material fact; thus, defendants are entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett, All* U.S. 317, 322 (1986); *Treistman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

Defendant also moves (Dkt. No. 132) for a preliminary injunction. He claims that on January 7, 2015 he was transferred to Five Points Correctional Facility, where he is not receiving proper meals, eating utensils, or medications. Such issues are not the subject of this lawsuit and are not properly before the Court. The preliminary injunction motion is denied.

**\*2** It is therefore

ORDERED that the Order and Report and Recommendation of United States Magistrate Judge Therese Wiley Dancks (Dkt. No. 129) is adopted and accepted; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 113) is granted and the case is dismissed with prejudice; and it is further

ORDERED that plaintiff's motion for a preliminary injunction (Dkt. No. 132) is denied.

IT IS SO ORDERED.

### *ORDER AND REPORT AND RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

In this *pro se* civil rights action commenced under 42 U.S.C. § 1983,[1] Plaintiff DeAndre Williams claims that Defendants violated his First Amendment right to practice his chosen religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth amendment right to equal protection under the law. (Dkt. No. 1 at ¶¶ 6 and 7.) Plaintiff's Complaint has also been construed to allege violations of the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*[2] Plaintiff's claims all arise out of Defendants' alleged deliberate refusal to acknowledge his faith as a Nazarite Jew and failure to provide him with a sufficiently nutritious alternative diet in accordance with the dietary laws of his faith. (*See generally* Dkt. No. 1.) Defendants, all named in their official and individual capacities, *id.* at ¶ 140, are Brian Fischer, Commissioner of the Department of Corrections and Community Supervision ("DOCCS"); Cheryl V. Morris, DOCCS Director of Ministerial, Family, and Volunteer Services; Omega B. Alston, incorrectly sued as Omega B. Albton, DOCCS Assistant Director, Ministerial, Family and Volunteer Services; D. Rock, Superintendent at Upstate Correctional Facility ("Upstate"); M. Lira, Deputy Superintendent at Upstate; Timothy Hawk (incorrectly sued as J. Hawk), Chaplain at Upstate; Don Haug, Food Administrator at Upstate; Karen Bellamy, DOCCS Director, Inmate Grievance Program; Kenneth S. Perlman, DOCCS Deputy Commissioner of Program Services; and Alec H. Friedmann, Jewish Chaplain at Upstate Correctional Facility. *Id.* at ¶ 2 and 3–4.[3] Plaintiff seeks both monetary and injunctive relief. *Id.* at 8.

Presently before the Court is Defendants' motion seeking the revocation of Plaintiff's preliminary *in forma pauperis* status under 28 U.S.C. § 1915(g) and for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 113.) Plaintiff has opposed the motion. (Dkt. No. 118.) For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted, and their request for revocation of Plaintiff's preliminary *in forma pauperis* status be denied as moot.

## I. FACTUAL BACKGROUND

### A. Plaintiff's Religious Beliefs and Practices

At all times relevant to the claims asserted in his Complaint, Plaintiff was an inmate confined in the Special Housing Unit ("SHU") at Upstate. (Dkt. No 1 at ¶ 2.) He professes to be a Nazarite, which he describes as, in his case, a sect of the Jewish religion. *Id.* at ¶ 6; Dkt. No. 113–3 at 20–21. Plaintiff believes in the "most high creator," whom he calls Yahweh. (Dkt. No. 113–3 at 69.) According to Plaintiff, he and other Nazarites in the DOCCS system are not under the teachings of rabbis or priests but are teachers unto themselves and take orders directly from God. *Id.* at 22–23, 27.

**\*3** Plaintiff's parents and sister are also Nazarites, as was his brother until his passing. *Id.* at 30. Plaintiff initially took the vows of abstinence as a Nazarite Jew in 1986. *Id.* at 30. He has described the vow taken by him as a Nazarite as prohibiting him from eating fruit from the grape vine, from touching or eating anything dead, including animals, and requiring that he grow his hair long and not comb it. *Id.* at 13, 15–16. Plaintiff broke the vow in 1996 but took it again before he entered prison and claims that he has been continuously under it since that time. *Id* . at 30. According to Plaintiff, the permanence of the vow depends upon the person whatever he or she can offer to the Most High. *Id.* at 17. Plaintiff believes his vow will be life-long unless he violates it. *Id.* at 83.

Plaintiff has been largely a vegetarian since about 1976, and a vegan since he took the Nazarite vow before being imprisoned. *Id.* at 13–14, 83. In addition to refraining from eating meat, fish, and foods that come from the grape vine, Plaintiff does not have milk products because he is either allergic to dairy or lactose intolerant. *Id.* at 23–24, 52; Dkt. No. 313–4 at 6–7. Plaintiff also refrains from eating eggs. *Id* at 52. Plaintiff claims he has not violated his dietary vow since being imprisoned. *Id.* at 87.

According to Plaintiff, at some point in 2001 or 2002, he informed the Rabbi at Upstate that he followed the Torah, which Plaintiff believes recognizes the Nazarites. (Dkt. No. 1 at ¶ 9.) In February of 2003, Plaintiff learned of the International Prison Yeshiva Jewish Outreach Congregation ("Prison Yeshiva") and began corresponding with the Director, Rabbi Jacob Feinberg ("Rabbi Feinberg" or "Feinberg"). *Id.* at ¶ 13 and 35. Plaintiff became an official member of the Prison Yeshiva in October of 2004 and thereafter engaged in regular correspondence with Feinberg about religious matters.[4] *Id.* at 35. The Prison Yeshiva is described in an undated letter from Feinberg to "Dear Chaplain" in which he identified himself as Rabbi at Congregation Bet Shalom Israel in Norman, Oklahoma, and director of the Congregation's Jewish Outreach Organization, "The Prison Yeshiva."[5] *Id.* at 35; Dkt. No. 113–4 at 21. According to Rabbi Feinberg, the Prison Yeshiva was composed of incarcerated men and women studying to convert to the Jewish faith. *Id.* Feinberg wrote that he had been engaged in outreach to Jewish prisoners and serving their personal needs for over fifteen years, serving as personal religious and spiritual guide for over four hundred prisoners, giving them instruction in all facets of Jewish observance and overseeing conversions. *Id.*

In the "Dear Chaplain" letter, Feinberg wrote:

> David Williams # 99A0052 became an official member of The Prison Yeshiva on October 9th 2004. I have been in regular correspondence with him, advising him on religious matters. In this time he has demonstrated to me his understanding of Jewish beliefs and dedication to Jewish practice. David has shown progress in his study of Jewish scriptures, including completing regularly the Correspondence Course lessons that I have sent to him and passing my examinations with excellent marks. It is obvious he is sincerely trying to follow the statutes and teachings of Judaism, and I fully support and endorse all of the requests that he is making.[6]

**\*4** *Id.* In an undated and unauthenticated "to whom it may concern" letter, Feinberg wrote that plaintiff had taken a number of correspondence courses with him, and during his studies, Plaintiff had said nothing that had led him to believe other than that he had taken the Nazarite vow. *Id.* at 37. He wrote that Plaintiff "abstains from anything that grows from the fruit of the vine, does not cut his hair, and states that he is a vegetarian and will not eat meat of any kind or type." *Id.* According to Feinberg, his courses were designed to weed out those who were not really trying to convert to Judaism but only trying to get extra food or days off or not cut their hair or shave. *Id.* Plaintiff claims he sent copies of Feinberg's letters to "everybody" so they could see he was asking for help. (Dkt. 113–3 at 61–62.)

When Defendant Alec H. Friedmann ("Rabbi Friedmann" or "Friedmann"), Rabbi at Upstate during Plaintiff's incarceration there, informed Plaintiff he was his Rabbi, Plaintiff responded that he was not. *Id.* at 26. According to Plaintiff, Rabbi means master and teacher, and it is a personal relationship. *Id.* Plaintiff explained that whereas Rabbi Friedmann would talk and laugh with the white inmates and provide them with religious books, he had done nothing to teach Plaintiff or try to help him with his religion. *Id.* at 25–26. Plaintiff claims that when he told Friedmann he was not his Rabbi, Friedmann responded by calling Plaintiff a "nigger." *Id.* at 26. Friedmann has denied doing so, but has acknowledged he has not played a role as Plaintiff's Rabbi since Plaintiff explicitly rejected him for that role. (Dkt. No. 113–4 at 59–60.) Plaintiff claims that people at Upstate showed him disrespect by saying that his religion was not recognized. *Id* . at 69–70. Plaintiff also believes that he was prejudiced against because he is Black. *Id.* at 70.

According to Defendant Cheryl V. Morris ("Morris"), DOCCS Director of Ministerial, Family, and Volunteer Services ("Ministerial Services"), Plaintiff has written to Ministerial Services on several occasions asking that his religion as a Nazarite Jew be recognized by DOCCS. (Dkt. No. 113–9 at ¶ 4.) Morris has explained in her Declaration that DOCCS would have to contact and consult with a reliable religious resource or clergy person outside of DOCCS, who could advise them of the requirements for the Nazarite Jewish religion and how DOCCS could appropriately accommodate the religion within the confines of a correctional institution. *Id.; see also* DOCCS Directive # 4202, as revised 10/07/2009 [7] ("Directive # 4202") (Dkt. 113–10 at 10.)

Plaintiff was also advised of the requirement for consultation with a reliable religious resource by now retired Deputy

Commissioner of Program Services, Defendant Kenneth S. Perlman ("Perlman"), and Defendant Omega B. Alston ("Alston"), retired DOCCS Assistant Director of Ministerial Services. (Dkt. Nos. 113–9 at ¶ 5; 113–10 at 23, 29, 32.) In a December 16, 2010, letter to Plaintiff, Perlman, to whom Defendant Brian Fischer ("Fischer") had referred a letter from Plaintiff complaining of denial of his religious rights, wrote:

> **\*5** In order to provide you with an advisor to assist you in meeting your spiritual needs, Department Directive # 4202, *Religious Programs and Practices,* states clearly, "For religions not represented by certified Chaplains, the Department will seek advice on matters of religious doctrine, practice, and tradition from recognized religious authorities in the outside community." Therefore, to best accommodate your religious practices as a Nazarite of the Jewish Faith, please write to your religious mentor and ask him to write directly to the Division of Ministerial, Family and Volunteer Services to potentially become a volunteer.

(Dkt. No. 113–10 at 23.)

Plaintiff provided Ministerial Services with Rabbi Feinberg's name. (Dkt. No. 113–9 at ¶ 6.) However, when Ministerial Services attempted to contact Feinberg, they were advised that he was deceased. *Id.* According to Morris, no other outside resources for the Nazarite Jewish faith have come forward. *Id.*

Defendants have submitted the Declaration of Rabbi Joseph Potasnik ("Rabbi Potasnik" or "Potasnik"), Executive Vice President of the New York Board of Rabbis, in support of their motion. (Dkt. No. 113–11.) Rabbi Potasnik, who advises and assists DOCCS on issues implicating the Jewish faith and the potential administrative implications of various religious practices, has made his Declaration based upon his familiarity with Jewish dietary laws. *Id.* at ¶¶ 2–3. Potasnik states that a Nazarite vow can technically be of any religion, that it is a personal choice, and that he has no cause to question Plaintiff's sincere beliefs. *Id.* at ¶ 5. However, he notes that the Nazarite vow is discouraged by most modern day Jewish scholars and societies and prohibited by others. *Id.* Potasnik describes the primary restrictions on a person taking the Nazarite vow as: (1) not cutting his hair; (2) not drinking wine; and (3) not coming into contact with dead bodies. *Id.* at ¶ 6. He opines that the prohibition against coming into contact with dead bodies derives from the book of Numbers, chapter 6, and applies only to human corpses. *Id.* ¶ 7. Under Jewish law, it does not apply to animals, particularly those slaughtered in accordance with Jewish Dietary Laws, and

members of the Jewish faith are not required to abstain from meat and become vegetarians. *Id.* at ¶¶ 7, 22, 23.

According to Rabbi Potasnik, DOCCS prisoners who wish to maintain a kosher diet may eat the Cold Alternative Diet ("CAD"), which has been approved as kosher because the meats and other animal products served have been prepared in accordance with Jewish Dietary Laws. *Id.* at ¶ 15. Inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative entrees on the general confinement menu. *Id.* at ¶ 21.

## B. Upstate's Alleged Failure to Accommodate Plaintiff's Right to Receive a Die t Consistent with his Sincerely Held Religious Beliefs

**\*6** Plaintiff was housed in Clinton Correctional Facility ("Clinton") before being moved to Upstate. *Id.* at 42. According to Plaintiff, while he was at Clinton, the same Rabbi as at Upstate helped him receive a Rastafarian diet of rice or beans, vegetables, and fruit.[8] *Id.* at 42, 50. When Plaintiff was moved to Upstate he expressed a desire to properly follow his religion of Judaism and contends there were no problems until he refused to accept Rabbi Friedmann as his Rabbi. *Id.*

According to Plaintiff, he has been provided with the CAD since approximately March of 2002, in accordance with the Upstate policy of providing the CAD to Jewish inmates because it contains Kosher items.[9] (Dkt. Nos. 1 at ¶¶ 18–19; 113–3 at 43–44.) Plaintiff has described the typical breakfast under the CAD diet includes alternating hot and cold cereal, along with bread, and eggs or peanut butter, juice, and coffee. (Dkt. No. 1 at 36.) Lunch typically consists of tuna, peanut butter or cheese, bread, vegetable, and on some days macaroni salad and fruit. *Id.* Dinner is some type of meat or fish, bread, vegetable, and soup.[10] *Id.* Because of his religious dietary restrictions, Plaintiff is unable to drink the grape juice served as part of the CAD diet and cannot eat the macaroni salad, which has vinegar.[11] He is also unable to eat the meat, fish, and cheese served at lunch and dinner. *Id.* at ¶¶ 45–46, and 26; Dkt. No. 113–3 at 50. The CAD diet meals are repeated week after week without change. (Dkt. No. 1 at ¶ 22.) Since no substitute for milk is provided at breakfast, Plaintiff has to eat the cereal dry. (Dkt. No. 113–3 at 54.) Plaintiff also claims that he was unable to use the alleged kosher hot water for his hot cereal at Upstate because was it heated in the area of the building used to store mops, brooms, and other cleaning

supplies, rendering it non-kosher and unsanitary. (Dkt. No. 1 at ¶¶ 30–34.)

Plaintiff has alleged in his Complaint that in about October of 2003, he began complaining to Defendants that the CAD was in contravention of the dietary laws of the Nazarite Jewish faith, and that he could not eat enough of the food being served to him to sustain him in good health. (Dkt. No. 1 at ¶¶ 39–40.) Since Plaintiff was not allowed the CAD diet until mid–2004 at the earliest, his complaints could not have begun until then. Plaintiff continued to complain over time and to request that an alternative be provided to him to supplement for the meat and dairy products he could not eat because of his religious beliefs and dairy allergy/intolerance. *Id.* at ¶ 43.

At various times in 2010, Plaintiff complained to the mess hall supervisors and requested that they stop putting salmon on his plate. *Id.* at ¶¶ 44–45; Dkt. No. 113–3 at 99–100; Dkt. No. 113–4 at 28. Plaintiff claims that the contamination of other food on his plate from the salmon juice made him nauseous and forced him to eat fruits and vegetables given to him by other prisoners or go hungry. (Dkt. Nos. 1 at ¶¶ 48–49; 113–3 at 50.) He contends his complaints were disregarded. (Dkt. No. 1 at ¶ 55 and 38.) Plaintiff also suggested solutions such as giving him hot cereal or peanut butter and jelly instead of the food he could not eat. *Id.* at ¶¶ 89 and 91.

**\*7** From 2009 through 2011, Plaintiff filed a series of largely repetitive grievance complaints relating to his religious recognition and dietary concerns, all of which were denied. *Id.* at ¶¶ 60–62, 113 and 41–44, 49–51, 54–58, 63; *see also* Dkt. No. 113–4 at 3–17, 29–36, 42–49, 63–65, 72–78, 81, 85–88. In its August 18, 2009, decision on Plaintiff's Grievance No. UST–39897–09, grieving the failure by DOCCS to recognize the Nazarite Jewish faith and provide him with a nutritionally adequate diet that accommodated his religious beliefs, the Upstate Internal Grievance Resolution Committee ("IGRC") wrote:

> In accordance with Directive # 4040, 701.5(d)(2)(ii): CORC decisions have the effect of directives. The CORC decision for UST–22390–05 states that it should be clearly understood that the Department takes no position "acknowledging" any particular religion within its inmate population. The department merely attempts to identify faiths within the inmate population in an effort to accommodate the legitimate spiritual needs of its inmates as reasonably as possible in a manner which is commensurate with its legitimate correctional interests and the safety and security of its respective facilities.

The CORC decision for CL–51228–05 states that CORC notes that inmates may refrain from eating those food items that are contrary to their religious beliefs.

The CORC decisions for A–43756–02 states that CORC asserts that the Department does not offer a vegetarian menu.

The grievant's religious designation is listed as Jewish since 7/26/04. As such, the grievant has requested and receives the Cold Alternative Diet as well as Grape Juice and Matzah crackers.

According to the Messhall, no substitutions are made to the CAD unless the inmate receiving it has an allergy to the items served. Then substitutions are made on a case by case basis.

The grievant is advised that any concerns he has regarding the CAD, or being removed from the CAD/Grape Juice & Matzah list, or his religious designation should be addressed directly to the Chaplain's Office. [12]

(Dkt. No. 113–4 at 47.)

The decision on the appeal to the superintendent of the denial of Plaintiff's October 14, 2010, Grievance No. UST–44053–10 requesting a nutritionally adequate diet accommodating his religious beliefs, stated in part that:

> The grievant receives a CAD (kosher) meal, the NYSDOCS does not have a vegetarian CAD (kosher) diet; they do have an alternative diet plan available. If grievant would like the alternative diet they must fill out the S–Block Meal form available on your housing unit.

(Dkt. No. 1 at 44.) According to Plaintiff, he could not have the alternative diet because it is not kosher and eating a kosher diet is a central tenet of Nazarite Judaism. *Id.* at ¶¶ 133–34. However, in a July 22, 2009, memorandum to the IGRC, Rabbi Friedmann wrote:

> Williams receives the Cold Alternative Diet, which meets all the standards for a 'Real kosher meal' and is nutritionally sound. He receives an adequate diet. However, he chooses to

not eat many of the items which are provided. In the past I have suggested the Religious Alternative Menu which would solve most of his vegetarian problems. He has insisted that he want (sic) the Cold Alternative Diet.

**\*8** (Dkt.No. 113–4 at 59.)

The Central Office Review Committee ("CORC") also denied Plaintiff's October 14, 2010 grievance, writing in part:

> CORC notes that the grievant's dietary concerns were addressed in its prior decisions UST–39582–09 and UST–39897–09, dated 9/2/09 and 10/7/09, respectively. CORC also notes that the grievant's Religion of Record is designated as "Jewish", and that he is receiving the Cold Alternative Diet and grape juice and matzo. CORC asserts that the Department does not offer a vegetarian diet, and advises the grievant that he may refrain from eating those food items which are contrary to his religious beliefs. No approval has been granted to alter the CAD to accommodate Nazarites. CORC advises the grievant to address medical concerns via the sick call mechanism.

*Id.* at 50.

At his deposition, Plaintiff testified that all he had to eat on a daily basis at Upstate was a cup-a-soup, juice, fruits and vegetables served with his meals or traded for with other inmates, and bread, which he used to make "apple pies." (Dkt. No. 113–3 at 14, 33, 54–57, 60.) According to Plaintiff, requests for Ensure, which he was given at Clinton, were denied at Upstate. *Id.* at 59.

When Plaintiff commenced this action, and at the time of his deposition in November of 2013 (Dkt. No. 113–3), because he was being held in SHU, he was without the benefit of food from the commissary or food packages to supplement his diet to make up for the CAD diet food he was unable to eat because of his religious beliefs and his dairy allergy or intolerance. (Dkt. Nos. 1 at ¶ 17; 113–3 at 58.)

## C. Health Problems Claimed By Plaintiff to Have Resulted From An Inadequate Diet

Plaintiff has alleged that as a result of the lack of adequate nutrition, he has sustained significant weight loss, and his health has dramatically declined, with pre-existing illnesses exacerbated as his body is starved for the nutrients it needs. (Dkt. Nos. 1 at ¶ 137; 113–3 at 36.) Plaintiff also claims to have contracted severe gum and sinus infections from dietary deficiencies, to suffer from stomach pains as a result of being starved, and to have been hospitalized on two occasions for stomach pains and internal bleeding because his health was failing due to malnutrition and an inadequate diet. (Dkt. No. 1 at ¶¶ 88, 99, and 111; 113–3 at 36–39.) Plaintiff contends that his request to see a dietician was denied. *Id.* at ¶ 112.

David Karandy, M.D. ("Karandy"), employed as a medical doctor with DOCCS and currently assigned to Great Meadow where Plaintiff is presently confined, performed a physical examination of Plaintiff on April 28, 2014. (Dkt. No. 113–7 at ¶¶ 2, 5.) Karandy's examination found Plaintiff to be in good health, with his vital signs normal. *Id.* at ¶¶ 6, 7. Plaintiff's weight was 130 pounds. *Id.* at ¶ 7. Based on his weight and measured height of 5′7.5″, Plaintiff's Body Mass Index ("BMI") was calculated to be 20.1. *Id.* at ¶ 8. A BMI between 18.5 and 24.9 is considered normal; accordingly, Plaintiff is in what Karandy describes as "the healthy range and consistent with appropriate nutrition." *Id.* at ¶ 9. Plaintiff's total protein and albumin levels, determined by a blood test on June 22, 2013, were found in the normal range. *Id.* at ¶¶ 10–11. Plaintiff's normal blood levels were also found consistent with good nutrition.

**\*9** Plaintiff's medical records reveal his weights during the time period from December 16, 2010, to March 28, 2011, as: December 16, 2010 weight 134 pounds; January 20, 2011 weight 134 pounds; February 7, 2011 weight 139 pounds; and March 28, 2011 weight 138 pounds. *Id.* at ¶ 13; Dkt. No 115 at 5–6, 8, 10.[13] Plaintiff's BMI during that time period ranged from 20.7 to 21.4, which, according to Karandy, is in the healthy range. *Id.* at ¶ 14. Plaintiff's recorded weights for the time period April 30, 2012, to March 13, 2013, were: April 30, 2012 151 pounds; August 22, 2012 145 pounds; September 13, 2012 145 pounds; November 29, 2012 148 pounds; February 13, 2013 148 pounds; March 3, 2013 145 pounds; March 10, 2013 145 pounds; and March 13, 2013 146 pounds. *Id.* at ¶ 15; Dkt. No. 15 at 12, 14, 15–19. Plaintiff's BMI during that time period ranged from 22.4 to 23.3, which according to Karandy was within the healthy range. *Id.* at ¶

16. Plaintiff refused to be weighed by the staff on August 20, 2010, November 4, 2010, and August 13, 2012. *Id.* at ¶ 17. Karandy has opined that in his professional medical opinion, Plaintiff did not suffer from malnutrition and was not in imminent physical danger between December 10, 2010 and March 13, 2013, and is not currently suffering from malnutrition, nor is he currently in physical danger. *Id.* at ¶ 18.

Plaintiff's medical records reveal that on a number of occasions between November of 2010 and March of 2011, he complained of blood in his stool, abdominal pain and an upset stomach, and that he was prescribed medication for his upset stomach at various times from November of 2010 to March of 2011. (Dkt. No. 115 at 2, 4, 6–10.) However, Plaintiff refused to have a colonoscopy on more than one occasion during that time period. *Id.* at 8–10. In February of 2011, Plaintiff attributed his digestive system problems to Crohn's disease. *Id.* at 9. There is no evidence in the medical records contained in the summary judgment record supporting Plaintiff's conclusory assertion that his digestive system problems were related to his diet. There is also no evidence in the record supporting Plaintiff's claim of gum disease or sinus problems resulting from malnutrition.

**D. DOCCS Food Service**

The duties of Robert Schattinger ("Schattinger"), DOCCS Director of Correctional Food and Nutritional Services for the past five years, and a DOCCS employee for approximately twenty-five years, include the development of menus, overseeing the operation of the Food Production Center (FPC") located at the Mohawk Correctional Facility, training staff, and managing personnel issues. (Dkt. No. 113–8 at ¶¶ 2–3.) In his Declaration in support of Defendant's motion, non-party Schattinger sets forth reasons why he believes what he describes as the vegetarian kosher diet being requested by Plaintiff should not and cannot be accommodated by DOCCS. *Id.* at ¶ 4.

**\*10** According to Schattinger, the menus of specific food items provided to inmates at the DOCCS correctional facilities are not decided at the facility level but are solely designed and implemented by the DOCCS Central Office Department of Nutritional Services in consultation with nutritionists, including Schattinger, and other specialists. *Id.* at ¶ 5. The diets are designed to be nutritionally sufficient and varied, and absent an emergency, no facility level administrator, including the Superintendent, the Food Service Administrator, the Deputy Superintendent, or any of the facility Defendants, has the authority to alter or override the

menus without prior approval of the Office of Nutritional Services, or create menus of their choosing. [14] *Id.* at ¶¶ 6, 11. The DOCCS Office of Nutritional Services falls under the Supervision of the Deputy Commissioner in charge of Administration and is responsible for providing all food services to inmates incarcerated at correctional facilities maintained by DOCCS. *Id.* at ¶ 7. The FPC produces the food for all fifty-eight of DOCCS' general confinement facilities for meals provided to the general inmate population, as well as food used in the CAD and the hot kosher program at Green Haven Correctional Facility. *Id.* at ¶ 8. The correctional facilities house approximately 55,000 inmates. *Id.* at ¶ 9.

*1. The General Confinement Menu*

The general confinement menu, a statewide menu prepared by the Office of Nutritional Services, has been served for breakfast, lunch, and dinner in each general confinement facility since the early 1990's. *Id.* at ¶ 10. In developing the general confinement menu, which contains an entree, side dishes, a beverage, and dessert with lunch and dinner, the Office of Nutritional Services has attempted to provide a variety of nutritious, palatable meals at a reasonable expense to taxpayers. *Id.* at ¶¶ 12–13.

*2. The "Religious Alternative Menu"*

In the early 1990s, after instituting the general confinement menu, the Office of Nutritional Service began to look for reasonable means to accommodate dietary preferences for inmates who had food allergies, had religious objections to certain foods, or were vegetarians. [15] *Id.* at ¶ 16. In 1993, the Office of Nutritional Services determined that the best way to meet variable dietary preferences was to add a nutritionally adequate alternative entree, known as the "religious alternative menu," to the general confinement menu as a substitute for meals that contain a meat entree. *Id.* at ¶ 19. Schattinger explains that "religious alternative menu" ("RAM") is a misnomer because the alternative entree is available to all inmates who choose it. *Id.* at ¶ 20. It is not intended to be kosher or halal or compliant with any other religious dietary rules, and the name was recently changed to "alternative entree." *Id.* An alternative entree is available for each lunch and dinner that includes a meat entree, but not those meals where the lunch and dinner entrees are non-meat. *Id* at ¶ 24. Of the twenty-one meals fed to the general population during a seven-day cycle, on average, nineteen meals include an alternative meatless entree. *Id.* at ¶ 27.

**\*11** One alternative entree per week is halal chicken. *Id.* at ¶ 31. DOCCS considered making every alternative entree meatless but decided not to do so because the purpose of the program was not only to accommodate vegetarians but inmates who had religious objections to certain foods or had food allergies. *Id.* at ¶ 29. On the day that the alternative entree is chicken, an inmate who consumes just the side dishes, dessert, and a beverage, would receive enough food to satisfy him or her. *Id.* at ¶ 37. According to Schattinger, catering to the dietary preferences of each inmate would pose an unreasonable financial burden on taxpayers and an impossible administrative burden on DOCCS. *Id.*

### 3. *The CAD*

Because with the exception of Green Haven, the DOCCS correctional facilities do not have kosher kitchens or facilities to prepare on-site kosher meals, Jewish inmates who request a kosher diet are served the CAD, which typically consists of a sandwich made with kosher meat or cheese, condiments, chips, a cookie or cake, and juice. *Id.* at ¶¶ 40–41. Some CAD items, including juices, salads, cold cuts and cheese, are prepared and packaged at the FPC in kosher compliant conditions, under rabbinical supervision. *Id* at ¶ 41.

### 4. *The Green Haven Program*

In the early 1980s, as an experimental pilot program, DOCCS built and began operating a kosher food service facility at Green Haven. *Id.* at ¶ 42. The menu, compiled by the Green Haven Food Administrator and Jewish Chaplain, is not vegetarian. *Id.* at ¶ 43. The menu parallels the menu offered to the general inmate population but contains no alternative to the meat entrees on the Green Haven hot kosher food menu. *Id.* DOCCS has learned from its experience with Green Haven that such an accommodation is extremely expensive and administratively burdensome. *Id.* at ¶ 44. Therefore, while DOCCS has chosen to maintain the kosher service at Green Haven, which is limited to Jewish inmates with good disciplinary records, it has determined that the service cannot be provided statewide.

### 5. *Considerations Regarding a Kosher Vegetarian Menu*

The CAD is not a vegetarian diet, and the meatless alternative entrees may or may not be kosher. *Id.* at ¶ 45. All fresh vegetables received by FPC are processed and used as ingredients in other dishes. *Id.* at ¶ 46. Although the FPC can prepare and package kosher food for inclusion in the CAD to a limited extent, because DOCCS' only kosher kitchens are at

FPC and Green Haven, maintaining the integrity of kosher at the facility level is problematic. *Id.* at ¶ 47. Kosher vegetarian meals would have to be sealed in individual packets to keep the food safely preserved and transportable, requiring DOCCS to provide the FPC with new equipment. *Id.* at ¶ 49. Even if DOCCS had sufficient equipment, it would not be able to manage the production because the preparation and packaging of kosher vegetarian meals would require a dedicated kosher production line, involving staff, work areas, and packaging equipment DOCCS does not currently have. *Id.* at ¶ 50.

**\*12** A kosher vegetarian menu would bring challenges beyond designating and providing a kosher vegetarian food line. For instance, a vegetarian kosher menu would have to provide adequate protein to fulfill the nutritional needs of inmates demanding kosher vegetarian meals. *Id.* at ¶ 51. DOCCS would have to bear the expense of purchasing items such as soy, increased legumes and other foods. *Id.* at ¶ 51.

According to Schattinger, in light of what DOCCS provides in its current menus, and the fact that there is no established dietary stricture requiring vegetarianism, DOCCS has determined that providing a kosher vegetarian meal plan would be exceedingly burdensome to staff and facility resources and is not financially feasible. *Id.* at ¶ 52.

## II. PROCEDURAL BACKGROUND

Plaintiff filed his Complaint and an application to proceed *in forma pauperis* on April 6, 2011. (Dkt. No. 1 and 2.) Plaintiff also filed the first of multiple motions for the appointment of counsel and injunctive relief, all of which, with the exception of pending motion for a preliminary injunction (Dkt. No. 124), have been denied. [16] (*see* Dkt. Nos. 4, 5, 10–11, 20, 22, 32, 56, 58, 60, 62, 67. 69, 73, 82, 87, 89, 92, 100, 103, 119–120.)

In reviewing Plaintiff's application to proceed *in forma pauperis,* the Hon. Norman A. Mordue, Senior D.J., noted that the three strikes rule of 28 U.S.C. § 1915(g) had been enforced against Plaintiff in the Northern District of New York. (Dkt. 11 at 3.) However, based upon Plaintiff's allegations that Defendants' ongoing refusal to provide him with "sufficient food to sustain him in good health in accordance with the dietary laws of the Nazarites faith" was causing him to suffer serious adverse health consequences, the Court made a preliminary finding that Plaintiff had sufficiently alleged "imminent danger" and allowed him to

commence the action *in forma pauperis,* subject to revocation if, during the course of the litigation the Court concluded that Plaintiff did not face imminent danger of serious physical injury when he commenced the lawsuit, or was otherwise not entitled to proceed *in forma pauperis. Id.* at 5.

Defendants moved to dismiss Plaintiff's Complaint on *res judicata* and collateral estoppel grounds pursuant to Federal Rule of Civil Procedure 12(b)(6) and pursuant to the three strike rule under 28 U.S.C. § 1915(g). (Dkt. No. 36.) This Court recommended denial of the motion (Dkt. No. 65), and the recommendation was adopted by Judge Mordue and the motion denied on February 20, 2013. [17] (Dkt. No. 66.) Defendants thereafter filed an Answer to the Complaint (Dkt. No. 70), and discovery ensued.

### III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc., Ml* U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, Ml* U.S. at 248.

**\*13** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified

complaint is to be treated as an affidavit. [18] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at \*3, 1999 U.S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999) [19] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### IV. ANALYSIS

#### A. Deficiencies in Plaintiff's Opposition Papers

Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) in his opposition to Defendants' summary judgment motion. [20] His response is limited to "I hereby deny & Object to Each & Every Allegation Set Forth by the Defendants in Opposing My Claims Under *Williams v. Fischer Et. Al–*911–CV–379 As Either 'Untrue, Misleading & Vacuous." (Dkt. No. 118 at ¶ 2.) While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se* ] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003).

**\*14** Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, [21] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion. [22] *See Champion, v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to

comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## B. New Claims Raised by Plaintiff in his Opposition Papers

Plaintiff was transferred to Great Meadow Correctional Facility ("Great Meadow") in December of 2013. (Dkt. No. 118–1 at 8.) Plaintiff's opposition to Defendants' summary judgment motion deals almost entirely with complaints about medical treatment and failure to accommodate his physical and hearing impairments at Great Meadow. (Dkt. No. 118–1 at 7–54, 59–66, 72–93.)[23] Plaintiff has also complained of the refusal to provide him with hot water for his hot cereal and cup-a-soup and discontinuance of his CAD meals during Passover at Great Meadow, claiming that he is intentionally being starved. *Id.* at 11, 57–58, 68–70. Plaintiff contends that his transfer to Great Meadow, the lack of proper medical care and accommodations, and the refusal to give him hot water for his soup, are all in retaliation for his filing of grievances and lawsuits and for the sole purpose of causing him harm. *Id.* at 8, 12–13, 33. Plaintiff has alleged in his opposition papers that at Great Meadow he is being subjected to cruel and unusual punishment; discrimination on account of his race, color, and religion; deliberate indifference to his serious medical needs; and retaliation for filing grievances and lawsuits. *Id.* at 8.

A plaintiff cannot, as a general rule, raise new claims in papers in opposition to a motion for summary judgment. (Dkt. No. 22 at 4–5 .) *See, e.g., Shah v. Helen Hayes Hosp.,* 252 F. App'x 364, 366 (2d Cir.2007) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summaryjudgment); *Jones v. Fischer,* No. 9:10–cv–1331 (GLS/ATB), 2013 WL 5441353, at *15, n. 23, 2013 U.S. Dist. LEXIS 140318, at *47, n. 23 (N.D.N.Y. Sept. 27, 2013) ("Generally a party may not raise new claims in his or her response to a motion for summary judgment.") (collecting cases); *Beckman v. U.S. Postal Service,* 79 F.Supp.2d 394, 407–08 (S.D.N.Y.2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow

each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (citations and internal quotation marks omitted); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (in an action filed in November of 2005, where discovery had closed in December of 2006, the court concluded that new factual allegations raised by plaintiff in opposition to summary judgment motion should not be considered, where "the four new allegations [were] not made in response to a motion to dismiss (which typically occurs relatively early in an action, before discovery has occurred) ... [and] the net effect of permitting Plaintiff to so change the landscape of his claims at this late stage of the action would be to deprive Defendants of the fair notice envisioned by Fed.R.Civ.P. 8.").

**\*15** In light of the foregoing, and given that the newly raised claims regarding Plaintiff's medical care, failure to accommodate physical impairments, refusal to provide hot water for Plaintiff's cereal and cup-a-soup, and discontinuance of the CAD diet during Passover at Great Meadow, are not asserted against Defendants herein, the Court recommends that the District Court disregard the factual allegations and claims relating to Plaintiffs alleged transfer to, and treatment at, Great Meadows.

## C. Plaintiff's Official Capacity Claims For Money Damages Against Defendants Under 42 U.S.C. § 1983

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at ¶ 140.) The Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 92–100 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual DOCCS employees sued in their official capacities are considered claims against New

York and are thus barred by the state's Eleventh Amendment immunity).

Therefore, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's § 1983 claims for money damages against Defendants in their official capacity on Eleventh Amendment grounds. [24]

**D. Plaintiff's Claim for Money Damages under RLUIPA**
Plaintiff's Complaint has been construed to state a possible claim under RLUIPA. (Dkt. No. 11 at 2 n. 1.) RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. ¶ 2000cc–1(a) (2012).

In *Sossamon v. Texas,* ––– U.S.––––, 131 S.Ct. 1651 (2011), the Supreme Court held that RLUIPA does not authorize claims for money damages against state officials acting in their official capacities. After the commencement of this lawsuit, the Second Circuit, in *Washington v. Gonyea,* 731 F.3d 143, 144 (2d Cir.2013), held that RLUIPA does not create a private right of action against state officials in their individual capacity. Thus, Plaintiff cannot pursue claims for money damages against Defendants in their official capacities and has no claim against Defendants in their individual capacities under RLUIPA.

**\*16** Therefore, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's RLUIPA claim for money damages against Defendants in their official and individual capacities.

**E. Legal Standards for First Amendment Free Exercise and RLUIPA Claims**

1. *First Amendment*

It is well-established that prisoners do not forfeit all of their constitutional rights by reason of incarceration. *See Bell v. Wolfish,* 441 U.S. 520, 545 (1979). "In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Those rights include the right to free exercise of religion. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *accord Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) ("[A] prisoner retains those First Amendment guarantees, including the right to participate in practices which are an integral part of his religious faith ....").

The Second Circuit has held that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). "Deny[ing] prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). However, courts are reluctant to grant dietary requests "where the cost is prohibitive," or "the accommodation is administratively unfeasible." *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990).

Because the free expression rights of prisoners must be balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system," free exercise claims brought by inmates are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to infringements of fundamental constitutional rights." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (quoting *O'Lone,* 482 U.S. at 349). A prisoner's sincerely held religious beliefs must yield if they are contrary to prison regulations that are "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *O'Lone,* 484 U.S. at 351–52 (Constitution does not require aprison to sacrifice legitimate penological objectives in order to satisfy an inmate's desire to exercise his religion as long as the inmate is not deprived of all forms of religious exercise); *Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ("Policies and practices which serve legitimate penological interests do not offend the Free Exercise clause.").

The Second Circuit recently examined the standard for analyzing a First Amendment freedom of religious expression claim in *Holland v.. Goord,* 758 F.3d 215, 220–21 (2d

Cir.2014). In *Holland,* the court noted that it has yet to be decided in this Circuit whether, to state a First Amendment claim, "a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." (quoting *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006)). The court did not decide the issue in *Holland,* rather it assumed, without deciding, the continued validity of the substantial burden test and analyzed the case accordingly. *Id.* The Court will follow *Holland.*

**\*17** If a substantial burden is found, courts must evaluate four factors set forth in *Turner* in determining if the regulation or governmental action are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. Those factors are: "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 90–91).

When prison officials are able to state a legitimate penological interest to justify their actions, the burden shifts to the plaintiff to show that the defendants' concerns are "irrational." *Weathers v. Rock,* No. 9:12–CV–1301 (NAM/ATB), 2014 WL 4810309, at \*4, 2014 U.S. Dist. LEXIS 140422, at \*11–12 (N.D.N.Y. Sept. 23, 2014) (citing *Ford,* 352 F.3d at 595). "Given the difficult judgments attendant to prison operation ... a generally applicable policy even one that burdens an inmate's free exercise will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Holland,* 758 F.3d at 222 (citation and internal quotation marks omitted).

2. *RLUIPA*
While a plaintiff has no claim for money damages under RLUIPA, injunctive and declaratory relief are permitted against defendants in their official capacities.[25] *See Williams v. Leonard,* No. 9:11–CV–1158 (TJM/TWD), 2013 WL 5466191, at \*6, 2013 U.S. Dist. LEXIS 142051, at \*18–19 (N.D.N.Y. Sept. 30, 2013) (denying defendants' motion to dismiss inmate's RLUIPA claims for injunctive relief regarding family participation in a religious meal); *Singh,* 520

F.Supp.2d at 508 (allowing claim for declaratory judgment under RLUIPA to proceed to trial).

Under RLUIPA, Plaintiff has the burden of showing that his religious exercise is burdened and that the burden is substantial. *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010). The government may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthers a compelling state interest and that it is the least restrictive means of furthering that interest. *Id.*

RLUIPA defines "religious exercise" to include "any exercise of religion whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (2000). A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh,* 520 F.Supp.2d at 498 (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)).

### F. Analysis of Plaintiff's First Amendment Free Exercise and RLUIPA Claims

1. *Personal Involvement in the Alleged Violation of Plaintiff's First Amendment Free Exercise and RLUIPA Rights*
**\*18** Defendants retired DOCCS Commissioner Fischer; DOCCS Director of the Inmate Grievance Program, Karen Bellamy; Upstate Superintendent D. Rock; Upstate Deputy Superintendent M. Lira; Upstate Chaplain Timothy Hawk; Upstate Food Administrator Don Haug; and Upstate Rabbi Friedman, all seek judgment dismissing Plaintiff's First Amendment claims against them on the grounds that they were not personally involved in the alleged violation of his right to free expression of his religious beliefs. (Dkt. No. 113–13 at 9–11.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL

651919, at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22–23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [26]

a. Fischer
Plaintiff wrote to Fischer on November 21, 2010, and January 14, 2011, alleging religious discrimination and requesting that he take action with regard to providing Plaintiff with a diet that accommodated his Nazarite religious beliefs. (Dkt. Nos. 1 at ¶¶ 80–83, 106–109; 113–10 at 24, 26–27.) Plaintiff claims that Fischer failed to take any effective action to protect Plaintiff's religious rights or ensure that he received a sufficiently nutritious alternate religious diet to sustain him in good health. (Dkt. No. 1 at ¶¶ 83, 109.)

**\*19** Fischer referred both of Plaintiffs letters to Perlman, under whose jurisdiction Ministerial Services fell. *Id.* at 23, 25; Dkt. No 113–10 at 1. Perlman responded to Plaintiff's letters on December 16, 2010, and February 7, 2011, respectively. (Dkt. No. 113–10 at 23, 25.) In his December 16, 2010, letter, Perlman disclosed that Fischer had referred Plaintiff's letter alleging religious discrimination to him for response. *Id.* at 25. Perlman recommended that Plaintiff contact Defendant Deputy Superintendent for Program Services at Upstate, M. Lira ("Lira"), regarding his discrimination concerns, and that in order to assist him in meeting his spiritual needs, Plaintiff write to his religious

mentor and ask him to write directly to Ministerial Services to potentially become a volunteer. *Id.* In his February 7, 2011, letter to Plaintiff, Perlman indicated that Fischer had asked him to respond to Plaintiff's letter regarding a request for special dietary considerations particular to the vow of the Nazarite. *Id.* at 25. Perlman noted that the issue had been addressed several times, most recently in Perlman's letter of December 10, 2010, to which he referred Plaintiff. *Id.* Perlman informed Plaintiff that the issue was considered closed. *Id.*

When asked about his claim against Fischer at his deposition, Plaintiff testified "[h]e just dealt with malfeasance and putting it off to somebody else. And then telling me, you know what I'm saying, that I have to deal with the religious advisor here and in Albany. I got to write to them. I you just putting it off." (Dkt. No. 113–3 at 97.) According to Plaintiff, Fischer failed to recognize his religion and passed it off to someone else. *Id.* at 98.

A supervisory official is not deemed to have been personally involved solely by virtue of referring a letter or complaint from a prisoner to the appropriate department for investigation. *See, e.g., Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (affirming dismissal on summary judgment for lack of personal involvement where the deputy commissioner received letters from the plaintiff and forwarded them to others for investigation); *Rush v. Fischer,* 923 F.Supp.2d 545, 552 (S.D.N.Y.2013) ("[P]ersonal involvement has not been shown where a supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation.") (citation and internal quotation marks omitted); *Josey v. Rock,* No. 9:11–CV–0028 (NAM/TWD), 2013 WL 1500435, at \*11, 2013 U.S. Dist. LEXIS 51989, at \*29 (N.D.N.Y. Mar. 19, 2013) ("A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement.")

Accordingly, Fischer's referral of Plaintiffs letters to Perlman for handling does not constitute personal involvement under any of the *Colon* factors, and the Court recommends that Fischer be granted summary judgment on Plaintiff's First Amendment claim against him.

b. Karen Bellamy
**\*20** Defendant Karen Bellamy ("Bellamy") has been sued as Director of the DOCCS Inmate Grievance Program. (Dkt. No. 1 at 4.) Plaintiff has alleged in his Complaint that in October of 2010, he appealed to CORC from the denial

of his appeal of an IGRC decision by Defendant Lira, as Acting Superintendent at Upstate. *Id.* at ¶ 67. According to Plaintiff, he "inform[ed] the DOCS grievance director that the Response from the Committee & the Acting Superintendent failed to Address the issues in his grievance and that Upstates (sic) policy was in Contravention of DOCS directive # 4202 And that the plaintiff was being starved which was affecting his overall health." *Id.* at ¶ 67.

Plaintiff has also alleged in his Complaint that on December 29, 2010, Bellamy rendered a decision reiterating the IGRC and Superintendent's reasons for denying Grievance No. UST–44053–10 and denying the appeal. According to Plaintiff, Bellamy categorized his faith as "Jewish" in the decision and made no attempt to investigate whether Plaintiff could be afforded a substitute for the foods he was prohibited from eating under his sect of the Jewish faith. *Id.* at ¶ 87 and 50.

Plaintiff also claims that Bellamy affirmed the actions of the other Defendants on his appeal from Defendant Upstate Superintendent D. Rock's ("Rock") January 10, 2011, denial of Grievance No. UST–44809–10, and a January 18, 2011, grievance complaining that he was passing blood and experiencing stomach pains due to the improper religious diet he was receiving. *Id.* at ¶¶ 101–102, 113.

All of Plaintiff's allegations against Bellamy deal with grievances appealed to, and decided by, CORC. There is no evidence in the record that Bellamy, as Director of the DOCSS Inmate Grievance Program, had any personal involvement whatsoever in the investigation, review, or determination by CORC of any of Plaintiff's grievance appeals. At most, the allegations in Plaintiff's Complaint regarding Bellamy, the memorandum from Bellamy simply acknowledging receipt of Plaintiff's Grievance No. UST–44053–10, *id.* at 49, and her signature, as Director, on CORC's determination denying Plaintiff's appeal on Grievance No. UST–44053, *id.* at 50, show that she was performing her administrative duties as Director. Therefore, the Court recommends that Bellamy be granted summary judgment on Plaintiff's First Amendment claim against her based upon her lack of personal involvement.

### c. Rock and Lira

In his Complaint, Plaintiff has alleged that he appealed an IGRC decision to Rock on October 20, 2010, and that on October 28, 2010, Lira, as Acting Superintendent, denied his appeal and suggested the RAM as an alternative to CAD,

since DOCSS does not have a vegetarian CAD diet. (Dkt. No. 1 at ¶¶ 65–66 and 44.) Plaintiff has also alleged that he appealed the IGRC's denial of his December 9, 2010, grievance requesting hot cereal to Rock, and that Rock denied the appeal on January 10, 2011. *Id.* at ¶¶ 96, 101 and 51–54.

**\*21** Although there is some dispute among district courts in the Second Circuit,[27] a superintendent's mere affirmance of an IGRC denial of a grievance has generally been found insufficient to show personal involvement for purposes of liability under § 1983. *Keitt v. Schun,* No. 11–CV–438 (RTA/ JJM), 2014 WL 347053, at *8, 2014 U.S. Dist. LEXIS 184557, at *23–24 (W.D.N.Y. Jan. 30, 2014) (affirmance of denial of plaintiff's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang v. Capra,* 889 F.Supp.2d 489, 503 (S.D.N.Y.2012); ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *White v. Sears,* No. 9:10–CV–0721 (MAD/GHL), 2011 WL 2728443, at *8, 2011 U.S. Dist. LEXIS 74689, at *21 (N.D.N.Y. June 20, 2011) (merely denying a plaintiff's grievance is insufficient to establish personal involvement); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement).

The evidence in the summary judgment record reveals no personal involvement by Rock and Lira in the alleged non-recognition of Plaintiff's Nazarite Jewish faith, or DOCSS' alleged failure to accommodate his religious dietary restrictions. DOCSS Directive # 4202, provides that "[i]t should be clearly understood that [DOCSS] takes no position 'acknowledging any particular religion within its inmate population." (Dkt. No. 113–10 at 10.) The Directive places the responsibility on Ministerial Services to provide inmates spiritual assistance and provide such opportunities as are feasible for inmates to work with approved religious volunteers from the outside when an inmate's faith is not represented by a chaplain at his facility.[28] *Id.*

Furthermore, as explained in the Schattinger Declaration (Dkt. No. 113–8), menus are designed and implemented by the DOCSS Central Office Department of Nutritional Services, and absent an emergency, no facility level administrator, including the Superintendent and Deputy Superintendent, has the authority to alter or override the menus without prior approval of the Office of Nutritional Services, or to create menus of their choosing. *Id.* at ¶¶ 5–6,

11.) Thus, Rock and Lira were without authority to direct that Plaintiff be provided the diet he requested.

Therefore, the Court concludes that none of the *Colon* factors apply to Plaintiff's First Amendment free expression claims against Rock and Lira and recommends that they be granted summary judgment on Plaintiff's First Amendment claims based upon their lack of personal involvement.

### d. Don Haug

Defendant Don Haug ("Haug"), is the Food Administrator at Upstate. (Dkt. No. 1 at 3.) Plaintiff claims that Haug denied his request to stop putting salmon on his tray. (Dkt. Nos. 1 at ¶¶ 44–45; 113–3 at 99–100; 113–4 at 28.) Inasmuch as the CAD meals were packaged at the FPC, and the Food Administrator at a correctional facility has no authority to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services, or to create menus of his or her own choosing, (Dkt. No. 113–8 at ¶¶ 5–6, 11), Haug was without authority to comply with Plaintiff's request to alter the meals containing salmon or provide the diet Plaintiff claimed would that accommodate his Nazarite Jewish faith. Therefore, the Court recommends that Haug be granted summary judgment on Plaintiff's First Amendment claim based upon a lack of personal involvement.

### e. Timothy Hawk

**\*22** Timothy Hawk ("Hawk") was Chaplain at Upstate during the time period relevant to Plaintiff's Complaint. (Dkt. No. 1 at 3.) In his Complaint, Plaintiff alleges that on September 22 and 27, 2010, he wrote to Defendant Hawk explaining that Defendant Alston had advised him to contact the Upstate Chaplain regarding the procedures Plaintiff had to follow to have his Nazarite Jewish religion recognized by DOCCS. *Id.* at ¶¶ at 57–58. Hawk sent Plaintiff a responsive memorandum on October 7, 2010, informing him that he had received his request for recognition of his religion by DOCCS, explaining the correct procedure to be followed, and directing Plaintiff to contact Defendant Morris because only Central Office could create a designation for a specific religious tradition. *Id.* at ¶ 68 and 45.

There is no evidence of Hawk's personal involvement in Plaintiff being denied a diet that he believed accommodated his Nazarite Jewish faith. Hawk was not authorized to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services. (Dkt. No. 113–8 at ¶¶ 5–6, 11.) Furthermore, under Directive # 4202(C), the authority

to identify particular faiths in the inmate population by DOCCS in an effort to accommodate the inmates' legitimate spiritual needs, resides in the first instance in Ministerial Services, to whom Hawk directed Plaintiff, rather than the facility Chaplain. (Dkt. No. 113–10 at 10.)

In light of the foregoing, the Court recommends that Defendant Hawk be granted summary judgment on Plaintiff's First Amendment claim based upon his lack of personal involvement.

### f. Rabbi Friedmann

Defendant Rabbi Friedmann was the Jewish Chaplain at Upstate during the time relevant to Plaintiff's First Amendment and RLUIPA claims. (Dkt. No. 113–4 at 59–60.) According to Plaintiff, Friedmann called him a "nigger" when Plaintiff rejected him as his Rabbi. (Dkt. No. 113–3 at 26.) A July 6, 2006, memorandum from Friedmann to the IGRC regarding Plaintiff's Grievance No. UST–27003–06, describes a meeting he had with Plaintiff on May 18, 2006, regarding a Change of Religious Designation Form, approved by Rabbi Feinberg, in which Plaintiff certified that he professed to be of the "Nazarite faith of the Orthodox Judaism Adhering to the Ancient Hebrew law. (Dkt. No. 113–4 at 60–62.) The memorandum also describes a letter dated May 15, 2006, from Plaintiff to Friedmann, that accompanied the Form, in which Plaintiff indicated he had sent Friedmann documents from Rabbi Feinberg on April 12, 2006, which Friedmann had sent back without acknowledgment, and had asked Friedmann when his rights as a Nazarite would be respected and he would be afforded his religious rights. *Id.*

In the memorandum, Rabbi Friedmann noted that if Rabbi Feinberg were an orthodox rabbi, he would not accept the "Nasserite" distinction as Judaism has not practiced it for approximately two-thousand years. *Id.* at 60. According to Friedmann, at the meeting, he informed Plaintiff that because Rabbi Feinberg was not a DOCCS chaplain, the Change of Religious Designation Form was not valid. *Id.* Friedmann denied using the "N Word" and denied being a racist, claiming that he had referred to Jewish practice according to Jewish law, and not to racial distinctions. *Id.* In a July 22, 2009, memorandum to IGRC regarding Plaintiff's Grievance No. UST–3971909, Friedmann noted that he had suggested to Plaintiff in the past that the RAM would solve most of his vegetarian problems. (Dkt. No. 113–4 at 59.) In a September 2, 2009, memorandum to Lira, Friedmann wrote that since Plaintiff had demanded three years ago that he have nothing to do with him as he was not his Rabbi, Friedmann had acceded

to Plaintiff's request and had not seen him since July of 2006. *Id.* at 101.

**\*23** The evidence establishes that Rabbi Friedmann had no authority to override or alter menus or create menus of his own choosing. (Dkt. No. 113–8 at ¶¶ 6, 11.) Furthermore, there is no evidence in the record suggesting that acknowledgment of Plaintiff's Nazarite sect of Judaism by Friedmann would have resulted in the desired changes in Plaintiff's diet. To the contrary, the Schattinger Declaration provides strong evidence it would not. (Dkt. No. 113–8.)

Because the evidence does reveal personal involvement by Friedmann with respect to the refusal to recognize Plaintiff's Nazarite Jewish religion, the Court recommends that summary judgment based upon lack of personal involvement be granted Friedmann only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

g. Morris, Perlman, and Alston
Defendants Morris, Perlman, and Alston are not specifically seeking summary judgment based upon a lack of personal involvement in the alleged violation of Plaintiff's First Amendment free exercise rights, and the evidence establishes that they were personally involved in the alleged failure to recognize Plaintiff's Nazarite Jewish faith. However, the undisputed evidence in the Schattinger Declaration supports the conclusion that even if Plaintiff's Nazarite Jewish religion and the dietary restrictions it required had been acknowledged by Ministerial Services, the diet he seeks would not have been made available to him. (Dkt. No. 113–8 at ¶¶ 45–51.) Therefore, the Court recommends that, as with Friedmann, summary judgment based upon lack of personal involvement be granted Morris, Perlman, and Alston only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

h. Conclusion
The Court recommends that Defendants Fisher, Bellamy, Rock, Lira, Haug, and Hawk be granted summary judgment on Plaintiff's entire First Amendment free exercise claim based upon a lack of personal involvement. The Court has also recommends that Defendants Friedmann, Morris, Perlman, and Alston be granted summary judgment as to that part of Plaintiff's First Amendment free exercise claim

regarding the failure to accommodate is religious dietary requirements based upon a lack of personal involvement.

If the District Court were to adopt this Court's recommendations, the only remaining First Amendment free exercise claim remaining for consideration on the merits would be Plaintiff's claim for the failure to recognize his Nazarite Jewish religion by Defendants Friedman, Morris, Perlman, and Alston. This Court will nonetheless consider whether, if personal involvement were found as to Plaintiff's entire First Amendment free exercise claim, Defendants would be entitled to summary judgment on the merits.

2. *Sincerity of Plaintiff's Religious Beliefs*
 **\*24** In determining whether an inmate's religious beliefs are entitled to free exercise protection, "the relevant inquiry is not whether as an objective matter, the belief is 'accurate or logical.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (citing *Jolly,* 76 F.3d at 476). Rather, the inquiry is whether the plaintiff's beliefs are "*sincerely held* and whether they are, in his own scheme of things, religious." *Id.* (emphasis in original) (citation and internal quotation marks omitted). A sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

Recognizing that they are "singularly ill equipped to sit in judgment on the verity of an adherent's religious beliefs," courts have rejected an objective, content-based approach in favor of a more "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford,* 352 F.3d at 588 (citations and internal quotation marks omitted). The Second Circuit has adopted an "expansive" definition of "religion" as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick,* 745 F.2d at 158 (quoting *United States v. Moon,* 718 F.2d 1210, 1227 (2d Cir.1983)) (quoting W. James, *The Varieties of Religious Experience* 31 (1910)).

The subjective test does not require that a plaintiff be a member of a particular religious organization. *Ford,* 352 F.3d at 589. *See also Jackson,* 196 F.3d at 321 (holding that the question of whether a plaintiff's beliefs are entitled to free exercise protection turns upon whether the beliefs were "sincerely held," not on the "ecclesiastical question" of whether the plaintiff was in fact a Jew under Judaic Law); *Ford,* 352 F.3d at 590–91 ("[T]he opinion of DOCS religious

authorities cannot trump the plaintiff's sincere belief"). A court may not deny First Amendment protection simply because it finds that the inmate's sincere belief is "objectively incorrect" according to the tenets of his religion. *Ford,* 352 F.3d at 590–91.

Defendants do not appear to be challenging the sincerity of Plaintiffs religious beliefs for purposes of their summary judgment motion, questioning only whether his beliefs regarding the vow of the Nazarite are objectively correct. They have submitted the Declaration of Rabbi Potasnik who, while disagreeing with Plaintiff's beliefs as to what is required to abide by the vow of the Nazarite, has specifically acknowledged that he has no cause to question Plaintiff's sincere beliefs. (Dkt. No. 113–11 at ¶ 5.)

The evidence in the record is, in any event, sufficient for the Court to assume for purposes of this motion that Plaintiff's Nazarite religious beliefs are sincerely held and therefore entitled to protection under the First Amendment free exercise clause and RLUIPA. Plaintiff testified at his deposition that his parents and sister are Nazarites, as was his brother before his death. (Dkt. No. 113–3 at 30.) He also testified as to his clear understanding of the Nazarite vow as prohibiting him from eating or drinking anything from the vine, touching dead animals, and cutting his hair. (Dkt. No. 113–3 at 13–16.) According to Plaintiff, he initially took the Nazarite vow in 1986 and, after breaking the vow in 1996, took it again before entering prison, where he has continued to adhere to the vow, including the dietary restrictions imposed by the vow, throughout his incarceration. *Id.* at 30–31. In addition, Plaintiff appears to have been engaged in an ongoing effort to obtain recognition of his law of the Nazarite Jewish faith from DOCCS, as well as a diet that accommodates his religious beliefs, through correspondence and grievances since at least May of 2006. (Dkt. No. 113–4 at 62.)

### 3. *Substantial Burden*

**\*25** A substantial burden on sincerely held religious beliefs occurs when "the state puts substantial pressure on an adherent to modify his behavior and violate his beliefs." *Jolly,* 76 F.3d at 477 (internal quotation marks and alterations omitted). Plaintiff claims that his free exercise rights under the First Amendment and his rights under RLUIPA are being substantially burdened by Defendants failure to recognize his religion and provide him a nutritionally adequate diet accommodating his Nazarite Jewish beliefs.

An inmate who adheres to a minority religion must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to the conventional religious precepts." *See Cruz v. Beto,* 405 U.S. 319, 322, n. 2 (1972). Reasonable opportunities, however, are not the same as identical treatment. As the Supreme Court explained in *Cruz,* ["w]e do not suggest ... that every religious sect or group within a prison however few in number must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent or the demand." *Id.* at 322.

Plaintiff has not complained of the need for a special place of worship. Nor, in light of Plaintiff's expressed belief that the Nazarites in DOCCS are separate unto themselves, are not under rabbis or priests, and are teachers unto themselves (Dkt. No. 113–3 at 22, 27), have Plaintiff's religious beliefs been substantially burdened by the absence of a spiritual leader or opportunities for formal worship in accordance with Nazarite practices. Although Plaintiff expressed concern at his deposition that he may at some point in the future be required to cut his hair, there is no evidence in the record that has occurred. *Id.* at 12–14.

The Court does conclude, however, that the evidence supports a finding for purposes of this motion that DOCCS' failure to provide Plaintiff a diet that conforms with his understanding of his Nazarite vow, does substantially burden his sincerely held religious beliefs. Defendants contend that Plaintiff is not spiritually burdened by the lack of a vegetarian diet because under Jewish authorities' interpretation of the Nazarite vow, a person under the vow is not required to refrain from eating meat. (Dkt. No. 113–13 at 14.) However, what matters in the Court's analysis is whether Plaintiff's sincerely held belief that under the Nazarite vow he is not allowed to eat meat is substantially burdened, not whether Jewish authorities find his belief "objectively incorrect" according to the tenets of the Jewish faith. *Ford,* 352 F.3d at 590–91.

At his deposition, Plaintiff testified that he has been a vegan since he became incarcerated in the DOCCS system. (Dkt. No. 113–3 at 13.) The nutritionally adequate diet that Plaintiff claims necessary to accommodate his Nazarite Jewish religious beliefs, as well as his dairy allergy/intolerance, is one that does not include meat, fish, any food that comes from the grapevine, eggs, or dairy. (Dkt. No. 113–3 at 13–14, 23–24, 52, 87.) Plaintiff has rejected the suggestion of Rabbis Friedmann and Potasnik that he eat the RAM, which is almost

entirely meat free, rather than the CAD, because it is not kosher. (Dkt. No. 1 at ¶¶ 133–34.) He has described the foods he believes should be substituted for the CAD as including "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts." (Dkt. Nos. 5 at 2; 56 at 4.)

4. *First Amendment Free Exercise and RLUIPA Claims*

**\*26** Even assuming that Plaintiff's religious beliefs regarding his diet are sincerely held and substantially burdened, the Court concludes for the reasons explained below that the DOCCS' dietary policies and practices, which do not allow for the diet Plaintiff is seeking, are "reasonably related to legitimate penological interests," and for purposes of Plaintiff's RLUIPA claim, that the challenged policies and practices, as described in the Schattinger Declaration, further a compelling state interest and provide the least restrictive means of furthering that interest.

a. Rational Connection of DOCCS Food Service Practices to a Legitimate Governmental Objective

In *O'Lone,* the Supreme Court explained that under the first *Turner* factor, the Court accorded great deference to the judgments of prison officials "charged with the formidable task of running a prison." *O'Lone,* 482 U.S. at 353; *see also Shaw v. Murphy,* 532 U.S. 223, 230 (2001) ("[U]nder Turner and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management.").

Recently, in *Smith v. Perlman,* No. 9:11–cv–00020 (MAD/CFH), 2014 WL 7333229, at \* 11, 2014 U.S. Dist. LEXIS 175341, at \* 34 (N.D .N.Y. Dec. 19, 2014), in which Defendants were granted summary judgment on Plaintiff's First Amendment/RLUIPA claim for a diet that conformed to both his therapeutic needs and religious beliefs, the District Court noted that "it is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." (quoting *Majid v. Fischer,* No. 07–CV–4585, 2009 U.S. Dist. LEXIS 71616, at \*18–19 (S .D.N.Y. July 31, 2009)). In an earlier decision in *Hamilton v. Smith,* No. 9:06–CV00805, 2009 WL 3199520, at \* 4, 2009 U.S. Dist. LEXIS 91039, at \*13 (N.D.N.Y. Sept. 30, 2009), Defendants were granted summary judgment on Plaintiffs First Amendment/RLUIPA claim regarding the failure to provide him a low sodium kosher diet. The District Court accepted the DOCCS defendants' argument that they had a "legitimate penological interest in carrying out their responsibility for daily preparation of meals for all inmates

within their control," and that it was "not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." In *Tafari v. Brown,* No. 10–CV–1065 (GTS/DRH), 2012 WL 1085852, at \*19, 2012 U.S. Dist. LEXIS 45054, at \*57–58 (N.D.N.Y. Mar. 6, 2012), *report-recommendation adopted in part and rejected in part on other grounds,* 2012 WL 1098447, 2012 U.S. Dist. LEXIS 45055 (N.D.N.Y. Mar. 30, 2012), the Court found the same to be true where the plaintiff claimed that his religious beliefs required that he be provided with a kosher vegetarian diet, and the DOCCS defendants argued, as in this case, that "such a diet was extremely expensive and administratively burdensome and thus was not a feasible alternative." *Id.*

**\*27** The Schattinger Declaration (Dkt. No. 113–8) describes the additional employees and facilities that would be required, the logistical and administrative burdens, and the expense of preparing vegetarian kosher meals for transport to the fifty-eight individual DOCCS confinement facilities housing around 55,000 inmates. (Dkt. No. 113–8 at ¶¶ 8–9.) The Court finds Defendants have established that the DOCCS practice of providing standard menus, i.e ., the general confinement menu, the RAM, and the CAD to meet the dietary preferences and religious needs of inmates to the extent reasonably possible, has a rational connection to legitimate governmental objectives. The Court further finds that Plaintiff has failed to submit evidence showing that DOCCS' administrative and financial concerns are irrational.

b. Alternative Means for Plaintiff to Exercise his Free Exercise Rights

The second *Turner* factor also weighs in favor of Defendants. In *O'Lone,* the Supreme Court construed the second factor, whether a prisoner had alternative means to exercise his religious beliefs, as not whether the inmate had an alternative means of engaging in the particular religious practice at issue, but whether the inmate has been denied "all means of expression." *O'Lone,* 482 U.S. at 352. *See also Furnace v. Arceo,* No. C 06–4609 MMC (PR), 2008 WL 618907, at \*8, 2008 U.S. Dist. LEXIS 16172, at \*23 (N.D.Cal. Mar. 3, 2008) (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon") (citation and internal quotation marks omitted).

In *Tafari,* the court found that the second *Turner* factor weighed in favor of the defendants, who, as in this case, argued that the provision of a vegetarian kosher diet would

be extremely expensive and administratively burdensome. *Tafari,* 2012 WL 1085852, at 15. The court noted that Tafari was able to practice his Jewish faith in that he was provided the kosher CAD meals three times a day, which complied with Tafari's religious tenets even though it was not the diet he felt would fully comply with his beliefs. *See also Hamilton,* 2009 WL 3199520, at*5.

In this case, Plaintiff receives the CAD diet but claims that Nazarites are a sect of the Jewish religion which imposes dietary restrictions in addition to those imposed by a kosher diet. As in *Tafari,* while the CAD diet is not the diet that Plaintiff feels complies most fully with his beliefs, it is adequate in that it provides him a kosher diet. Furthermore, Plaintiff has what is likely the even better option of the RAM diet, which is almost entirely meatless and was recommended to him by Rabbi Friedmann as a way to solve most of his vegetarian problems. (Dkt. No. 113–4 at 59 .) In his Declaration, Rabbi Potasnik explains that fruits and vegetables are kosher unless infected with insects or worms that may not be eaten and notes that inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative. (Dkt. No. 113–11 at ¶ 13.) Potasnik points out that not all members of the Jewish faith follow strict kosher guidelines and some have opted for the alternative entree menu.

**\*28** In addition to having adequate dietary alternatives, which although not perfect in Plaintiff's mind, have been shown to be adequate by his healthy weight and BMI and satisfactory nutritional state after many years on the CAD, Plaintiff has also been allowed to keep his hair long as required under his Nazarite vow. (Dkt. No. 113–3 at 72–73.) There is no evidence that suggests Plaintiff has been prevented from studying his faith, praying, or attending Jewish religious ceremonies and rituals. *See Hamilton,* 2009 WL 3199520, at *5. The evidence does reveal that it was Plaintiff who decided that Rabbi Friedmann was not his Rabbi (before Friedmann allegedly called Plaintiff a racially derogatory name), and Plaintiff who claims that because he is his own religious teacher, he needs no spiritual leader. It is also Plaintiff who has not provided Ministerial Services with the identity of a living religious resource who could advise them of the requirements for a Nazarite Jew and how DOCCS could best accommodate the religion within the confines of a correctional institution, despite having been requested to do so. *Id.* at 22–23, 26–27; Dkt. Nos. 113–9 at ¶¶ 5–6; 113–10 at 10, 23, 29, 32.

c. Impact on Guards, Inmates, and Prison Resources of Providing Plaintiff a Diet Accommodating his Religious Beliefs

The third *Turner* factor also militates in favor of Defendants. The evidence clearly establishes that making a kosher vegetarian diet available to inmates would have a detrimental financial and administrative impact on DOCCS. (Dkt. No. 113–8 at ¶¶ 45–52.) It would require the purchase of additional equipment for the FPC for creation of a dedicated kosher vegetarian production line and packaging for the meals, additional staff to run the line, and increased food costs. *Id.* "Even where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Smith,* 2014 WL 7333229, at *12 (quoting *Hamilton,* 2009 WL 3199520, at *5) (quoting *Arceo,* 2008 WL 618907, at *8). In this case, the Schattinger Declaration establishes that the cost and administrative burden would be far greater than small or negligible.

In addition, the evidence reveals that even if DOCCS were to make a kosher vegetarian meal available to inmates as one of its standard meal choices, it would not satisfy Plaintiff's religious beliefs and dairy allergy/intolerance. Based upon the foods requested in his preliminary injunction motions and deposition testimony, Plaintiff would require a vegan diet prepared especially for him. [29] (Dkt. Nos. 5 at 2; 56 at 4; 113–3 at 13–14, 23–24, 52, 83.)

As in *Hamilton,* providing Plaintiff with a meal option outside of the established DOCCS-wide menus could have "a significant 'ripple effect' on fellow inmates, *Turner,* 482 U.S. at 90, in that such accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." *Hamilton,* 2009 WL 3199520, at *6.

**\*29** The Court finds nothing in the record showing that DOCCS position is unreasonable. *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995) ("The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable.").

d. Alternative Means of Facilitating Plaintiff's Right that Have a De Minimis Effect on Valid Penological Interests

The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating Plaintiff's

right to a diet that accommodates his religious beliefs which impose only a de minimis effect on DOCCS' valid penological interests. The burden is on Plaintiff, rather than DOCCS officials, to show that there are "obvious, easy alternatives" to the established DOCCS-wide menu plan. *See O'Lone,* 482 U.S. at 350. Plaintiff has failed to put forth any alternative to the DOCCS-wide menu plan that would accommodate his religious beliefs and dairy allergy/intolerance at a minimal cost or with minimal disruption of the administration and operation of the DOCCS food service. Plaintiff contends that the RAM does not meet his needs because it is not kosher (Dkt. No. 1 at ¶¶ 133–34). He claims that the CAD, which is kosher, does not meet his needs because it contains meat, fish, cheese, and grape products, and is nutritionally inadequate if he eats only those foods that are not prohibited and do not contain dairy. (Dkt. Nos. 1 at ¶¶ 43, 45–46, 88, 89, 137; 113–3 at 23–24, 52, 87; 113–3 at 14, 33, 36, 54–57, 60.)

Plaintiff testified at his deposition that DOCCS has an alternative diet where an inmate is given a substitute for something he is unable to eat for religious reasons, and suggested that he be provided with fruits, vegetables, rice, grains, peanut butter and jelly as substitutes for the foods he cannot eat in the CAD. (Dkt. 113–3 at 48–49.) That is essentially the diet Plaintiff has requested in his preliminary injunction motions. (Dkt. Nos. 5 at 2; 56 at 4.) However, Plaintiff has offered no evidence that DOCCS offers any such diet, and the Schattinger Declaration establishes that the only diets offered by DOCCS, aside from medically prescribed diets, are the general confinement diet, the RAM, the CAD, and the Green Haven program. (Dkt. No. 113–8.) The alternative means of meeting his religious dietary and dairy allergy or intolerance needs suggested by Plaintiff would be even more onerous than the kosher vegetarian diet DOCCS has found to be too administratively and financially burdensome to implement.[30] *Id.* at 45–51. Accordingly, the final *Turner* factor weighs in favor of Defendants as well.

e. Compelling State Interest under RLUIPA

Plaintiff's Complaint has been construed by the Court as seeking a permanent mandatory injunction in the nature of the preliminary injunctions he has requested throughout the litigation regarding his diet. Defendants' lack of personal involvement in, and lack of authority with respect to Plaintiff's First Amendment free exercise claim regarding DOCCS' alleged failure to provide him with a nutritionally adequate diet satisfying his religious beliefs and dairy allergy/intolerance, leads the Court to conclude that there is no

Defendant in this action against whom effective injunctive relief could be awarded under RLUIPA.[31] Even if there were, for the reasons discussed herein, the Court finds that Defendants are entitled to summary judgment.

**\*30** "As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009). Nonetheless, the Supreme Court has observed that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's [compelling state interest] standard with due deference to the experience and expertise of prison and jail administrators in establishing the regulations and procedures necessary to maintain good order, security, and discipline consistent with consideration of costs and limited resources." *Cutter v. Wilkinson,* 544 U.S. 709, 717 (2005).

The Court has found that Plaintiff's religious exercise has been substantially burdened by DOCCS' failure to provide him with a diet that accommodates his religious beliefs. The onus is therefore on Defendants to demonstrate that the challenged practices further a compelling governmental interest, and that the burden imposed is the least restrictive means of achieving that interest. *See Jova,* 582 F.3d at 415. Controlling costs and the administrative burdens placed on correctional facilities have been found to constitute compelling state interests under RLUIPA. *See, e.g., Vega v. Lantz,* No. 304CV1215DFM, 2009 WL 3157586, at \*8, 2009 U.S. Dist. LEXIS 88550, at \* 30 (D.Conn. Sept. 25, 2009) ("[T]he defendants have demonstrated ... that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs, and maintaining workable administrative procedures."), *motion for reconsideration granted on other grounds,* 2012 WL 5831202, 2012 U.S. Dist. LEXIS 163963 (D.Conn. Nov. 16, 2012); *Phipps v. Morgan,* No, 04–CV–5108, 2006 WL 543896, at \*9, 2006 U.S. Dist. LEXIS 12198, at \* 20 (E.D.Wash. Mar. 6, 2006) ("The Court finds that Defendants have not only shown legitimate interest for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks, they have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA.").

The Court finds that Defendants have met the burden of showing that for financial and administrative reasons, DOCCS has a compelling state interest in limiting the number of menu options available to the inmates in the DOCCS

system, even though that limitation has resulted in a kosher vegetarian diet being unavailable to those inmates whose religious beliefs require it. The Court also concludes, for the reasons articulated in the Schattinger Declaration (Dkt. No. 113–8), that limiting the number of different menus available to inmates on a DOCCS-wide basis, and restricting individuals facilities' ability to alter those menus, satisfies the least restrictive means standard.

### 5. *Conclusion*

For the foregoing reasons, the Court recommends that all of the Defendants be granted summary judgment on Plaintiff's First Amendment free exercise and RLUIPA claims.

### G. Eighth Amendment Claim for Cruel and Unusual Punishment

**\*31** Plaintiff claims that as a result of Defendants' refusal to provide him with a nutritionally adequate diet that accommodates his religious beliefs, he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs. (Dkt. Nos. 1 at ¶ 137; 113–3 at 36.) Plaintiff claims that Defendants' refusal constitutes cruel and unusual punishment in violation of his Eighth Amendment rights. *Id.* at ¶ 136 and 6 and 9.

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiffs diet and medical care, the medical evidence fails to support Plaintiff's Eighth Amendment claim. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." *U.S. Const. amend. VIII.* The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble, 429 U.S. 97, 102–03 (1976).* Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain, or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle, 429 U.S. at 102* (quoting *Trop v. Dulles, 356 U.S. 86, 101 (1958)*). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan, 511 U.S. 825, 832 (1994)* (citation omitted).

Under the Eighth Amendment, prisons are required to provide for the basic human needs of inmates, including "nutritionally adequate food that is prepared and served

under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir.1983)* (per curiam) (citation and internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly, 76 F.3d at 480* (citations omitted). "[A] prisoner may prevail only where he proves both an objective element that the prison officials' transgression was sufficiently serious and a subjective element that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir.2002)* (quoting *Farmer, 511 U.S. at 834*) (internal quotation marks omitted).

Under the objective test, no constitutional violation will be found as to restrictive diets unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured the inmate." *McEachin, 357 F.3d at 199–201. See, e.g., Beckford v. Portuondo, 151 F.Supp.2d 204, 213 (N.D.N.Y.2001)* (a deprivation of two of three meals per day for eight days created an issue of material fact sufficient for an Eighth Amendment claim to survive summary judgment); *Moss v. Ward, 450 F.Supp. 591, 596–97 (W.D.N.Y.1978)* (denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate inmate's Eighth Amendment rights).

**\*32** Plaintiff's claim that he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs as a result of not being given the diet he demands is not supported by the medical evidence in the record. During the period from December of 2010 to March of 2013, while he was being given the CAD diet, Plaintiff's weight actually increased from 134 pounds on December 16, 2011, to 146 pounds on March 13, 2013. (Dkt. No. 113–7 at ¶¶ 13, 15.) During that time, Plaintiff's BMI has remained within the healthy range. *Id.* at ¶¶ 14, 16.

While Plaintiff's medical records reveal that he suffered from stomach pains for which he was given Alamag,[32] and blood in his stool, there is nothing in the records attributing those health problems to the failure to provide him with a nutritionally adequate diet that accommodates his religious beliefs and dairy allergy/intolerance. (Dkt. No. 115; *see also* Dkt. No. 113–4 at 8.) To the contrary, Plaintiff's medical progress notes for February 4 and 7, 2011, indicate that his kosher diet was not deemed to be a medical issue. (Dkt. No.

115 at 7, 9.) Plaintiff himself at one point blamed his digestive system problems on Crohn's disease, but in the late winter and early spring of 2011 refused to have a colonoscopy. *See id.* at 8–10.

Plaintiff filed Grievance No. UST–45070–11 on January 21, 2011, claiming that nothing was being done with regard to his stomach problems and passing blood. (Dkt. No. 113–4 at 5.) He also asked to see a dietician or be transferred to a facility that serves full kosher meals, not the CAD, so that he could get balanced meals. *Id.* In its unanimous denial of Plaintiffs appeal from denial of the grievance, CORC noted that Plaintiff had a colonoscopy on May 11, 2011, and was scheduled for a colorectal surgical consult in the near future. *Id.* at 3.

The record also fails to support Plaintiff's claim that he has worsening gum disease that had moved into his sinuses as a result of malnutrition, or that his spinal stenosis or other health problems are in any way related to his diet. *See* Dkt. No. 115. Furthermore, Karandy's April 28, 2014, examination of Plaintiff revealed him to be in good health with a weight and BMI in the healthy range and, along with the results of Plaintiff's blood work, consistent with appropriate nutrition. (Dkt. No. 113–3 at ¶¶ 9–11.)

Plaintiff's conclusory allegations of violation of his constitutional rights alone, without the support of competent medical evidence, are insufficient to establish a significant risk to his health necessary to defeat Defendants' motion for summary judgment on Plaintiff's Eight Amendment cruel and unusual punishment claim. *See Tafari,* 2012 WL 1085852, at *19 (citing *Llorente v.. Rozeff,* No. 99–CV–1799, 2001 WL 474261, at *3–4, 2001 U.S. Dist. LEXIS 5655, at *11 (N.D.N.Y. Apr. 12, 2001)* (plaintiff was required to present competent medical evidence of both the injury and the reaction to support a claim of deliberate indifference to a medical need). Accordingly, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's Eighth Amendment claim.

## H. Equal Protection Claim

**\*33** Plaintiff contends that his rights to equal protection under the Fourteenth Amendment have also been violated by Defendants' refusal to provide him with a diet that accommodates the tenets of his faith. (Dkt. No. 1 at 8.) According to Plaintiff, he was the only Black Nazarite Jew at Upstate who complained that he was not receiving an adequate and nutritional kosher diet in accordance with the tenets of the Nazarite Jewish faith. (Dkt. No. 1 at ¶ 37.) Other Jewish inmates at Upstate and other DOCCS' facilities were provided the CAD, which contains meat, but Defendants refused to provide Plaintiff with an alternate diet accommodating his beliefs. (Dkt. No. 1 at ¶ 128.) Plaintiff blames Defendants' failure to recognize his Nazarite Jewish faith and provide him with the alternate diet on discrimination based upon his race and religion. (Dkt. Nos. 1 at ¶¶ 36–37 and 39, 41, 56; 113–3 at 25–26, 69–70.)

The Equal Protection Clause directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause, ... a plaintiff must demonstrate that he was treated differently from others similarly situated as result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992).

In the prison context, "the Supreme Court has specifically held that ... the Equal Protection clause does not require that 'every religious sect or group within a prison ... must have identical facilities or personnel.' " *Pugh v. Goord,* 571 F.Supp.2d 477, 502 (S.D.N.Y.2008) (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972). The *Turner* standard has been applied to equal protection claims by the Second Circuit, such that "even if plaintiffs can demonstrate that two groups are similarly situated disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Benjamin,* 905 F.2d 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.' " *Benjamin,* 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoner's Labor Union, Inc.,* 433 U.S. 119, 136 (1977)).

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiff's dietary requests, the evidence fails to support Plaintiff's claim that they violated his right to equal protection. The evidence supports the finding that the denial of the diet Plaintiff requested, while other Jewish inmates religious dietary requirements were met by the CAD, did not result from "intentional or purposeful discrimination" either on the basis of his race or religion.

**\*34** Plaintiff's claim that he was discriminated against on account of his race is largely conclusory. Plaintiff's disputed allegation that Rabbi Friedmann called Plaintiff a "nigger" after Plaintiff rejected him as his Rabbi, is not sufficient to raise a material issue of fact as to racial discrimination for purposes of Plaintiff's equal protection claim. "The law is clear that verbal harassment or even threats alone are not actionable under 42 U.S.C. § 1983." *Cotz v. Mastroeni,* 476 F.Supp.2d 332, 372 (S.D.N.Y.2007) (citing case law involving a corrections officer harassing an inmate by, *inter alia,* directing racial epithets at him and finding that such an action does not rise to the level of a constitutional violation).

Even if Plaintiff's allegations regarding Friedmann were enough to raise a factual issue regarding racial discrimination, there is no evidence in the record that Friedmann was personally involved in Plaintiff being denied the religious diet he has requested. In fact, the evidence shows that Friedmann had no authority to determine an inmate's religious diet (see Schattinger Declaration 113–8), except for the involvement, if any, he had in Ministerial Services making the determination that an inmate was Jewish and entitled to the CAD. *See* Directive # 4202(P). Likewise, there is no evidence that Plaintiff was denied the religious diet he requested by Friedmann or any of the other Defendants because of purposeful and intentional discrimination as a result of his Nazarite Jewish faith or because he is Black, but rather because of the policies and practices of DOCCS food service, which for financial and administrative reasons, do not allow for a personalized religious diet for each inmate.

In his Complaint, Plaintiff described himself as the "Only Black Nazarite Jewish Prisoner Confined at Upstate who has been Complaining About Not Receiving An Adequate & Nutritional Kosher diet in Accordance with the tenets of the Nazarite." (Dkt. No. 1 at ¶ 37.) The evidence shows that Plaintiff is not similarly situated to the significantly larger group of Jewish prisoners in the DOCCS system, whose religious beliefs are satisfied by the CAD diet.

Finally, even if Plaintiff could demonstrate that Black, or even all members of the Nazarite Jewish faith, as a group, are similarly situated to other Jewish inmates in DOCCS, as a group, the Court's analysis of the *Turner* factors with regard to Plaintiff's First Amendment free exercise claim, reveals that the disparate treatment complained of Plaintiff is "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89.

The Court therefore recommends that Defendants motion for summary judgment be granted as to Plaintiff's equal protection claim.

**I.** 42 U.S.C. §§ 1981, 1982, 1985 **and** 1986

Plaintiff has alleged in his Complaint that he has brought his claims for violation of his First, Fifth, Eighth and Fourteenth Amendment rights not only under 42 U.S.C. § 1983, but also pursuant to 42 U.S.C. §§ 1981, 1982, 1985, and 1986. (Dkt. No. 1 at 7.)

**\*35** Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000). Like the Equal Protection Clause, § 1981 can only be violated by purposeful discrimination. *Gen. Bldg. Contractor's Ass'n., Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982). Purposeful discrimination is "conduct motivated by a discriminatory purpose," rather than conduct that "merely result[s] in a disproportionate impact on a particular class." *Id.* at 386.

Where, as in this plaintiff does not put forward any claim under § 1981 that has not also been asserted under § 1983, the § 1981 claim is encompassed by the § 1983 claim, and they are analyzed together. *See Gladwin v. Pozzi,* 403 F. App'x 603 (2d Cir.2010). Because the Court has found that Plaintiff's § 1983 claims lack merit, so does Plaintiff's duplicative claim under § 1981. *See Howard v. City of New York,* No. 12 Civ. 933(JMF), 2014 WL 84357, at \*2, 2014 U.S. Dist LEXIS 1015, at \*23 (S.D.N.Y. Jan. 6, 2014).

42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State ..., as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The statute, by its clear terms, has no relevance to the claims asserted by Plaintiff in this action.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy, (2) for the purpose of depriving, either directly or

indirectly, any person or class of persons of equal protection of the laws, ... (3) an act in furtherance of a conspiracy, (4) whereby a person is ... deprived of any right of a citizen of the United States." *Brown,* 221 F.3d at 341 (citation and internal quotation marks omitted). The "conspiracy must also be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam) (citation and internal quotation marks omitted). The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985. *See Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993). In this case, the Complaint is devoid of factual allegations showing that any of the Defendants were involved in a conspiracy against Plaintiff, and there is no evidence in the record to support a conspiracy. Furthermore, the Court has concluded that Defendants have not denied Plaintiff's constitutional rights. Because Plaintiff's § 1985 claim fails, his claim under § 1986 fails as well. *See Brown,* 221 F.3d at 341.

**\*36** Given the foregoing, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's claims, if any, under 42 U.S.C. §§ 1981, 1982, 1985, and 1986.

### J. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. Inasmuch as the Court is recommending that Defendants be granted summary judgment based upon lack of personal involvement and/or on the merits, it finds it unnecessary to reach the qualified immunity argument.

### V. CONCLUSION

Based upon the foregoing, the Court recommends that Defendants motion for summary judgment be granted in its entirety. Inasmuch as the Court is recommending summary judgment in Defendants' favor, it also recommends that Defendants' request for revocation of Plaintiff's *in forma pauperis* status be denied as moot.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 113) be ***GRANTED IN ITS ENTIRETY;*** and it is further

**RECOMMENDED** that Defendants' motion for the revocation of Plaintiff s *in forma pauperis* status under 28 U.S.C. § 1915(g) be ***DENIED ON MOOTNESS GROUNDS;*** and it is further

**ORDERED** that the Clerk's Office provide Plaintiff with copies of all unpublished decisions cited herein; and it is further

**ORDERED** that the Clerk's Office correct the civil docket in this matter to reflect the correct spelling of the names of Defendants Kenneth S. Perlman and Omega B. Alston.

Filed Jan. 15, 2015.

### All Citations

Slip Copy, 2015 WL 1137644

---

Footnotes

1   Plaintiff's Complaint also contains conclusory reference to 42 U.S.C. §§ 1981, 1982, 1985, and 1986. Defendants have addressed only Plaintiff's civil rights claims under § 1983. The Court has concluded, nonetheless, for reasons discussed below, that Defendants are entitled to judgment dismissing any claims Plaintiff may have intended to assert under §§ 1981, 1982, 1985, and 1986.

2   Plaintiff alleged violations of the Religious Freedom Restoration Act ("RFRA") in his Complaint. (Dkt. No. 1 at ¶ 7.) The District Court previously noted that the RFRA was invalidated by the Supreme Court in *City of Boerne v. Flores,* 521 U.S. 507 (1997) and, in deference to Plaintiff's *pro se* status, construed his Complaint as alleging a claim under RLUIPA, which was enacted by Congress to rectify the perceived infirmity of RFRA. *See Pugh v. Goord,* 571 F.Supp.2d 477, 504 n. 11 (2008). (Dkt. No. 11 at 2 n. 2.)

3   Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system.

4   Plaintiff testified at his deposition that he had not communicated with Rabbi Feinberg in a while and believes he has passed. (Dkt. No. 113–3 at 61); *see also* Dkt. No. 113–9 at ¶ 6 regarding Feinberg's passing. Plaintiff has not taken on a new spiritual leader since Feinberg's death. (Dkt. No. 113–3 at 94.)

**5**     In his Complaint, Plaintiff has alleged that Feinberg sent the letter in or about December of 2003. (Dkt. No. 1 at ¶ 41.) However, since the letter states that Plaintiff became a member of the Prison Yeshiva in October of 2004, it would not have been sent before that date. Plaintiff appears to have sent a copy of the letter to Rabbi Friedman on April 12, 2006, indicating that the letter had been received at Upstate prior to that time. (Dkt. No. 113–4 at 60, 62.)

**6**     Feinberg used the exact same language in a letter written on behalf of the plaintiff inmate in *Perkins v. Booker,* No. 2:08–cv–97, 2009 WL 2058780, at *10, 2009 U.S. Dist. LEXIS 64092, *27–28 (W.D.Mich, N.D. May 29, 2009).

**7**     The Court takes judicial notice that DOCCS Directive # 4202 (Dkt. No. 113–10 at 10, *et seq.*), as revised 10/07/09, has now been superseded by DOCCS Directive # 4202, dated 07/24/14.

**8**     Clinton does not appear to have been as accommodating to Plaintiff's religious dietary restrictions as he now claims. In 2000, Plaintiff brought an unsuccessful civil rights action against the superintendent of Clinton arising in part out of Clinton's refusal to eliminate soy and soy products, milk and milk products, eggs, and fish from his diet and to provide him with a vegetarian diet to accommodate his Rastafarian religious beliefs. *See Williams v. Senkowski,* No. 9:00–CV–1580 (TJM/DEP) (N.D.N.Y.) ("*S enkowski*"). The Hon. David E. Peebles, M.J., recommended that the defendants be granted summary judgment on Plaintiff's claim that his First Amendment rights were violated by the defendants failure to accommodate his religious beliefs by providing him with a vegetarian diet. (*Senkowski,* Dkt. No. 66.) The Hon. Thomas J. McAvoy, Senior D.J., adopted Judge Peeble's Report–Recommendation in *Senkowski* and granted the defendants summary judgment. (*Senkowski,* Dkt. No. 68.)

**9**     Plaintiff filed a grievance in 2002 requesting a vegetarian diet. (Dkt. No. 113–4 at 65.) Denial of the grievance was upheld by the Central Office Review Committee after full investigation on the grounds that meals were provided in accordance with a state-wide menu, and DOCCS did not offer a vegetarian diet. *Id.* Grievance records from June of 2004 show that Plaintiff's religious designation at that time was Mohammedan. (Dkt. No. 113–4 at 66.) In a June 14, 2004, decision, the Central Office Review Committee denied Plaintiff's request for the CAD on the grounds that it was only available to those who proclaimed themselves to be Jewish. *Id.* at 66. Based upon the foregoing documentary evidence, it appears that Plaintiff did not begin receiving the CAD diet until some time in 2004.

**10**     Defendants have submitted the weekly CAD diet menu, which provides more detail regarding what is included in the meals. (Dkt. No. 113–5.) Defendants have also submitted the eight week general confinement menu which shows the meatless alternative entrees available to prisoners regardless of religious persuasion. (Dkt. Nos. 113–6; 113–9 at ¶ 7.)

**11**     While Plaintiff claims that he cannot eat the macaroni salad because it has vinegar, which may or may not be grape vinegar, in the mayonnaise, in his Grievance No. UST–45070–11, Plaintiff complained that he could not eat the macaroni salad because the mayonnaise made him pass blood. (Dkt. No. 113–4 at 5.)

**12**     The language of the decision is taken from the report of an investigation of the grievance which identifies Defendants Don Haug and Timothy Hawk as the investigative sources. (Dkt. No. 113–4 at 49.)

**13**     There is no evidentiary support in the record for Plaintiff's conclusory assertion that he was not properly weighed at Upstate. *See* Dkt. No. 133–3 at 37.

**14**     The Upstate messhall response in an investigation of one of Plaintiff's grievances over the failure to provide a diet that accommodated his religious believes, states that "[t]here are no substitutes for meat or fish unless it is medically indicated...." (Dkt. No. 113–4 at 14.)

**15**     Schattinger acknowledges that the inmate population includes vegetarians of varying degrees and vegans. *Id.* at ¶ 17. He includes as vegetarians inmates who eat fish and poultry but not red meat or pork and those who do not eat any type of animal flesh or eggs. *Id.*

**16**     Plaintiff has, on more than one occasion in this litigation, sought a mandatory injunction directing Defendants to provide him with a "sufficiently nutritional alternative kosher diet that conforms to plaintiff's religious dietary requirements." (Dkt. Nos. 5 at 2; 56 at 4.) Specifically, Plaintiff requested an order directing meal substitutes of "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts" in lieu of the CAD he was currently receiving. *Id.* In its March 26, 2012, Decision and Order denying Plaintiff's first motion for a preliminary injunction, the District Court concluded that Plaintiff had failed to make the requisite "clear" or "substantial" showing of a likelihood of success on the merits on his First Amendment, RLUIPA, and Eighth Amendment inadequate medical care claims. (Dkt. No. 56.)

**17**     Defendants' motion pursuant to 28 U.S.C. § 1915(g) seeking conditional dismissal of Plaintiff's Complaint on the grounds that Plaintiff failed to satisfy the imminent harm exception to the three strike rule was denied without prejudice. (Dkt. No. 68.)

18    Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

19    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

20    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

21    L.R. 7.1(a)(3) provides that *"iThe Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* However, *see Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

22    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 113–12.)

23    Plaintiff's complaints regarding his medical care and failure to provide accommodations for his physical impairments at Great Meadow relate generally to: (1) problems with his legs, including damage from a gun-shot wound to the knee; (Dkt. No. 118–1 at 7–11); (2) drop-foot and his need for a leg brace, *id.* at 10, 42, 76–79; (3) denial of physical therapy for his leg problems and reasonable accommodations such as being allowed to use the elevator, that he was given at Upstate, *id.* at 8–9, 30, 33–34, 69; (4) denial of appropriate pain medication for excruciating pain, *id.* at 9–11; (5) the prescribing of medications for worsening spinal stenosis with the sole intention of causing him harm, pain, and possibly death, *id.* at 8, 10, 51–55, 65; (5) vomiting blood, *id.* at 12; and (6) failure to provide the accommodations for his hearing impairment that were provided at Upstate. *Id.* at 8, 20–24, 60–61.

24    The Eleventh Amendment allows declaratory and prospective injunctive relief from violations of the Constitution and federal law. *See Edelman v. Jordan,* 415 U.S. 651, 677 (1974) ("federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief."); *see also Ex parte Young,* 209 U.S. 123 (1908) (Eleventh Amendment immunity does not preclude suits for injunctive and declaratory relief from continuing violations of federal law brought against state officers in their official capacities).

25    In his Complaint, Plaintiff requests a temporary restraining order and preliminary injunction compelling Defendants to provide him with a sufficient alternative religious diet. (Dkt. No. 1 at 8.) Although Plaintiff has not specifically requested permanent injunctive relief, the Court has liberally construed his *pro se* Complaint to seek permanent injunctive relief. Generally, when an inmate is transferred to another facility during the pendency of a lawsuit seeking injunctive relief, the request for injunctive relief is deemed moot. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir.2011) ("in this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief.") (citation and internal quotation marks omitted). However, as pointed out in the Schattinger Declaration, inmate menus are controlled on a DOCCS-wide, not facility basis. Therefore, Plaintiff's claim for injunctive relief with respect to his diet are not mooted by his transfer to another facility in the DOCCS system. *See Pugh v. Goord,* 571 F.Supp.2d 477, 488 (S.D.N.Y.2008) ("there is an exception to the mootness doctrine for challenged actions that are 'capable of repetition, yet evading review.' " (quoting *Murphy v. Hunt,* 455 U.S. 478, 482 (1982)).

26    The Second Circuit has thus far found it unnecessary to decide whether *Iqbal* eliminated any of the *Colon* bases for liability. *See, e.g., Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

27    *See, e.g., Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983).

28    The outside sponsor requirement has been upheld by the Second Circuit. *See Benjamin v. Coughlin,* 905 F.2d 571, 577 (2d Cir.1990).

29    According to Schattinger, DOCCS looked into the feasibility of providing additional or variant kosher programs after the implementation of the program at Green Haven and concluded that it would be extremely expensive and administratively burdensome. (Dkt. No. 113–8 at ¶¶ 43–44.)

30    Communications among DOCCS personnel, including Defendant Haug, as a part of the investigation of Plaintiff's grievances regarding the failure to provide him with a diet accommodating his religious beliefs, confirm Schattinger's

statement that DOCCS does not have a kosher vegetarian meal and explain that no substitutions are made on the CAD unless an inmate has an allergy, that food allergies are handled on an individual basis, and substitutions, if approved, are only made with items already served on the CAD menu. (Dkt. No. 113–4 at 67–69, 71.) According to Haug, Plaintiff's diet order had a milk allergy identified which required substitution of fruit for pudding and cream cheese and jelly with meat or eggs. *Id.* at 71.

31    Commissioner Fischer is retired, and as explained herein, even if his successor were substituted as a defendant, Plaintiff is not entitled to an award of injunctive relief under RLUIPA or any of his other claims.

32    Alamag is described as an antacid used to treat acid indigestion, heartburn, upset stomach, and sour stomach. *See* http://dailymed.nlm.nih.gov/ dailymed/archives/fdaDrugInfo.cfm?archieved 40097, last viewed on 12/29/14.

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    27

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at \*5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at \*3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8;*Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold, 2006 WL 71672, at \*1, \*3* (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at \*5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 WL 2789473
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tony HARRISON, Plaintiff,
v.
David STALLONE, Deputy Superintendent
of Programs, et al., Defendants.

No. 9:06-CV-902 (LEK/GJD).
|
Sept. 24, 2007.

**Attorneys and Law Firms**

Tony Harrison, pro se.

Maria Moran, Asst. Attorney General for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Gustave J. DiBianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 15). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Tony Harrison, which were filed on September 6, 2007. Objections (Dkt. No. 16).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 15) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 12) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED IN ITS ENTIRETY;** and it is further

**ORDERED,** that Plaintiff's Motion for a temporary restraining order (Dkt. No. 16) is **DENIED AS MOOT;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GUSTAVE J. DI BIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants retaliated against him for the exercise of plaintiff's First Amendment right to file a grievance regarding the conditions in the law library at Auburn Correctional Facility. (Dkt. No. 1). Presently before the court is defendants' motion to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to exhaust administrative remedies. (Dkt. No. 12). Plaintiff has responded in opposition to defendants' motion. (Dkt. No. 14).

**DISCUSSION**

**1.** *Motion to Dismiss*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The court must accept the material facts

alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**\*2** When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998). The court may also consider public documents and those of which judicial notice may be taken. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). When matters outside the pleadings are presented, the court may either exclude these matters or treat the motion as one for summary judgment under FED.R.CIV.P. 56. FED. R. CIV. P. 12(b).

## 2. *Facts*

Plaintiff alleges that on July 1, 2006, defendant Merville "accosted" plaintiff and asked him why plaintiff had complained about Merville. Complaint at p. 4. Plaintiff states that he assured defendant Merville that he did not "write him up," rather, plaintiff was complaining about the allegedly inadequate conditions in the Law Library at Auburn Correctional Facility. *Id.* Plaintiff claims that defendant Merville told plaintiff that Merville would "just have to find something to write [plaintiff] up for." *Id.* Plaintiff claims that on the same day, plaintiff was notified by the company officer that plaintiff was being "keeplocked" by the Law Library officer. On July 2, 2006, plaintiff states that he was issued a misbehavior report by defendant Merville for "eating candy in the library."

Plaintiff states that he remained "keeplocked" [1] for 23 hours per day until the disciplinary hearing on July 5, 2006. Plaintiff states that he was found guilty of the misbehavior and received "time served" and a five dollar surcharge. Plaintiff states that on July 18, 2007, he was told by a Law Clerk that plaintiff was "being targeted by every shift in the Law Library" for complaining about the conditions in the Law Library. Complaint at p. 5.

Plaintiff claims that he spoke with defendant Stallone on July 18, and plaintiff told defendant Stallone what the Law Clerk had said. Plaintiff claims that defendant Stallone told plaintiff that he "need[ed] to be harassed because defendant Stallone had to respond to plaintiff's grievance about the Law

Library. *Id.* Plaintiff claims that later in the day on July 18, 2006, plaintiff was keeplocked by defendant Womak [2] and was issued a misbehavior report on July 19, 2006, charging plaintiff with stealing or misusing state property. Plaintiff states that defendant Womak charged plaintiff with looking through a book that was given to plaintiff by another inmate. *Id.* Plaintiff claims that he was keeplocked for 23 hours until the disciplinary hearing. Complaint at p. 5.

Plaintiff claims that defendants Merville and Womak violated plaintiff's First Amendment rights by retaliating against him for complaining about the Law Library. Plaintiff also claims that defendant Stallone did nothing to stop their actions, despite being told about their conduct by plaintiff.

## 3. *Exhaustion of Administrative Remedies*

**\*3** Defendants argue that plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to *all inmate suits about prison life,* whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). The Supreme Court has recently held, agreeing with the Second Circuit, that the exhaustion requirement is an *affirmative defense,* not a jurisdictional prerequisite. *Jones v. Bock,* 127 S.Ct. 910, 921 (2007); *Giano v. Goord,* 380 F.3d at 675-76. The Second Circuit has also held that there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

Additionally, as with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies. *McCoy v. Goord,* 255 F.Supp.2d 233, 247-48 (S.D.N.Y.2003). Where questions of fact exist as to exhaustion, summary dismissal [3] is not appropriate. *Pendergrass v. Corrections Officers,* 01-CV-243A, 2004 U.S. Dist. LEXIS 28224, \*6-7 (W.D.N.Y. Sept. 1, 2004). At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v.. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff

obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The court notes that the Supreme Court's decision in *Woodford v.. Ngo,* 126 S.Ct. 2378 (2006) may have changed the law regarding possible exceptions to the exhaustion requirement. In *Woodford,* the Supreme Court held that the PLRA's exhaustion requirement mandates "proper" exhaustion of administrative remedies. In *Woodford,* the plaintiff filed a grievance that was rejected as "untimely." *Id.* at 2384. Woodford appealed the procedural denial through the administrative process, and "technically" exhausted his administrative remedies because there were no administrative remedies "available" to him. *Id.* However, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 2387. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 2385-93 (emphasis added).

**\*4** It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. In fact, based upon the concurring opinion in *Woodford,* it appears that these decisions have **not** been overruled in that respect. In that concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 126 S.Ct. at 2393 (citing *Spruill v. Gillis,* 372 F.3d 218,

232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates." Id.* (emphasis added).

The Second Circuit has not specifically considered the effect that *Woodford* may have had on *Giano-Hemphill* line of cases. [4] However, in *Ruggiero v. County of Orange,* 467 F.3d 170, 175-76 (2d Cir.2006), the Second Circuit stated that it did not need to determine what effect *Woodford* has upon the Second Circuit case law in the exhaustion area because in *Ruggiero,* the court found that plaintiff would not have prevailed even assuming the continued validity of the ability to "excuse" non-exhaustion. *See also Reynoso v. Swezey,* No. 06-1835-pr, 2007 U.S.App. LEXIS 15105, \*4 (2d Cir. June 25, 2007) (unpublished order) (continuing to state that the court was not deciding whether the decision in *Woodford* affected Second Circuit case law). In *Sloane v. Mazzuca,* the court stated that it would follow the "current" law in the Second Circuit until the Second Circuit specifically addressed the issue. *Sloane v. Mazzuca,* 04-CV-8266, 2006 U.S. Dist. LEXIS 79817, \*19-20 (S.D.N.Y. Oct. 31, 2006) (citation omitted).

The Supreme Court cited *Woodford* in *Jones v. Bock,* explaining that the holding in *Woodford* only imposed a requirement that in order to properly exhaust administrative remedies, the inmate must " 'complete the administrative review process in accordance with the applicable procedural rules.' " *Jones,* 127 S.Ct. at 922 (citing *Woodford,* 126 S.Ct. at 2384). These rules are defined by the prison grievance process itself, and not by the PLRA. *Id.* In *Jones,* the Court ultimately held that exhaustion was not *per se* inadequate simply because a defendant that was later named in the civil rights complaint was not named in the grievance. *Id.* at 923.

New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP.CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (N.Y.CRR). The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill,* 380 F.3d at 682. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b). [5] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed

to the Central Office Review Committee (CORC). *Id.* § 701.5(d). Time deadlines apply at all levels of the process, but exceptions to any of the deadlines may be made based on "mitigating circumstances." *Id.* §§ 701.5(a)(1); 701.6(g). An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a). The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h). A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.9.

In this case, plaintiff concedes that he did not file any grievances regarding defendants' behavior. Complaint at p. 2. Plaintiff states that his reason for failing to file a grievance was fear of retaliation. *Id.* at p. 3. Defendants argue that a "general fear" of retaliation will not excuse plaintiff's failure to exhaust. Defendants' Memorandum of Law at p. 3. Because the Second Circuit has not specifically held that the "exceptions" to the exhaustion requirement have been affected by *Woodford,* this court will still evaluate this case pursuant to the three-part *Brownell* test to determine if the exhaustion requirement has been waived or may be excused.

Plaintiff does not claim that the administrative procedure was not literally "available" to him. In fact, as stated above, there is a special procedure to bring grievances alleging harassment or discrimination against facility employees. 7 N.Y.C.R.R. §§ 701.8 & 701.9. Plaintiff, however, claims that the grievance procedure was not "available" due to the fear of retaliation or that the fear of retaliation constitutes a "special circumstance" excusing his failure to exhaust. [6]

It has been held that a "general fear" of retaliation is ***not*** sufficient to excuse the exhaustion requirement. *See Hines v. Valhalla County Corr.,* 01 Civ. 6935, 2002 U.S. Dist. LEXIS 14550, \*10-11 (S.D.N.Y. Aug. 8, 2002). If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure because as District Judge Scheindlin stated in *Hines,* "any inmate complaint can result in retaliation." *Id.*

However, it has also been held that grievance procedures may be rendered "unavailable" because of a "reasonable fear of retaliation." *Thomas v. Cassleberry,* 03-CV-6394, 2007 U.S. Dist. LEXIS 30129, \*3-6 (W.D.N.Y. April 24, 2007). In *Thomas,* the court found that plaintiff's fears were "reasonable" due to his allegations concerning widespread beatings and shacklings shortly after a "mini-riot" at Southport Correctional Facility. *Id.* These allegations, together with plaintiff's claim that he was personally threatened by defendants if he did not "drop it" were sufficient to create a "reasonable fear of retaliation," rendering the grievance procedure "unavailable" to plaintiff and excusing his failure to exhaust. *Id.* at \*3.

**\*6** In this case, the court cannot find that plaintiff had a "reasonable fear" of retaliation. The case is distinguishable from *Thomas* in which plaintiff had alleged that he was involved in a riot and that there had been other beatings. Plaintiff in this case simply stated in the complaint that he was "afraid of retaliation." In plaintiff's response to defendants' motion to dismiss, he appears to claim that he had a "legitimate fear" of retaliation because his substantive claim is one for retaliation, and that he has been the subject of retaliation in the past. (Dkt. No. 14 at 6).

If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims. This is a result that the court does not believe was contemplated by the PLRA or by the Second Circuit in analyzing possible exceptions to the exhaustion requirement. Additionally, a general exception to the exhaustion requirement would eliminate the need for, or the use of, the special provisions in the New York State regulations for claims of employee harassment. Thus, plaintiff has not alleged either that the grievance procedures were "unavailable," nor has he sufficiently alleged that there were "special circumstances" that caused his failure to exhaust his administrative remedies.

In his response to defendants' motion to dismiss, plaintiff argues that the defendants are relying on plaintiff's "confusion" over the proper grievance procedure. (Dkt. No. 14 at 6). It is unclear to what "confusion" plaintiff is now referring. He clearly knew what the grievance procedures were, since his substantive claim in this action is that defendants retaliated against him for using those grievance procedures. Thus, he could not have been "confused" about how to bring a grievance. He does not specify in his memorandum of law what that confusion was.

Finally, plaintiff argues that there are special circumstances justifying his failure to exhaust because plaintiff was transferred to another facility. (Dkt. No. 14 at 7). The court notes that the last allegedly retaliatory action by defendants occurred on July 19, 2006 when defendant Womak issued plaintiff a misbehavior report, charging him with violating a rule prohibiting stealing or misusing state property. (Dkt. No. 1 at ¶ 6). Plaintiff was not transferred to Sullivan Correctional Facility until July 31, 2006, eleven days later. Although the grievance may not have been decided before plaintiff was transferred, plaintiff had plenty of time to *file* a grievance under section 701.8, providing for an expedited procedure in cases of harassment.

The court also notes that the regulations provide for the processing of grievances and appeals after transfer. 7 N.Y.C.R.R. § 701.6(h). This section specifically provides that the response to a grievance filed by an inmate who has been transferred will be mailed to the inmates new facility, and an inmate transferred to another facility "may continue an appeal of any grievance." *Id.* §§ 701.6(h)(1) & (h)(2). Thus, the fact that plaintiff was transferred to another facility eleven days after the last incident does not excuse his failure to pursue the grievance procedures.

**\*7 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 12) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 2789473

### Footnotes

1 "Keeplock" is a form of confinement where the inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

2 Plaintiff states that defendant Womak is also a Law Library officer. Complaint at p. 5.

3 The court in *Pendergrass* was referring to summary judgment under FED. R. CIV. P. 56. The motion in this case is one to dismiss under Rule 12(b)(6), and the court may, therefore, only rely upon the statements made in the complaint.

4 The court does note that the Second Circuit has decided that to the extent that its decision in *Braham v. Casey,* 425 F.3d 177, 183 (2d Cir.2005) supported a plaintiff's argument that would have allowed for less than "proper exhaustion," it was overruled by *Woodford. See Loera Macias v. Zenk,* 2007 U.S.App. LEXIS 17795, * 16-17 (2d Cir. July 26, 2007). The issue upon which *Braham* was overruled involved whether "informal complaints" would be sufficient to exhaust a claim. In *Loera Macias,* the Second Circuit implied that the "exceptions" to exhaustion, including availability, estoppel, and special circumstances continued to exist. *Id.* at *19-22.

5 The court notes that the sections governing inmate grievances were re-numbered in 2006. This court will refer to the current numbering which is different than the numbers that appear in *Hemphill.*

6 Plaintiff could also argue that the defendant's past allegedly retaliatory conduct estops them from raising the failure to exhaust as a defense.



Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.[FN1] The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon

which relief can be granted. Rule 12(c) provides:

> After the pleadings are closed but within such
> time as not to delay the trial, any party may move
> for judgment on the pleadings. If, on a motion for
> judgment on the pleadings, matters outside the
> pleadings are presented to and not excluded by
> the court, the motion shall be treated as one for
> summary judgment and disposed of as provided
> in Rule 56, and all parties shall be given reason-
> able opportunity to present all material made per-
> tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra,* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 8919463
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina, Florence Division.

George Cleveland, III, Plaintiff,

v.

Warden Willie Eagleton, individually and
in his official capacity; Associate Warden
Roland McFadden, individually and in his
official capacity; IGC Argie Graves, individually
and in her official capacity; Officer M.
Thomas; Unknown Nurse Manager; and
Unknown Medical Doctor, Defendants.

C/A No. 4:14-2444-RBH-TER
|
Signed 11/12/2015

**Attorneys and Law Firms**

George Cleveland, III, Turbeville, SC, pro se.

Samuel F. Arthur, III, Aiken Bridges Nunn Elliott and Tyler,
Florence, SC, for Defendants.

Report and Recommendation

Thomas E. Rogers, III, United States Magistrate Judge

### PROCEDURAL BACKGROUND

**\*1** Plaintiff, a prisoner proceeding *pro se,* filed this action
under 42 U.S.C. § 1983 [1] on June 19, 2014, alleging a
violation of his constitutional rights. Plaintiff is currently
housed at the Turbeville Correctional Institution. At all
times relevant to the allegations contained in the complaint,
Plaintiff was housed at Evans Correctional Institution (ECI).
On April 10, 2015, Defendants filed a motion for summary
judgment. As the Plaintiff is proceeding *pro se,* the court
issued an order on or about April 13, 2015, pursuant to
*Roseboro v. Garrison,* 528 F.2d 309 (4 th Cir.1975), advising
Plaintiff of the motion for summary judgment procedure
and the possible consequences if he failed to respond
adequately. After several extensions, Plaintiff filed a response
in opposition to the motion on August 10, 2015. Defendants
filed a reply.

On August 20, 2015, Plaintiff filed a motion for a temporary
restraining order. (Doc. # 117). Defendants filed a response
in opposition on September 8, 2015. (Doc. # 123). On
August 27, 2015, Plaintiff filed a motion for protective order.
Defendants filed a response in opposition on September 11,
2015.

**Plaintiff's motion for TRO**

On August 20, 2015, Plaintiff filed a second motion for
a temporary restraining order (TRO). (Doc. # 117). In the
motion, Plaintiff requests that the court prevent "S.C.D.C.
and MacDougall Correctional Institution from holding a
disciplinary hearing on August 19, 2015, and/or thereafter for
abuse of privileges; S.C.D.C. offense 847 pursuant to SCDC
policy OP–22.14 (Inmate Disciplinary system) because they
have failed to tell me what privilege I abused ..." *Id.*
Plaintiff argues that the SCDC is trying to discipline him "in
Retaliation for requesting 400 sheets of legal white paper"
thereby depriving him of access to courts since they are
depriving him of a proper amount of legal white paper to file
motions. *Id.* Plaintiff seeks a TRO to prevent the prison from
sanctioning him to lock-up time, or any other "sanction under
S.C.D.C. policy" and to enjoin MCI from an administrative
transfer. *Id.* On August 27, 2015, Plaintiff filed a motion
for a protective order with the same similar arguments as
set forth in his motion for TRO. Plaintiff seeks injunctive
relief to order the institution to provide him with "the
proper amount of legal material necessary to communicate
with the court after I provide prison Administration without
Reprisals, harassment, punishment, or penalties because of
my decision to seek Judicial Review ..." (Doc. # 119).
Plaintiff seeks a protective order to prevent the "S.C.D.C.
staff at any institution in their prison system to inquire
to the contents of my Locker unless its Related to the
introduction of contraband, and/or institutional security."*Id.*
On August 28, 2015, Plaintiff filed a notice of change of
address informing the court that he is currently housed at the
Turbeville Correctional Institution.

**\*2** The standard articulated in *Winter v. Natural Res. Def.
Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249
(2008),* governs the issuance of preliminary injunctions. *See
Real Truth About Obama, Inc. v. Fed. Election Comm'n,
607 F.3d 355 (4th Cir.2010)* (per curiam) ("On further
consideration, we now reissue Parts I and II of our earlier
opinion in this case, 575 F.3d at 345–347, stating the facts
and articulating the standard for the issuance of preliminary
injunctions."). Under the *Winter* standard, Plaintiff must

demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 346 (quoting *Winter,* 555 U.S. at 20). All four requirements must be satisfied. *Id.* Furthermore, to obtain injunctive relief, Plaintiff must demonstrate more than the "possibility" of irreparable harm because the "possibility of irreparable harm" standard is inconsistent with the Supreme Court's characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that a plaintiff is entitled to such relief. *Id.*

Here, Plaintiff requests that this court issue a restraining order to enjoin SCDC and MCI from holding a disciplinary hearing and from issuing an administrative transfer on August 19, 2015, but the motion was filed on August 20, 2015. On August 28, 2015, Plaintiff informed the court that he had been transferred to Turbeville Correctional Institution. Therefore, the motion should be denied as moot. Further, in the motion for a protective order, Plaintiff requests that the court issue an order preventing the SCDC from inquiring into "the contents of my Locker unless its Related to the introduction of contraband, and/or institutional security." (Doc. # 119). The courts are directed to leave prison administration to the discretion of those best suited to running the prisons. Granting Plaintiff injunctive relief would have the effect of allowing a prisoner to "approve" actions taken by the prison administration that might have an impact on them, because any attempt to require his compliance might be construed (by any of the parties) as a violation of the order. Importantly, the plaintiff has not shown that he is currently subject to a real and *immediate* threat of harm. *See Los Angeles v. Lyons,* 461 U.S. 95 (1983). Thus, it is recommended that the motion for protective order be denied.

In the alternative, Plaintiff has failed to satisfy the four requirements as set out in *Winter, supra.* Additionally, decisions relating to the day-to-day operation of prisons are entrusted to the officials of the particular institution or correctional system. *See Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed. 813 (1983). Accordingly, it is recommended that Plaintiff's motion for a temporary restraining order (Doc. # 117) and motion for protective order (Doc. # 119) be denied. [2]

### DISCUSSION

### STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto,* 405 U.S. 319 (1972); *Haines v. Kerner,* 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, *Weller v. Dep't of Social Servs.,* 901 F.2d 387 (4th Cir.1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed.R.Civ.P. 56(c).

**\*3** The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. *Celotex,* 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). The nonmoving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston,* 929 F.2d 1009, 1011 (4th Cir.1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.,* 977 F.2d 874–75 (4th Cir.1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. *See Celotex,* 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." *Id.* at 322; *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc.,* 33 F.3d 390 (4th Cir.1994); *Orsi v. Kickwood,* 999 F.2d 86 (4th Cir.1993); Local Rules 7.04, 7.05, D.S.C.

### *ARGUMENT OF PARTIES/ ANALYSIS*

The Plaintiff alleges a constitutional violation due to the conditions of confinement at the ECI. Plaintiff's allegations primarily revolve around allegations that he was denied access to an extra restroom outside his cell in addition to the toilet in his cell and, in a related claim, that he is being forced to shower in stalls contaminated with human waste. Plaintiff alleges that on one occasion he urinated on himself when Defendant Thomas arrived at his cell door while conducting his security check because he had refused to return to open the door earlier. Plaintiff alleges that Defendant Eagleton's decision to lock an unoccupied cell that was previously used by inmates as an extra restroom violated his constitutional rights. He also alleges that prison officials have been deliberately indifferent to his medical needs. [3]

To state a claim that conditions of confinement violate constitutional requirements, "a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials'." *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir.1993) ( quoting *Williams v. Griffin,* 952 F.2d 820, 824 (4th Cir.1991)). Further, a plaintiff must demonstrate that he suffered a serious or significant physical or mental injury as a result of the challenged condition. *See Strickler,* 989 F.2d at 1380–81. "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir.2003); *see also White v. Gregory,* 1 F.3d 267, 269 (4th Cir.1993) ("[A] prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") (citation omitted).

Also, decisions relating to the day-to-day operation of prisons are entrusted to the officials of the particular institution or correctional system. *See Ohm v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed. 813 (1983). "[T]he Constitution does not mandate comfortable prisons, and prisons ... which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). "To the extent such conditions are restrictive and even harsh, they are part of the penalty that criminals pay for their offenses against society." *Id.* at 338.

**\*4** Plaintiff has not presented evidence to create a genuine issue of material fact as to whether he was denied the minimal civilized measure of life's necessities, or that the named Defendants engaged in any conduct "for the very purpose of causing harm or with the knowledge that harm would result." *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Plaintiff has not shown that he was deprived a "basic need" and that these deprivations were attended by deliberate indifference on the part of the Defendants. *Strickler, supra.* Plaintiff had a bathroom in his cell so he was not without a bathroom. Plaintiff has failed to present evidence of the type of serious injury required to state a cognizable claim of cruel and unusual punishment. *Strickler,* 989 F.2d at 1381 ("plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions"). Therefore, it is recommended that summary judgment be granted for Defendants on this claim.

### *Medical Indifference*

Plaintiff alleges that he was taking prescription medications prior to prison for high cholesterol which was made known to the medical staff upon his arrival at ECI in mid November 2013. Plaintiff asserts that in April 2014, he was called to medical at ECI for the purpose of signing a medical release form to obtain his medical records from his doctor. Plaintiff alleges that he sent two requests to medical for the purpose of placing him back on his medication. He contends that one request was sent to medical in March 2013 and a second in April 2014, but he never received a response from the medical staff. In mid April 2014, Plaintiff alleges he wrote Warden Eagleton about the medical staff not responding to either request and explained the urgency of the situation for him to see the medical doctor, but he did not receive a response. Plaintiff alleges that the "unknown" Doctor and Nurse put him at a risk of harm by their lack of urgency and put him at "a risk of developing a fatty liver, and heart problems among many more chronic illnesses which I have a family history

of, and the medical staff knows about my family history. Eagleton, Nurse Manager, and the Medical Doctor has failed to act in a reasonable amount of time." (Complaint at 14).

Defendants submitted the affidavit of Amy L. Smith who attests that she is employed with the SCDC as the Health Care Authority at ECI and is familiar with Plaintiff's complaint. (Smith Affidavit). Smith reviewed Plaintiff's medical records while he was incarcerated at ECI based on the time frame referenced in the complaint and attached an eight-page copy of Plaintiff's medical records maintained by the SCDC beginning January 7, 2014, to November 24, 2014, during his incarceration at ECI as Exhibit A. *Id.* Smith also attached as Exhibit B, a true and accurate copy of an SCDC medical record relating to Plaintiff's medical conditions and medications at the time of his transfer from Kirkland to ECI on January 7, 2014. *Id.* The medical records reflect that upon his transfer to ECI on January 7, 2014, Plaintiff had a history of cerebral palsy, anxiety, low testosterone, and hyperlipidemia. *Id.* Upon arriving at ECI from Kirkland, Plaintiff was not taking any prescription medications as of January 7, 2014. *Id.* Encounter 9 reveals that on January 14, 2014, Plaintiff had blood drawn for a lipid panel and testing of testosterone levels. *Id.* Encounter 11 reveals that Plaintiff's lab work results were abnormal and were reviewed by SCDC physician Michael L. Hughes. *Id.* Medical encounter 14 reveals that Plaintiff reported to ECI medical department on January 27, 2014, for discussion of his abnormal lab results and was advised that he would be placed on a heart healthy diet. *Id.* On September 18, 2014, Encounter 28 reveals that Plaintiff reported to the ECI medical department on September 18, 2014, for sick call and requested that his cholesterol be checked. *Id.* Plaintiff had been removed from the previously placed heart healthy diet due to noncompliance. *Id.* On September 25, 2014, Plaintiff had blood drawn again for testing of his cholesterol and triglyceride levels. *Id.* Encounter 31 indicates that Plaintiff's lab results revealed an improved cholesterol level of 214 as compared to the 240 result from the January 24, 2014, blood testing. *Id.* In addition to the specific encounters, Exhibit A indicates that Plaintiff had been seen by ECI medical personnel and ECI mental health staff on other occasions between the dates of January 7, 2014, and November 24, 2014, for various reasons. *Id.* Smith attests that having reviewed Plaintiff's medical records, it is her opinion that he received more than simply adequate medical treatment and care for any isolated and ongoing medical conditions and that all actions taken by an SCDC employee or official were appropriate and in the best interest of Plaintiff. *Id.*

**\*5** "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir.2008) (internal quotation marks omitted).

To show a defendant's deliberate indifference to a serious medical need, a prisoner must allege the defendant knew of and disregarded "the risk posed by" that need. *Id.* "[A]n inadvertent failure to provide adequate medical care" does not satisfy the standard, and thus mere negligence in diagnosis or treatment is insufficient to state a constitutional claim. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285. Such indifference can be displayed, however, through the response of prison doctors and other institutional personnel to an inmate's medical needs, including ignoring an inmate's serious condition or delaying medically necessary treatment. *Id.* "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir.2010) (vacating and remanding summary dismissal of complaint alleging three-month delay in dental treatment); *see Smith v. Smith,* 589 F.3d 736, 738–39 (4th Cir.2009) (finding claim of delay in administering prescribed medical treatment stated an Eighth Amendment claim).

Upon review of the record, including Plaintiff's medical records, the court does not find that Plaintiff has presented evidence sufficient to create a genuine issue of material fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Plaintiff has alleged that he did not receive requested medication for his high cholesterol. However, he was not on medication when he was transferred into ECI, a blood panel screen was performed and upon finding that he had high cholesterol, he was placed on a heart healthy diet. He was removed from the diet for noncompliance. His blood was tested again in September 2014 and his levels had improved. Even if Plaintiff's allegations are true, he has shown nothing more than a disagreement with the medical treatment provided, not that he was completely denied medical treatment. Plaintiff has failed to show that he had a serious medical need of which Defendants knew about and consciously ignored and has provided no evidence of any injury or harm caused by any

alleged delay in treatment. Plaintiff has not offered evidence that would support a finding that Defendants knew about and intentionally or with reckless disregard ignored a risk posed by Plaintiff's condition. Therefore, any claims of medical indifference should be dismissed.

Moreover, as to any allegations of medical indifference as to Defendants who are nonmedical personnel, the claims fail. The Fourth Circuit has held that to bring a claim alleging the denial of medical treatment against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct. *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990). Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. *Id.* Under these principles, the Plaintiff has not alleged sufficient facts stating any claim actionable under § 1983 regarding his medical treatment against non-medical personnel.

**\*6** Based on the evidence presented, there has been no deliberate indifference shown to the overall medical needs of the Plaintiff.[4] For the above stated reasons, summary judgment should be granted in favor of Defendants on this issue.

### Qualified Immunity

Defendants deny that any of the alleged conduct or conditions complained of by Plaintiff gives rise to a constitutional violation. However, Defendants assert that, even if this Court concludes that the facts are sufficient to establish a Constitutional claim, they are entitled to qualified immunity.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

*Akers v. Caperton,* 998 F.2d 220, 225–26 (4th Cir.1993).

The Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), established the standard which the court is to

follow in determining whether Defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does

> not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow,* 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established', the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

*Wiley v. Doory,* 14 F.3d 993 (4th Cir.1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed above, the Plaintiff fails to show that Defendants violated any of his clearly established constitutional or statutory rights. However, even if there was a violation, Defendants are entitled to qualified immunity. Thus, the undersigned recommends that summary judgment be granted as to these Defendants.

### Eleventh Amendment Immunity

The Defendants contend that the Plaintiff's § 1983 claims against them for money damages in their official capacity are barred pursuant to Eleventh Amendment Immunity. Defendants also argue that the action against them should be dismissed as a matter of law to the extent that they are sued in their official capacity because while acting in their official capacity as an employee of the SCDC they are not a "person" under 42 U.S.C. § 1983 and, therefore, not subject to suit.

**\*7** When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution. Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.

In the case of *Will v. Michigan Department of State Police, 491 U.S. 58 (1989)*, the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity (cites omitted) or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. *Will, supra* at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

There is no dispute that Defendants were/are employees of the SCDC at the time of the allegations in the complaint. Thus, they are entitled to Eleventh Amendment immunity from monetary damages in their official capacity.

### *Pendent Jurisdiction*

Assuming Plaintiff's § 1983 claim is dismissed by this Court and Plaintiffs' complaint somehow can be conceived to state an additional claim for relief under any state common law theory, the undersigned concludes that such claim(s), if any, ought to be dismissed as well for want of jurisdiction. Specifically, this Court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

### *CONCLUSION*

The Plaintiff has failed to show that Defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983. It is therefore, for the reasons stated herein,

RECOMMENDED that the Plaintiff's motion for a temporary restraining order (Doc. # 117) and motion for protective order (Doc. # 119) be DENIED. It is FURTHER RECOMMENDED that the motion filed by Defendants (document # 86) for summary judgment be GRANTED IN ITS ENTIRETY and the case dismissed.

IT IS FURTHER RECOMMENDED that all outstanding motions be deemed MOOT.

### All Citations

Slip Copy, 2015 WL 8919463

Footnotes

1   All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

2   Plaintiff fails to make the requisite showing. Injunctive relief, such as the issuance of a preliminary injunction, is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)*.

3    In his complaint, Plaintiff raised claims about not having what he believes to be adequate educational or vocational opportunities. Further, Plaintiff raised complaints regarding the handling of his grievances based on the SCDC grievance system. These claims were dismissed by Order filed November 4, 2014.

4    If Plaintiff is attempting to hold any of the Defendants liable for the actions of their employees, the claim fails. Under the doctrine of *respondeat superior,* an employer or supervisor is not liable for the acts of their employees, absent an official policy or custom which results in illegal action. *See Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978) and *Fisher v.* Washington Metro Area Transit Authority, 690 F.2d 1133, 1142–43 (4th Cir.1982).

---

**End of Document**                                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.      7

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Orrel EVANS, Plaintiff,
v.
ALBANY COUNTY CORRECTIONAL FACIL-
ITY; Mary Kay Weis, Kitchen Supervisor; James
Campbell, Sheriff; T. Rockwell, ISU; Gloria
Cooper, Medical Supervisor; and Thomas Wigger,
Jail Administrator, Defendants.

No. 9:05–CV–1400.
May 14, 2009.

Orrel Evans, Coxsackie, NY, pro se.

Thuillez, Ford, Gold, Butler & Young LLP, Kelly
M. Monroe, Esq., of Counsel, Albany, NY, for De-
fendant Gloria Cooper.

Roche, Corrigan McCoy & Bush, Robert P. Roche,
Esq., of Counsel, Albany, NY, for Remaining De-
fendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se*
prisoner civil rights action are (1) Defendant
Cooper's motion for summary judgment (Dkt. No.
53), (2) the remaining Defendants' motion to dis-
miss for failure to state a claim and/or for summary
judgment (Dkt. No. 54), (3) United States Magis-
trate Judge David E. Peebles's Re-
port–Recommendation recommending that Defend-
ant Cooper's motion be granted, and that the re-
maining Defendants' motion be granted in part and
denied in part (Dkt. No. 66), and (4) Defendants'
timely Objections to the Report–Recommendation
(Dkt. No. 67). For the reasons set forth below, the
Report–Recommendation is adopted in part, De-
fendants' motions for summary judgment are gran-
ted in their entirety, and Plaintiff's Second

Amended Complaint is dismissed in its entirety.

**I. BACKGROUND**

**A. Relevant Procedural History**

On November 9, 2005, Plaintiff filed this ac-
tion against Albany County Correctional Facility
("ACCF") and five individuals employed by Al-
bany County. On July 13, 2007, Plaintiff amended
his Complaint for the second time. (Dkt. No. 27.)
Generally, in his Second Amended Complaint,
Plaintiff claims that Defendants violated his rights
under the First, Eighth and Fourteenth Amendments
by failing to provide him on a regular basis with a
vegetarian diet which, he maintains, was necessit-
ated by both an allergy to certain foods and his
genuinely held religious beliefs. (*Id.*) More spe-
cifically, Plaintiff alleges that this failure (1) in-
fringed upon his right to freely exercise his chosen
religion, as guaranteed by the First Amendment to
the United States Constitution, (2) exposed him to
cruel and unusual punishment and/or deliberate in-
difference to a serious medical need, in violation of
the Eighth Amendment, and (3) denied him equal
protection under the law, as guaranteed under the
Fourteenth Amendment. (*Id.*)

On October 2, 2007, Defendants filed their An-
swer to Plaintiff's Second Amended Complaint.
(Dkt. No. 31.) On May 15, 2008, Defendant Gloria
Cooper filed a motion for summary judgment pur-
suant to Fed.R.Civ.P. 56. (Dkt. No. 53.) The
next day, the remaining Defendants filed a motion to
dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6) and, in the alternative, a mo-
tion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 54.)

On January 30, 2009, Magistrate Judge Peebles
issued a Report–Recommendation recommending
that Defendants' motions be granted in part and
denied in part. (Dkt. No. 66.) Specifically, Magis-
trate Judge Peebles recommended that (1) all claims

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**

against Defendant Cooper be dismissed, (2) all claims against Defendant ACCF be dismissed, (3) Plaintiff's Fourteenth Amendment claim be dismissed, and (4) a trial be held on Plaintiff's remaining First and Eighth Amendment claims because of the existence of genuine issues of material fact. Familiarity with the grounds of the Report–Recommendation is assumed in this Decision and Order.

On February 12, 2009, Defendants (other than Defendant Cooper) filed their Objections to the Report–Recommendation. (Dkt. No. 67.)

**B. Undisputed Material Facts**
**\*2** Plaintiff was incarcerated at the ACCF on June 30, 2005. Upon intake, the staff at ACCF performed a medical screening of Plaintiff. During his screening, Plaintiff filled out a medical history and screening form.FN1 On the form (which he signed), Plaintiff indicated that he had no allergies, medical or otherwise, and further indicated that he did not require any special diet. On July 3, 2005, Plaintiff submitted a Health Services Request Form to the medical department.FN2 This form did not reference any special/vegetarian diet.

FN1. (Dkt. No. 54, Part 8, at 5.)

FN2. (*Id.* at 12–13.)

On July 5, 2005, Plaintiff sent a letter to the Inmate Services Unit ("ISU"), in which he indicated—for the first time—that he was a vegetarian.FN3 Generally, there are at least four separate types of vegetarian diets offered at ACCF.FN4 In addition, there are at least three separate "vegetarian style" diets, which either include the use of fish, cheese or eggs.FN5

FN3. (Dkt. No. 54, Part 7, at 26.)

FN4. (Dkt. No 54, Part 2, at 3–4.)

FN5. (*Id.*)

On July 7, 2005, Plaintiff submitted a second Health Services Request Form, which again made no reference to any special/vegetarian diet.FN6 However, on July 8, 2005, Plaintiff submitted a third Health Services Request Form that did indicate that he was a vegetarian, in addition to being allergic to meat and eggs.FN7 On that same day, the medical department wrote an order for Plaintiff to receive a vegetarian diet.FN8

FN6. (Dkt. No. 54, Part 8, at 14.)

FN7. (*Id.* at 15.)

FN8. (*Id.* [noting that a slip was sent].)

On July 20, 2005, Plaintiff submitted a letter to Defendant Rockwell at ISU, in which he complained that it took "years" for him to get his food.FN9 On July 29, 2005, Plaintiff submitted a letter to ISU, indicating that he was not receiving the proper meals, even though the medical department had indicated that he was a vegetarian.FN10 On that same day, ISU provided the letter to the kitchen supervisor and to the medical department. ISU also sent a letter to Plaintiff, informing him that his letter had been sent to the "kitchen and medical supervisor," and that his card on his "tier is marked for a rasafarian [sic] vegitarian [sic] diet."FN11

FN9. (Dkt. No. 54, Part 7, at 28.)

FN10. (*Id.* at 30.)

FN11. (*Id.* at 31.) The Court notes that Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, the particular dietary requirements of his Rastafarian religion.

On July 30, 2005, the medical department prepared a Special Diet Request Form for Plaintiff, which indicated that Plaintiff should receive a vegetarian diet, and should not receive any animal products.FN12 However, according to Plaintiff, on August 5, 2005, he "again did not receive a meal because [,] according to an unknown correctional

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**

officer, there was nothing in the kitchen stating Plaintiff was to receive vegetarian meals." [FN13] Plaintiff unsuccessfully "tried explaining his situation regarding him not receiving his and having his name removed from the vegetarian diet list to an unknown supervising officer making rounds." [FN14]

FN12. (Dkt. No. 54, Part 8, at 10.)

FN13. (Dkt. No. 27, ¶ 24 [Plf.'s Second Am. Compl.].)

FN14. (*Id.* at ¶ 25.)

As a result, Plaintiff submitted a Health Services Request Form to the medical department on August 20, 2005. [FN15] In this Health Services Request Form, Plaintiff indicated that the "wrong meal" was being sent to him. The form was reviewed by the medical department on August 22, 2005. Defendant Cooper noted on the form that, according to the department's records, Plaintiff had already been placed on a vegetarian diet since August 5, 2005. [FN16] However, according to Plaintiff, even after submitting a grievance on August 20, 2005, regarding the receipt of the wrong meals, he "continued to have problems receiving, and quality of his meals." [FN17]

FN15. (Dkt. No. 54, Part 8, at 16.)

FN16. (*Id.*)

FN17. (Dkt. No. 27, ¶ 27 [Plf.'s Second Am. Compl.].) The Court notes that, in Plaintiff's last letter to Defendant Rockwell dated September 19, 2005, Plaintiff explained that he had to wait "over 30 minutes or more" for a "court sandwich that was so old bread hard and falling apart." (Dkt. No. 54, Part 7, at 33.) In the same letter, Plaintiff explained that on another occasion, he "had to wait over 40 minutes [to receive his meal] then they sent over a dirty tray. I don't no [sic] who the hell they think they are dealing with

that way." (*Id.*)

**\*3** In early September 2005, Plaintiff submitted a Health Services Request Form complaining of skin irritation on his face and arm. [FN18] The form did not mention any allergy, or problems with his vegetarian/special diet. After receiving the form, the medical department saw Plaintiff and gave him ointment for an acne breakout.

FN18. (Dkt. No. 54, Part 8, at 17.)

On October 13, 2005, Plaintiff submitted another Health Services Request Form regarding a problem with urinating. [FN19] The form made no mention of any allergy, or problems with his vegetarian/special diet. On October 14, 2005, Plaintiff was seen for this complaint.

FN19. (*Id.* at 18.)

According to Plaintiff, "[o]n October 20, 2005, [he] received a 'supposed' vegetarian meal" that was actually "badly burnt eggs and pears." [FN20]

FN20. (Dkt. No. 27, ¶ 28 [Plf.'s Second Am. Compl.].)

In addition, attached as an exhibit to his unsworn opposition memorandum of law, Plaintiff has provided the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late. [FN21] The Court notes that, apart from not being attached to an affidavit, the calendar fails to specify which days Plaintiff missed a meal, and which days he simply received his meal late. In addition, the calendar fails to specify whether he missed the meal because (1) he was not given a meal at all, or (2) he was not given the (presumably vegetarian) meal he requested. Finally, the calendar indicates that Plaintiff did not receive a timely meal at ACCF on June 29, 2005 (though incarcerated there at the time), which appears inaccurate because he was not incarcerated at ACCF until June 30, 2005.

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**

FN21. (Dkt. No. 57, Part 2, at 7, 30.)

In any event, in their memorandum of law in support of their motion for summary judgment, Defendants concede that Plaintiff did not receive a vegetarian meal on a few occasions.FN22 Furthermore, in their reply papers, Defendants attempt to quantify the extent of this deprivation by indicating that Plaintiff did not receive the proper meal "a half dozen or so times."FN23

FN22. (Dkt. No. 54, Part 4, at 3.)

FN23. (Dkt. No. 59, at 2.) The Court notes that, in their Objections, Defendants offer (for the first time) evidence in support of this estimate, although the Court declines to consider this late-blossoming record evidence, pursuant to the legal standard described below in note 26 of this Decision and Order. (*See, e.g.,* Dkt. No. 67, Part 1, ¶ 8 [Roche Affid.]; Dkt. No. 67, Part 5, ¶¶ 8–9 [Clark Affid.]; Dkt. No. 67, Part 8 [Ex. C to Clark Affid.]; Dkt. No. 67, Part 9, ¶ 7, 10, 11, 12 [Weis Affid.].)

As a result of the foregoing treatment, Plaintiff alleges that he lost thirty (30) pounds between June 28, 2005, and October 2005.FN24 Plaintiff also alleges that he suffered from migraine headaches, and dizziness because of his hunger.FN25

FN24. (Dkt. No. 27, ¶ 33 [Plf.'s Second Am. Compl.].) Plaintiff alleges that the departmental medical staff at Downstate Correctional Facility (where Plaintiff was transferred on October 25, 2005) has a record of his weight, which supports his weight loss claim. (*Id.*)

FN25. (*Id.* at ¶ 14.)

## II. APPLICABLE LEGAL STANDARDS

## A. Standard of Review on Objection from Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).FN26 When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).FN27 Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN26. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g .,* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present ad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ditional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN27. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*4** After the pleadings are closed, a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) [citations omitted]; *see also* Fed.R.Civ.P. 12(b), 12(c). However, the motion for judgment on the pleadings is then decided according to the same standard as is a motion to dismiss for failure to state a claim. *Id.*

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211 nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

[emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212 n. 17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on the merits." *Id.* at 212 n. 18 [citations omitted].FN28

FN28. *See also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ( "[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.* at 212 n. 20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212 n. 21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213 n. 22 [citations omitted].

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**

99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965 [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted].[FN29]

> **FN29.** *See also Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) ("[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*").

**\*5** As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN30] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551

U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965 n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level.[FN31]

> **FN30.** *See, e.g., Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

> **FN31.** For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199–2200. Expressed differently, the

Court held that such a plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

Finally, in reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations and/or where the complaint is submitted *pro se.* However, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN32] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN33] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedur-

al rules that even *pro se* civil rights plaintiffs must follow.[FN34] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214 n. 28 [citations omitted].

FN32. *Sealed Plaintif v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

FN33. See *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter, 469 F.2d 691*) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN34. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted], *accord,*

*Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

## C. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

**\*6** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more

than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se.*[FN35] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.[FN36] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[FN37] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[FN38]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[FN39]

FN35. *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at \*12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at \*1–4, 2006 WL 395269

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

FN36. *Krug v. County of Rennselaer,* 04–CV–0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept.18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant is not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted].

FN37. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532

(1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ( "*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ( "[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

FN38. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered para-

graphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN39. *See, e.g., Hassig v. N.Y.S. Dep't of Envtl. Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb.2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec.23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2–3, 2006 WL 395269; *Singleton v. Caron,* 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept.5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96–CV–1634, 1998 WL 743710, at *1 n. 2 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96–CV1812, 1998 WL 566773, at *1 n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a] [3] "to carry out the conduct of

its business").

## III. ANALYSIS

### A. Plaintiff's First Amendment Claim

Plaintiff claims that Defendants violated his rights under the Free Exercise Clause of the First Amendment by denying him food consistent with his Rastafarian faith. The First Amendment guarantees the right to free exercise of religion. U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citation omitted). This protection extends "into ... aspects of prison life including, pertinently, that of an inmate's diet ...." *Ward v. Goord,* 06–CV–1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan.13, 2009) (Hurd, J.) (citation omitted). "The Second Circuit has held that it is clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ward,* 2009 WL 102928, at *9 (citation omitted). Therefore, "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Johnson v. Guiffere,* 04–CV–0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (Hurd, J.) (internal quotation marks and citation omitted). "A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand." *Guiffere,* 2007 WL 3046703, at *4 (citation omitted).

**\*7** "Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework." *Id.* at 5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

fringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Importantly, in evaluating this factor the court must be wary of questioning the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds, and instead may only consider whether the particular plaintiff holds a belief which is religious in nature." *Id.* (internal quotation marks and citations omitted). Stated another way, "[t]he freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984). Rather, a subjective test must be employed to determine whether the disputed conduct infringes on the plaintiff's sincerely held religious beliefs. *See Ford v. McGinnis,* 352 F.3d 582, 589–90 (2d Cir.2003).

"Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Guiffere,* 2007 WL 3046703, at *5 (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 101 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citation omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others guards and inmates in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that[,] when applying this test, a court should examine 'the existence of alternative means of facilitating exercise of the right that have only a

*de minimis* adverse effect on valid penological interests.' " *Id.* (citations omitted).

With all of this in mind, it is important to note that "[t]here may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored." *Tafari v. Annets,* 06–CV–11360, 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (quoting *McEachm v. McGuinnis,* 357 F.3d 197, 203 n. 6 [2d Cir.2004] ). "In this respect, this area of the law is no different from many others in which the time-honored maxim *de minimis non curat lex* applies." *McEachm,* 357 F.3d at 203 n. 6.

**\*8** Here, as an initial matter, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the disputed conduct infringed on his sincerely held religious beliefs. In particular, Plaintiff has not alleged or established how the meals that he received were actually "wrong." For example, Plaintiff has not alleged or established that the meals were "wrong" because they were not in conformity with his Rastafarian faith, or because they contained a product to which he is allergic. Nor has Plaintiff alleged or established how receiving non-vegetarian meals infringed on his sincerely held religious beliefs. *See Benjamin v. Coughlin,* 905 F.2d 571, 580 (2d Cir.1990) (dismissing Rastafarians' "dietary claim" asserting they had constitutional right to observe "Ital," because plaintiffs "failed to clearly define the claim or to make the evidentiary showing required to establish any constitutional dietary claim").

In any event, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the "wrong meals" he (allegedly) received constituted a burden that was anything more than *de minimis* in nature. As explained above in Part I.B. of this Decision and Order, Plaintiff has not established (or even alleged) the number of "wrong meals" that he (allegedly) received.[FN40] As also explained above in Part I.B., in their motion for summary judgment, Defendants

concede that Plaintiff was denied vegetarian food during "a few of his meals." Furthermore, in an effort to quantify the extent of this deprivation, Defendants estimate that Plaintiff received the "wrong meal" about "a half dozen or so times."

> FN40. As explained above in Part I.B. of this Decision and Order, the closest Plaintiff comes to doing so is when he provides the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late.

For the sake of argument, the Court will assume that the number of "wrong meals" was *three times* the number of "wrong meals" conceded by Defendants, which would be the equivalent of one "wrong meal" per week for each of the 18 weeks that Plaintiff was incarcerated at ACCF. What is significant as the number of "wrong meals" is the time period over which they occurred. Here, such "wrong meals" were not delivered to Plaintiff consecutively. Rather, Plaintiff asserts they were delivered over the course of Plaintiff's incarceration at ACCF, from June 30, 2005, until October 25, 2005—a time period of approximately 118 days. Given that Plaintiff was supposed to receive three meals per day, Plaintiff was supposed to receive approximately 354 meals while at ACCF. Assuming that Plaintiff received the "wrong meal" approximately 18 out of 354 times, the Court finds that a rational juror could not conclude that the resulting burden on Plaintiff's religious beliefs was anything more than *de minimis.*

In the analogous case of *Odom v. Dixion,* the Western District of New York held that the New York State Department of Correctional Services' failure to provide a prisoner with Kosher meals on seven out of 33 occasions (i.e., over an eleven-day time period) did not "support a § 1983 violation under either the First Amendment or RLUIPA." *Odom v. Dixion,* 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb.15, 2008) (noting that deprivation

was due to "an administrative error based on [the prisoner's] failure to timely advise [the facility's] food service personnel of his brief confinement on keeplock status"). Other courts have issued similar rulings. *See, e.g., Norwood v. Strada,* 249 F. App'x. 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-onehalf-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment for defendants because denial of pork-free meal on three occasions out of 810 meals constituted *de minim is* burden, where the denials were caused by "institutional shortage," and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals."); *Thomas v. Picio,* 04–CV–3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar.26, 2008) (assuming that inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion); *Omar v. Casterline,* 414 F.Supp.2d 582, 593 (W.D.La.2006) ("[T]he refusal to hold three meals [until sunset] because of Ramadan states only a *de minimis* imposition on ... free exercise rights.") . FN41

> FN41. *Cf. Tafari,* 2008 WL 2413995, at *16 (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation."); *Ward,* 2009 WL 102928, at *9 ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Peterson v. Price,* 06–CV–0106, 2007 WL 2893009, at *6 (N.D.W.Va. Sept.28, 2007) ("[T]he failure to provide inmates with one or two kosher meals does not rise to the level of a constitutional claim.").

**\*9** For each of these alternative reasons,

Plaintiff's First Amendment claim is dismissed.

## B. Plaintiff's Eighth Amendment Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights in two separate ways. First, he claims that, by denying him food consistent with his vegetarian diet, which was approved by the medical department at ACCF, he was denied the right to adequate prison conditions. Second, he claims that, by knowingly being allowed to lose significant weight, he was denied the right to adequate medical care. The relevant legal standard governing both claims is the same.

"The Eighth Amendment prohibits 'cruel and unusual punishments' in the course of incarceration." *Labounty v. Gomez,* 94–CV–3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998). "To bring a cause of action pursuant to Section 1983 of Title 42, United States Code, for a violation of the Eighth Amendment's prohibition, a plaintiff must establish that the deprivation of which he is complaining is 'sufficiently serious' to constitute cruel and unusual punishment and that a defendant's actions in allowing the deprivation must have amounted to deliberate indifference." *Labounty,* 1998 WL 214774, at *2 (citing *Farmer v. Brennan,* 511 U.S. 825, 114 [1994, 114 S.Ct. 1970, ——— ———, 128 L.Ed.2d 811, ——— ———] ). "Thus, there is an objective and subjective component to the test." *Id.* (citing *Rivera v. Senkowski,* 62 F.3d 80, 84 [2d Cir.1995] ).

"The denial of a medically proscribed diet may constitute an Eighth Amendment violation under certain circumstances." *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15–16 [2d Cir.1983] ) (other citations omitted). Likewise, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles,* 725 F.2d at 15–16 [citations omitted]; *see also Chapdelaine v. Keller,* 95–CV–1126, 1998 WL 357350, at *12 (N.D.N.Y. Apr.16, 1998) (Sharpe, M.J.) ("[T]he Eighth Amendment requires that prisoners receive

nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it"). However, "[m]ere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation." *Abdush–Shahid,* 933 F.Supp. at 180.

To establish a valid claim that the denial of food (or the denial of a medically proscribed diet) constitutes an Eighth Amendment violation, one must establish that there was a "sufficiently serious" condition that resulted from the food not being received. *See, e.g., Labounty,* 1998 WL 214774, at *2 . A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted). FN42

> FN42. *See also Bost v. Bockelmann,* 04–CV–0246, 2007 WL 527320, at *8 (N.D.N.Y. Feb.20, 2007) (Sharpe, J.) (concluding that, although Plaintiff allegedly lost fifteen pounds in two days, "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's food intake and weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation"); *cf. Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (Kahn, J.) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was deprived of two out of three meals per day for eight days); *Moss v. Ward,* 450 F.Supp. 591, 594, 597 (W.D.N.Y.1978) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was completely deprived of food for four consecutive days,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and was given only one meal a day for next three days).

If Plaintiff is able to establish a "sufficiently serious condition," he must also establish "that corrections personnel intentionally denied, delayed access to, or interfered with the [receipt of food]." *Abdush–Shahid,* 933 F.Supp. at 180; *see also Portuondo,* 151 F.Supp.2d at 213. Stated another way, deliberate indifference requires more than "negligent oversight." *Bockelmann,* 2007 WL 527320, at *10. In addition, a showing of deliberate indifference requires more than just "vague and conclusory allegations." *Labounty,* 1998 WL 214774, at *2. Finally, it is worth noting that a plaintiff has "a duty to inform [facility] staff that he was not receiving his medically prescribed diet," and if he "fail[s] to do so[,] ... [d]eliberate indifference does not exist." *Labounty,* 1998 WL 214774, at *2.

### 1. Whether Plaintiff's Weight Loss Constitutes a Serious Medical Need

**\*10** As an initial matter, Plaintiff's claim that he is allergic to meat and eggs is problematic because the admissible record evidence before the Court fails to establish a diagnosis by any medical professional that Plaintiff suffers from allergies to meat or eggs. *See Bockelmann,* 2007 WL 527320, at *8 (noting, as an initial problem to Plaintiff's claim that his medical condition constitutes a serious medical need, that "the record before the court fails to disclose a diagnosis by any medical professional that [Plaintiff] suffers from a medical condition requiring the high calorie diet which he so persistently sought"). The only proof that Plaintiff has offered that supports his claim that he is allergic to meat and eggs is his statement to medical staff, as well as the letters he wrote to Defendant Rockwell, indicating that he is allergic to meat and eggs. (Dkt. No. 54, Part 7, at 26, 28, 30, 32.) Apart from the conclusory and self-serving nature of this "evidence," it should be noted that (1) Plaintiff failed to inform Defendants of this alleged allergy for roughly a week, despite having multiple oppor-

tunities to do so, and (2) he affirmatively indicated during his screening on June 30, 2005, that he did not suffer from any allergies.

However, even assuming that Plaintiff is indeed allergic to meat and eggs, and was entitled to a vegetarian diet for that reason, the only harm that he has alleged as a result of being deprived vegetarian meals on an unspecified number of occasions is that he lost thirty (30) pounds over a four-month period, and that this weight loss contributed to him suffering migraine headaches and dizziness. There are three problems with this alleged harm.

First, although Plaintiff claims that Downstate Correctional Facility has a record of his weight, which supports his weight loss claim, Plaintiff has failed to adduce admissible record evidence establishing this loss of thirty pounds. Second, the record reflects that, at no point in any of the complaints that Plaintiff filed between July and October 2005, or during any of his visits with medical staff, did Plaintiff indicate that he had lost any weight or was experiencing headaches or dizziness. Finally, Plaintiff does not adduce admissible record evidence establishing (or even allege facts plausibly suggesting) that he has been unable to gain weight since leaving ACCF, or that the headaches and dizziness have persisted since October 2005.

As a result, even assuming that Plaintiff lost thirty pounds and experienced dizziness and headaches over a four-month period (from June 30, 2005 to October 25, 2005), as the District Judge Gary L. Sharpe of this Court concluded *Bost v. Bockelmann,* the undersigned concludes that "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Bockelmann,* 2007 WL 527320, at *8.

### 2. Whether Defendants Were Deliberately Indifferent to any of Plaintiff's Serious Medical Needs

**\*11** Even if the Court were to find a question

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of fact as to whether Plaintiff's weight loss constituted a sufficiently serious condition, the Court could not find any admissible record evidence establishing that Defendants were deliberately indifferent to this condition. When viewing the record in the light most favorable to Plaintiff, the Court finds that, during his incarceration at ACCF, Plaintiff (1) wrote four letters to Defendant Rockwell at ISU, (2) complained twice to unidentified corrections officers about his food, and (3) notified the medical staff that he was receiving the "wrong meals" one time in a Health Services Request Form. *See* Part I.B. of this Decision and Order.

Based on these undisputed facts, the Court finds that there is at least a question of fact as to whether there were certain days on which Plaintiff did not receive vegetarian meals. However, the Court also finds that "[t]here is no evidence in the record ... to suggest that this deprivation was deliberate and calculated to deprive the plaintiff of the nourishment constitutionally required and necessary to avoid ... weight loss, as distinct from the result of negligent oversight[,] which does not rise to a level of deliberate indifference." *Bockelmann,* 2007 WL 527320, at *10. "Simply stated, the evidence is lacking that any of the constituent groups sued in this action, including the county defendants, prison medical personnel, and the food service providers at [ACCF], were both cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed ... diet would result in a substantial risk of serious harm." *Bockelmann,* 2007 WL 527320, at *10.

In support of this finding, the Court makes four points. First, of the four letters that Plaintiff wrote to ISU, two focused almost exclusively on the quality of the food he received,[FN43] and another was the first letter that he sent to ISU, notifying them that he was a vegetarian. (Dkt. No. 54, Part 7, at 26, 28, 33.) The remaining letter, written on July 29, 2005, explained that Plaintiff was a vegetarian and implied that Plaintiff had problems receiving vegetarian meals. (Dkt. No. 54, Part 7, at 30.) However, neither this letter, nor any of the other letters, in any way stated that Plaintiff was losing weight, or suffering from other side-effects as a result of receiving the "wrong meal." (Dkt. No. 54, Part 7, at 26, 28, 30, 32, 33, 35, 38, 40, 42.)

> FN43. "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *Bockelmann,* 2007 WL 527320, at *10 (citing *LeMaire v. Maass,* 12 F.3d 1444, 1456 [9th Cir.1993] [other citation omitted] ).

Second, the Court notes that Plaintiff indicated on August 20, 2005, in a Health Services Request Form, that "everyday they send up the wrong meal." The record reflects that, after filling out this form, Plaintiff filled out Health Services Request Forms on two separate occasions (once in early September 2005 and once on October 13, 2005). On neither occasion did Plaintiff mention that he was still receiving the "wrong meal." The Court finds this fact material because, if Plaintiff was having a problem with his meals, based on the fact that he had previously notified the medical department in a Health Services Request Form of his problem, it would be reasonable to expect that he would have again voiced this problem to the medical department.

**\*12** Third, the record reflects that, in all of the visits that Plaintiff had from the medical department throughout his four-month stay at ACCF, never once did he speak of weight loss, or mention other side-effects that he was suffering as a result of receiving the "wrong meal."

Finally, the record reflects that Defendant Rockwell took action to make the kitchen staff and medical staff aware of Plaintiff's issues; the medical staff also took action to so notify the kitchen staff; and the kitchen staff did not intentionally deprive Plaintiff of his vegetarian diet.[FN44] Simply stated, whatever harm Plaintiff suffered cannot be attrib-

uted to anything more than negligence, which, again, is not actionable under the Eighth Amendment.

> FN44. In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff argues that "a screw up or simple negligence or inadvertent failure to provide food or care as requested automatically [gives rise] to a deprivation of constitutional privilege." However, the law is clear that simple negligence does not rise to the level of deliberate indifference. *See Bockelmann, 2007 WL 527320, at \*10.* Rather, deliberate indifference is a state of mind akin to criminal recklessness. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003); *Hathaway v. Coughlin* ("Hathaway II"), 99 F.3d 550, 553 (2d Cir.1996).

For all of these reasons, Plaintiff's Eighth Amendment claims are dismissed.

**C. Plaintiff's Fourteenth Amendment Claim**

Magistrate Judge Peebles recommended that the Court dismiss Plaintiff's Fourteenth Amendment claim that Defendants' refusal to adhere to the Court Order that he receive a special vegetarian diet associated with his religious practices violated Plaintiff's right to equal protection under the law. Neither party has objected to this recommendation. As a result, the Court reviews the recommendation for clear error, and finds no such error. Accordingly, for the reasons set forth in Magistrate Judge Peebles's Report–Recommendation, Plaintiff's Fourteenth Amendment claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report–Recommendation (Dkt. No. 66) is **ADOPTED in part,** as described above; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt.Nos.53, 54) is **GRANTED** in

its entirety; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 27) is **DISMISSED** in its entirety. The clerk is directed to enter judgment and close this case.

N.D.N.Y.,2009.
Evans v. Albany County Correctional Facility
Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Jonathan ODOM, Plaintiff,
v.
Thomas DIXION, Don Lopes, Jeff Sekuterski, C.
Jabcuga, C. Petties, Sgt. Markowski, and John Doe,
Defendants.
No. 04-CV-889F.

Feb. 15, 2008.
Jonathan Odom, Auburn, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York,
Kim S. Murphy, Assistant Attorney General, of Counsel,
Buffalo, NY, for Defendants.

## DECISION and ORDER

LESLIE G. FOSCHIO, United States Magistrate Judge.
### JURISDICTION
*1 On October 24, 2005, the parties to this action
consented to proceed before the undersigned. The matter
is presently before the court on Defendants' motion for
summary judgment (Doc. No. 47), filed December 14,
2006.

### BACKGROUND and FACTS[FN1]

FN1. The Facts are taken from the pleadings and
motion papers filed in this action.

Plaintiff Jonathan Odom ("Plaintiff") commenced this
civil rights action on November 8, 2004, pursuant to 42
U.S.C. §§ 1983 and 1985, alleging Defendants, employees
of the New York State Department of Corrections
("DOCS"), at Attica Correctional Facility ("Attica"),
where Plaintiff was then incarcerated, violated his
constitutional rights by denying him properly prepared
kosher meals in accordance with Plaintiff's religious
beliefs, and by harassing and retaliating against Plaintiff

when he filed grievances regarding the alleged denial of
such meals. The Complaint names as Defendants
Lieutenant Thomas Dixon [FN2] ("Lt.Dixon"), Attica Food
Services Administrator II Donald Lopes ("Lopes"),
Correction Officer ("C.O.") Christopher Jabcuga
("Jabcuga"), Sergeant S. Markowski ("Sgt.Markowski"),
C.O. Corey Petties ("Petties"), Sergeant Jeff Sekuterski
("Sgt.Sekuterski"), and John Doe ("Doe"). Plaintiff
specifically alleges as his First Cause of Action a denial of
the right to freely exercise his religion in violation of the
First Amendment and the Religious Freedom Restoration
Act ("RFRA"), 42 U .S.C. § 2000bb et seq., and a denial
of equal protection in violation of the Fourteenth
Amendment, and, as his Second Cause of Action,
retaliation for filing grievances in violation of the First
Amendment, and an Eighth Amendment excessive force
claim.

FN2. Incorrectly spelled as "Dixion" in the
Complaint's caption and allegations.

The gravamen of Plaintiff's religious freedom and
equal protection claims concerns his kosher diet, referred
to as the "cold alternative diet" or "CAD." On September
1, 2004, Plaintiff filed Inmate Grievances Nos. 47427-04
and 47428-04 ("the Grievances"), complaining about the
manner in which the CAD meals were provided to
Plaintiff. According to Plaintiff, Defendants failed to
provide Plaintiff with the proper utensils to open
hermetically sealed kosher food packs, or with hot water
for his instant oatmeal and coffee, permitted a non-Jewish
inmate to prepare Plaintiff's kosher food, in violation of
the dietary rules of the Jewish religion ("the kashrut"),
deprived Plaintiff of a proper meal with which to break his
fast during Yom Kippur on September 25, 2004, failed to
provide Plaintiff with kosher meals while in keeplock on
October 1, 6, 7, 10 and 11, 2004, and refused to permit
Plaintiff to take certain food items from the assigned mess
hall to Plaintiff's cell. Complaint, First Cause of Action.
As for the retaliation and excessive force claims, Plaintiff
alleges that Defendants retaliated against Plaintiff for
filing the Grievances regarding the alleged kosher food
plan violations, including the denial of kosher meals,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

threatening Plaintiff with bodily harm if he continued to pursue his grievances, and, on October 15, 2004, flooding Plaintiff's cell with water, and physically assaulting Plaintiff, causing Plaintiff to sustain injuries. Complaint, Second Cause of Action.

**\*2** In support of Plaintiff's allegation that he has exhausted all available administrative remedies relative to his claims as required under the Prison Litigation Reform Act of 1986 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, Plaintiff attaches to the Complaint a copy of a letter from DOCS Inmate Grievance Program Director Thomas G. Eagen, dated October 12, 2004, acknowledging receipt of Plaintiff's correspondence dated September 29, 2004, pertaining to two inmate grievances, specifically, Grievances Nos. 47427/04 and 47428/04 ("the grievances"), raising the issues alleged in this action, and advising that Plaintiff's concerns asserted in the grievances had already been addressed by the Inmate Grievance Program Supervisor on September 30, 2004.

In a Decision and Order filed May 24, 2005 (Doc. No. 13) ("May 24, 2005 Decision and Order"), District Judge Charles J. Siragusa, *sua sponte*, converted Plaintiff's RFRA claim to a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("the RLUIPA"), 42 U.S.C. § 2000cc-1, and permitted the First Cause of Action asserting Plaintiff's claims under the RLUIPA, and the First and Fourteenth Amendments, to proceed only against Defendants Dixon, Lopes and Jabcuga, dismissed such claim as against the other Defendants, thereby dismissing the First Amendment and RLUIPA religious claims and the Fourteenth Amendment equal protection claim against Defendants Sekuterski, Petties, Markowski and Doe. May 24, 2005 Decision and Order at 5-8. Judge Siragusa, also *sua sponte,* permitted Plaintiff's Second Cause of Action alleging First Amendment retaliation and Eight Amendment excessive force claims to proceed only against Defendants Dixon, Markowski and Petties, and dismissed such claims as to the remaining named Defendants, *i.e.,* Lopes and Jabcuga. *Id.* at 8-11. Finally, Judge Siragusa dismissed Plaintiff's § 1985 conspiracy claim as against all Defendants for failing to allege with any specificity that any "meeting of the minds" occurred as required for a conspiracy under § 1985. *Id.* at 12-13.

On December 14, 2006, Defendants filed the instant motion for summary judgment (Doc. No. 47) ("Defendants' motion"), along with a Memorandum of Law (Doc. No. 48) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Doc. No. 49) ("Defendants' Statement of Facts"), and the Declarations of Lt. Dixon (Doc. No. 50) ("Dixon Declaration") with attached exhibits A through P ("Dixon Declaration Exh(s). __"), Attica Registered Nurse Vance Hawley (Doc. No. 51) ("Hawley Declaration"), Jabcuga (Doc. No. 52) ("Jabcuga Declaration"), Lopes (Doc. No. 53) ("Lopes Declaration"), Markowski (Doc. No. 54) ("Markowski Declaration"), Rabbi Arthur Morgenstern ("Rabbi Morgenstern") (Doc. No. 55) ("Rabbi Morgenstern Declaration"), and Petties (Doc No. 56) ("Petties Declaration").

In light of Plaintiff's *pro se* status, on December 29, 2006, a notice to Plaintiff pursuant to Local Rule of Civil Procedures 56.2 and *Irby v. New York City Transit Authority,* 262 F.3d 412, 413 (2d Cir.2001) (Doc. No. 58) ("IRBY notice"), was mailed to Plaintiff, advising Plaintiff that Defendants had moved the court to decide Plaintiff's claims against Plaintiff, without a trial and based only on written materials submitted in support of Defendant's motion. The IRBY notice further advised Plaintiff that to avoid summary judgment being granted in Defendants' favor, it was necessary to file papers, including sworn affidavits, establishing the existence of a material issue of fact, and that any material issue of undisputed fact set forth in Defendants' Statement of Facts would be deemed admitted if not controverted by Plaintiff.

**\*3** An Order filed January 3, 2007 (Doc. No. 59), established February 16, 2007, as Plaintiff's deadline for filing a response opposing Defendants' motion, and March 2, 2007 as Defendants' deadline for filing any reply in further support of the motion. Plaintiff did not timely respond in opposition to summary judgment and, on March 1, 2007, Defendants filed the Declaration of Assistant Attorney General Kim S. Murphy ("Murphy") (Doc. No. 60) ("Murphy Declaration"), requesting summary judgment be granted in Defendants' favor and the case be dismissed. By letter filed March 8, 2007 (Doc. No. 61) ("March 8, 2007 letter"), Plaintiff advised that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

during a recent transfer between prison facilities, his legal materials and papers were destroyed such that Plaintiff was unable to further litigate the instant action, and requested the action be terminated. Accordingly, on March 9, 2007, the undersigned entered an order (Doc. No. 62) ("the Dismissal Order"), granting Plaintiff's request and directing the file be closed.

On March 19, 2007, Plaintiff filed a motion (Doc. No. 63), to vacate the Dismissal Order, explaining that the March 8, 2007 letter was intended only to advise the court of Plaintiff's inability to timely respond in opposition to Defendants' motion, rather than to request the action be terminated. Defendants' response in opposition to the motion was filed on April 3, 2007, and, on April 13, 2007, Plaintiff filed a reply in further support of the motion to vacate. By Order filed March 23, 2007 (Doc. No. 69), the undersigned granted Plaintiff's motion to vacate the Dismissal Order, and set July 31, 2007 as the deadline for Plaintiff to file a response in opposition to summary judgment, and August 31, 2007 as Defendants' deadline to file any reply.

On August 20, 2007, Plaintiff filed in opposition to summary judgment a Declaration (Doc. No. 73) ("Plaintiff's Declaration"), with attached exhibits A through M ("Plaintiff's Exh(s). __"), a Brief in Opposition to Defendants' Summary Judgment Motion (Doc. No. 74) ("Plaintiff's Memorandum"), a Statement of Disputed Factual Issues (Doc. No. 75) ("Plaintiff's Statement of Facts"), and the Declaration of Marquis Brooks (Doc. No. 76) ("Brooks Declaration").

In further support of summary judgment, Defendants filed on September 18, 2007, the Reply Declaration of Assistant Attorney General Kim S. Murphy (Doc. No. 78) ("Murphy Reply Declaration"). On October 17, 2007, Plaintiff filed a Supplemental Declaration in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. No. 79) ("Plaintiff's Surreply Declaration"), with attached exhibit A ("Plaintiff's Surreply Exh. A"). Oral argument was deemed unnecessary.

Based on the following, Defendants' motion is GRANTED in part and DENIED in part.

*DISCUSSION*

**1. Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner, supra.* The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

*4 "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex, supra,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

> Fed.R.Civ.P. 56(e).

Defendants are alleged to have violated Plaintiff's civil rights under 42 U.S.C. § 1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983, however, " 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989); and *Baker,* 443 U.S. at 140). Here, Plaintiff alleges as his First Cause of Action violations of his right to religious freedom under the First Amendment, as determined by the court, and the RLUIPA, and a Fourteenth Amendment equal protection violation, and, as his Second Cause of Action, an Eighth Amendment excessive force claim, and a First Amendment retaliation claim. As discussed *infra,* summary judgment is GRANTED as to the claims asserted under the First Cause of Action, but GRANTED in part and DENIED in part as to the claims asserted under the Second Cause of Action.

**2. Religious Freedom**

**\*5** Plaintiff's religious liberty claim is asserted under both the First Amendment's Free Exercise Clause and § 3 of the RLUIPA. Preliminarily, the court observes that whether asserted under the First Amendment or the RLUIPA, a religious liberty claim requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs." Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006) (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003) (First Amendment Free Exercise Clause)).[FN3]

> FN3. Because the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same, the court does not consider whether a violation of the RLUIPA, which provides for a separate cause of action, can serve as a basis for a § 1983 claim. *See Salahuddin,* 467 F.3d at 273-75 (addressing inmate plaintiff's § 1983 religious liberty claim asserted under both First Amendment Free Exercise Clause and RLUIPA § 3, without discussing whether RLUIPA provides a basis for § 1983 action).

As relevant, § 3 of the RLUIPA provides that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government demonstrates that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a); *see Salahuddin,* 467 F.3d at 273. "Religious exercise" is defined under the RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that received Federal financial assistance.' " *Salahuddin,* 467 F.3d at 273 n. 2 (quoting 42 U.S.C. § 2000cc-1(b)(1). "In the prison context, this section sweeps broadly as '[e]very State ... accepts federal funding for its prisons.' " *Id.* (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 716 n. 4 (2005)).

Analyzing Plaintiff's claim under the First Amendment, "[t]he Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). Because prisoners retain their right to religious freedom even when incarcerated, inmates are entitled to reasonable accommodation of their religious beliefs, consistent with needs of prisoner security, including "religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.' " *Jackson,* 196 F.3d at 320 (citing cases and quoting *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)).

Prisoners do not abandon their constitutional rights at the "jailhouse door," *Bell v. Wolfish,* 441 U.S. 520, 576 (1979) (Marshall, J., dissenting), although " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)). As such, "a challenged prison regulation is judged 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin,* 467 F.3d at 274 (quoting *O'Lone,* 482 U.S. at 349 (additional internal quotation marks omitted)).

**\*6** As stated, a religious liberty claim, whether asserted under the First Amendment or the RLUIPA, requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs."* *Salahuddin,* 467 F.3d at 274-75 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003) (discussing requirements of First Amendment Free Exercise Clause)). "The defendants [prison officials] then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," to shift the burden back to the inmate to "show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (citing *Ford,* 352 F.3d at 595) (internal quotations marks and brackets omitted) (bracketed material added).

**A. Sincerity of Plaintiff's Religious Beliefs**

As a threshold matter, Defendants argue that Plaintiff's alleged Jewish faith, including its kosher dietary requirements, is not a sincerely held belief, a threshold requirement for any religious freedom claim under either the First Amendment or the RLUIPA. Defendants' Memorandum at 3-5. According to Defendants, Plaintiff "did not practice any type of Judaism prior to his DOCS incarceration in 1992. On August 5, 2004, just a few months prior to the complained of actions, plaintiff switched his religious designation from Muslim to Jewish." Defendant's Memorandum at 4 (citing Dixon Declaration ¶ 4 and Exh. B). Thus, Plaintiff, as far as the prison officials at Attica were concerned, was "Jewish" for less than one month prior to the date of the earliest allegations in the Complaint. *Id.* Defendants also maintain that because DOCS kosher diet is generally considered as better than the meals provided to non-Jewish inmates in the regular prison diet, inmates have been known to convert to Judaism, by submitting forms to change, administratively, their religious preference at the correctional facility, to receive the more palatable meals. *Id.* (citing Dixon Declaration ¶ 10). Furthermore, Defendants urge the court to find that Plaintiff's religious beliefs are not sincerely held given that "[o]utside prison walls, it is very difficult for a civilian to convert to Judaism," in accordance with the requirements of Judaic law, and also in consideration of "plaintiff's extensive history of bringing frivolous lawsuits." Defendants' Memorandum at 4-5 (citing Rabbi Morgenstern Declaration ¶ 2). Plaintiff has not directly responded to this argument.[FN4]

> FN4. Plaintiff neither challenges the accuracy of Rabbi Morgenstern's interpretation of Judaic law nor disputes Rabbi Morgenstern's explanation of any of the tenets of the Jewish faith.

As discussed, Discussion, *supra,* at 10, the threshold determination to be made with regard to a religious liberty claim under either the First Amendment or the RLUIPA is whether the inmate plaintiff's religious beliefs are sincerely held. *Salahuddin,* 467 F.3d at 274-75 (RLUIPA); and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause). Whether an inmate's beliefs in the Jewish religion are sincerely held, however, is subjective and requires a determination of genuine issues of material

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

fact. Specifically, in a similar case in which the plaintiff inmate alleged that the defendant prison officials' refusal to provide the inmate with a kosher diet violated the inmate's right to religious freedom, the Second Circuit held that summary judgment was precluded based on a genuine issue of material fact as to whether an inmate's beliefs in the Jewish religion were sincerely held, despite the prison's Jewish chaplain's statement that the inmate's alleged conversion to Judaism was not in accordance with Judaic law as required to be considered Jewish. *Jackson,* 196 F.3d at 320-21. Similarly, in the instant case, despite the timing of Plaintiff's "conversion" and Defendants' alleged interference with Plaintiff's kosher diet, the sincerity of Plaintiff's conversion to Judaism cannot be determined without weighing facts. As such, this aspect of Defendants' motion does not warrant summary judgment.

**B. Manner in which kosher meals are provided**

**\*7** Plaintiff's allegations, under both the First Amendment and RLUIPA, that Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, Complaint ¶ 10, or with hot water for his instant oatmeal and coffee, *id.,* and permitted a non-Jewish inmate to prepare kosher food by opening cans of kosher tuna and sardines, and placing the contents into paper cups, Complaint ¶¶ 17-18, essentially challenge the manner in which Plaintiff's kosher meals are provided to him. Defendants maintain that even assuming, *arguendo,* such allegations are true, they fail to establish that Defendants substantially burdened Plaintiff's exercise of a key tenet of his religion, citing statements made by Rabbi Morgenstern in support. Defendants' Memorandum at 5-12 (citing Rabbi Morgenstern Declaration ¶¶ 4-6).

As discussed, Discussion, *supra,* at 10, both the First Amendment and the RLUIPA require that the conduct of which the inmate plaintiff complains "substantially burdens" the inmate's "sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (RLUIPA), and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause)). Although the court is precluded on summary judgment from weighing facts so as to determine the sincerity of Plaintiff's religious beliefs, *Jackson,* 196 F.3d at 320, the court is permitted to determine whether, as a matter of law, Defendants' conduct challenged by Plaintiff "substantially burdens" Plaintiff's practice of his religion

by interfering with or violating a key tenet of Judaism. *Salahuddin,* 467 F.3d at 274-75; *Ford,* 352 F.3d at 587.

According to Rabbi Morgenstern, kashrut, the Jewish dietary law governing the preparation and consumption of kosher food, makes no provision regarding where a Jewish person is to consume kosher food, and the location of Plaintiff's kosher meals "has no bearing whatsoever on [Plaintiff's] ability to practice Judaism." Rabbi Morgenstern Declaration ¶¶ 4-5. Nor is there any requirement that kosher food be prepared only by people of the Jewish faith, and not by a non-Jewish person. *Id.* ¶ 6 ("Having a non-Jewish or non-kosher person prepare or open kosher food does not make the food unkosher."). This includes the removal of lids from cans of tuna fish and sardines before serving the contents to the inmates. *Id.* Defendants maintain, and Plaintiff does not dispute, that because the lids have sharp metal edges that could be used as weapons, the removal of the lids before serving the canned foods is a legitimate penological reason, as recognized by the Supreme Court. Defendants' Memorandum at 8 (citing *O'Lone,* 482 U.S. at 353); Dixon Declaration ¶ 16. Rabbi Morgenstern further maintains that it would not offend the kashrut for an inmate who keeps kosher to request a member of the correctional facility to open hermetically sealed foods if the inmate is unable to do so with a plastic utensil. *Id.* Rabbi Morgenstern does not, however, address Plaintiff's allegations regarding the lack of hot water in the mess hall without which Plaintiff was unable to prepare his instant oatmeal, sanka coffee or tea.

**\*8** In opposition to summary judgment, Plaintiff submits a copy of an article entitled "Kashrut: Jewish Dietary Laws," ("the article") Plaintiff's Exh. A,[FN5] which Plaintiff maintains establishes that the kashrut requires inmates to eat in a kosher dining hall, and for kosher food to be prepared only by people of the Jewish faith. Plaintiff's Declaration ¶¶ 4-7. A plain reading of the article, however, reveals no mention of any requirement under the kashrut that meals are to be eaten in any particular place, or that only Jewish persons are able to prepare kosher food.

> FN5. Defendants do not challenge the article as inadmissible hearsay.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

As for Plaintiff's allegations regarding the lack of hot water in the mess hall for preparation of the instant oatmeal packets, sanka coffee and tea, Defendants concede that although generally hot water for such use is made available in the mess hall, on occasion, no hot water is available in the mess halls. Lopes Declaration ¶ 9. Defendants further maintain that even if hot water is not available, inmates are permitted to have in their cells hot pots for heating water for such purposes. *Id.* Regardless of whether hot water is available for inmates to prepare instant oatmeal packets, sanka coffee or tea, Plaintiff points to nothing establishing that the consumption of such foods is required to maintain a kosher diet. Nor does the article Plaintiff submits in opposition to summary judgment specifically require such foods be made available as part of a kosher diet.[FN6] *See* Plaintiff's Exh. A, *passim.* As such, Plaintiff has failed to establish that the denial of hot water for such purpose substantially burdens the exercise of his religion as required for a religious freedom claim under either the First Amendment Free Exercise Clause or the RLUIPA.

FN6. Notwithstanding the Supreme Court's instruction to liberally construe pleadings of *pro se* plaintiffs, *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (allegations of complaint drafted by *pro se* plaintiff held to less stringent standards than formal pleadings drafted by attorneys), the court declines to construe Plaintiff's allegations regarding the lack of hot water in the mess hall with which to prepare instant oatmeal packets, sanka coffee and tea, Complaint ¶¶ 10, 15, as alleging an Eighth Amendment violation based on prison conditions. Specifically, despite Plaintiff's later assertions in papers opposing summary judgment regarding the poor quality of the food served for the kosher meals, Plaintiff's Memorandum at 8 and 12-15, as well as the Declaration of Marquis Brooks (Doc. No. 76), Plaintiff submits no evidence that he was unable to obtain nutritionally sound meals from the kosher diet or that he suffered any physical ailments as a result of the diet. Nor has Plaintiff moved to amend the Complaint to allege such a claim.

Furthermore, there is no merit to Plaintiff's contention that to the extent Plaintiff's interpretation of the kashrut differs from that endorsed by Rabbi Morgenstern, and not challenged by Plaintiff, Plaintiff's interpretation is entitled to First Amendment protection, even if it is not consistent with a generally accepted tenet of Judaism, so long as the subject belief is sincerely held by Plaintiff. Plaintiff's Memorandum at 9-12. In support of this argument, Plaintiff references *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829 (1989); *Jackson,* 196 F.3d 316, and *Patrick,* 745 F.2d 153. *Id.* Each of these cases, however, is inapposite.

At issue in *Frazee, supra,* was whether the Illinois Department of Employment Security's determination that the plaintiff's refusal to work on Sunday, where such refusal was not based on the basic tenets of an established religious sect but, rather, on the plaintiff's own personal religious beliefs given that the plaintiff was not a member of any established church or religious sect, disqualified the plaintiff from receiving unemployment benefits. In holding that the denial of unemployment benefits violated the First Amendment's Free Exercise Clause, the Court stated that *"[u]ndoubtedly, membership in an organized religious denomination, especially forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs,* but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Frazee,* 489 U.S. at 834 (italics added). The Court thus implied that where, as here, the plaintiff asserts membership in an organized religious denomination, Judaism, the plaintiff must establish that the defendants' challenged conduct violates a fundamental tenet of the particular religion.

**\*9** At issue in *Jackson, supra,* was the inmate's removal from the kosher diet program based on the statement of the correctional facility's rabbi that the inmate was not Jewish according to specific criteria set forth under Judaic law, *i.e.,* that "a Jew is one who was born Jewish or has formally converted." *Jackson,* 196 F.3d at 317-18 (internal quotation marks omitted). In *Jackson,* the inmate plaintiff had, upon entering the prison system in 1986, identified himself as being of the Jewish faith and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

participated in the kosher diet program until the rabbi's determination in 1995 that Plaintiff was not Jewish. *Id.* In finding that a genuine issue of fact precluded summary judgment as to whether the inmate plaintiff's beliefs that he was Jewish were sincere, the court stated that "[a] claimant need not be a member of a particular organized religious denomination to show sincerity of belief." *Id.* at 320 (citing *Frazee,* 489 U.S. at 834). As such, the district court had erred in relying on the prison rabbi's statement that the plaintiff was not Jewish. *Id.* In other words, at issue was not whether any particular practice of the inmate plaintiff was in accordance with a sincerely held religious belief but, rather, whether the inmate plaintiff sincerely believed he was of the Jewish faith, a fact which could not be reached on summary judgment. Further, in contrast to the instant case, the plaintiff in *Jackson* was not claiming a violation of his religious liberty based on his own personal interpretation of any the tenet of the Jewish religion.

With regard to *Patrick, supra,* there the inmate plaintiff alleged the defendant prison officials interfered with the plaintiff's right to practice his religion by refusing to recognize as a religious group "the Five Percenter Nation of Islam" and, consequently, denying the plaintiff the right to gather with other inmates for worship purposes. *Patrick,* 745 F.2d at 155. Thus, the issue in *Patrick* was not whether the inmate plaintiff's religious beliefs were sincerely held but, rather, whether the "religion" the inmate practiced should be recognized as a religion, the practice of which would be entitled to First Amendment protection. Accordingly, none of these cases supports Plaintiff's assertion that, as a sincere adherent to Judaism, Plaintiff's individual interpretations of Judaism's dietary requirements must, under the First Amendment or the RLUIPA, be accepted.

Moreover, the sincerity of Plaintiff's interpretation of the kashrut as requiring him to eat in a kosher mess hall, and that the CAD meal be prepared only by people of the Jewish faith who keep kosher, is negated by Plaintiff's reliance on the article for the basis of such belief. Simply put, support for Plaintiff's interpretation of the kashrut is not found anywhere in the article, and Plaintiff's claim thus is nothing more than a conclusory assertion insufficient to survive summary judgment. Rule 56(e); *Kia v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."). Nor does Plaintiff dispute or challenge the validity or accuracy of Rabbi Morgenstern's interpretation of the kashrut. Further, discovery in this action has concluded and Plaintiff does not contend that he has been prevented by Defendants from obtaining the requisite evidence necessary to support his claim.

**\*10** As for Plaintiff's assertion that he was unable to open the hermetically sealed packets of meats with the plastic spoon provided, creating a further violation of his Kashrut beliefs, Complaint ¶ 10, Rabbi Morgenstern states that "[i]t would not offend kashrut for plaintiff to ask a member of the facility staff to open his hermetically sealed foods for him if he is not able to do so with a plastic spoon or fork." Rabbi Morgenstern Declaration ¶ 6. Plaintiff's conclusory assertion fails to meet his burden on summary judgment by pointing to any evidence contradicting Rabbi Morgenstern's statement. Rule 56(e); *Kia,* 235 F.3d at 763. Significantly, Plaintiff does not challenge Rabbi Morgenstern's standing to make definitive and correct statement regarding the tenets and Judaism, and its related kosher laws.

Finally, Plaintiff's later assertion in opposition to summary judgment that he was provided with non-kosher utensils with which to consume his kosher meal, in violation of the kashrut, Plaintiff's Memorandum at 13; Plaintiff's Declaration ¶ 2; Plaintiff's Statement of Facts ¶ 8, a claim not found in the Complaint, [FN7] is inconsistent with Plaintiff's allegation, Complaint ¶ 10, that only plastic spoons were provided, as well as with Defendants' assertion that inmates are provided with plastic "sporks" which are not reused and, as such, would never come into contact with any prohibited items. Murphy Reply Declaration ¶ 9. Significantly, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes,* 84 F.3d at 619. This claim is therefore without merit.

> FN7. Significantly, Plaintiff has not moved to amend the Complaint to add this claim.

Plaintiff has thus failed to point to any evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

establishing any genuine issue of material fact that the manner in which the kosher meals are prepared and served substantially burdens any sincerely held religious belief, constituting a major tenet of Judaism, as required to establish a claim under either the First Amendment Free Exercise Clause or the RLUIPA. Summary judgment as to this aspect of Defendants' motion is therefore GRANTED.

## C. Location where meals are to be consumed

Plaintiff's allegation that he is not permitted to take certain food items from the mess hall to his cell, including uncooked whole onions, green peppers, cucumbers, and packets of instant oatmeal, sanka coffee and tea, Complaint ¶¶ 9, 11, 15-16, challenges the location where Plaintiff is permitted to consume his kosher food. In support of summary judgment, Defendants rely on Rabbi Morgenstern's statement that neither the location of Plaintiff's meals nor Plaintiff's ability to remove food from the mess hall to consume in his cell "has [any] bearing whatsoever on his ability to practice Judaism." Defendants' Memorandum at 7 (citing Morgenstern Declaration ¶ 4). Significantly, Plaintiff points to nothing contradicting Rabbi Morgenstern's statement, nor does the article on which Plaintiff relies, Plaintiff's Exh. A, support this conclusory assertion so as to defeat summary judgment. Rule 56(e); *Kia*, 235 F.3d at 763.

**\*11** Summary judgment is GRANTED as to this claim.

## D. Failure to provide kosher meals

Plaintiff alleges that on September 25, 2004, Defendants Dixon and Lopes canceled Plaintiff's "call-out" to pick up trays of proper foods with which to break the Yom Kippur fast, Complaint ¶¶ 19-21, and that Defendant Lopes failed to provide Plaintiff with kosher meals for breakfast on October 1, 7 and 10, 2004, and dinner on October 6, 7, 10, and 11, 2004, during which time Plaintiff was in keeplock status. Complaint ¶ 22. Defendants do not deny that Plaintiff was not provided with several kosher meals upon being confined on keeplock status; rather, in support of summary judgment, Defendants contend that upon being placed on keeplock status for 15 days, beginning with September 30, 2004, Plaintiff, as a special diet inmate, was required by DOCS regulations to inform Attica's Food Service personnel of

the special diet so that appropriate arrangements could be made to provide Plaintiff with the CAD meal in his cell, but that Plaintiff failed to do so. Defendants' Memorandum at 8-9; Dixon Declaration ¶¶ 17-18, and Dixon Declaration Exhs. I and J. Because, as Defendants contend, Plaintiff failed to timely notify Attica's Food Service personnel of his kosher diet requirements, Plaintiff was temporarily removed from the CAD program, but Plaintiff only missed a few kosher meals over a five-day program resulting from the administrative error caused by Plaintiff's own lack of communication with Attica's food service personnel which, at most, constitutes negligence, and provides no basis for § 1983 relief. *Id.* In fact, in a letter dated October 12, 2004, DOCS Deputy Commissioner John H. Nuttall advised Plaintiff that although Plaintiff's paperwork indicating his religious affiliation had been changed to Jewish from Muslim had been filed, the "automated record system" had not been updated, but had since been corrected and the matter resolved. Dixon Declaration Exh. J. Plaintiff submits nothing contradicting Defendants' assertion that Plaintiff's temporary removal from the CAD program was nothing more than an administrative error based on Plaintiff's failure to timely advise Attica's food service personnel of his brief confinement on keeplock status.

It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir.2002). The evidence submitted by Defendants in support of summary judgment, including copies of a grievance Plaintiff filed regarding the denial of the CAD meals while in keeplock status, demonstrates no material issue of fact that such denial resulted from Plaintiff's failure to advise Attica's Food Service personnel of such status, and the fact that such confinement occurred within a short time of Plaintiff's administrative change in his religious designation from Muslim to Jewish. Dixon Declaration Exhs. I and J. The evidence also establishes that upon bringing the error to the attention of prison officials, the situation was remedied and Plaintiff received his CAD meal for the balance of his keeplock confinement. *Id.* Plaintiff offers nothing to rebut this evidence. As such, the circumstances of the instant case regarding Plaintiff's deprivation of kosher meals while in keeplock are insufficient to support a § 1983 violation under either the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

First Amendment or RLUIPA.

**\*12** Insofar as Plaintiff maintains that Defendants "canceled" Plaintiff's "call-out" to pick up trays of kosher food with which Plaintiff was to break the Yom Kippur fast, Complaint ¶ 20, Defendants argue that neither Lt. Dixon, Lopes nor Jabcuga, the only remaining Defendants against whom this claim is asserted, were personally involved in this alleged violation of Plaintiff's religious liberty, as required for § 1983 liability. Defendants' Memorandum at 15-16. Defendants also reference a memorandum prepared by Sr. Rosalind Rosolowski, Coordinating Chaplain to the Attica Watch Commander, dated September 9, 2004, which provides that Jewish inmates are to be provided with meals proper for Jewish High Holy Days, including Yom Kippur for which the "break-the-fast" CAD meal was to be provided "one hour after sundown, [at] approximately 8:00 pm." Dixon Declaration Exh. L.[FN8] That the subject meal was provided two hours later than the normal dinner hour suggests that Plaintiff may have been confused as to when he should have anticipated being called for the meal, a finding which would negate liability as to Defendants, based on the absence of causality, but which also would require a factual finding not permitted on summary judgment. The court, however, need not deny summary judgment as to this claim for a more basic reason.

> FN8. Plaintiff has not objected to the memorandum as inadmissible hearsay.

In particular, Plaintiff does not allege, and points to no evidence suggesting, that he was obligated to eat the specific "break-the-fast" meal for Yom Kippur. As such, it is not established, for the purpose of avoiding summary judgment, that the denial of the meal "substantially burdened" Plaintiff's sincerely held religious belief in any major tenet of the Jewish faith, *Salahuddin,* 467 F.3d at 274-75; *Ford,* 352 F.3d at 587, and this unintentional deprivation therefore provides no basis for liability as a violation of Plaintiff's rights to religious exercise under the First Amendment or the RLUIPA. Accordingly, summary judgment as to this aspect of Plaintiff's claim is GRANTED.

**3. Equal Protection**

As for Plaintiff's Fourteenth Amendment equal protection claim, the court observes that Plaintiff essentially alleges Defendants did not permit Jewish inmates receiving the CAD meal to remove kosher food from the mess hall to eat in their cells, while permitting inmates who eat the regular prison diet, presumably non-Jewish inmates, to do so. Complaint ¶¶ 7, 9, 11-12, 24. Plaintiff specifically maintains he was not allowed to bring to his cell his packets of instant oatmeal, sanka coffee and tea, as well as whole onions, green peppers and cucumbers, and hermetically sealed packages of meats and cheese, whereas non-Jewish inmates who eat the regular prison diet are permitted to take out of the mess hall all "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread." *Id.* ¶¶ 9-12. In support of summary judgment, Defendants attribute Plaintiff's equal protection claim to a misunderstanding created by the renovation of Attica's mess halls just prior to Plaintiff's changing his designated religion to Jewish from Muslim, such that during the renovations, Jewish inmates receiving the CAD diet were required, and permitted, to eat their entire kosher meals in their cells, rather than reporting to an assigned mess hall where the kosher meals are normally provided. Defendants' Memorandum at 6-7; Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Defendants further maintain that Plaintiff has failed to establish that Defendants' application of Attica's prison policies regarding security and related matters constituted intentional discrimination against Plaintiff based on his Jewish religion. Defendants' Memorandum at 14-15.

**\*13** "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo,* 100 F.3d 253, 260 (2d Cir.1996) (citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985)). Inmates are not, however, similarly situated to unincarcerated persons, and "[t]he rights of prisoners are necessarily limited because of their incarceration," and "[a] state may treat differently situated people in a different way." *Allen,* 100 F.3d at 260 (citing cases). Establishment of an equal protection violation requires the plaintiff show "purposeful discrimination directed at an identifiable suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing cases). Although discrimination based on religion can establish an equal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

protection violation, *Benjamin v. Coughlin,* 905 F.2d 571, 574-75 (2d Cir.1990), inmates are not a suspect class, *Allen,* 100 F.3d at 260 n. 1, and, thus, no higher level of scrutiny is required. *Turner v. Safley,* 482 U.S. 78, 81 (1987) (holding lower level of scrutiny is applied to equal protection challenges to prison rules and regulations).

Here, in support of summary judgment, Defendants explain that Plaintiff's equal protection claim is properly attributed to Plaintiff's misunderstanding regarding Attica's policy on the CAD program. Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Lt. Dixon explains that upon enrolling in the CAD program on August 9, 2004, Plaintiff received a memorandum from Attica Deputy Superintendent Richard Savage instructing Plaintiff that he could receive his CAD meal by reporting to Mess Hall A and passing through the "Special Diet Line," and also advising that "[m]eal attendance and strict adherence to the Alternative Diet is mandatory and will be closely monitored," and that three unexcused absences within one week's time would result in Plaintiff's suspension from participating in the program. Dixon Declaration ¶ 6; Dixon Declaration Exh. C. Lt. Dixon further explains that between April 6 and July 16, 2004, Attica's three mess halls "underwent reconstruction, followed by a cleanup period," and during this time, one mess hall would be closed for reconstruction, leaving the other two open for service. Dixon Declaration ¶ 8. According to Dixon, with the temporary closure of one mess hall, there was not sufficient room to accommodate the entire prison population, so the decision was made to feed the special diet inmates, including the CAD inmates like Plaintiff, in their cells throughout the reconstruction period while the rest of the general prison population, including the non-Jewish inmates, ate in the two open mess halls. *Id.* Upon completion of the reconstruction, the special diet inmates, including the CAD inmates like Plaintiff, were fed in Mess Hall B, according to the same prison regulations applicable to the general prison population inmates who eat the regular prison diet. *Id.* ¶¶ 8-9 and Exh. E (August 24, 2004 Memorandum from Lopes advising Plaintiff that as of August 26, 2004, Plaintiff was to report to Mess Hall B to receive his CAD meal).

**\*14** Significantly, Plaintiff submits nothing in support of his allegation that inmates within the general prison population who eat the regular prison diet (and who presumably are not Jewish), are routinely permitted to take food items from the mess halls to their cells and that inmates receiving the CAD are not. Rather, according to the "Inmate Orientation Guideline Manual, Section IV-Food Services, Messhall [*sic* ] Policy and Procedures Part 8.3" ("Food Service Policy"), Dixon Declaration Exh. F, all meals are to be provided "cafeteria style with limits placed on certain items ." Inmates are required to eat all food items selected, and although certain rationed items are permitted to be carried from the mess hall, all other food must be consumed or discarded in the mess hall. Food Service Policy Part 8.3 A maximum of four rationed items are permitted to be taken out of the mess hall, including bakery items, bread, desserts, fresh fruit, meat without sauce and sugar. *Id.* Certain foods, however, may not be removed, including bulk or scooped food, liquids (such as coffee, juice, and milk), corn on the cob, and vegetables. *Id.*

A plain reading of the Complaint reveals that none of the food items Plaintiff was prohibited from removing from the mess hall, including the instant oatmeal, sanka coffee and tea packets, and the whole onions, peppers and cucumbers, were among the list of rationed items permitted to be removed from the mess hall. Insofar as Plaintiff maintains that the peppers and cucumbers are fruits, rather than vegetables, Complaint ¶ 13, Plaintiff does not allege that any non-Jewish inmate was permitted to remove such food items from the mess hall as required to establish an Equal Protection violation. As for the CAD meal meat items Plaintiff maintains he was not allowed to remove, evidence in the record establishes that Plaintiff was permitted to remove such items once they had been opened, including the hermetically sealed meats and cheeses, and the cans of tuna fish and sardines, and that the requirement that such items be opened prior to eating was a matter of legitimate prison security concerns. *See* Dixon Declaration ¶¶ 15-16; Dixon Declaration Exhs. M and N. Furthermore, all the items Plaintiff maintains the non-Jewish inmates who received the regular prison diet were permitted to remove from the mess hall, including "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread," Complaint ¶ 12, are included on the list of rationed items permitted to be removed from the mess hall by any inmate, including Plaintiff if he chose to do so.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

Food Service Policy Part 8.3. Significantly, Plaintiff does not claim that any other general population non-Jewish inmate was allowed to remove hermetically sealed packages of meat and cheese, or unopened cans of tuna fish and sardines or any other canned foods.

According to Lt. Dixon, in August 2004, around the time that the Jewish inmates began to again receive their CAD meals from the mess hall, rather than having the meals served to them in their cells because of the diminished mess hall seating capacity attributed to the renovation of the mess halls, "CAD inmates were attempting to leave Mess Hall B with their CAD trays still wrapped." Dixon Declaration ¶ 15. Lt. Dixon advised CAD inmates, including Plaintiff, that such conduct was not allowed because of security concerns, but that once the trays were opened in the mess halls, the inmates were permitted to take the same items from the trays to their cells, *i.e.,* the rationed items, as were the non-Jewish and general prison population receiving the regular prison diet. Dixon Declaration ¶ 15. Plaintiff does not contradict Dixon's Declaration in this regard. Absent some evidence that the Food Service Policy was applied to CAD inmates in a manner different from the way it was applied to non-CAD inmates, there is no basis for Plaintiff's equal protection claim.

**\*15** On this record, Plaintiff's equal protection claim fails, and summary judgment is GRANTED.

**4. Excessive Force**

Plaintiff alleges that Defendants Dixon, Petties and Markowski repeatedly threatened and harassed Plaintiff in an attempt to coerce Plaintiff to discontinue pursuing his grievances, and that when Plaintiff failed to do so, Defendant Petties assaulted Plaintiff. Complaint ¶¶ 33-35. According to Plaintiff, Defendant Markowski ordered Petties to assault Plaintiff, and after the assault, Markowski "informed Plaintiff 'that was just a warning, so you better drop your grievances ... or the next time you won't be so lucky,' " and that " 'accidents happen,' " "advising Plaintiff " 'to be smart and drop his grievances ... and save himself [Plaintiff] a lot of trouble, or he might end up in the hospital, if he don't [*sic* ].' " Complaint ¶¶ 36-37. Defendants argue in support of summary judgment

of Plaintiff's Eighth Amendment excessive force claim alleged against Defendants Dixon, Petties and Markowski, that Plaintiff has failed to exhaust administrative remedies relative to such claim, Defendants' Memorandum at 18, that no objective evidence substantiates Plaintiff's claim, *id.* at 19-21, and that the alleged use of force was, at most, *de minimus,* which is not actionable under the Eighth Amendment. *Id.* at 22-23. These arguments are, however, insufficient to support summary judgment.

**A. Failure to Exhaust Administrative Remedies**

Defendants contend that Plaintiff's failure to exhaust available administrative remedies as to his Eighth Amendment excessive force claim requires summary judgment on such claim. Defendants' Memorandum at 18. In opposition, Plaintiff argues that he prepared and filed a grievance relative to the excessive force claim, but that Attica's "prison authorities" never forwarded the grievance to DOCS Central Office Review Committee ("the CORC"). Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14. In support of his contention, Plaintiff does not attach copies of the putative grievances but, rather, references a hand-written list of the inmate grievances he allegedly filed, including the two Plaintiff maintains pertained to the assault, *i.e.,* Inmate Grievances "47651-04-Threats" and "47825-04-Threats." Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14 (all referencing Plaintiff's Exh. I). Significantly, in further support of summary judgment, Defendants assert that the fact that the disputed grievance were assigned grievance numbers negates Plaintiff's assertion that the grievances were never filed and processed. Murphy Reply Declaration ¶ 15.

Under the PLRA, exhaustion of all available administrative remedies is required before a § 1983 civil rights action challenging prison conditions, including excessive force claims, may be commenced. 28 U.S.C. § 1997e; *Macias v. Zenk,* 495 F.3d 37, 40 (2d Cir.2007) (" 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). In New York, DOCS provides a three-step review process which an inmate must exhaust prior to commencing a § 1983 action. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

(W.D.N.Y.20002).

*16 Specifically, the grievance must first be submitted to the prison's Inmate Grievance Review Committee ("the IGRC"), comprised of both inmates and DOCS employees. *Reyes,* 206 F.Supp.2d at 432. If the IGRC's decision is unfavorable to the inmate, the inmate may appeal the decision to the superintendent of the relevant correctional facility. *Id.* The superintendent's decision is further appealable to the CORC which makes the final administrative decision. *Id.* Significantly, all three levels of administrative review must be exhausted before an inmate may seek § 1983 relief in federal court. *Id.* (citing cases).

Exhaustion of administrative remedies is, however, an affirmative defense, rather than a jurisdictional requirement. *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 919-20 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). As such, if not raised as an affirmative defense, the defendants waive the failure to exhaust. *Johnson,* 380 F.3d at 695. Furthermore, as with any affirmative defense, the burden is on the defendants to establish that the plaintiff failed to exhaust. *Giano,* 380 F.3d at 675. Accordingly, in the instant case, it is Defendants' burden to establish that Plaintiff failed to exhaust administrative remedies relative to the Eighth Amendment excessive force claim.

Although exhaustion generally is mandatory, in certain situations, including where administrative remedies are not " 'available' to prisoners seeking redress of their grievances," the plaintiff's failure to exhaust is justified. *Giano,* 380 F.3d at 675 (citing 42 U.S.C. § 1997e(a)). Thus, to meet their burden on the affirmative failure to exhaust defense, Defendants must first establish that administrative remedies were available, but that Plaintiff failed to exhaust them. Significantly, the parties do not dispute that DOCS provides a formal procedure by which an inmate may seek administrative relief for grievances arising at DOCS's facilities and applicable to Plaintiff as of October 15, 2004, when Plaintiff alleges he was assaulted. Rather, Defendants, inconsistently, maintain that Plaintiff "never filed a grievance regarding this alleged assault, and he makes no allegation to the contrary

in the complaint," Defendants' Memorandum at 18, but later assert, inconsistently, that although Plaintiff contends Attica prison officials prevented him from filing any grievance regarding the alleged assault, that Plaintiff's handwritten list of the inmate grievances, Plaintiff's Exh. I, includes two grievances pertaining to the alleged assault which were assigned inmate grievance numbers establishes that such grievances were, in fact, filed. Murphy Reply Declaration ¶ 15.

The court need not, however, attempt to resolve this apparent discrepancy as such general assertions regarding Plaintiff's failure to exhaust administrative remedies is, without more, insufficient to satisfy Defendants' burden of proof on this affirmative defense. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (holding it is defendant's burden in a § 1983 action to prove, either at trial or on summary judgment, affirmative defense asserted by defendants, and plaintiff was not required to establish absence of such defense). Significantly, Defendants admit that "DOCS maintains records of grievances filed by inmates," Murphy Reply Declaration ¶ 15, yet have not submitted anything substantiating their contention that Plaintiff did not exhaust his administrative remedies as to the alleged assault, such as a log showing the absence of any such claim having been filed during the relevant period of time, an affidavit from Attica's Inmate Grievance Program ("IGP") indicating that no such claim had ever been filed, or, more significantly, that Inmate Grievance Nos. 47651-04 and 47825-04 were assigned to other claims unrelated to the alleged October 15, 2001 assault on Plaintiff or have never been assigned to any grievance. Nor do Defendants submit anything indicating that Plaintiff's claim was filed with the IGRC, and denied, and that Plaintiff failed to appeal the denial, despite, as indicated, admitting, Murphy Reply Declaration ¶ 15, that the assignment of an inmate grievance number to the disputed grievances is evidence that the grievances were, in fact, filed. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 278 (2d Cir.2003) (observing that absent statutory language to the contrary, Second Circuit would not hold that Congress intended plaintiff to carry the burden of establishing a negative proposition where such would impose an "enormous evidentiary burden," and citing cases, including *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003) (concluding Congress intended PLRA's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

administrative exhaustion requirement as an affirmative defense because, *inter alia,* prison official defendants have better access to prison records).

**\*17** Accordingly, summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust administrative remedies is DENIED.

**B. Merits of Excessive Force Claim**

Having denied summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust, the court considers the merits of the claim. Plaintiff claims that Defendant Petties, acting on Markowski's direction, assaulted him on October 15, 2004, causing Plaintiff physical injuries, including blurry vision, ringing in the ears, migraine headaches and dizziness. Complaint ¶¶ 32 and 40. Defendants argue in support of summary judgment on this claim that no objective evidence in the record supports this claim, Defendants' Memorandum at 19-21, and, in any event, there is no evidence that any force Defendant Petties used against Plaintiff on October 15, 2004 was more than *de minimus,* which is not actionable under § 1983. *Id.* at 22-23.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.2d at 104; *see Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 9. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury.

*Id.* at 9-10. The subjective component of an Eighth Amendment excessive force claim is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, and the use of any unnecessary force is always considered excessive. *Whitley v. Albers,* 475 U.S. 312, 322 (1986) (use of force is always unreasonable where action was "taken in bad faith or for no legitimate purpose"). In fact, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] *per se* ... whether or not significant injury is evident.' " *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)) (brackets and ellipses in original).

Nor does an Eighth Amendment excessive force claim require any serious injury. *Whitley,* 475 U.S. at 322. Rather, a prison official's malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether any significant injury is evident. *Hudson,* 503 U.S. at 9 (citing *Whitley,* 475 U.S. 312, 327 (1986)). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," a result as unacceptable to the drafters of the Eighth Amendment as it is today. *Id.* (citing *Estelle v. Gamble,* 429 U.S. 97, 102 (1976), and *Wilkerson v. Utah,* 99 U.S. 130, 136 (1879)).

**\*18** In evaluating Defendants' contentions directed to Plaintiff's excessive force claim, the court finds *Griffin, supra,* to be apposite. At issue in *Griffin,* was whether the District Court erred in dismissing the plaintiff inmate's § 1983 excessive force claim given that the claim was "weak" and the supporting evidence was "extremely thin." *Griffin,* 193 F.3d at 91-92. In particular, the inmate plaintiff claimed he was subjected to excessive force by two prison guards who assaulted him and then faked and inflicted injuries onto themselves to cover up the misconduct. *Id.* at 90. In that case, the inmate also had pleaded guilty in state court to criminal charges brought in connection with the incident. *Id.* at 90-91. Further, the only evidence offered in support of the claim was plaintiff's own testimony and minimal injuries of a bruised shin and some swelling over a knee. *Id.* at 91. Nevertheless, in reversing, the Second Circuit held that the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

"weakness" of the claim and "extremely thin" evidence, *i.e.,* the plaintiff's averments and minimal injury, did not preclude a reasonable jury from finding that excessive force was used against the plaintiff. *Id.* at 92.

Here, in support of summary judgment, Defendants maintain that no objective evidence in the record supports Plaintiff's claim that he was assaulted on October 15, 2004 and, as such, any force Defendant Petties used against Plaintiff on that day was, at most, *de minimus,* which is not actionable under § 1983. Defendants' Memorandum at 19-23. In opposing summary judgment on Plaintiff's claim that he sustained physical injuries as a result of the assault, including blurred vision, ringing in the ears, migraine headaches, dizziness, and pain, Complaint ¶ 40, Plaintiff maintains that Defendants have failed to refute the allegation that Petties, acting at Markowski's direction, ordered Plaintiff to the commissary so as to assault Plaintiff, and that Plaintiff's personal log of inmate grievances filed demonstrates he filed an inmate grievance regarding the assault. Plaintiff's Memorandum at 24-25; Plaintiff's Declaration ¶ 12; Plaintiff's Exh. I. Significantly, these averments are corroborated by a statement made by Attica Registered Nurse Vance Hawley ("Hawley"). Specifically, Hawley states that "[a]s the Attica nurse on duty on October 18, 2004, I performed plaintiff's medical examinations because he complained of an assault by an unnamed individual. The medical records of the examination indicate that plaintiff had subjective, unsupported complaints of ringing in the ears and blurred vision." Hawley Declaration ¶ 3. Although Plaintiff "exhibited no bruising, swelling, redness or other signs of any assault," Hawley provided Plaintiff with over-the-counter pain medication. *Id.*[FN9] Plaintiff's medical records, as related by Vance, thus corroborate Plaintiff's claim that he was assaulted on October 15, 2004 and creates a genuine issue of material fact as to whether Plaintiff was assaulted. *See Griffin,* 193 F.3d at 91-92.

> FN9. While Hawley further avers that "[a] true and correct copy of plaintiff's ambulatory health record is attached hereto as Exhibit A," Hawley Declaration ¶ 3, no such exhibit is attached, nor is any copy of Plaintiff's ambulatory health record found elsewhere in the record.

**\*19** Nor is the fact that Plaintiff's medical records provide no direct evidence that Plaintiff was injured on February 28, 2004 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff complained of injuries on Monday, October 18, 2004, three days after the alleged assault on Friday, October 15, 2004, thereby presenting a reasonable basis to support an inference that the passage of time between the alleged assault and Vance's examination was sufficient for Plaintiff's injuries to heal enough as to not be readily apparent to Hawley.

Further, the statements submitted by Petties and Markowski do not preclude the possibility that Plaintiff may have been assaulted on October 15, 2004. Specifically, although Petties maintain that Plaintiff "incorrectly alleges that I assaulted him on October 15, 2004," Petties Declaration ¶ 3, Petties, without directly denying Plaintiff's allegation, only supports this assertion by pointing to the absence of any documentary evidence to the contrary. For example, Petties represents that he was not aware that Plaintiff had filed Grievances 47427-04 and 47428-04 until Petties read the Complaint. *Id.* ¶ 4. Petties also points to the absence of any "use of force report" which Petties would have been required to complete had he used force against Plaintiff, and that the completion of such report "would have prompted an investigation which never occurred." *Id.* ¶ 5. Petties further asserts that Plaintiff, incorrectly, *see* Discussion, *supra,* at 31-32, never filed any grievance regarding the alleged assault, which would have been investigated, *id.,* and that Petties was never disciplined in connection with any assault. *Id.* ¶ 6. Petties summarizes that the absence of any documentary evidence or investigation into the alleged assault "demonstrate[s] that no assault ever took place." *Id.*

Similarly, Defendant Markowski states that he "never observed any use of force by C.O. Petties on plaintiff," Markowski Declaration ¶ 4, and that Plaintiff never filed any grievance regarding the alleged assault, which would have prompted a thorough investigation into the matter. *Id.* ¶ 5. Markowski continues that he was not aware Plaintiff had filed Grievances 47427-04 and 47428-04 until he read

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

Plaintiff's complaint. *Id.* ¶ 6.

The Petties and Markowski Declarations, however, fail to demonstrate the absence of any genuine issue of material fact as to whether Plaintiff was assaulted. Rather, accepting Petties's statement implying that he did not assault Plaintiff, and Markowski's statement that he did not "observe" Petties assault Plaintiff over Plaintiff's unambiguous statement that he was assaulted by Petties, acting at Markowski's direction, would require the court to weigh evidence, which is not allowed on summary judgment. *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 206 (2d Cir.2006) (" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " (quoting *Anderson,* 477 U.S. at 249)); *see Griffin,* 183 F.3d at 91-92 (court's consideration of evidence in support of plaintiff inmate's claim as "thin" was improper basis for dismissal of claim). Furthermore, Defendants' assertion that Plaintiff never filed any grievance regarding the alleged assault begs the question given that, as Defendants concede, Murphy Reply Declaration ¶ 15, Plaintiff has submitted evidence, Plaintiff's Exh. I, that a grievance pertaining to the alleged assault was both filed and assigned an inmate grievance number. *See* Discussion, *supra,* at 31-32. Simply, Petties's failure to directly deny Plaintiff's claim that he assaulted Plaintiff, while insisting that Plaintiff "incorrectly" maintains he was assaulted, and Markowski's failure to deny that he directed Petties to assault Plaintiff, and statement that he never observed such an assault attempts to 'slice the cheese' a bit too finely. Indeed, a reasonable jury could find the statements of Petties and Markowski to be evasive. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

**\*20** The subjective component of an Eighth Amendment excessive force claim requires that the defendants act maliciously and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application

of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. In evaluating a prisoner's Eighth Amendment excessive force claim, even *de minimis* force is taken in bad faith if used for no legitimate purpose. *Id.* at 322. Here, with regard to the first *Whitley* factor, it is undisputed that any injuries Plaintiff sustained as a result of the alleged October 15, 2004 use of force were *de minimus.* Nevertheless, as with the objective prong, whether Plaintiff was subjected to the use of any unnecessary force is a critical disputed fact. This unresolved factual issue as to the objective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment as it also precludes the court from making any determination as to the second, third, fourth and fifth *Whitley* factors necessary to establish the claim's subjective element.

Nothing in the record, however, indicates any personal involvement by Defendant Dixon in the alleged assault. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (to establish liability under § 1983, plaintiff must show defendant was personally involved in the alleged constitutional violation). As such, summary judgment on Plaintiff's excessive force claim is GRANTED as to Dixon.

Here, because the record establishes a genuine issue of material fact as to whether Plaintiff was subjected to any force on October 15, 2004, the court is unable to reach the issue as to whether such force was reasonable, a question that must therefore await trial. As such, summary judgment as to Plaintiff's excessive force claim is DENIED as to Defendants Petties and Markowski, but GRANTED as to Defendant Dixon.

**5. Retaliation**

Plaintiff alleges that after filing Grievances 47427/04 and 47428/04 on September 1, 2004, complaining about the manner in which the CAD meals were provided, Defendants retaliated against him by placing Plaintiff in keeplock confinement from September 30, through October 15, 2004, threatening Plaintiff with physical harm if Plaintiff did not withdraw the grievances, flooding

Plaintiff's cell on October 15, 2004, and that Petties assaulted Plaintiff on October 15, 2004. Complaint ¶¶ 8, 27, 31-37. Defendants argue in support of summary judgment that Plaintiff is unable to establish that Defendants took any adverse action against Plaintiff, or that any adverse action taken against Plaintiff was causally connected to Plaintiff's participation in any protected activity, in this case, his grievance filings. Defendants' Memorandum at 23-27.

**\*21** For a plaintiff to succeed in a First Amendment retaliation claim, he must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Courts are properly skeptical of prisoner retaliation claims as "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." " *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes,* 239 F.3d at 493 (internal quotation marks and citations omitted).

The filing of prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). *See Smith v. Woods,* 2006 WL 1133247, at \* 10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to making of oral complaints to correctional officers), *aff'd,* 219 Fed. Appx. 110 (2d Cir.2007). As such, Plaintiff's allegations that he was subjected to retaliatory conduct for filing Grievances 47427-04 and 47428-04 satisfies the first element of the retaliation claim.

With regard to the second element requiring adverse

action, Plaintiff's alleges that Defendants threatened and harassed him to drop the grievances, flooded Plaintiff's cell with water, placed him in keeplock confinement, and that Petties, at Markowski's direction, assaulted him. Complaint ¶¶ 8, 27, 31-37; Plaintiff's Memorandum at 24-26; Plaintiff's Declaration ¶¶ 12-13. Insofar as Plaintiff maintains that Defendant Petties and Markowski threatened and assaulted Plaintiff and Defendants flooded Plaintiff's cell, such assertions satisfy the second element of a retaliation claim. *See Davis,* 320 F.3d at 352 (the use of unnecessary force to retaliate against a plaintiff for engaging in protected activity constitutes unlawful retaliation); *Gill v. Pidlypchak,* .389 F.3d 379, 384 (2d Cir.2004) (allegations that corrections officers made threats against inmate for filing prison grievance along with allegation that corrections officers followed through with such threats constitutes adverse action for § 1983 retaliation claim); *Woods v. Medlock,* 2008 WL 123845, \*6 (W.D.Pa. Jan. 9, 2008) (denying motion to dismiss inmate's § 1983 retaliation claim alleging defendant correctional officers placed inmate plaintiff in unlighted, flooded, filthy cell to retaliate against plaintiff's filing lawsuits).[FN10] Nevertheless, although "[a]n allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a prison grievance, states a claim under § 1983," *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citing *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir.1988)), Plaintiff's allegation that he was placed in keeplock confinement on September 30, 2004, in retaliation for filing the grievances, however, is without merit.

> **FN10.** Defendants' assertion, Dixon Declaration ¶ 27, and October 16, 2004 Memorandum from DOCS Lt. J. Lambert to Sgt. K. Barbary, Dixon Declaration Exh. P, explaining that no "logical explanation why water was coming through the cell vent of Odom's cell" on October 15, 2004, and that such flooding has not reoccurred does not, as Defendants insist, Defendants' Memorandum at 25 n. 5, establish that no Defendant was responsible for the flooding of Plaintiff's cell or that such flooding was unintentional. Rather, the unexplained cause of the undisputed, but suspicious, flooding can be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

interpreted as establishing the flooding was the result of a purposeful act. Significantly, Defendants, who possess the exclusive capability to do so, fail to explain what steps were taken to objectively investigate the issue, or any other efforts to establish the actual cause of the flooding. Surely, a competent plumber could provide a reasonable explanation. Indeed, DOCS's failure to determine the cause could be circumstantial evidence of a conscious avoidance of knowledge of Defendants' involvement.

**\*22** Essentially, such an allegation calls into question the validity of the prison violation with which Plaintiff was charged, resulting in the keeplock confinement. Plaintiff, however, has not challenged the veracity of such charges. *See Jones v. Coughlin,* 34 F.3d 677 at 679 (2d Cir.1995) (vacating and remanding district court's decision that inmate plaintiff's claim of retaliatory filing of false misbehavior report was wholly conclusory as based solely on adverse disciplinary decision where plaintiff, although provided a hearing on the disputed disciplinary charges, "was unfairly denied the right to call key witnesses in defense of the charges against him," and, thus, had no opportunity to prove charges were false, as required before the district court could consider whether filing of false charges was intended to retaliate against the plaintiff). Further, the filing of a false misbehavior report does not constitute "a *per se* constitutional violation actionable under § 1983" provided the inmate is afforded due process protection through a disciplinary hearing on the misbehavior report. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982 (1988). "The key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections [to dispute a false or incorrect charge] guaranteed by the Fourteenth Amendment." *Franco v. Kelly,* 854 F .2d 584, 587 (2d Cir.1988) (bracketed material added). Summary judgment on a retaliation claim based on the filing of a false misbehavior report, however, is improper where an inmate either is not granted a hearing

on the alleged false disciplinary charges, or is granted a disciplinary hearing, but is unfairly denied the right to rebut the charges by presenting evidence or calling witnesses in defense of the charges against him. *Jones,* 45 F.3d at 679. Here, Plaintiff does not allege that no disciplinary hearing on the charges was ever held, or that Plaintiff was denied due process in connection with such hearing. As such, Plaintiff cannot establish the second element of a retaliation claim based on his keeplock confinement and summary judgment is GRANTED as to this aspect of Plaintiff's retaliation claim.

Finally, with regard to the third element requiring a causal connection between Plaintiff's participation in the protected activity, *i.e.,* the filing of grievances, and the adverse action, the Second Circuit has held that the temporal proximity of an adverse action in relation to the filing of an inmate grievance is circumstantial evidence of a causal connection so as to establish a retaliation claim. *Colon,* 58 F.3d 872. Here, because the alleged threats, assault, and unexplained flooding of Plaintiff's cell occurred within a short time after Plaintiff filed the grievances on September 1, 2004, a material fact issue regarding the causal connection is established as to this aspect of the claim.

**\*23** As Plaintiff has demonstrated a material issue of fact necessary to establish that Defendants took adverse action against Plaintiff based on Plaintiff's grievances, *i.e.,* flooding Plaintiff's cell and threatening and assaulting Plaintiff, summary judgment on this portion of Plaintiff's retaliation claim is DENIED.

**6. Qualified Immunity**

Alternatively, Defendants argue they are qualifiedly immune from liability in the instant action. Defendant's Memorandum at 27-30. Because summary judgment is GRANTED in favor of Defendants on the Plaintiff's First Amendment and RLUIPA religious freedom claims and the Fourteenth Amendment Equal Protection claim, qualified immunity is considered only with regard to Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims. Plaintiff argues in opposition that Defendants are not qualifiedly immune from liability in the instant case because it was not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

objectively reasonable for Defendants to believe the actions of which Plaintiff accuses them did not violate Plaintiff's civil rights as alleged in his Second Cause of Action. Plaintiff's Response at 32-40.

The doctrine of qualified immunity "shields a government official acting in an official capacity from suit for damages under § 1983 unless the official 'violated clearly established rights of which an objectively reasonable official would have known.' " *Blouin v. Spitzer,* 356 F.3d 348, 359 (2d Cir.2004) (quoting *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003)). "The determination generally involves a two-step inquiry: do the facts alleged show the officer's conduct violated a constitutional right, and, if so, was the right in question clearly established?" *Blouin,* 356 F.3d at 359 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (qualified immunity does not shield government official from liability in civil rights action where alleged facts, taken in light most favorable to party asserting injury, show defendant government official's conduct violated a constitutional right that was clearly established at the time of the alleged violation)). Here, the record before the court fails to establish that qualified immunity shields Defendants from the instant litigation with regard to the Eighth Amendment excessive force claim and the retaliation claim based on threats, abuse and flooding.

In particular, at the time of the alleged constitutional violations, excessive use of force against inmates for any purpose regarding prison administration was well established. *See Hudson,* 503 U.S. at 7-8. Plaintiff's right to file an inmate grievance, including verbal complaints to prison supervisors, without fear of retaliation was equally well established at the time of the alleged events in this case. *Davis,* 320 F.3d at 352-53 (filing of prison grievances is activity protected by the First Amendment). Moreover, on this record, the court finds that if the facts pertaining to Plaintiff's excessive force claim as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights. *Saucier,* 533 U.S. at 201.

**\*24** As such, Defendants' summary judgment motion, insofar as it alternatively asserts the defense of qualified immunity, is DISMISSED as moot in regard to Plaintiff's religious freedom and equal protection claims, and the excessive force claim as alleged against Dixon, and is DENIED as to the excessive force claim against Defendants Petties and Markowski and the retaliation claim.

***CONCLUSION***

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 47) is GRANTED in part and DENIED in part.

The parties are to appear before the undersigned on April 2, 2008 at 11:00 A.M. to schedule further proceedings. The Attorney General's Office shall make arrangements for Plaintiff to appear by telephone.

SO ORDERED.

W.D.N.Y.,2008.

Odom v. Dixon
Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.