IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CHAMMA K. BRANDON,

                Plaintiff,

     v.

DR. GLEN SCHROYER, *et al.*,

                Defendants.

_____

Civil Action No.
9:13-CV-0939 (TJM/DEP)

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

CHAMMA K. BRANDON, *Pro se*
12-A-5715
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

FOR DEFENDANT SCHROYER:

THUILLEZ, FORD, GOLD, BUTLER &     KELLY M. MONROE, ESQ.
MONROE, LLP                        MOLLY C. CASEY, ESQ.
20 Corporate Woods Blvd., 3rd Floor
Albany, NY 12211

FOR REMAINING DEFENDANTS:

LEMIRE, JOHNSON & HIGGINGS, LLC    BRADLEY J. STEVENS, ESQ.
P.O. Box 2485
2534 Route 9
Malta, NY 12020

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

# REPORT AND RECOMMENDATION

This is an action brought by *pro se* plaintiff Chamma K. Brandon, a prison inmate formerly confined in the Clinton County Jail ("CCJ"), pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, against several individuals working at the facility, including Dr. Glen Schroyer, alleging that they deprived him of his civil rights during his period of incarceration there. As relates to defendant Schroyer, on April 25, 2016, Senior District Judge Thomas J. McAvoy ordered the entry of summary judgment dismissing all but one of plaintiff's claims brought against him. As a result of that decision, in his sole remaining cause of action against that defendant, plaintiff alleges that Dr. Schroyer retaliated against him for filing grievances by removing Brandon from a low-fat, low-cholesterol ("heart-healthy") diet for one month, in violation of his First Amendment rights.

Defendant Schroyer has now moved for the entry of summary judgment dismissing plaintiff's remaining retaliation claim against him. For the reasons set forth below, I recommend that the motion be granted.

# I.   BACKGROUND[1]

Plaintiff was confined in the CCJ beginning on January 14, 2012, and again from the time of his re-arrest on March 2, 2012, until December 28, 2012, when he was transferred into the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 17 at 3, 12. Plaintiff alleges, *inter alia*, that, while he was incarcerated at the CCJ, defendant Schroyer, the staff physician at the facility, retaliated against him for exercising his First Amendment rights by authorizing his removal from a heart-healthy diet in response to grievances and complaints filed by Brandon during his incarceration at the CCJ. *See* Dkt. No. 17 at 35-36.

When he first arrived at the CCJ, plaintiff announced that he was allergic to shellfish. Dkt. No. 17 at 4; Dkt. No. 75-6 at 2. A special diet notification form reflecting that food allergy was forwarded to the facility's

---

[1]   In light of the procedural posture of the case, the following recitation is derived from the record evidence now before the court as it relates to plaintiff's remaining claim against defendant Schroyer, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In support of his motion, defendant Schroyer has expressly relied on the record, including his statement of undisputed material facts, that was before the court in connection with his first motion for summary judgment. *See* Dkt. No. 100 at 1. In opposing defendant Schroyer's motion, plaintiff similarly rests on the same record evidence on which he previously relied in responding to defendant Schroyer's first motion for summary judgment. I will therefore rely, for purposes of deciding this motion, on the same factual record that was before this court on defendant Schroyer's first motion for summary judgment.

kitchen.[2] *See* Dkt. No. 17 at 47; Dkt. No. 75-1 at 37. In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. Dkt. No. 17 at 4; Dkt. No. 75-6 at 2. As a result, a notification was sent by medical personnel to the CCJ kitchen pertaining to plaintiff's diet, indicating "no tomato or tomato products per MD." Dkt. No. 17 at 48; Dkt. No. 75-1 at 38.

In May 2012, defendant Schroyer placed plaintiff on a heart-healthy diet due to his high cholesterol levels. Dkt. No. 17 at 4-5, 49; Dkt. No. 75-1 at 39; Dkt. No. 75-6 at 2. Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, however, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the acquisition of several items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[3] Dkt. No. 17 at 8-9, 52; Dkt. No. 75-1 at 41; Dkt. No. 75-6 at 3.

---

[2]    The order was later reiterated on July 5, 2012. Dkt. No. 17 at 50; Dkt. No. 75-1 at 40.

[3]    In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. Dkt. No. 75-6 at 3. This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. Dkt. No. 83 at 3-4. Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

Interrogatory No. 15:

Did Dr. Schroyer or anyone else within the Medical-

4

The record reveals, for example, that during the relevant period plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. Dkt. No. 75-1 at 60-62. During the relevant times, plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. Dkt. No. 17 at 10, 53, 188; Dkt. No. 75-1 at 42. Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. Dkt. No. 17 at 10.

In addition to his dietary restrictions related to food allergies, insensitivity to tomatoes, and high cholesterol, plaintiff has alleged a need

---

Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?

Answer to Interrogatory No. 15:

The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such non-compliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.

Dkt. No. 83-3 at 25. While those seemingly contradictory assertions potentially present a disputed question of fact, as will be discussed below, it is not material to resolution of plaintiff's retaliation claim against defendant Schroyer.

for additional restrictions to accommodate his religious beliefs as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his religion, he cannot eat pork. Dkt. No. 17 at 12-13; Dkt. No. 83 at 6. According to Brandon, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. Dkt. No. 17 at 17-18, 20-22. Plaintiff claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a proper religious diet, and that in response, Nurse Kinter, a former defendant in this case, stated that the kitchen was aware of his dietary restrictions.[4] *Id.* at 13.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. Dkt. No. 17 at 13, 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse[5] wrote, "Done – for no fish/shell fish. Need to ask security staff to

---

[4]   Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. Dkt. No. 17 at 13. Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at Dkt. No. 83-3 at 2 and Dkt. No. 93-4 at 68, and again, half of the document cannot be deciphered.

[5]   Plaintiff alleges that Nurse Kinter authored the response to this sick-call request. Dkt. No. 17 at 14. It is not clear, however, that this is accurate since Nurse Kinter

submit diet slip for <u>pork</u> medical does not do religious diets." *Id.* at 67 (emphasis in original).

Plaintiff cites eight additional occasions when he was served pork, and raised complaints concerning the matter. The first and second occurred on September 24, 2012, during lunch and dinner. Dkt. No. 93-4 at 82-82. The next two instances occurred on October 9 and 10, 2012. *Id.* at 94-99. Plaintiff contends that on October 17, 2012, he was served pork, after which he filed a grievance and was provided a new meal. Dkt. No. 17 at 18; Dkt. No. 93-4 at 116-17. Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." Dkt. No. 17 at 20. Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter, it is not included within his submissions. Dkt. No. 17 at 21. The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. Dkt. No. 17 at 22; Dkt. No. 93-4 at 164-65.

Between May 28, 2012 and October 15, 2012, plaintiff filed ten grievances related, in whole or in part, to his diet. *See Generally* Dkt. No.

---

signed responses to other sick-call requests as "SK." *See, e.g.*, *id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

17 at 6-8; Dkt. No. 83-3 at 46-75. In the first, filed on May 28, 2012, plaintiff complained that he was "denied [his] special diet and [that] the cook refused to make proper accommodations to [his] diet." Dkt. No. 83-3 at 46. Plaintiff filed a grievance on August 9, 2012, complaining that he was given an "incomplete trey [sic]." *Id.* at 48. On September 15, 2012, plaintiff grieved that he was "being forced to eat what [he] is medically prescribed not to eat." *Id.* at 51. Plaintiff filed two grievances on September 24, 2012, one related to his being served a "BLT sandwich" at lunch and another related to his being served a salad with tomatoes and bacon strips at dinner. *Id.* at 53, 55. On September 27, 2012, plaintiff grieved about being served a "peanut butter and jelly sandwich" because it "is high in cholesterol." *Id.* at 57. Plaintiff filed a grievance on October 1, 2012, complaining about "being served a sandwich with tomatoes on it," *Id.* at 59, and another on October 3, 2012, stating that he "was served tomato soup." *Id.* at 63. On October 15, 2012, plaintiff grieved that he was again served a "peanut butter and jelly sandwich." *Id.* at 75. Each grievance filed by the plaintiff was submitted to the grievance coordinator at the CCJ. *See Generally* Dkt. No. 17 at 6-8; Dkt. No. 83-3 at 46-75.

Plaintiff contends that defendant Schroyer was aware of some or all of these complaints, which constitute the protected activity on which plaintiff relies to support his retaliation claim against Dr. Schroyer. Dkt. No.

17 at ¶ 307.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. Plaintiff's amended complaint names the following defendants:

| Defendant | Position |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ  Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |

County of Clinton.

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise

to his claims. The causes of action set forth in that pleading include the claim for retaliation against defendant Schroyer that is the subject of the motion now before the court.

On August 3, 2015, defendant Schroyer filed a motion for summary judgment requesting dismissal of the claims asserted against him in plaintiff's complaint. Dkt. No. 75. I issued a report on February 26, 2016, in which, among other things, I recommended that defendant Schroyer's motion be granted and that all of plaintiff's claims against him, with the exception of his retaliation claim, which was not challenged in defendant Schroyer's motion, be dismissed. Dkt. No. 99. I further recommended that defendant Schroyer be permitted to file a second motion for summary judgment addressing the plaintiff's retaliation claim. *Id.*

On March 9, 2016, defendant Schroyer filed a second motion for summary judgment. Dkt. No. 100. On March 10, 2016, I issued a text order indicating that the filing of that motion was premature in light of the fact that Senior District Judge Thomas J. McAvoy had not yet ruled upon the report in which I recommended that defendant Schroyer be permitted to file a second motion. Dkt. No. 102. Thereafter, on April 25, 2016, Judge McAvoy issued a decision and order in which, among other things, he (1) adopted my report and recommendation in its entirety, (2) granted defendant Schroyer's motion and dismissed all of plaintiff's claims

asserted against him except for plaintiff's First Amendment retaliation claim, and (3) accepted as filed defendant Schroyer's second motion for summary judgment. Dkt. No. 112.

Defendant Schroyer's most recent motion for summary judgment is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Retaliation

In his amended complaint, plaintiff claims that defendant Schroyer

discontinued his heart-healthy diet for a period of approximately one month, in retaliation for plaintiff's many grievances concerning his diet at the facility.

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including but not limited to the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To succeed on a section 1983 claim for retaliatory conduct, a plaintiff must demonstrate that (1) he engaged in protected conduct; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action – in

other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).[6]

In this case, I have assumed for purposes of this report that plaintiff can satisfy the first and second elements of a retaliation claim.[7] *See, e.g., Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."); *See Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir. 1999) (observing that denial of kosher diet may be an adverse action that supports a retaliation claim). Plaintiff's claim fails, however, based upon

---

[6]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[7]     In a prison inmate setting, the standard for determining the adverse action prong under the prevailing retaliation test is an objective one, examining whether the action taken would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), superseded by 320 F.3d 346 (2d Cir. 2003); *see also Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). I have significant doubt as to whether a reasonable factfinder could conclude that removing the plaintiff from a heart healthy diet for a period of slightly in excess of one month satisfies this test. Nonetheless, this is an issue which cannot be resolved on motion for summary judgment, when all inferences are drawn in plaintiff's favor. In any event, it is unnecessary to resolve this question in order to decide defendant Schroyer's pending summary judgment motion.

his inability to satisfy the causation element.

I note, initially, that none of the grievances that are included in the record were ever addressed specifically to or against defendant Schroyer. Moreover, as I noted in my prior report and recommendation, aside from plaintiff's sheer conjecture, there exists no evidence in the record from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances. *See* Dkt. No. 99 at 23. This fact alone is sufficient to warrant dismissal of plaintiff's retaliation claim. *See Perez v. Keysor*, No. 10-CV-0518, 2013 WL 5493932, at *15 (N.D.N.Y. Sept. 30, 2013) (finding a "failure to prove [defendants'] knowledge of [plaintiff's] grievances . . . even in light of temporal proximity, is fatal to [plaintiff's] claim").[8]

In his opposition to defendant Schroyer's motion, plaintiff cites an attachment to his complaint as suggesting the doctor's awareness of Brandon's grievances at the time his heart healthy diet was discontinued. *See* Dkt. No. 115 at 10. That document, however, only shows that a

---

[8]     Plaintiff contends that Lieutenant Kevin Laurin, a former defendant in this case, became upset over the number of grievances filed by the plaintiff up until October 15, 2012, and, as a result, made a false assessment regarding plaintiff's commissary purchases, and then instructed defendant Schroyer to remove plaintiff from the heart-healthy diet. Dkt. No. 17 at 25-27. There is no evidence in the record, however, to support these allegations, which amount to little more than pure conjecture on plaintiff's part. In any case, the record evidence on which plaintiff relies to show that defendant Schroyer was aware of the grievances filed by plaintiff, *see* Dkt. No. 115 at 10 (citing Dkt. No. 17 at 85, 87, and 141), establishes, at best, only that a nurse was aware of certain of those grievances.

grievance investigator contacted the medical office regarding plaintiff's diet and the alleged removal of a restriction on serving plaintiff tomato-based foods. Dkt. No. 17 at 141. The document does not reference Dr. Schroyer, and it is not clear whether the call was made on October 27, 2012, the date on the document, or earlier. *Id.* If it was made on that date then it does not establish the requisite nexus, since the decision to discontinue the heart healthy diet predated the contact. It stands to reason that any grievances filed by the plaintiff after he was removed from the heart-healthy diet could not have formed the basis of the now retaliation claimed since such a sequence would by definition negate the requisite causation element. *See, e.g., Turner v. Sidorowicz*, 12-cv-7048, 2014 WL 641454, *11 (S.D.N.Y. Feb. 18, 2014) (dismissing retaliation claim based on allegation that, after plaintiff "filed a grievance in June 2009 concerning the discontinuation of his tramadol prescription, Dr. Sidorowicz retaliated against him by failing to restore Plaintiff's medication in July 2009" because "there was no change in behavior after the grievance" such that "it is impossible to show that the failure to reinstate Plaintiff's medication was a result of his grievance").

I also note that the record evidence shows plaintiff was non-compliant with the restrictions of the heart-healthy diet through purchases he made at the commissary. The record also reveals that defendant

Schroyer was aware of those purchases, authorized the cancellation of plaintiff from the heart-healthy diet as a result of these purchases, and reinstated plaintiff on the heart-healthy diet after Brandon agreed to comply with his dietary restrictions. Dkt. No. 75-1 at 22; Dkt. No. 75-6 at 3. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still prevail on a motion for summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.*; *see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

Here, even assuming defendant Schroyer was aware of one or more

of the grievances filed by plaintiff and caused the cancellation of his heart-healthy diet in part based on the filing of these grievances, the record before the court also shows that his removal of plaintiff from the heart-healthy diet was for a legitimate, non-retaliatory purpose, and specifically enforcement of the CCJ's legitimate penological interest in maintaining prison discipline in the facility and ensuring a legitimacy to the prison's dietary programs. *See, e.g., Russell v. Wilkinson*, 79 F. App'x. 175, 177 (6th Cir. 2003) (affirming dismissal of First Amendment retaliation claim based on plaintiff's termination of his special kosher diet following a determination that he had purchased non-kosher food from the inmate commissary, holding that "the denial of kosher meals was based on Russell's obvious actions in not observing kosher food requirement outside meals, [and defendant] had a legitimate penological interest in discontinuing Russell's request"). Under such circumstances, defendant Schroyer has established that he would have taken the same action for legitimate, non-retaliatory reasons even absent any allegedly retaliatory motivation, and no reasonable factfinder could conclude otherwise. Plaintiff's retaliation claim against defendant Schroyer thus also fails based upon the court's finding that even absent an allegedly retaliatory motivation, defendant Schroyer would still have discontinued the plaintiff's heart-healthy diet on legitimate, non-retaliatory grounds.

For these reasons, I recommend that plaintiff's retaliation claim against defendant Schroyer be dismissed.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

A careful review of the evidence currently before the court firmly establishes that no reasonable factfinder could conclude defendant Schroyer caused plaintiff to be removed from his heart-healthy diet for the improper purpose of retaliating against him for filing multiple grievances concerning his diet at the CCJ. Accordingly, it is hereby respectfully

RECOMMENDED that defendant Schroyer's second motion for summary judgment (Dkt. No. 100) be GRANTED, and that plaintiff's remaining retaliation claim asserted against him be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    July 13, 2016
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

### REPORT-RECOMMENDATION

SHARPE, Magistrate J.
  I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

*1 Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

### II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

### III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)*. Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978)*. However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Hoefer v. Board of Educ. of Enlarged City School
Dist. of Middletown,    S.D.N.Y.,    April 7, 2014

2013 WL 5493932
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Carlos PEREZ, Plaintiff,

v.

D. KEYSOR, Deputy Superintendent of
Administration, Clinton Correctional Facility;
D. Holdridge, Captain, Clinton Correctional
Facility; Miller, Lieutenant, Clinton Correctional
Facility; R. Furnia, Sergeant, Clinton Correctional
Facility; K. Rabideau, Clinton Correctional Facility;
D. Duquette, Clinton Correctional Facility; S.
Tousignant, Clinton Correctional Facility; St.
Louis, Clinton Correctional Facility; Mussen,
Clinton Correctional Facility, Defendants.

No. 9:10–CV–0518 (LEK/CFH).
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Carlos Perez, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Gregory J. Rodriguez, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

**I. INTRODUCTION**

 *1  This matter comes before the Court following a
Report–Recommendation filed on July 25, 2013, by
the Honorable Christian F. Hummel, U.S. Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c) of the Northern District of New York. Dkt. No.
99 ("Report–Recommendation"). After fourteen days
from the service thereof, the Clerk has sent the entire
file to the undersigned, including the Objections by

Plaintiff Carlos Perez ("Plaintiff"), which were filed on
August 7, 2013. Dkt. No. 101 ("Plaintiff's Objections").
Defendants filed Objections on August 6, 2013. Dkt.
No. 100 ("Defendants' Objections"). For the following
reasons, the Court approves and adopts the Report–
Recommendation in its entirety.

**II. BACKGROUND**

**A. Procedural History**

On May 3, 2010, Plaintiff filed his *pro se* Complaint
against Defendants Brian Fischer, Lucien LeClaire, Jr.,
Dale Artus, S. Racette, D. Keysor, D. Holdrige, Miller,
R. Furnia, K. Rabideau, D. Duquette, S. Tousignant,
St. Louis, Mussen and six John/Jane Doe Defendants
(collectively, "Defendants") alleging that they violated
his constitutional rights. Dkt. No. 1 ("Complaint"). On
August 8, 2011, Defendants filed a pre-answer Motion
for summary judgment. Dkt. No. 40. On March 30, 2012,
the Court, on the basis of a Report–Recommendation,
granted Defendants' Motion for summary judgment as
to Defendants Fischer, Artus, LeClaire, and Racette
and terminated them from the action. Dkt. Nos.
48, 51. Furthermore, Plaintiff's claims of conspiracy
against Defendants Keysor and Miller and Plaintiff's
First Amendment access-to-courts and Sixth Amendment
claims were against all other Defendants were denied.
Dkt. Nos. 48, 51. The six John/Jane Doe Defendants were
dismissed without prejudice pursuant to Fed.R.Civ.P.
4(m). Dkt. Nos. 48, 51.

On December 12, 2012, Defendants moved for summary
judgment as to the remaining claims: (1) excessive
use of force by Defendants Duqutte, Rabideau, St.
Louis, Tousignant and Furnial; (2) medical indifference
by Defendants Tousignant and Furnia; (3) retaliation
by Defendants Duquette and Mussen; (4) failure
to protect by Defendant Holdridge; and (5) violation of due
process by Defendants Miller and Keysor. Dkt. No. 77.
Judge Hummel recommends that Defendants' Motion for
summary judgment be granted as to all claims against
all Defendants except: (1) Plaintiff's Eighth Amendment
excessive-force claim against Defendants Rabideau,
Duquette, St. Louis, Furnia, and Tousignant; and (2)
Plaintiff's Eighth Amendment medical-indifference claim
against Defendants Furnia and Tousignant. Defendants'
Objections were filed on August 6, 2013, followed by
Plaintiff's Objections on August 7, 2013.

## B. Factual Background

The Court presumes the parties' familiarity with the facts underlying this case. For a statement of the facts, reference is made to the Report–Recommendation.

## III. LEGAL STANDARDS

### A. Objections to a Report–Recommendation

**\*2** A district court must review *de novo* any objected-to portions of a magistrate judge's report-recommendation or specific proposed findings or recommendations therein and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b); *accord*FED. R. CIV . P. 72(b); *see also Morris v. Local 804, Int'l Bhd. of Teamsters,* 167 F. App'x 230, 232 (2d Cir.2006); *Barnes v. Prack,* No. 11–CV–0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. *Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011); *Barnes,* 2013 WL 1121353, at \*1;*Farid v. Bouey,* 554 F.Supp.2d 301, 306–07 & n.2 (N.D.N.Y.2008); *see also Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). A district court also "may receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b); *accord*FED. R. CIV. P. 72(b)(3).

### B. Summary Judgment

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Corp.,* 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). A court's duty in ruling on a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994)

## IV. DISCUSSION

### A. Defendants' Objections

**\*3** Defendants object to Judge Hummel's recommendation that their Motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim be denied. Specifically, Defendants contend that Judge Hummel erroneously addressed only Defendants' *de minimis* injury argument and overlooked their argument based on the Second Circuit's holding in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). Defendants also object to Judge Hummel's recommendation that the Court deny their Motion for summary judgment on Plaintiff's medical-indifference claim against Defendants Furnia and Tousignant.

### 1. Eighth Amendment Claim

Plaintiff contends that Defendants assaulted him on two separate occasions on February 3, 2009, and that he sustained injuries to his back, legs, arms, head, and face in the first assault and was rendered unconscious in the second assault. Report–Rec. at 6–7. Defendants object that the Report–Recommendation overlooked

their argument that the medical evidence did not substantiate Plaintiff's claim and therefore no rational factfinder could credit Plaintiff's allegations. *See* Defs.' Objs. (citing *Jeffreys,* 426 F.3d 529).

Defendants' argument was presented to Judge Hummel and addressed in the Report–Recommendation. *See* Report–Rec. at 27 ("Even though medical records do not confirm the injuries which Perez contends to have incurred, any or no injuries resulting from the events as described by Perez could represent a *per se* constitutional violation." (citing *Baskerville v. Mulvaney,* 411 F.3d 45, 48–49 (2d Cir.2005))); *id.* at 26 (" '[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se'* regardless of the seriousness of the injuries." (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999) (alterations in original)). Accordingly, the Court reviews this aspect of the Report–Recommendation only for clear error.

Judge Hummel suggested that, if credited, Plaintiff's evidence "would establish that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to maliciously assault an inmate for no apparent reason." Report–Rec. at 28. Because a malicious use of force would constitute an Eighth Amendment violation regardless of the severity of injuries actually sustained by Plaintiff as a result, the failure of the medical records to show that Plaintiff sustained more than *de minimis* injuries does not determine the issue. Judge Hummel therefore properly concluded that "[t]he competing evidence rests on the credibility of Perez on the one hand and [D]efendants on the other," and that Plaintiff, as the non-moving party, was entitled to have his version of events credited by the Court for purposes of Defendant's Motion for summary judgment. Report–Rec. at 28. Because there is no clear error in Judge Hummel's report on this claim, his recommendation is adopted over Defendants' objection.

*2. Medical–Indifference Claim*

**\*4** Defendants further assert that Plaintiff's medical-indifference claim against Defendants Furnia and Tousignant is not supported by sufficient facts. Defendants argue that Plaintiff has not shown the existence of a serious medical need because there is no evidence that he "suffered from a condition capable of causing death, degeneration, or extreme pain on February 3, 2009." Defs.' Objs. This argument was also addressed by

Judge Hummel, *see* Report–Rec. at 30, and therefore the Court reviews this aspect of the Report–Recommendation only for clear error.

As Judge Hummel observed, "a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain.' " *Id.* at 29 (quoting *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (internal quotation marks omitted)). Judge Hummel then concluded that Plaintiff's medical records showed "a bruise on Perez's left side and neck, swelling on his neck, and pain in his neck and back," and if Plaintiff's testimony that he perceived his medical need as worthy of comment and requested medical attention was credited, a reasonable factfinder could determine that Plaintiff had a serious medical need. Because there is no clear error in Judge Hummel's report on this claim, his recommendation is adopted.

**B. Plaintiff's Objections**
Plaintiff does not offer any new arguments or evidence in his Objections to the Report–Recommendation. Instead, he points to specific sections of his prior arguments to Judge Hummel and objects generally to all recommendations that summary judgment be granted for Defendants. *See generally* Pl.'s Objs. The Court has therefore reviewed the remainder of the Report–Recommendation only for clear error. Finding none, the remainder of Judge Hummel's recommendations are adopted.

**V. CONCLUSION**
Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 99) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

CARLOS PEREZ,

Plaintiff,

v.

D. KEYSOR, Deputy Superintendent of Administration, Clinton Correctional Facility; D. HOLDRIDGE, Captain, Clinton Correctional Facility; MILLER, Lieutenant, Clinton Correctional Facility, R. FURNIA, Sergeant, Clinton Correctional Facility; K. RABIDEAU, Clinton Correctional Facility; D. DUQUETTE, Clinton Correctional Facility; S. TOUSIGNANT, Clinton Correctional Facility; ST. LOUIS, Clinton Correctional Facility; MUSSEN, Clinton Correctional Facility, Defendants. [1]

## REPORT–RECOMMENDATION AND ORDER [2]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Carlos Perez ("Perez"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, nine DOCCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' second motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 77. Perez opposes this motion. Dkt. Nos. 82, 95. Defendants replied to Perez's opposition. Dkt. No. 85. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

### I. Background

 **\*5** By Decision and Order dated March 30, 2012, the Court dismissed Perez's conspiracy claims against defendants Keysor and Miller and First Amendment access to courts and Sixth Amendment claims. Dkt. No. 51 at 2–3. The facts discussed will be those relevant to the claims herein remaining. Those claims occurred during Perez's incarceration at Clinton Correctional Facility ("Clinton").

### A. Failure to Protect

From approximately December 15, 2008 through January 26, 2009, Perez, through his court appointed attorney Barry Stendig of Appellate Advocates, filed grievances to, *inter alia,* the inmate grievance review committee [3] and non-party Commissioner Brian Fischer, complaining "that [Perez's] life was in danger by numerous Correction[s] Officers and/or Prison Officials at Clinton [who] ... had been constantly harassing and threatening to beat up [Perez]...." Compl. ¶ 69; *see, e.g.,* Dkt. No. 95–3 at 16–39, 41–48, 52–61, 74–81. Additionally, there was an alleged pattern and large number of incidents involving use of force against inmates. Compl. ¶¶ 72–74. Despite these pleas for help and Clinton's supposed history with excessive force, Holdridge took no action. *Id.* ¶ 70.

According to Holdridge, on or about February 5, 2009, non-party Racette, deputy superintendent of security, directed him to investigate Perez's allegations contained in a letter addressed to DOCCS's Inspector General, dated January 17, 2009, but received by Clinton on February 5, 2009. Holdridge Decl. (Dkt. No. 77–8) ¶ 5; Dkt. No. 77–8 at 7–14. Perez alleged that Rabideau issued him a misbehavior report in retaliation for filing a grievance against him and denied him law library call-outs. Holdridge Decl. ¶ 6. Holdridge's review of Perez's prison file indicates that Holdridge did not receive Perez's complaints that he feared for his safety prior to February 5, 2009. Holdridge Decl. ¶ 8. After reviewing Perez's January 17 letter, Holdridge directed non-party Guynup to conduct an investigation into Perez's allegations. *Id.* ¶ 10; Dkt. No. 77–8 at 16. In his February 18, 2009 memorandum to Holdridge, Guynup reported that he had already interviewed Perez on January 8, 2009 regarding the letter and Perez informed Guynup that he had nothing to add to that letter. Holdridge Decl. ¶ 12; Dkt. No. 77–8 at 18. Based on Guynup's investigation, it was determined that Perez could not provide evidence or witnesses to support the allegations made in the January 17, 2009 letter and the staff denied Perez's allegations. Holdridge Decl. ¶ 13; Dkt. No. 77–8 at 21.

### B. Misbehavior Report Dated December 15, 2008 [4]

On December 15, 2008, defendant Rabideau authored a misbehavior report against Perez for being disruptive in the law library. Perez Dep. (DKt. No. 77–3 at 4– 185) at 19:22–20:6. [5] Perez contends that Rabideau was a male officer and allegations in that report were false. *Id.* at 22:24–25, 39:6–12. Perez was placed in keeplock for fourteen to fifteen days before having this misbehavior report was dismissed. *Id.* at 36:10–37:10. After filing several grievances against Rabideau, Perez was permitted to return to the library around mid-January 2009. *Id.* at 43:3–44:19. From mid-January until February 3, 2009, Perez did not encounter any problems with Rabideau. *Id.* at 44:20–25.

**\*6** On February 21, 2009, Perez received a memorandum from Holdridge indicating that Perez's "staff complaint, grievance and letter ... ha[ve] been investigated on at least two separate occasions...." Dkt. No. 45–2 at 39. Holdridge addressed the "reported multiple acts of misconduct, [which] are the fault of [Rabideau], in retaliation for you filing a grievance. Staff ha[ve] gone on record denying [the] allegations and there is no evidence or witnesses to support the allegations of your letter...." *Id.* Holdridge concluded by indicating that all investigations into the staff misconduct were closed absent new evidence. *Id.*

According to non-party Gregory, the Inmate Grievance Program Supervisor at Clinton, a review of Clinton's records shows that Perez lodged only one complaint against Rabideau prior to February 3, 2009. Gregory Decl. (Dkt. No. 77–7) ¶¶ 1, 4. That complaint was filed December 17, 2008, alleging that Rabideau harassed Perez in the law library on December 15, 2008 in order to deny him access to the library. [6] Gregory Decl. ¶ 5; Dkt. No. 77–7 at 4–8.

### C. Excessive Force and Medical Indifference

At approximately 8:30 p.m. on February 3, 2009, defendant St. Louis escorted Perez from the law library back to Perez's cell. Compl. ¶ 22. All inmates being escorted from the library were required to pass through a metal detector prior to arriving at their housing unit. *Id.* ¶ 23. Defendants Rabideau and Duquette assisted St. Louis with the metal detector. *Id.* ¶ 24. Perez took off his watch and passed through the detector without activating it, but Rabideau and Duquette ordered Perez to the wall to be frisked, claiming that he had triggered the metal detector.

*Id.* ¶¶ 24–25; Perez Dep. 58:1–8. Perez saw Duquette "passing [a walkie-talkie] ... through the detector after [he] went through, so it could ring," which was also witnessed by Rabideau. Perez Dep. 58:8–12, 64:3–7. Rabideau ordered Duquette to pat-frisk Perez while he took all of Perez's legal work for personal inspection. Compl. ¶ 26. Rabideau then made the statement that Perez had filed many grievances and complaints against Rabideau. *Id.* ¶ 27. Rabideau also exclaimed that Perez had a weapon hidden amongst his legal documents and ordered Duquette to place mechanical restraints on Perez. *Id.* [7]

Defendant Furnia, the area sergeant, was then notified of the situation and Rabideau ordered another corrections officer to escort the rest of the inmates back to their cellblocks. Compl. ¶¶ 28–29. After the other inmates left, Rabideau, Duquette, St. Louis, and Furnia surrounded Perez and Rabideau threatened Perez, stating that he was aware of all of the grievances that were being filed against him and the other Clinton officers and recommended that Perez cease the filings. *Id.* ¶¶ 29–30. Perez asked Rabideau to clarify what he meant whereupon Rabideau, Furnia and Duquette pulled Perez to the floor and, along with St. Louis and Tousignant, began kicking and punching Perez throughout the head and body for approximately two minutes. *Id.* ¶¶ 31–34; Perez Dep. at 81:2–83:4. Rabideau and Furnia also told Perez, while they were assaulting him, that he would face additional charges. Compl. ¶ 33.

**\*7** Rabideau and Duquette then dragged Perez to the facility hospital. Compl. % 35; Perez Dep. 87:15–25. Perez was taken into a room by Furnia and Tousignant for a strip-frisk during which time Rabideau, Duquette and St. Louis left. Compl. ¶¶ 36–37. Furnia and Tousignant completed the strip-frisk and Tousignant reapplied the mechanical restraints behind Perez's back. *Id.* ¶ 38; Dkt. No. 1–6 at 8, 10 (memoranda reporting that Tousignant strip-frisked Perez under Furnia's direction); Dkt. No. 1– 6 at 13 (report of strip frisk). An unidentified nurse then entered the room, asking Perez if he was alright. Compl. ¶ 39. Furnia responded that they were just there for a strip-frisk since Perez was found to be in possession of a weapon, but Perez quickly added that he had been framed and physically assaulted prior to being brought to the hospital. *Id.* ¶¶ 40–41. Furnia ordered the unidentified nurse to leave, while Furnia and Tousignant again assaulted Perez, knocking him unconscious and requiring the nurse to awaken him with smelling salts. *Id.* ¶¶ 42–

44; Perez Dep. at 101:17–25. After reviving Perez, the nurse left the room. Compl. ¶ 45. Furnia and Tousignant then escorted Perez to solitary confinement in restricted housing without any further medical intervention for the injuries Perez sustained to his head, neck, arms and legs or the extreme pain he was experiencing. *Id.* ¶¶ 46–47.

For two days, Perez remained in his cell and suffered from severe pain despite his pleas to the patrolling corrections officers for medical care. Compl. ¶ 48; Perez Dep. at 113:22–114:10. Perez requested medical care from Furnia and Tousignant during the escort back to his cell, which was also denied. Perez Dep. at 114:11–23.

On February 5, 2009, Perez was taken to a mental health examination where the social worker, upon seeing Perez's physical condition, rushed him to the infirmary for medical treatment. Compl. ¶¶ 50–52. Perez was eventually interviewed and photographs of his injuries were taken. *Id.* ¶¶ 53–55; Perez Dep. at 125:1–4. Perez was given a shot for neck and back pain, had developed a black eye and injuries to his neck and back, and discovered he was beginning to suffer from arthritis. [8] Compl. ¶ 56; *see also* Dkt. No. 45–2 at 47 (inmate injury report noting a bruise on Perez's left side and neck, swelling on his neck, and pain in his neck and back), 48 (same). After Perez's pain medication ran-out, an unidentified doctor failed to provide him with more of the same medication, and instead, gave him over-the-counter pain relievers. Compl. ¶¶ 57–58. Perez contends that Furnia, Rabideau, Tousignant, St. Louis, and Duquette denied him medical attention because they assaulted him and failed to provide him medical treatment. Perez Dep. at 124:11–25.

Defendants have a different account of these events. It is undisputed that on February 3, 2009, Rabideau and Duquette were processing inmates returning from a law library call-out. Rabideau Decl. (Dkt. No. 77–13) ¶¶ 1, 5– 6; Duquette Decl. (Dkt. No. 77–4) ¶ 8. However, Duquette did not take any action to cause Perez to activate the metal detector. Duquette Decl. ¶¶ 9–11. Rabideau, a female law library officer, believes that Perez activated the metal detector with a watch he was wearing. Rabideau Decl. ¶¶ 5–7.

**\*8** Duquette was the only individual who pat-frisked Perez's body and legal documents, then found and confiscated the weapon. Duquette Decl. ¶¶ 12–14; Rabideau Decl. ¶ 8; Dkt. Nos. 1–6 (unusual incident report) at 6, 77–4 (misbehavior report) at 6. Duquette attested that while he was pat-frisking Perez, Perez's legal materials were placed on a desk nearby and no one tampered with them. Duquette Decl. ¶¶ 15–17. Duquette was unaware of a grievance that Perez lodged against Rabideau. *Id.* ¶ 18. Duquette authored the misbehavior report against Perez not as a retaliatory action but because he discovered a weapon in Perez's legal materials. *Id.* ¶ 25. Duquette and Rabideau maintain they did not assault Perez, witness other officers assault Perez, place the weapon in Perez's legal materials or witness any Clinton security personnel place a weapon in Perez's legal materials, carry out retaliatory actions against Perez for filing grievances against Rabideau, and did not escort Perez to the facility hospital. *Id.* ¶¶ 16–17, 21, 23, 25; Rabideau Decl. ¶¶ 12–14, 17, 19.

It was Tousignant, under Furnia's supervision, who escorted Perez to the facility hospital to be strip frisked. Duquette Decl. ¶¶ 22–23; Furnia Decl. (Dkt. No. 77–5) ¶¶ 7, 11. Perez was not dragged to the hospital and during the transport, Perez did not indicate that he was in pain, injured, or required medical treatment. Furnia Decl. ¶¶ 12–16; *see* Dkt. No. 77–5 at 8–13 (unusual incident report documenting the absence of use of force and medical issued related to the discovery of the weapon). Tousignant strip-frisked Perez in an exam room and no contraband was found. Furnia Decl. ¶ 8; Dkt. No. 77–5 at 20, 24. Perez was interviewed, made no statement, and was escorted to his cell without incident. Furnia Decl. ¶¶ 9–10.

Furnia maintains that he never assaulted Perez or witnessed Perez being assaulted, had no knowledge of a grievance that Perez lodged against Rabideau, and never retaliated against Perez for any reason. Furnia Decl. ¶¶ 17–18, 20. Furnia attested that upon reviewing the log book pages dated February 3, 4, and 5 of 2009 for Perez's cell block, he concludes that Perez never sought medical attention from any security staff member. *Id.* ¶¶ 22–24, 32. Furnia supports this conclusion by attesting that a number of individuals were on Perez's cell-block and never received a medical request from Perez. [9] *Id.* ¶¶ 25–31.

Tousignant, a corrections officer, was directed by Furnia to escort Perez to the facility hospital. Tousignant Decl. (Dkt. No. 77–15) ¶¶ 1, 6. Tousignant was accompanied only by Furnia and maintains the escort was uneventful. *Id.* ¶¶ 7–8. Perez did not complain about being in pain, limp, bleed, or suffer from any injury. *Id.* ¶ 9. Tousignant

strip frisked Perez in an exam room and did not find any contraband. *Id.* ¶ 10; Dkt. No. 77–15 at 6–7. Tousignant did not recall that a nurse was present during the strip frisk because a nurse would only be present if there was a use of force incident or Perez indicated he was suffering from an injury. Tousignant Decl. ¶¶ 11–12. Tousignant then escorted Perez back to the cell block without incident and Perez neither complained about being in pain or injured nor in need of medical attention. *Id.* ¶¶ 13–14. Tousignant maintains he did not use force on Perez, did not witness any security personnel use force on Perez, was unaware of Perez's grievance against Rabideau, and did not retaliate against Perez in any way. *Id.* ¶¶ 15–18.

**\*9** St. Louis maintains that he did not escort Perez to the facility hospital, assault Perez, witness other security personnel assault Perez, was unaware of Perez's grievance against Rabideau, and did not retaliate against Perez in any way. St. Louis Decl. (Dkt. No. 77–14) ¶¶ 1, 5, 10–14.

After Perez was found with a weapon, Mussen, a corrections officer, was directed by Furnia to search Perez's cell. Mussen Decl. (Dkt. No. 77–11) ¶¶ 1, 7–8. Mussen explained that each inmate is accountable for the one state-issued razor that is provided to him or her upon entry to Clinton. *Id.* ¶ 12. Mussen issued a misbehavior report against Perez because Perez's state-issued razor was missing from his cell. *Id.* ¶¶ 13–14; Dkt. No. 77–11 at 7. Perez contended that had Mussen testified at his disciplinary hearing, Mussen would have stated that he did not search Perez's eyeglass case, which held the razor. Mussen Decl. ¶ 17. However, Mussen attested he thoroughly frisked Perez's cell, which entailed searching through Perez's clothing, legal materials and books, property under the bed, and locker. *Id.* ¶¶ 8–9. Based on the Personal Property Transferred Form, Mussen maintains Perez did not have an eyeglass case on February 3, 2009. *Id.* ¶ 11; Dkt. No. 77–11 at 9. Mussen further attested that he did not issue the misbehavior report in retaliation, has never carried out retaliatory action against Perez, worked in a separate unit from Rabideau during February 2009, and was unaware of Perez's grievance against Rabideau. Mussen Decl. ¶¶ 15, 19–20.

**D. Medical Treatment and Injuries**

On February 5, 2009, non-parties Nurse Fitzgerald and Dr. Lee saw Perez for Perez's complaints of a staff-assault that occurred February 3, 2009. Dkt. No. 78 at 6; Adams Decl. (Dkt. No. 78) ¶¶ 1–2, 6. Fitzgerald noted a bruise on Perez's left shoulder and neck area, redness in the back of Perez's neck, and Perez's head was tilted to the left and he could not straighten it when an X-ray was taken. [10] Dkt. No. 78 at 6; Adams Decl. ¶ 6. A psychiatric nurse was notified to review Perez's psychiatric medications and Dr. Lee gave Perez a shot for extrapyramidal symptoms. [11] Dkt. No. 78 at 6; Adams Decl. ¶ 6. On February 7, 2009, Perez was seen at emergency sick call with a tilted head, was given Ibuprofen, and ordered medical bed rest for three days. Dkt. No. 78 at 6; Adams Decl. ¶ 6.

On February 9, 2009, non-party Adams, a DOCCS medical doctor, examined Perez and noted that Perez had a small light brown area around the nape of the neck which was consistent with a two to three day old contusion requiring no treatment. Adams Decl. ¶ 8; Dkt. No. 78 at 7. Perez was provided Flexerol for neck pain. Adams Decl. ¶ 8; Dkt. No. 78 at 7.

On February 13, 2009, Perez's anti-seizure medications were reviewed for a court trip. Dkt. No. 78 at 8; Adams Decl. ¶ 9. During the court trip, Perez was housed at Auburn Correctional Facility, where he was seen at sick call complaining of pain in the left side of his neck and was given Ibuprofen. Dkt. No. 78 at 9; Adams Decl. ¶ 10.

**\*10** On March 3, 2009, Perez returned to Clinton and his health record entry dated March 17, 2009 indicated Perez did not have medical problems. Dkt. No. 78 at 11; Adams Decl. ¶ 11. On June 8, 2009, an X-ray taken of Perez's cervical spine indicated no fracture or dislocation. Dkt. No. 78 at 12; Adams Decl. ¶ 12.

**E. Disciplinary Hearings and Appeals**

On February 6, 2009, Perez was escorted to a hearing room for two disciplinary hearings scheduled as a result of the two misbehavior reports which Duquette [12] and Mussen had issued on February 3, 2009. Compl. ¶¶ 59–60. The hearings were conducted by defendants Keysor and Miller, both of whom were biased, denied Perez the opportunity to present a defense, and failed to provide adequate assistance. *Id.* ¶¶ 61–64. Miller found Perez

guilty of losing his property and sentenced him to thirty days of keeplock and loss of privileges, effective from February 3, 2009 through March 5, 2009. Miller Decl. (Dkt. No. 77–10) ¶¶ 9–10; Dkt. Nos. 1–7 at 1, 77–10 (hearing transcript) at 10–11. Keysor found Perez guilty of possessing a weapon and smuggling his state issued razor. Compl. ¶ 67; Dkt. 1–6 at 32. Keysor relied on Duquette's misbehavior report and testimony from Duquette and Rabideau which she deemed credible. Dkt. No. 1–6 at 33. Perez was sentenced to six months in the Special Housing Unit ("SHU") [13] and six months loss of privileges. Dkt. No. 1–6 at 32; Compl. ¶ 67.

According to Keysor, Perez initially met with his chosen inmate assistant on February 5, 2009 but refused to endorse the Assistant Form. Keysor Decl. (Dkt. No. 77–9) ¶ 8; Dkt. No. 77–9 at 28–29. Keysor began the Tier III hearing on February 6, 2009. Keysor Decl. ¶ 9. At the onset of the hearing, Perez advised Keysor that he was dissatisfied with the assistance he received. Keysor Decl. ¶ 10; Dkt. No. 77–9 at 35. Keysor read the misbehavior report into the record and asked Perez how he pled to the charges against him. Keysor Decl. ¶ 11; Dkt. No. 77–9 at 35–36. Perez signed the hearing record sheet to record his pleas to the charges against him and Keysor adjourned the hearing so that Perez could get necessary assistance for his defense. Keysor Decl. ¶ 11; Dkt. No. 77–9 at 36.

Keysor reconvened the hearing on February 13, 2009 and confirmed that Perez met with one of his chosen assistants and received assistance on February 9, 2009. Keysor Decl. ¶ 12; Dkt. No. 77–9 at 36. Keysor permitted Perez to summarize on-the-record his hearing testimony statement. Keysor Decl. ¶ 13; Dkt. No. 77–9 at 36–41. Perez's requested witnesses, Furnia, Duquette, Rabideau, and Tousignant, all testified as witnesses. Keysor Decl. ¶¶ 14–15; Dkt. No. 77–9 at 41–55. When Duquette testified, Perez raised questions about his testimony. Keysor Decl. ¶ 16; Dkt. No. 77–9 at 57. Keysor had Duquette return to clarify his prior testimony. Keysor Decl. ¶ 16; Dkt. No. 77–9 at 57–62.

**\*11** After reviewing documentation that Perez had submitted to his assistant, Keysor attempted to call three random inmates who were on library call-out on February 3, 2009. Keysor Decl. ¶ 17; Dkt. No. 77–9 at 55. However, those inmates refused to testify and signed witness refusal forms. Keysor Decl. ¶ 18; Dkt. No. 77–9 at 62–63, 70–72. Perez requested to call a

nurse he claimed was in the hospital examining room to testify. Keysor Decl. ¶ 19. Keysor considered Perez's theory that Perez was issued the misbehavior report as retaliation for filing grievances against Rabideau; however, because the unidentified nurse did not observe the alleged misbehavior, Keysor concluded her testimony was not relevant and denied Perez's request. Keysor Decl. ¶¶ 19–23; Dkt. No. 77–9 at 74 (witness interview notice). Relying on the misbehavior report and testimonies by Rabideau and Duquette, Keysor found Perez guilty and imposed six-months of SHU confinement along with loss of recreation, packages, commissary, phone privileges, and good time credits. Keysor Decl. ¶¶ 24–25; Dkt. No. 77–9 at 77.

On March 4, 2009, Perez filed an appeal to non-party Artus seeking reversal of Miller's finding of guilt. Dkt. No. 1–7 at 1–10. On March 10, 2009, Holdridge affirmed Perez's conviction and sentence. *Id.* at 11. On June 22, 2009, Perez initiated an Article 78 proceeding [14] to challenge the determination. Dkt. Nos. 1–8, 45–2 at 52. The state court proceeding was dismissed because "[o]n December 29, 2009, the determination was reversed and expunged based upon state law involving administrative issues." Mastracco Aff. (Dkt. No. 1–9) ¶ 7; *see also id.* ¶ 8; Dkt. No. 1–10 at 1 (letter reversing and expunging conviction); Dkt. No. 45–2 at 51–52 (Decision and Order dated January 15, 2010 dismissing state case).

On March 29, 2009, Perez filed an appeal to the unnamed Director of Special Housing seeking reversal of the disciplinary hearing Keysor conducted beginning on February 6, 2009. Dkt. No. 1–1. The superintendent's hearing was initially affirmed on April 24, 2009. Dkt. No. 1–2 at 2. Perez filed a petition in state court seeking to have his conviction reversed. Dkt. No. 1–10 at 1–66; Dkt. No. 1–11. Eventually, Keysor's finding of guilt was administratively reversed and expunged from Perez's record on March 22, 2010 for Keysor "inappropriate[ly] deni[ed] ... a potentially relevant witness regarding the inmate's retaliation defense." Compl. ¶ 68; Prack Decl. (Dkt. No. 77–12) ¶¶ 4–5; Dkt. Nos. 1–2 at 6, 45–2 at 50, 77–12 at 5.

## II. Discussion

Perez contends that: (1) defendants Duquette, Mussen, and Holdridge violated his First Amendment right against

retaliation for filing grievances; (2) defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment right against the use of excessive force; (3) defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment right by exhibiting deliberate indifference to his medical needs; (4) defendant Holdridge violated his Eighth Amendment right by failing to protect him from Clinton's security staff; (5) defendants Keysor and Miller violated his Fourteenth Amendment due process rights during his disciplinary hearings; and (6) defendants Duquette and Mussen violated his Fourteenth Amendment rights by authoring false misbehavior reports. Defendants contend that Perez's constitutional claims are meritless and that Holdridge and Keysor are entitled to qualified immunity.

## A. Legal Standard

**\*12** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *FED. R. CIV. P. 56(c)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Second Motion for Summary Judgment & Law of the Case

**\*13** Perez contends that defendants' second motion for summary judgment should be dismissed because defendants already filed such a motion on August 8, 2011, which was decided upon on March 30, 2012. Perez Reply (Dkt. No. 82) at 1.

A successive motion for summary judgment may be procedurally improper if it presents no new facts and seeks to raise arguments that could have been raised in the first motion. *Brown v. City of Syracuse,* 673 F.3d 141, 147 n.2 (2d Cir.2012) (quoting *Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.,* 221 F.R.D. 409, 409 (409 (S.D.N.Y.2004)). Nevertheless, district courts may use their discretion in considering successive dispositive motions. *Id.* (quoting *Kovacevich v. Kent State Univ.,* 224 F.3d 806, 835 (6th Cir.2000) ( "District courts may in their discretion permit renewed or successive motions for summary judgment, particularly when the moving party has expanded the

factual record on which summary judgment is sought.")); *Sira v. Morton,* 380 F.3d 57, 68 (2d Cir.2004) (citing the same). Here, defendants did not address Perez's First and Eighth Amendment claims in their first motion for summary judgment. Dkt. No. 48 at 14 n.10. However, given that "[d]efendants primarily rel[ied] on the failure to exhaust as the basis for the [first] motion" and expanded the factual record by conducting discovery, including deposing Perez, defendants had reason to move again for summary judgment after the completion of discovery. *Id.; Brown,* 673 F.3d at 147 n.2.

Further, in his supplemental response, Perez contends that, pursuant to the law of the case doctrine, defendants cannot again make certain arguments that were made in their first motion for summary judgment and already decided by the Court. *See, e.g.,* Perez Suppl. Resp. (Dkt. No. 95–2) at 8, 11–14. In applying the law of the case doctrine, courts have long recognized the distinction between pre-discovery motions, based on an undeveloped record, and post-discovery motions for summary judgment. *See, e.g., DiLaura v. Power Authority,* 982 F.2d 73, 76–77 (2d Cir.1992) (findings made by a court for the purpose of injunctive relief are not the law of the case for subsequent litigation on the merits); *Clalit Health Serv. v. Israel Humanitarian Found.,* 385 F.Supp.2d 392, 398 n. 8 (S.D.N.Y.2005) (holding that a pre-discovery determination on a motion to dismiss not the law of the case for purposes of summary judgment). Here, the first motion for summary judgment was based on an undeveloped record. After discovery closed, defendants filed this present summary judgment motion. Thus, the determination on the first motion for summary judgment is not the law of the case for purposes of the second motion for summary judgment.

Accordingly, Perez's contentions on these grounds should be denied and the Court will consider defendants' arguments in their second motion for summary judgment.

### C. First Amendment

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and

the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008).

**\*14** "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his

exercising of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

### 1. Duquette and Mussen

In this case, Perez has satisfied the first and second prongs of the First Amendment analysis. It is undisputed that Perez has satisfied the first prong of the First Amendment analysis for the filing of prison grievances is a constitutionally protected activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.2010). Further, defendants also do not dispute that the filing of false misbehavior reports against Perez and his sentences of six-months in SHU and thirty days in keeplock constituted adverse action against Perez. *Gill,* 389 F.3d at 384 (finding the filing of false misbehavior reports that resulted in a sentence of three weeks in keeplock would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through grievances and lawsuits); *Davis,* 320 F.3d at 353.

As for the causal connection factor, Perez alleged that Duquette and Mussen issued him false misbehavior reports because he filed grievances against Rabideau on January 21, 2009. Defendants contend that the temporal proximity between the protected conduct and the alleged retaliatory conduct is too attenuated to establish a causal relationship. Defs.' Mem. of Law at 23–24. Perez filed a grievance against Rabideau on January 21, 2009 involving use of the law library and the alleged retaliatory conduct took place within two weeks on February 3, 2009, which has been held to sufficiently support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citation omitted) (finding the passage of six months between the protected conduct and alleged retaliatory assault supported the inference of a causal connection). Defendants argue that Perez used the law library during this time period without any incident, which in turn, diminishes the weight attached to the temporal proximity between Perez's protected conduct and the alleged retaliatory acts. However, the absence of conflict or incident during this period does not do away the undisputed fact that an alleged assault occurred shortly after Perez lodged a grievance against Rabideau. Thus, this factor lends support in Perez's favor.

**\*15** While there is appropriate temporal proximity between the alleged protected conduct and adverse action, "[i]n many circumstances ... th[at] alone is insufficient to avoid summary judgment." *Webster v. Fischer,* 694 F.Supp.2d 163, 183 (N.D.N.Y.2010). Failure to prove Duquette and Mussen's knowledge of Perez's grievances against Rabideau, even in light of the temporal proximity, is fatal to Perez's claim. *Shaheen v. Filion,* No. 04–CV–625 (FJS)(DRH), 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (dismissing retaliation claim where inmate "provide[d] no evidence to demonstrate that any defendant had any knowledge of his complaints ... prior to the filing of the misbehavior report," and to which defendants "provided a declaration stating that he or she was unaware of any of [the inmate's] writings that criticized prison officials and conditions."). Perez's conclusory and speculative allegations are contrary to the declarations of Duquette and Mussen, who claimed that they had no knowledge of such grievances. Perez alleged that Rabideau verbally declared, in Duquette's presence, that Perez possessed legal materials containing Rabideau's name. However, this verbal statement occurred subsequent to the metal detector's activation, which provided Duquette a reason to search Perez and his legal materials. Duquette would not have garnered knowledge of the grievances from this statement alone. Therefore, beyond Perez's conclusory allegations, there is nothing in the record refuting the testimonies of Duquette and Mussen that they were not aware of Perez's grievances against Rabideau involving the law library.

Furthermore, this district has previously held that inmate actions alleging retaliation "against other prison employees elsewhere in the New York penal system," without providing additional factual allegations establishing knowledge and involvement, are insufficient to state a claim. *Gonzales v. Wright,* No. 06–CV–1424 (JMH), 2010 WL 681323, at *12 (N.D.N.Y. Feb. 23, 2010) (Dkt. No. 52–23 at 27); *see also Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (finding that the inmate "has failed to provide any basis to believe that [a corrections counselor] retaliated for a grievance that she was not personally named in.") (collecting cases). Moreover, Perez's disciplinary history,

where he was charged with damaging property, making an unauthorized exchange, fighting, and possessing a weapon, only weakens the causal evidence in the record.

Lastly, while "[v]indication of the inmate after a hearing may constitute circumstantial evidence of defendant's retaliatory motive," Perez's disciplinary dispositions were reversed based on procedural grounds, not the because the charges against Perez were supported by insufficient evidence. *Lashley v. Wakefield,* 367 F.Supp.2d 461, 468 (W.D.N.Y.2005) (citing *inter alia, Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (finding that summary judgment inappropriate when "essentially all relevant adverse actions by DOCS officials were subsequently found to have been unjustified ... not on procedural or technical grounds but because ... they were found to have been devoid of factual support.")). Therefore, because defendants have shown through record evidence that there is an absence of factual issues with regard to the causal connection prong, Perez's retaliation claims against Duquette and Mussen are without merit. *Celotex Corp.,* 477 U.S. at 323.

**\*16** Accordingly, defendants' motion on this ground should be granted.

### 2. Holdridge

Perez contends that he had repeatedly informed Holdridge about being harassed by corrections staff but Holdridge refused to take action in retaliation for Perez lodging grievances against Rabideau. Perez Dep. at 148:21–149:7. Perez also testified during his deposition that Holdridge failed to properly investigate his claims of staff harassment in retaliation for his grievance received on February 3, 2009, filed against Rabideau. *Id.* at 147:20–149:7. However, despite these conclusory allegations, Perez does not make any factual allegations to support the causal connection between the grievance and the disposition of its investigation. *Jackson,* 549 F.Supp.2d at 214–15. Perez cannot merely show there is some doubt as to the true nature of the facts surrounding his retaliation claim against Holdridge with wholly conclusory assertions. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. Perez does not substantiate his assertions with any documentation addressed to Holdridge which concerned Rabideau. Further, Perez does not make further factual allegations or provide support to explain how Holdridge improperly

investigated his grievance. A rational factfinder would not be able to find in favor of Perez based on such conclusory and unsubstantiated allegations. *Gallo,* 22 F.3d at 1223–24. As such, Perez's retaliation claim against Holdridge is also without merit.

Accordingly, defendants' motion on this ground should be granted.

### D. Eighth Amendment

Perez contends that defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment rights by using excessive force against him and exhibiting deliberate indifference to his medical needs. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*17** The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."

*Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

Defendants contend that Perez's claims are insufficient to establish satisfy the objective prong of the Eighth Amendment analysis because Perez's injuries are *de minimis* and the claims are unsubstantiated. Perez contends that defendants assaulted him on two separate occasions on February 3, 2009. Perez further contends that while he was handcuffed from behind, Rabideau and Duquette threw him face first to the ground. Rabideau and Duquette, joined by St. Louis, Tousignant, and Furnia, proceeded to kick and punch him in the back, legs, arms, head, and face for approximately two minutes. While Perez was transported to the facility, he was dragged by his feet. Perez also contends that in the medical exam room, Furnia and Tousignant assaulted him until he became unconscious. Despite Perez's compliance with the pat-frisk and the examination, Perez claims to have

been assaulted for two minutes for the first incident and five minutes for the second incident. Even though medical records do not confirm the injuries which Perez contends to have incurred, any or no injuries resulting from the events as described by Perez could represent a *per se* constitutional violation. *See Baskerville v. Mulvaney,* 411 F.3d 45, 48–49 (2d Cir.2005). Thus, defendants' argument that Perez's injuries were merely *de minimis* cannot result in the dismissal of Perez's excessive force claims.

**\*18** As for the subjective prong, defendants fail to show the absence of a genuine issue of material fact. Perez alleged the assaults were unprovoked and nothing in the record indicates that Perez behaved in any threatening manner posing a danger to officers or inmates. Thus, Perez's contentions that he was punched and kicked throughout the body were disproportionate to the amount of force required. If Perez's evidence is credited, a reasonable factfinder could find the actions of Rabideau, Duquette, St. Louis, Tousignant, and Furnia were wanton and malicious. The need for force in response to compliant and non-threatening behavior could be deemed malicious. Perez's evidence would establish that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to maliciously assault an inmate for no apparent reason, which could constitute a per se constitutional violation.

The competing evidence rests on the credibility of Perez on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party directs the Court to credit Perez's version of events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases). Thus, viewing the facts in the light most favorable to Perez, he has proffered sufficient evidence to raise genuine issues of material fact as to the objective and subjective prong of the Eighth Amendment analysis.

Accordingly, defendants' motion on this ground should be denied.

### 2. Medical Indifference

The Eighth Amendment prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*19** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

#### a. Furnia and Tousignant

Perez claims that Furnia and Tousignant refused to permit him to leave his cell and seek medical attention. Here, Perez has established the objective prong to the medical indifference analysis. Perez made repeated requests for medical attention to Furnia and Tousignant. Perez's complaints caused Fitzgerald to exam Perez and Dr. Lee to provide him with pain relief medication. Perez's medical records indicate that Perez exhibited a bruise on Perez's left side and neck, swelling on his neck, and pain in his neck and back. Crediting Perez's requests for medical attention, as he perceived his medical need was worthy of comment, Perez has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury. *Brock,* 315 F.3d at 162–63.

Perez has also presented a genuine issue of fact with respect to the subjective prong of the test. Furnia and Tousignant had knowledge of Perez's medical need for Perez verbally informed them of such. *Chance,* 143 F.3d at 702. Perez further contends that Furnia and Tousignant refused to allow him to leave his cell for medical attention; thus, intentionally delaying Perez's access to medical attention. *Estelle,* 429 U.S. at 104. Even though Perez eventually saw Fitzgerald two days after the alleged assault, this opportunity was not provided by either Furnia or Tousignant. Further, the absence of sick-call entries does not vitiate against claims of deliberate indifference since part of Perez's claim is that Furnia and Tousignant prevented him from obtaining medical care. Moreover, Perez contends he made further efforts by attempting to receive medical assistance from patrolling officers; however, they disregarded his requests. Therefore, Perez has shown that factual issues exist with respect to the subjective prong of his medical indifference claim.

Accordingly, defendants' motion on this ground should be denied.

#### b. Rabideau, Duquette, St. Louis

Although defendants do not bring this contention to the Court's attention, Perez claims in his deposition that

Rabideau, Duquette, and St. Louis exhibited deliberate indifferent to his serious medical needs because they assaulted him without subsequently providing him with medical attention. While Perez rationalizes that Rabideau, Duquette, and St. Louis should have been aware that he was suffering from serious medical needs as a result of the alleged assault carried out by the same defendants, Perez does not allege that he informed them of his serious medical needs. *Chance,* 143 F.3d at 702. More importantly, this allegation is a mere afterthought during Perez's deposition. Thus, Perez has failed to make a showing against Rabideau, Duquette, and St. Louis such that a reasonable factfinder could find in his favor. *Gallo,* 22 F.3d at 1223–24.

**\*20** Accordingly, Perez's medical indifference claims against Rabideau, Duquette, and St. Louis should be dismissed.

### 3. Failure to Protect

The Eighth Amendment also obliges corrections officers to protect Perez from known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Id.* at 832. Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834 (*citing Helling v. McKinney,* 509 U.S. 25, 31–32 (1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). To state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison office must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Matthews v. Armitage,* 36 F.Supp.2d 121, 124–25 (N.D.N.Y.1999) (internal citations and quotations omitted).

Here, defendants challenge the subjective prong of Perez's failure to protect claim. Perez contends that Holdridge failed to protect him from Clinton corrections officers despite being notified of harassment and threats made to Perez. Perez contends he, through his attorney, filed numerous complaints to Holdridge complaining of Perez's safety at Clinton. A letter received on February 5, 2009 indicates that Holdridge was unaware of Perez's claims until after the alleged February 3, 2009 use of force incident. None of the other letters submitted to the Court were both filed against Rabideau and addressed to Holdridge. Thus, Perez has failed to show that Holdridge knew of the harm under which he was subjected and had the opportunity to cease or prevent such harm. *Farmer,* 511 U.S. at 829; *Matthews,* 36 F.Supp.2d at 124–25.

Accordingly, defendants' motion on this ground should be granted.

### F. Fourteenth Amendment

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that confinement or condition was atypical and significant in relation to ordinary prison life. *See Sandin v. Conner,* 515 U.S. 472, 483–84 (1995); *Jenkins v. Haubert,* 179 F .3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*21** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in

determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of [Special Housing Unit] SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). "[I]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM) (ATB), 2012 WL 4093791, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).

### a. Miller

In this case, Perez has failed to establish a protected liberty interest for his due process claim against Miller. As a result of Miller's disciplinary hearing disposition, Perez served thirty days of keeplock confinement. Perez does not allege any facts indicating, in any way, that during this brief keeplock period, he suffered atypical and significant hardship in relation to ordinary prison life and the record does not reflect otherwise. *Sandin,* 515 U.S. at 483–84. Given the status of the detailed factual record, the brief period of confinement, and the complete absence of any allegations by Perez that his disciplinary confinement was anything other than ordinary, Perez has failed to establish a protected liberty interest with respect to his claim against Miller. *Palmer,* 364 F.3d at 65–66.

Accordingly, defendants' motion on this ground should be granted.

### b. Keysor

Defendants do not challenge the liberty interest requirement to Perez's due process claim against Keysor. Rather, they argue that Keysor provided Perez with all the process that he was due. Perez contends that Keysor deprived him of his procedural due process rights by not being an impartial hearing officer, denied his request for a nurse as a witness, and failed to provide adequate assistance.

Perez has failed to establish a genuine issue of fact with regards to being denied the appropriate procedural protections. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

**\*22** Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira,* 380 F.3d at 69. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer].." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

It is clear that Perez's disciplinary disposition was based on reliable evidence of his guilt. The misbehavior report issued against Perez charges Perez with possessing a weapon and smuggling it, which are corroborated by testimonies of Rabideau and Duquette. Despite Perez's persistent attempts to elicit testimony on what actually caused the metal detector to go off, testimonies indicated that a weapon was nevertheless discovered in Perez's legal materials. Even if Duquette or another officer had set of the metal detector, intentionally or unintentionally, this does not vitiate against the fact that a weapon was found in Perez's possession. Thus, Keysor based her disposition on reliable evidence.

Perez was denied the opportunity to call an unidentified nurse as a witness to testify at the hearing. However, "[i]t

is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotation marks and citations omitted); *see also Richardson v. Van Dusen,* 833 F.Supp. 146, 152 (N.D.N.Y.1993) (quoting *Scott v. Kelly* ). While Keysor denied Perez's request to have a nurse testify, Keysor considered Perez's theory that the misbehavior report was issued in retaliation for filing grievances and noted the nurse did not observe the alleged misbehavior involving the weapon and metal detector. Thus, since this nurse did not witness the events contained in the misbehavior report, her testimony would not assist Perez.

Furthermore, Perez was given the opportunity to extensively question Furnia, Duquette, Rabideau, and Tousignant through Keysor. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Keysor retained the authority and discretion to administer the questioning in a manner she deemed appropriate. A review of the hearing transcript shows that she did permit Perez to question the witnesses extensively, even though not every question was permitted to be asked. Moreover, when Keysor denied Perez's questions, she provided reasoning for the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report. *See, e.g.,* Dkt. No. 77–9 at 42, 46, 49, 53.

*23 Moreover, the record belies Perez's contention that he was provided inadequate assistance. "Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). Such assistance is intended to aid inmates to "gather [ ] evidence, obtain[ ] documents and relevant tapes, and interview [ ] witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Id.* at 898. In disciplinary settings, inmates requiring counsel may "seek the aid of a fellow inmate, or ... have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Wolff,* 418 U.S. at 570. Any violations of this right to assistance are reviewed to assess "whether the

error was harmless or prejudicial." *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). During the inception of the hearing on February 6, 2009, Perez advised Keysor that his originally chosen inmate assistance provided him with inadequate assistance. As a result, Keysor adjourned the hearing so that Perez may receive adequate assistance to prepare his defense. The hearing was reconvened on February 13, 2009, during which Perez conceded that he received adequate assistance from another inmate assistant on February 9, 2009. Dkt. No. 77–9 at 36. This record evidence directly contradicts Perez's allegation that Keysor denied him inmate assistance.

Accordingly, despite Perez's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Perez was provided. Because Perez received all process to which he was entitled, defendants' motion on this ground should be granted.

### 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). Here, as discussed *supra,* Perez's retaliation claims cannot withstand this motion for summary judgment. As such, Perez's claims against Duquette and Mussen based on the issuance of false misbehavior reports is also without merit.

Accordingly, defendants' motion on this ground should be granted.

### G. Qualified Immunity

Defendants claims that even if Perez's constitutional claims against Keysor and Holdridge are substantiated, Keysor and Holdridge are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,*80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

**\*24** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Perez's Fourteenth Amendment claim against Keysor or First and Eighth Amendment claims against Holdridge because, as discussed *supra,* it has not been shown that either Keysor violated Perez's Fourteenth Amendment rights or Holdridge violated Perez's First or Eighth Amendment rights.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 77) be **GRANTED** as to all claims against all defendants except for Perez's (1) Eighth Amendment excessive force claim against defendants Rabideau, Duquette, St. Louis, Furnia and Tousignant and (2) Eight Amendment medical indifference claim against defendants Furnia and Tousignant.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5493932

Footnotes

1    By Decision and Order dated March 30, 2012, the Court dismissed defendants Fischer, Artus, LeClaire, Racette and all "John/Jane Doe" defendants from this action. Dkt. No. 51 at 2o3.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

4    Non-party Gardner, a disciplinary lieutenant at Shawangunk Correctional Facility, reviewed Perez's disciplinary history records for purposes of this action. Gardner Decl. (Dkt. No. 77–6) ¶¶ 1, 3. According to Gardner, while housed at Sing Sing Correctional Facility on October 9, 2007, Perez was charged with and found guilty for damaging property and making an unauthorized exchange. Gardner Decl. ¶ 5; Dkt. No. 77–6 at 5–7. While housed at Midstate Correctional Facility on April 16, 2008, Perez was issued two misbehavior reports, one for engaging in a fight and another for possessing a weapon. Gardner Decl. ¶ 6; Dkt. No. 77–6 at 9–12. As a result, Perez was found guilty and served 180 days of Special Housing Unit ("SHU") confinement. Gardner Decl. ¶ 6; *see* note 10 *infra* on definition of SHU. Perez was in SHU from April 23, 2008 to September 20, 2008. Gardner Decl. ¶ 7; Dkt. No. 77–6 at 15.

5    The page numbers following "Perez Dep." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

6    In an interdepartmental communication, Rabideau maintained that he counseled Perez, on numerous occasions, to cease his habit of speaking with other inmates during callouts as such behavior disrupts other inmates from completing their legal work. Dkt. No. 77–7 at 12. Non-party Sergeant Guynup interviewed two inmates who were present in the law library when the alleged incident occurred. *Id.* at 13. Inmate Jordan claimed he saw Perez in the library and started to talk to him, at which point Rabideau gave Perez an order to stop talking loudly. *Id.* Inmate Madison told Guynup that he never heard Rabideau use vulgar language and heard Rabideau give Perez an order to stop talking in the library. *Id.*

7    In the unusual incident report, the weapon was described as a "sharpened ... plastic shank type weapon with a cloth handle," wrapped in a paper towel. Dkt. No. 1–6 at 5.

8    Perez contends his back pain persists at least until August 28, 2012, the date of Perez's deposition. Perez Dep. at 128:9–20.

9    These individuals include: an insulin nurse; a medical nurse; a sergeant; a psychiatric nurse; the unit chief with the Office of Mental Health; and a social worker with the Office of Mental Health. Furnia Decl. ¶¶ 25–31; Dkt. No. 77–5 at 31–34.

10   Photos taken of Perez largely confirms Fitzgerald's observations. Dkt. No. 78–1 at 10–15.

11   According to Adams, "[e]xtrapyramidal symptoms are various movement disorders or reactions as a result of taking antipsychotic drugs." Adams Decl. ¶ 6.

12   Duquette's misbehavior report cited Perez with smuggling and possession of a weapon. Dkt. No. 1–6 at 11.

13   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP.CODES R. & REGS. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

14   N.Y. Civil Practice Law and Rules Art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   19

2014 WL 641454
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Halbert TURNER, Plaintiff,

v.

Wladyslaw SIDOROWICZ, Genevieve Switz,
Ginger Eggler, Sharon Lilley, Holly Miller, Lynn
Lilley, Leslie Malin, and Shawn Kemp Individually
and in their Official Capacities, Defendants.

No. 12–cv–7048 (NSR).
|
Feb. 18, 2014.

OPINION AND ORDER

NELSON S. ROMÁN, District Judge.

**\*1** Halbert Turner, a state prisoner proceeding
*pro se* ("Plaintiff"), brings this action pursuant
to 42 U.S.C. § 1983, alleging violations of his
constitutional rights during his incarceration at Sullivan
Correctional Facility [1] ("Sullivan") against Sullivan
employees W ladysl aw Sidorowicz, Director of
Health Services ("Dr.Sidorowicz"), Genevieve Switz,
Physician Assistant ("PA Switz"), Ginger Eggler,
Nurse Administrator ("NA Eggler"), Sharon Lilley,
former Nurse Administrator ("NA Lilley"), Holly
Miller, Nurse ("Nurse Miller"), Lynn Lilley, Deputy
Superintendent of Administration ("DSA Lilley"), Leslie
Malin, former Deputy Superintendent of Programs
("DSP Malin"), and Shawn Kemp, Correction Officer
("CO Kemp") (together, "Defendants"). Before the Court
is Defendants' Motion to Dismiss Plaintiff's Complaint
under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the
following reasons, Defendants' Motion to Dismiss is
GRANTED in part and DENIED in part.

I. Factual Background [2]

A. Discontinuance of Plaintiff's **Tramadol** Prescription
Plaintiff's claims are that certain individuals at
Sullivan denied Plaintiff adequate medical treatment,
inappropriately revoked his religious diet, and falsified

reports and other documents. Plaintiff alleges that on
April 10, 2009, Nurse Miller "willfully, purposefully and
maliciously falsified an official report" regarding Plaintiff
in which she stated that Plaintiff was frisked under
suspicion of pocketing **tramadol**, [3] a pain medication
that Plaintiff was taking twice daily for back pain
since August 2005, and found to have a cup with a
white residue. Relying on this allegedly false report,
Dr. Sidorowicz discontinued Plaintiff's prescription
for **tramadol**. Plaintiff states that over a period of
over six months, Dr. Sidorowicz continued to refuse
Plaintiff the medication and failed to issue Plaintiff
substitute medication. Plaintiff alleges that because the
"highlyaddictive" prescription was discontinued abruptly,
contrary to the manufacturer's recommendations, he was
forced to detox cold-turkey. Over the course of six
months allegedly without treatment, Plaintiff asserts that
he suffered severe pain.

On June 22, 2009, Plaintiff filed a grievance to the
Inmate Grievance Resolution Committee regarding the
discontinuance of Ultram. Plaintiff's Opposition Exhibit
("Opp'n Ex.") 8. Shortly after, Plaintiff went to sick
call and requested that his medication be reinstated. Dr.
Sidorowicz refused to reinstate the prescription on July
14, 2009 and Plaintiff alleges he refused to do so in
retaliation for Plaintiff's grievance. On July 27, 2009,
Dr. Sidorowicz once again denied Plaintiff's request to
have his medication restored. Plaintiff alleges that Dr.
Sidorowicz directed a nurse to backdate Plaintiff's medical
records to falsify the date on which Plaintiff's **tramadol**
had been discontinued. Plaintiff filed another grievance on
September 9, 2009, complaining of the continued failure
to provide him with **tramadol**. A further grievance was
filed on October 23, 2009, in which Plaintiff complained
of continued lack of attention of the medical department
to address his medication issue. Dr. Sidorowicz reinstated
Plaintiff's medication on October 30, 2009.

B. Administration of **Tramadol**
**\*2** When Plaintiff began receiving **tramadol** again, it was
administered crushed rather than as a pill. Plaintiff did
not want to receive the medication crushed and presented
Dr. Sidorowicz with certain documentary evidence that
it was dangerous to ingest crushed **Tramadol** Immediate
Release. Dr. Sidorowicz told Plaintiff that the medication
was administered in crushed form in order to ensure that
inmates did not smuggle their medication outside of the

clinic area. Plaintiff alleges that NA Eggler falsified her response to the grievance committee, stating that Plaintiff was receiving tramadol rather than tramadol immediate release. Plaintiff believes that he was receiving tramadol immediate release because documents Plaintiff received from the prison's pharmacy state that the pharmacy does not stock tramadol. *Id* at p. 5. Plaintiff claims that tramadol immediate release is dangerous to ingest crushed. Opp'n Ex. 24 p. 7 (Manufacturer's instructions for tramadol immediate release state, "Do not crush, chew, break, or open a controlled-release, delayed-release, or extended-release tablet or capsule.").

Plaintiff alleges that in addition to Dr. Sidorowicz, NA Lilley and DSA Lilley falsified records in order to mislead Plaintiff and the rest of the prison population regarding the dangers of taking tramadol in crushed form. Specifically, Plaintiff alleges that NA Lilley and Dr. Sidorowicz "attempt[ed] to fabricate alibis and further falsify official records" regarding the decision to crush Ultram before giving it to prisoners. Plaintiff alleges that the order to crush the prescription did not come from the central office, as prison officials stated, but was a unilateral decision made by medical personnel at Sullivan.

### C. Kosher Diet

Plaintiff's religious beliefs are based on the Old Testament and as such, Plaintiff follows a kosher diet and was receiving the cold alternative diet ("CAD") at Sullivan. On January 13, 2011, Plaintiff received a memo from DSP Malin and DSA Lilley informing him that he would no longer be receiving the CAD because it was reported that Plaintiff took two pieces of cake and cool-aid from the regular meal line on January 4, 2011. Opp'n Ex. 46. Plaintiff claims that such report of his infraction does not exist and that DSP Malin and DSA Lilley acted in retaliation for the grievances that Plaintiff filed against the medical department. Plaintiff claims that DSA Lilley told Plaintiff that it was not necessary to file a misbehavior report or conduct a hearing before "imposing the sanction[ ] of removing ... your Kosher Meal" and that if Plaintiff wanted to resume his kosher meals, he "should just change your religious denomination from Messianic Jew, and convert to Orthodox/Conservative Judaism[.]" Am. Compl. ¶ 47.

### D. Plaintiff's TENS Unit

On April 7, 2011, while attending an appointment to have his knee braces reissued, Plaintiff had a disagreement with PA Switz because the appointment stated that Plaintiff was scheduled to be seen about wrist braces rather than knee braces. Plaintiff was then directed to return to the clinic later that day with his Transcutaneous Electrical Nerve Stimulator ("TENS") Unit, which had been prescribed to him by a physical therapist for his lower back pain. Plaintiff alleges that when he returned later in the day, he was told that his TENS Unit was being revoked. Plaintiff claims that the revocation was initiated by PA Switz as retaliation for the earlier disagreement.

### E. September 2011 Tramadol Prescription

**\*3** Later in 2001, on September 24, 2011, CO Kemp came to Plaintiff's cell and told Plaintiff that he had to sign a form stating that he had refused to take his medication that morning. Plaintiff did not sign the form and stated that his medication was prescribed as needed and that it was not mandatory that he take it. On the medical refusal form, CO Kemp wrote "I ain't going" as Plaintiff's reason for refusal of the medication. On September 26, 2011, Dr. Sidorowicz discontinued Plaintiff's medication. The apparent reason for the failure to provide Plaintiff with the medication was that he had refused to take it for two consecutive days. Plaintiff met with Dr. Sidorowicz on September 29, 2011 where Dr. Sidorowicz stated that he was "confused" regarding the medication because Plaintiff had signed a medical refusal form. Dr. Sidorowicz reinstated Plaintiff's medication on September 29, 2011.

## II. Discussion

### A. Claims against CO Kemp Voluntarily Dismissed

Plaintiff filed a letter with the Court requesting to voluntarily discontinue the action as against C.O. Kemp. Docket No. 53. Accordingly, Plaintiff's claims against C.O. Kemp are dismissed.

### B. Claims for Declaratory & Injunctive Relief

In deciding a motion to dismiss brought under Fed.R.Civ.P. 12(b)(1) as well as other grounds, "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined ." *United*

*States ex rel Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155–56 (2d Cir.1993) (internal citation and quotation marks omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). "When a case becomes moot, the federal courts lack subject matter jurisdiction over the action." *In re Kurtzman,* 194 F.3d 54, 58 (2d Cir.1999).

"[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Since the filing of his Complaint, Plaintiff has been transferred from Sullivan Correctional Facility to Auburn Correctional Facility. All Defendants are either currently or formerly employed at Sullivan, and none are currently employed at Auburn, where Plaintiff is now incarcerated. Therefore, Plaintiff's claims for declaratory relief as against all Defendants are moot and therefore dismissed. [4] *See also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996).

**C. Motion to Dismiss Standard/Pro Se Standard**
On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted," dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); accord *Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010). "Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

**\*4** The court should accept as true the facts in the complaint "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted must be "a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Id.* at 679.

"*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal.*" *Thomas v. Westchester,* No. 12–CV–6718 (CS), 2013 WL 3357171 (S.D.N.Y. July 3, 2013). The court should read pro se complaints "to raise the strongest arguments that they suggest." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) ("even after *Twombly,* though, we remain obligated to construe a pro se complaint liberally."). Even so, "pro se plaintiffs ... cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor,* 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). "In order to justify the dismissal of the plaintiffs' *pro se* complaint, it must be beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Lerman v. Bd. of Elections,* 232 F.3d 135, 139–40 (2d Cir.2000) (internal citations, quotation marks and footnote omitted), *cert. denied,* 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001).

**D. Documents Considered on Motion to Dismiss**
The materials that may be considered on a motion to dismiss are limited to "the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). Courts may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). One way a document may be deemed incorporated by reference is where the complaint "refers to" the document. *EQT Infrastructure Ltd. v. Smith,* 861 F.Supp.2d 220, 224 n. 2 (S.D.N . Y.2012). Conversely, when documents are included on a motion to dismiss that do not fall into these categories, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d

Cir.2000) (internal quotation marks omitted). "Where ... 'exhaustion of administrative remedies is a prerequisite to bringing suit, a court may take judicial notice of the records and reports of the relevant administrative bodies, as well as the facts set forth therein.' " *Zappulla v. Fischer,* No. 11 Civ. 6733(JM F), 2013 WL 1387033, at * 1 (S.D.N.Y. Apr. 5, 2013) (citing *Wilson v. N.Y.C. Police Dep't,* No. 09 Civ. 2632(PAC)(HBP), 2011 WL 1215031, at *6 (S.D.N.Y. Feb. 4, 2011))

 **\*5** Generally, " 'when matters outside the pleadings are presented in ... a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.' " *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988)). [5] Defendants argue that the Court should not consider the fifty-eight exhibits that Plaintiff attached to his Opposition to the Motion to Dismiss.

In Plaintiff's Amended Complaint, he cited forty-four exhibits by number but did not attach any documents to his Amended Complaint. Without anything further, the fact that Plaintiff refers to exhibits is enough for them to be "incorporated by reference" so that they may be considered on a motion to dismiss. Further, Defendants fail to make clear that the exhibits were excluded at the direction of Judge Briccetti. [6] In light of the fact that Plaintiff referred to exhibits in his Complaint and was directed to not include them at the time, and the Court's obligation to construe a *pro se* plaintiff's complaint liberally, the Court will consider the forty-four exhibits Plaintiff referred to in his Amended Complaint in determining the motion to dismiss. Of the additional fourteen exhibits Plaintiff attached to his opposition but did not refer to in his Amended Complaint, the Court will consider only Exhibit 55, which is the grievance Plaintiff filed on January 28, 2011 regarding the suspension of his kosher diet. When a court considers documents that are outside the four corners of the complaint, it is not required to accept as true any facts alleged in the complaint that are contradicted by the documents submitted. *See NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 149 n. 1 (2d Cir.2012), *cert. denied,* 133 S.Ct. 1624, 185 L.Ed.2d 576 (2013).

**E. Statute of Limitations**

"In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.' " *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (quoting *Owens v. Okure,* 488 U.S. 235, 249–50 (1989)). New York law provides a statute of limitations of three years for claims brought pursuant to 42 U.S.C. § 1983, as found in the residual personal injury statute, Civil Practice Law and Procedure ("CPLR") § 214(5). *See Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). Accrual of the action is governed by federal l aw, which provides that the statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id* (citing *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)). Recently, in *Gonzalez v. Hasty,* 651 F.3d 318 (2d Cir.2011), the Second Circuit held that the statute of limitations in a civil action brought by an inmate should be tolled during the period of time it takes for the prisoner to exhaust his or her administrative remedies.

 **\*6** Plaintiff's first claim against Nurse Miller and D r. Sidorowicz is based on falsification of a medical report and discontinuance of Plaintiff's tramadol prescription on April 10, 2009. Plaintiff's claim accrued on April 10, 2009 because that is the date on which Plaintiff became aware of his injury. A m. Compl. ¶ 11. Plaintiff filed a grievance regarding the complained-of conduct on June 22, 2009. *Id* at ¶ 17. The Central Office Review Committee (C.O.R.C.) issued a final decision regarding such grievance on September 16, 2009. *Id.* The statute of limitations was tolled from June 22 until September 16, or for eighty-six days. The statute of limitations on Plaintiff's claims arising out of the allegedly false report and discontinuance of his tramadol prescription therefore expired on July 5, 2012. Plaintiff filed his complaint on September 18, 2012. Accordingly, these claims are barred by the statute of limitations.

Chronologically, Plaintiff's next claim is Dr. Sidorowicz's failure to reinstate Plaintiff's pain medication. Plaintiff alleges in his Complaint that on July 14, 2009, Dr. Sidorowicz refused to reinstate Plaintiff's medication in retaliation for filing a grievance, and continued to refuse until October 30, 2009. Plaintiff's claim against Dr. Sidorowicz for inadequate medical care and retaliation accrued on July 14, 2009. Plaintiff filed a grievance regarding his medical care on September 9, 2009 and again on October 23, 2009. Am. Compl. ¶ 24–25. Final

decisions regarding those grievances were issued by the C.O.R.C. on December 16, 2009 and April 7, 2010, respectively. The grievance filed on October 23 complains of essentially the same treatment as the grievance filed on September 9.[7] The Second Circuit reasoned that the statute of limitations for an inmate exhausting his administrative remedies should be tolled because " '[t] he 'catch–22' ... is self-evident: the prisoner who files suit ... prior to exhausting administrative remedies risks dismissal based upon § 1997e; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness.' " *Gonzalez,* 651 F.3d at 323 (quoting *Johnson v. Rivera,* 272 F .3d 519, 522 (7th Cir.2001)). Where a second grievance addressing the same issue if filed, the purpose of tolling the statute of limitations is no longer applicable. Therefore, the statute of limitations on Plaintiff's claim should be tolled only for the length of the first grievance, or from September 9 through December 16. Plaintiff's Complaint was filed before the statute of limitations on that claim expired on October 20, 2012 and therefore it is not barred by the statute of limitations.

**F. Claims Against PA Switz**

The only claim that Plaintiff brings against PA Switz was that she was involved in the removal of Plaintiff's TENS Unit. Plaintiff bases this allegation on the fact that Dr. Sidorowicz was not working on the day Plaintiff's TENS Unit was confiscated and the nurse on call stated that she was "just following orders," leaving Plaintiff to assume that PA Switz was the only person who could have ordered the revocation. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Plaintiff himself notes that there is no documentation or record of PA Switz ordering the removal of Plaintiff's TENS Unit. Such conclusory allegations do not rise to the level of stating a claim and therefore, Plaintiff's Eighth Amendment and First Amendment retaliation claims against PA Switz are dismissed.

**G. Eighth Amendment Claims**

**a. Eighth Amendment Legal Standard**

**\*7** The Cruel and Unusual Punishments clause of the Eighth Amendment forms the basis of a convicted prisoner's claim that he or she is not being provided adequate medical care. *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). To establish an Eighth Amendment claim arising from inadequate medical treatment, a prisoner must show that there was a "deliberate indifference to [a] serious medical need." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Under this standard, prison officials are required to ensure that prisoners receive adequate medical attention. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). However, "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). To determine if a prisoner's Eighth Amendment rights were violated, courts apply a test with a subjective and an objective component: plaintiff must show that (1) objectively, the prison official's deprivation of medical care was "sufficiently serious [and] result[ed] in the denial of the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. at 834 (internal citations omitted); and (2) subjectively, the prison official acted with a sufficiently culpable state of mind. *Id.*

The first requirement for a showing of an Eighth Amendment violation is that there was a deprivation of care that was sufficiently serious, which is determined by an objective test with two prongs. The first prong is whether the prisoner was actually denied adequate medical care. *Salahuddin,* 467 F.3d at 279. "[T]he prison official's duty is only to provide reasonable care," *id,* and thus, "prison officials who act reasonably [when responding to an inmate] cannot be found liable under the Cruel and Unusual Punishments Clause," *Farmer,* 511 U.S. at 845. Conversely, liability may result where prison officials fail "to take reasonable measures" in response to a medical need. *Id* at 847.

The second prong of the objective test is whether the alleged deprivation of medical care was sufficiently serious. *Salahuddin,* 467 F.3d at 279. "[T]he prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright,* 412 F .3d 398, 403 (2d Cir.2005) (internal quotation marks omitted); *see also Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) ("The standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain." (internal quotation marks omitted)). The inquiry is "fact-specific" and "must be tailored to the specific circumstances of each case," *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003), meaning that "[i]n cases

where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Salahuddin,* 467 F.3d at 280. For instance, where a prisoner is receiving on-going treatment, but complains of a delay or interruption in such treatment, the "focus [is] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Smith,* 316 F.3d at 185.

**\*8** The second requirement for an Eighth Amendment violation is that the violator acted with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280. In Eighth Amendment prison-conditions cases, a sufficiently culpable state of mind is "deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. 825, 834 (1994) (internal quotation marks and citation omitted). A prison official may only be found liable if "the official knows of and disregards an excessive risk to inmate health or safety." *Id* at 837. In order to meet this standard, the "charged official [must] act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Farmer,* 511 U.S. at 836–37.

### b. Analysis

The time frame of Plaintiff's claim for inadequate medical treatment that survives the statute of limitations runs from June 24, 2009 through October 30, 2009. [8] Plaintiff alleges an interruption of adequate treatment for a period of six months in 2009. [9] Although Plaintiff states in his Amended Complaint that medical staff refused to treat his back pain, the documents provided suggest otherwise. On September 17, 2009, physical therapy was prescribed for Plaintiff's back pain. Opp'n Ex. 4 p. 10. On September 21, 2009, Plaintiff refused to take Robaxin because he stated that it "doesn't work" and on September 24, 2009, Plaintiff refused Robaxin, Ibuprofen, Naprosyn, Feldene, and Tylenol because he wanted only "strong medication." *Id.* at 11. The Court recognizes that as Plaintiff states in his claim, his pain was "excruciating" and "crippling" at times, however, "[t] he prisoner's right is to medical care-not the type or scope of medical care which he personally desires. A difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983." *Gonzales v. Wright,* 665 F.Supp.2d 334, 347 (S.D.N.Y.2009) (quoting *U.S. ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970)); *see also Sonds v. St. Barnabas Hosp. Correctional Health Svs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("disagreements

over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim."); *Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs."); *Estelle v. Gamble,* 429 U.S. 97, 107 (1976) (no Eighth Amendment claim against treating physician who saw plaintiff on 17 occasions over a 3 month period, prescribed pain relievers, and muscle relaxants for plaintiff suffering from back pain). Plaintiff went to sick call and was seen by medical personnel on at least thirteen occasions for his back pain and related issues between June 24, 2009 and October 30, 2009. Opp'n Ex. 4 pp. 6–12. Plaintiff, therefore, fails to establish the first prong of the objective test, and his Eighth Amendment claim fails. [10]

**\*9** Similarly, the two days in September 2011 that Plaintiff was denied his pain medication do not rise to the threshold of stating an Eighth Amendment deliberate indifference claim. Even if being without medication for three days can be considered a sufficiently serious deprivation to establish the objective prong, *see, e.g., Clay v. Kellmurray,* 456 Fed. App'x 46, 47 (2d Cir.2012), the fact that Dr. Sidorowicz reinstated Plaintiff's pain medication shortly after a discussion with Plaintiff in which it was determined that there was a misunderstanding clearly demonstrates that the subjective prong of deliberate indifference is not satisfied.

Plaintiff also claims that his tramadol prescription should have been provided as a pill rather than crushing the medication. Although there are inconsistencies in the documents provided by Plaintiff regarding whether he was receiving tramadol immediate release or regular tramadol, Plaintiff does not allege any harm from the fact that his prescription was given to him crushed rather than as a pill. *See Black v. Farago,* Civil Action No. 9:07–cv–1194 (GLS/ RFT), 2008 WL 4793712, at \*4 (N.D.N.Y. Oct. 30, 2008) (prisoner plaintiff failed to show any harm from crushing medication). Although a court may issue an injunction to prevent future harm, *see Helling v. McKinney,* 509 U.S. 25, 33 (1993), Plaintiff here is not entitled to declaratory and injunctive relief. Plaintiff claims that there are dangers that may arise from such consumption, but Plaintiff's

Complaint does not allege that he suffered any harm, and thus the Court can provide no relief.

## H. Kosher Meals

Plaintiff alleges that on January 13, 2011, DSP Malin and DSA Lilley suspended his kosher diet without explanation and in retaliation for the grievances filed by Plaintiff against the medical department. Plaintiff claims that the depravation of his religious diet was a violation of his due process rights, as he was not given notice or a hearing prior to the cancellation of his religious diet. In his opposition, Plaintiff states that he is not claiming to have a liberty interest in receiving kosher meals but rather, once he was given kosher meals, he was entitled to due process before his kosher diet was suspended.

In order to show a violation of a due process right, a plaintiff must demonstrate that he or she has an actual liberty or property interest protected by the due process clause and was deprived of that interest without adequate process. *See Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."); *see also Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

In order to claim a constitutionally protected property right, a plaintiff must have a "legitimate claim of entitlement." *Id* at 569. An inmate has no legitimate claim of entitlement in receiving kosher meals. *See Russell v. Wilkinson,* 79 F. App'x 175, 178 (6th Cir.2003) ("In this case, [plaintiff] does not possess a constitutionally protected property interest in receiving kosher meals. Prison regulations allow an inmate to obtain such accommodations, but also place certain restrictions and availability on those accommodations. Ultimately, the decision to grant or deny an accommodation lies within the discretion of the prison warden."). Courts in this Circuit have similarly held that prisoners have no liberty interest in receiving kosher meals while incarcerated. *See Dove v. Broome County Correctional Facility,* Civil Action No. 9:10–CV–0002 (DNH/DEP), 2011 WL 1118452, at *12 (N.D.N.Y. Feb. 17, 2011) ("While the provision of a kosher diet may implicate free exercise concerns under the First Amendment and the RLUIPA, it does not rise to the level of a cognizable liberty interest giving rise to the procedural safeguards guaranteed under the Fourteenth Amendment."); *see also Arce v. Walker,* 139 F.3d 329, 334

(2d Cir.1998) ("With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the [sic] the most basic liberty interests in prisoners.").

*10 To the extent that Plaintiff claims that his due process rights were violated because of a liberty interest created by state statutes or regulations, such claim also fails. Although Plaintiff concedes that he did not intend to bring a claim solely based on violations of the DOCCS's rules and regulations, to the extent that his Amended Complaint may be read to assert such a claim, it must fail. The Second Circuit has made clear that Section 1983 claims based on violations of prison regulations cannot stand. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004) ("[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution[.]").

Plaintiff's Amended Complaint does not specifically claim a violation of his First Amendment free exercise right regarding the suspension of his kosher diet. However, a *pro se* complaint must be read "to raise the strongest arguments that they suggest." *Pabon,* 459 F.3d at 248. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), and it is clearly established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Id.* at 597 (citing *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975)). At this stage of the litigation, the Court finds that, reading Plaintiff's Amended Complaint in the most favorable light, it states a free exercise claim. [11]

## I. Retaliation

The Second Circuit urges caution when addressing retaliation claims brought by prisoners because "claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Ci r.1983). Therefore, courts should "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Accordingly, "a complaint which alleges retaliation in wholly conclusory terms may safely be

dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13. To survive a motion to dismiss, a prisoner asserting retaliation claims must "allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). Filing grievances is a protected activity and thus Plaintiff meets the first prong of the test. *Davis,* 320 F.3d at 352–53.

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 353. "In order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.' " *Id* (citing *Dawes,* 239 F.3d at 492 (internal quotation marks and citation omitted)). To establish a causal connection, "[a] plaintiff must allege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him." *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal citations, alterations, and quotation marks omitted). Factors that may be considered when determining whether there is a causal connection include "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* No. 98 CIV. 5204(BSJ), 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

**\*11** In Plaintiff's opposition, he states that there is evidence of three cases of retaliation against him: the false report filed by Nurse Miller, a report that led to the suspension of Plaintiff's kosher diet, and a report filed by CO Kemp stating that Plaintiff refused to take his tramadol. The first claim is barred by the statute of limitations (*see supra* section II.D.), the third claim was voluntarily dismissed by Plaintiff (*see supra* section II.A.). However, Plaintiff's Amended Complaint alleges retaliation claims against D r. Sidorowicz, PA Sw itz,[12] NA Eggler, DSA Lilley and DSP Malin, and therefore

the Court will address all of the claims set forth in the Amended Complaint.

**a. Dr. Sidorowicz**

Plaintiff alleges that after he filed a grievance in June 2009 concerning the discontinuation of his tramadol prescription, D r. Sidorowicz retaliated against him by failing to restore Plaintiff's medication in July 2009. There is no causal connection between Plaintiff's grievance and the failure to reinstate Plaintiff's medication. The medication was initially discontinued two months prior to Plaintiff's grievance, in April 2009. Dr. Sidorowicz failed to reinstate Plaintiff's medication before and after Plaintiff's grievance, and thus there was no change in behavior after the grievance. Where that is the case, it is impossible to show that the failure to reinstate Plaintiff's medication was a result of his grievance. *See Sledge v. Bernstein,* No. 11 Civ. 7450(PKC) (H BP), 2012 WL 4761582, at *7 (S.D.N.Y. Aug. 2, 2012). Indeed, Dr. Sidorowicz eventually reinstated Plaintiff's tramadol prescription despite Plaintiff filing an additional two grievances regarding of Dr. Sidorowicz's conduct. Therefore, Plaintiff does not adequately allege a retaliation claim against Dr. Sidorowicz.

**b. NA Eggler**

Plaintiff's Amended Complaint states that NA Eggler submitted false statements and reports during a grievance investigation as retaliation for the grievances that Plaintiff filed against the medical department. Plaintiff alleges that NA Eggler stated that Plaintiff was receiving regular tramadol but in reality, he was receiving tramadol immediate release. "[A] prison inmate has no general constitutional right to be free from being falsely accused in a ... report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *see also Cole v. Fischer,* No. 07 Cv. 11096(BSJ), 2009 WL 1514699, at *6 (S.D.N.Y. May 29, 2009). As a result of the allegedly false reports, the grievance committee ultimately decided against Plaintiff. Although Plaintiff did not prevail, the allegation that the statement made to the grievance committee was false makes this factor less important in the Court's determination. The temporal proximity is particularly relevant since the alleged retaliatory action was taken directly in response to a grievance. At this point, the Court is not inclined to dismiss Plaintiff's retaliation claim against NA Eggler

due to the conflicting information regarding the type of medication that Plaintiff was receiving and the varying effects that crushing the two medications could ostensibly produce.

### c. DSA Lilley & DSP Malin

 **\*12** Plaintiff claims that DSA Lilley and DSP Malin retaliated against him for filing grievances by revoking his kosher diet. The causal connection between Plaintiff's grievances and the suspension of his kosher diet is lacking. For one, DSA Lilly and DSP Malin are not members of the medical department, suggesting that there is no reason why they would retaliate for Plaintiff's grievances against the medical department. [13] Further, the grievance committee upheld the decision to suspend Plaintiff's kosher diet.

### J. Qualified Immunity

"In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein,* No. 11 Civ. 7450(PKC)(HBP), 2012 WL 4761582, at \*4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v.. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (a defense of qualified immunity in a motion to dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) ("Government officials performing discretionary functions, generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Plaintiff's only surviving claims are a free exercise claim and a retaliation claim. None of the defendants implicated in the surviving claims are entitled to qualified immunity here. It is clearly established that inmates have a right to a meal plan in accordance with their sincerely held religious beliefs. Additionally, it is clearly established that prison personnel may not submit false reports in retaliation against prisoners for exercising their right to file a grievance.

### Conclusion

In conclusion, the Court GRANTS Defendant's motion to dismiss IN PART as follows: Plaintiff's Eighth Amendment claims, Fourteenth Amendment due process claims, retaliation claims against Dr. Sidorowicz, NSA Lilley, and DSP Malin, all claims against PA Switz, and all claims against CO Kemp0 are DISMISSED, the Clerk of Court is directed to terminate the motion. Docket No. 37.

 **\*13** SO ORDERED:

### All Citations

Not Reported in F.Supp.3d, 2014 WL 641454

---

Footnotes

1    Plaintiff is currently incarcerated at Auburn Correctional Facility, where he has been since February 28, 2013. Docket No. 18.

2    The following facts are drawn from Plaintiff's Amended Complaint, Dock. 11, unless otherwise stated.

3    Tramadol is the generic name for the medication Ultram, which is a drug for the management of moderate to moderately severe pain. RxList, Ultram, http://www.rxlist.com/ultram-drug.htm (last visited February 14, 2014).

4    Plaintiff additionally fails to address this argument and therefore "apparently concedes that the claim fails, as evidence by his lack of opposition." *Wasserman v. Maimonides Medical Ctr.,* 970 F.Supp. 183, 192 (E.D.N.Y.1997).

5    Defendants note that "[i]t is a basic principle that a complaint may not be amended by the plaintiff's brief lied in opposition to a motion to dismiss. *Connolly v. Havens,* 763 F.Supp. 6, 8 n. 2 (S.D.N.Y.1991). Further, Defendants state that although

the Court is "obligated to construe a pro se complaint liberally," *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009), "[t]he procedural latitude granted to pro se litigants ... 'typically does not extend so far as permitting a plaintiff to supplement the claims in his complaint with additional allegations in his motion papers.' " *Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *2 (S.D.N.Y. Apr. 5, 2013) (quoting *Salemo v. Murphy,* No. 11 Civ. 2525(TPG), 2012 WL 4714765, at *2 (S.D.N.Y. Sept. 27, 2012)); *but see Brooks v. Jackson,* No. 11 Civ. 6627(JM F), 2013 WL 5339151, at *3 (S.D.N.Y. Sept. 23, 2013) ("because a pro se plaintiff's allegations must be construed liberally, it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint."). Here, however, Plaintiff does not make additional *assertions* or *allegations* in his opposition papers but rather attaches additional documents that were not included in his Amended Complaint.

6    This case was initially assigned to Judge Briccetti. It was reassigned to Judge Roman on July 17, 2013. In a letter dated January 16, 2013, Plaintiff requested that the Court direct the correctional facility to allow him to make copies of his exhibits to include with his complaint free of cost because he was proceeding in forma pauperis ("IFP"). Doc. 8. In response, Judge Briccetti wrote, "Although plaintiff is proceeding [IFP], being granted IFP status only relieves plaintiff of his obligation to pay the filling fee; it does not entitle him to unlimited copies from the court or the correctional facility." *Id.*

7    Plaintiff's September 9, 2009 grievance complained of "the blatant mistreatment, pusposely [sic] misleading information, and the deliberate indifference to my medical needs by certain staff here at Sullivan...." Opp'n Ex. 11 p. 1. Plaintiff's October 23, 2009 grievance states that he is filing a grievance "again" due to an "ongoing problem with the medical department" and acknowledges that he has "filed numerous grievances on this issue." Opp'n Ex. 12 p. 1.

8    The statute of limitations for Plaintiff's claims is three years. Taking into consideration the 86 days during which the statute of limitations was tolled, the earliest conduct of which Plaintiff may complain is on June 24, 2012.

9    Plaintiff notes several times in his Complaint that the medical treatment was interrupted and he was in extreme pain for "over six months." Am. Compl. ¶¶ 12, 25, 67, 69, 70. Plaintiff states that Dr. Sidorowicz "reluctantly" reinstated Plaintiff's pain medication on October 30, 2009. *Id* at ¶ 34.

10   Although Plaintiff claims that some of his medical reports were falsified, he does not allege that Defendants falsified the records stating that he refused all forms of treatment other than tramadol. *See Espinal v. Goord,* No. 00 Civ. 2242(AJP), 2001 WL 476070, at * 15 n. 51 (S.D.N.Y. May 7, 2001).

11   Defendants claim that Plaintiff may not assert a new claim in opposition to the motion to dismiss. The Court does not purport to substantiate a new claim brought in opposition to the motion to dismiss. Instead, the Court, reading Plaintiff's Amended Complaint in the most favorable light as it must, Plaintiff states a First Amendment free exercise claim.

12   The Court already addressed the lack of any allegation regarding the involvement of PA Switz. *See supra* Section I. E.

13   Plaintiff's suggestion that DSA Lilley retaliated against Plaintiff because her mother worked in the medical department is concl usory and does not rise to the level of stating a claim.

---

     © 2016 Thomson Reuters. No claim to original U.S. Government Works.