**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHAMMA K. BRANDON,

                                        Plaintiff,                    9:13-cv-00939 (BKS/ATB)

v.

SUZANNE KINTER, LAWRENCE BEDARD, ROBERT
WEBB, THOMAS PERRY, ERIC BLAISE, KEVIN
LAURIN, and MARGARET CLANCY,

                                        Defendants.

_____

**Appearances:**

_For Plaintiff:_
William S. Nolan
Gabriella R. Levine
Jennifer M. Thomas
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260

_For Defendants:_
April J. Laws
Johnson & Laws, LLC
646 Plank Road, Suite 205
Clifton Park, New York 12065

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Chamma K. Brandon brings this action against the above-named Defendants,

employees of Clinton County Jail ("CCJ"), under 42 U.S.C. § 1983, alleging that during his 2012

incarceration, he was served meals containing pork in violation of his Muslim diet and retaliated

against for filing grievances regarding his religious and medical diets. (Dkt. No. 17). Plaintiff

pressed two claims at trial: (1) that Defendants Corrections Lieutenant Kevin Laurin, Registered Nurse and Healthcare Coordinator Suzanne Kinter, Corrections Sergeant Margaret Clancy, Food Service Manager Lawrence Bedard, and Corrections Officers Robert Webb and Thomas Perry violated Plaintiff's right to the free exercise of religion under the First Amendment; and (2) that Defendants Lt. Laurin, Nurse Kinter, Sgt. Clancy, Bedard, and Corrections Officer Eric Blaise retaliated against Plaintiff for filing meal-related grievances in violation of the First Amendment. (*Id.*). The Court held a three-day bench trial at which Plaintiff and all Defendants, except Margaret Clancy,[1] testified.

After carefully considering the trial record, the credibility of the witnesses, and the submissions of the parties,[2] the Court finds Plaintiff proved by a preponderance of the evidence that: (1) Lt. Laurin violated Plaintiff's First Amendment right to the free exercise of religion; (2) Officers Webb and Perry are entitled to qualified immunity; (3) Lt. Laurin and Nurse Kinter retaliated against Plaintiff for engaging in conduct protected by the First Amendment; and (4) Plaintiff is entitled to compensatory damages, and punitive damages are warranted. The Court further finds that Plaintiff failed to prove by a preponderance of the evidence: (1) his free exercise claims against Nurse Kinter, Sgt. Clancy, and Bedard; and (2) his retaliation claims against Sgt. Clancy, Officer Blaise, and Bedard. The following constitutes the Court's findings of fact and conclusions of law.

---

[1] Prior to trial, the Court appointed Samantha Clancy, Margaret Clancy's daughter, as guardian ad litem for Margaret Clancy due to medical issues. (Dkt. No. 241).

[2] In his Proposed Findings of Fact and Conclusions of Law, Plaintiff seeks an award of sanctions in connection with the Special Diet Notification form, one version of which is contained in Defendants' Exhibit 21,(Dkt. No. 247, at 72–75), and a second version is contained in Plaintiff's Exhibit 8, *see infra* Figure 1. The Court addresses this request in an Order to Show Cause that will be issued separately.

## II.     FINDINGS OF FACT

### A.     The Individual Defendants

Lt. Laurin was a "Corrections Lieutenant at CCJ whose duties included supervising corrections sergeants and the day-to-day activities throughout CCJ, as well as overseeing the grievance program at CCJ." (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)). Nurse Kinter, a registered nurse, "was the Jail Healthcare Coordinator whose duties included supervising Registered Nurses at CCJ and overseeing the medical treatment of inmates detained at CCJ." (*Id.* ¶ 3(a)(viii)). Sgt. Clancy "was a Corrections Sergeant at CCJ whose duties included supervising Corrections Officers [and] documenting reports," and assisting Lt. Laurin in overseeing the grievance program. (*Id.* ¶ 3(a)(vii); Trial Transcript, at 70 ("T. 70")). Bedard "was the Food Service Manager at CCJ whose duties included supervising the cooks in the kitchen to make sure food was provided in compliance with the menu, recipes, and special diets that the inmates have on file with the kitchen." (Joint Pre-Trial Stipulation, ¶ 3(a)(v)). Officers Webb, Perry, and Blaise were "Corrections Officer[s] whose duties included providing for the safety, security and order of the facility." (*Id.* ¶¶ 3(a)(ix–xi)).

### B.     Religious and Medical Diets

CCJ is a 300-bed facility that housed approximately 210 inmates in 2012, the time period relevant to this action. (T. 284). During the booking and intake process, the booking officer documented each inmate's religion, if any, for the purpose of ascertaining whether the inmate required a religious diet. (T. 293). If so, the booking officer would fill out a "Special Diet Notification" form for a religious diet and "physically bring that [form] to the kitchen." (Dkt. No. 250, ¶ 12; T. 293–94, 446). A CCJ lieutenant, sergeant, and grievance coordinator were also authorized to fill out a Special Diet Notification form documenting an inmate's need for a

religious diet. (Pl.'s Ex. 8; Defs.' Ex. 21; T. 343).[3] CCJ medical staff and facility nurses were responsible for approving medical diets and for notifying the kitchen of an inmate's need for a medical diet by sending a Diet Notification form specifying the medical diet to the kitchen. (T. 448).[4]

###    C.    CCJ Kitchen and Meal Service

Inmates at CCJ received all their meals on trays that the kitchen staff delivered to them in their housing units, or "pods." (T. 296–97). Unless the kitchen had been notified of a medical or religious diet, each inmate received a "regular" or "general population" meal. (T. 455). In addition to the general population diet, the CCJ kitchen prepared "approximately ten" special diets, including diabetic, lactose free, low fat/low cholesterol, low sodium, gluten-free, and "no-pork" or religious diets. (*Id.*). Each day, to ensure each inmate received "the proper meal in [the] right area," Bedard, as food service manager, reviewed the menu and the inmate housing report and prepared a list with each inmate's name, special diet, if any, and the inmate's pod. (T. 441–42). Bedard maintained inmate files and would place all special diet slips—religious or medical—in the inmate's file. (T. 293, 461).

Bedard, several cooks, and up to seven inmates worked in the kitchen. (T. 449). The cooks were responsible for making the meal designated by the menu that day—"whatever soup it is for the day, whatever sandwiches for that day," for example. (T. 443). There was a "food line"

---

[3] The CCJ 2012 "Inmate Handbook Rules/Regulations" stated: "There will be NO special diets unless ordered by the facility nurse or doctor, and ONLY for a legitimate medical or religious reason." (Defs.' Ex. 24). However, there was no evidence at trial showing that a facility nurse could order or remove a religious diet. Nurse Kinter testified that the nurses "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; *see also* T. 468 (Bedard testifying that "I would only allow the booking officer to give me the religious diet or a nurse a medical diet")). At most, a facility nurse could check an inmate's kitchen file to ascertain whether that inmate had a religious diet on file. (Defs.' Ex. 20).

[4] Information about an inmate's special diet was also contained in a file in the inmate's housing unit, or "pod." (T. 488).

in the kitchen, which Bedard described as "a conveyer-type line where the trays are placed on the conveyer from one end to the other end as the food is being served." (T. 443). The cooks were responsible for placing the "main course" and other food items on the trays. (T. 444, 451). Bedard was "not always on [the] food line," but he would, at times, work on the food line serving small items such as condiments, fruit, or a package of cookies. (T. 451). The inmate workers also served on the food line, and one inmate worker was "at the very end to put the trays into the cart" for delivery to the designated pod. (T. 443). Prior to each meal, "sticky note tabs" were prepared for each inmate receiving a special diet. (T. 444). The sticky notes listed the inmate's name and type of diet and were first placed above the food line and then onto the meal tray before the tray was placed onto the cart for delivery. (T. 444 (Bedard testifying that if the inmate had a religious diet, for example, that inmate's name and "no pork" would be on the tray's label)).

Once the trays were placed onto the cart, a corrections officer and inmate worker would escort the cart to "particular pods." (T. 43). The corrections officer in the pod would alert the inmates that meals had arrived and divide the inmates into two lines—"regular gen pop" and "special diet persons"—to receive their trays. (T. 44). If an inmate complained that his meal did not comply with a special diet, the pod corrections officer could check the inmate's file, a copy of which was contained "at the podium" in the inmate's pod, to verify the diet. (T. 487–88). The corrections officer could also call the kitchen, or send the tray back to the kitchen where Bedard or a cook would inspect the tray and, if the tray was not right, replace the incorrect item or the entire meal. (T. 451, 487–88).

### D.     Plaintiff

#### 1.     Religious Background

Plaintiff, a born Muslim, grew up attending religious services with his father. (T. 35). The *Quran* prohibits Muslims from eating pork. (T. 38). Eating pork is "haram," "a sin," for which "you can be placed in hellfire." (T. 39); *see Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) ("For Muslims who follow Islamic dietary laws, consuming pork is a sin at any time, regardless of whether the consumption occurs during a holiday or not" and "[t]he Quran expressly commands against it." (citing *Quran* 2:173)). The practice of Islam also prohibits the eating of pork products, or "anything associated" with pork. (T. 39). For this reason, not only is the handling of pork prohibited, but a plate of food containing pork and non-pork products is considered contaminated and inedible. (T. 39).

#### 2.     Plaintiff Booked at CCJ - January 2012 and March 2012

Plaintiff was booked into CCJ twice during 2012. During all time periods relevant to this action, Plaintiff was a pretrial detainee. Plaintiff's first stay at CCJ was from January 14, 2012 until March 2, 2012. (Pl.'s Ex. 5; Defs.' Ex. 2; T. 42, 191). No religion is noted on Plaintiff's January 12 booking sheet. (Pl.'s Ex. 5; Defs.' Ex. 2). "On January 14, 2012, Plaintiff was issued a 'no shellfish diet' at CCJ." (Joint Pre-trial Stipulation, ¶ 3(a)(xii)). Plaintiff did not request religious, no-pork meals during this stay. (T. 41–42). If Plaintiff received a meal with pork in it, he did not complain but he would not eat the meal, either. (T. 41–42). Some form of pork, i.e., sausage, ribs, salami, bologna, was featured on the menu for the general population diet two to four times each week. (T. 48–49, 72–73; Pl.'s Exs. 1, 2).

On March 2, 2012, Plaintiff was "released," though, for reasons that are not relevant here, he was never "physically" "released" from the facility, and he was, instead, arrested and booked into CCJ a second time. (T. 42, 191). Plaintiff's March 2 booking sheet lists his religion as

Muslim. (Defs.' Ex. 3). However, the booking officer, who is a not a defendant in this case, did not bring a religious "no-pork" diet slip to the kitchen after Plaintiff's booking, or at any time thereafter. (T. 344, 371). Because Plaintiff identified as Muslim when he was rebooked on March 2, 2012, he should have had a religious diet slip forwarded to the kitchen as of March 2, 2012. (T. 370–71).

### 3.      Plaintiff's Requests for Muslim Diet – March to August 2012

"On March 23, 2012, Plaintiff was issued a 'no tomato or tomato product diet,'" because he has severe acid reflux. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiii); T. 46). "On May 21, 2012, Plaintiff was issued a 'low fat, low cholesterol' diet" because he had high cholesterol. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiv); T. 46).

In March, April, and May 2012, Plaintiff received meals with pork two to four times each week. (T. 49, 76–77). If Plaintiff received a meal tray with pork, he did not eat it; he would either give it away, throw it away, or trade with another inmate. (T. 75). If Plaintiff could not consume a food tray because it contained pork, and if he had "commissary," he "would "eat commissary" though it "had nothing to really substitute" for a meal and "[i]t was just junk." (T. 75, 79). If he did not have commissary food, he "just wouldn't eat anything." (T. 75). As a result of missing meals, Plaintiff had headaches, fatigue, dizziness, and confusion, and was frustrated. (T. 79). Plaintiff experienced the "angst of knowing" that he was not going to eat. (*Id.*).

In May 2012, Plaintiff began complaining to shift corrections officers, who knew he was Muslim and that he was "not supposed to get pork." (T. 78). One officer responded by suggesting that Plaintiff "write a medical," (*id.*), and told him that the medical ward "would address" his religious dietary needs. (T. 80). On May 28, Plaintiff filed a grievance stating:

> I was denied my meal. I'm on a special diet and the cooks [sic] refused to make the proper accommodations to my diet. The housing unit officer told the trustee to obtain the proper special diet meal and

> that was to no avail. The housing unit officer called the kitchen in a
> further attempt to obtain my special diet me[al] and resulted in the
> cook's absolute refusal.

(Pl.'s Ex. 10).[5] Although it is not referenced in the grievance, Defendants acknowledge that on

May 28, Plaintiff stated in writing to CCJ that he was Muslim. (Dkt. No. 250, ¶ 77; T. 202–03).

On June 21, Plaintiff submitted a "Sick Call Request" inquiring about a knee brace and

requesting that a "no pork order" be sent to the kitchen and placed in his folder, explaining that

he did "not eat pork yet [was] still being served pork during meals." (Pl.'s Ex. 11). Medical staff

responded: "given knee brace." (*Id.*). Plaintiff received no response regarding his request for a

no-pork diet and continued to receive meals with pork. (T. 82).

On or about July 4, Plaintiff sent another Sick Call Request. (Pl.'s Ex. 12). In it, Plaintiff

stated that his inmate folder reflects that he is to have "no fish or shellfish" due to "allergy" and

requests that the "kitchen" be notified. (*Id.*). Although the remainder of the request is largely

illegible, it appears to seek a no-pork product diet. (*Id.*). The response, from a nurse who is a not

a defendant in this case, stated: "Done—for no fish/shellfish. Need to ask security staff to submit

diet slip for pork. Medical does not do religious diets." (*Id.*). When Plaintiff received this

response, he showed it to a security officer who said: "we don't do that. We don't do religious

diets, that's a medical thing." (T. 83).

On July 6, Plaintiff submitted a third Sick Call Request. (Pl.'s Ex. 13). He wrote: "I've

made several attempts to have my meals altered to a no pork or pork products diet. I'm a Muslim

and do not consume anything associated with pork. I told the 'Security Staff' [illegible] they

directed me to consult medical about this matter. Please make the proper adjustment to my diet."

---

[5] Plaintiff did not pursue the grievance after filing; under "Summary of facility staff attempts to resolve," Plaintiff placed a check-mark next to "I accept this resolution." (Pl.'s Ex. 10). The "resolution" is not stated on the grievance form.

(*Id.*). On July 9, Nurse Kinter responded: "You will have to speak with jail Sgt. or Lt." (*Id.*). Nurse Kinter explained at trial that she referred Plaintiff to the jail sergeant or lieutenant because she had always been told by "security . . . all the way up to the major," that "nurses were not allowed to do religious diets." (T. 389). Plaintiff continued to receive meals with pork in July, August, and September 2012. (T. 86–87).[6]

### 4. Plaintiff's Muslim Diet Grievances and Lt. Laurin's Involvement – September 2012

On September 15, 2012, Plaintiff filed a grievance complaining that he was being given trays with food he could not eat due to his medical conditions and that were inconsistent with his "various restrictive diets." (Pl.'s Ex. 14). He further stated that "this is one of several grievances I've made but to no avail." (*Id.*). Plaintiff sought a:

> complete overhaul of the kitchen staff. This is one of many complaints which seems to go unresponded. I've been here for more than 9 mths [sic] and at least 1 time per week there has been a problem with my meals. I've filed several grievances, made countless complaints to shift officers. Still this problem still reoccurs.

(*Id.*). The grievance's "Summary of facility staff attempts to resolve" stated: "Sent tray back to kitchen. Talked with kitchen staff." (*Id.*) The staff individual, who is not a defendant here "stated that everything on inmate Brandon's tray coinsided [sic] with inmate Brandon's diet. The tray was sent back down to D-Pod and Inmate Brandon took the tray and asked for a grievance." (*Id.*).

---

[6] In 2012, the holy month of Ramadan was between July and August. (T. 87). During Ramadan, Plaintiff was required "to abstain from consuming food or beverage" from sunrise to sundown. (T. 88). In July, Plaintiff told a corrections officer that "Ramadan is coming up" and he was "supposed to fast" and asked who he should "speak to about getting the accommodation of fasting, of receiving a meal prior to the beginning of fast and then a meal after fast" (T. 88–89). Plaintiff testified that he was told that CCJ would not accommodate the fast. (T. 89). Plaintiff also testified that he filed "grievances" related to meals he received with pork during Ramadan. (*Id.*). However, none of this testimony is corroborated.

On September 24, Plaintiff filed a grievance stating that he "can not/do[es] not eat pork or any pork products nor tomatoes" but that he was served a BLT for lunch and that when he "instructed the server to produce another tray," the server later "returned with the same tray stating the kitchen will not accommodate." (Pl.'s Ex. 15). As to the "[a]ction requested," Plaintiff wrote that "stating some sort of action to be conducted seems useless" because he had been in CCJ "for 250+ days and continuously receive[d] food" he could not eat. (*Id.*). The grievance's "Summary of facility staff attempts to resolve" stated: "called the nurse to see what the inmate 'Brandon' couldn't eat and she stated he is on a low fat low sodium diet and that the inmate is allergic to tomatos [sic]." (*Id.*). Plaintiff did not receive a replacement for the September 24 lunch. (T. 93). Later that day, Plaintiff filed a second grievance: "Again, I'm being denied a dinner (meal). I do not/can not eat pork or pork products or tomatoes. For dinner I was served a salad which had tomatoes & bacon strips . . . . The officer instructed the server to make accommodations & the server returned with the same tray after picking out the tomatoes." (Pl.'s Ex. 16). Under "Action requested by the grievant," Plaintiff wrote: "I've made countless grievances to what seems to be a useless process. I've went many times without having a meal because of the kitchen's seemingly inability to make simple food accommodations." (Pl.'s Ex. 16). The grievance's "Summary of facility staff attempts to resolve" stated: "I called the nurse to see what the inmate can't have and she stated no tomatoes or low fat low salt items." (*Id.*).

On or about September 26, 2012, Sgt. Clancy, who had been handling Plaintiff's grievances, went to Lt. Laurin with a concern about the number of grievances Plaintiff had submitted about meals. (T. 302, 306–07 (Lt. Laurin testifying that he received Plaintiff's grievance on September 26 and that he began to investigate on September 26 or 27)). Sgt. Clancy "had tried to explain [to Plaintiff] that the meals that [Plaintiff] was receiving were his meals."

(T. 302). When Lt. Laurin and Sgt. Clancy investigated, they found Plaintiff had a medical diet in place—low fat, low sodium, no fish, no shellfish, no tomatoes, and no tomato products. (*Id.*). Sgt. Clancy also told Lt. Laurin that Plaintiff was stating that "he wasn't getting his Muslim no pork, no pork products diet." (T. 303). Lt. Laurin "dismissed Sergeant Clancy from doing the grievances" and took them over himself because there was "a problem and [he] needed to find out where the problem was" and see if he "could cure it." (T. 304). On either September 26 or 27, 2012, Lt. Laurin "went down physically" to the kitchen and he and Bedard went through Plaintiff's file together. (T. 305–06). Lt. Laurin explained that "[t]he paper that normally has religious diets that are generated by security staff is a little bit smaller" and he "wanted to make sure that it wasn't being missed." (*Id.*). They "did not find a religious slip" in Plaintiff's file. (*Id.*).

Lt. Laurin testified that on either September 9 or 27, he *verbally* notified the kitchen that Plaintiff was to be on a "no pork or no products" diet. (T. 307, 333–34). The Court does not credit this testimony. Lt. Laurin could not recall who he told about Plaintiff's diet. (T. 307 (Lt. Laurin testifying that he "would have to go to Bedard" but that he did not "know exactly" who he talked to, only that he "talked to somebody down in the kitchen")). Nor could Lt. Laurin accurately state on what date he told the kitchen of Plaintiff's no pork diet, (*compare id.* (Lt. Laurin testifying that he notified the kitchen on September 26 or 27); *with* T. 333–34 (Lt. Laurin testifying that he verbally notified the kitchen on September 9)).[7] Indeed, Lt. Laurin's

---

[7] The September 9 date is repeated in a response Lt. Laurin provided to a Prisoner Request Form Plaintiff submitted on October 11 complaining that he was still being served pork and had not received a response to his grievances, (Pl.'s Ex. 21; Defs.' Ex. 16 (Lt. Laurin responding: "You have not received pork or pork products since 9/9/12")), and again in an October 15 response to Plaintiff's October 10 grievance regarding a chef salad with ham, (Pl.'s Ex. 19 (Lt. Laurin responding: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012")). However, given Lt. Laurin's testimony that he did not become aware of Plaintiff's entitlement to Muslim meals until September 26, (T. 302, 306–07), Lt. Laurin's statements to Plaintiff in October that Plaintiff had not received pork since September 9 were false. Had this date appeared once, it might be explained as a typographical error, but Lt. Laurin used it in two separate documents, and again at trial, without explanation. However, as Plaintiff has not argued that

representations regarding when the kitchen was notified—verbally or in writing—of Plaintiff's religious diet have varied greatly in this case. For example, at trial, Lt. Laurin acknowledged that he previously filed an affidavit in this matter, in support of Defendants' motion for summary judgment, that stated: "due to plaintiff's March 2012 declaration that he was a Muslim, plaintiff did have a notification placed in his file that provided him a diet with no pork or no pork products." (T. 372 (citing Pl.'s Ex. 67 (marked for identification)); *see infra* Section II.D.6. Lt. Laurin further acknowledged that, in that affidavit, he referred to "Exhibit A," a copy of the Special Diet Notification form that the Court has found was not actually given to the kitchen until October 5, 2012. *See infra* Section II.D.6. The Special Diet Notification form that Lt. Laurin cited in his affidavit is in all respects identical to the Special Diet Notification form that was given to the kitchen on October 5, 2012 except that the date ("10/5/12") is missing.[8] (T. 374–75). Moreover, not only was Lt. Laurin's testimony regarding a verbal notification to the kitchen not credible, but Bedard[9] testified that no one at CCJ *told* him that Plaintiff should not be

---

Lt. Laurin had personal knowledge of Plaintiff's deprivation of a Muslim diet before September 26, the Court concludes Plaintiff implicitly acknowledges the September 9 date is inaccurate. (*See generally* Dkt. No. 247; *see also id.* at 64–65 (discussing Lt. Laurin's personal involvement and September 26 discovery "that Plaintiff had no religious diet slip on file with the kitchen")).

[8] It was undisputed at trial that the *dated* form contained in Defendants' Exhibit 21 was the authentic form. (*See* Figure 1 *infra* Section II.D.6.). At trial, the Court took judicial notice (T. 375–76) that United States Magistrate Judge David E. Peebles issued a Report and Recommendation recommending granting Defendants' motion for summary judgment as to Plaintiff's First Amendment free exercise of religion and retaliation claims in which he noted that the "date of '10/5/12'" appeared to be written in "defendant Laurin's handwriting," and  found "it plausible, that the version of this notice produced by defendants in support of their motion has been 'falsified . . . by removing the date written on the notification.'" *Brandon v. Schroyer*, 13-cv-939, 2016 WL 1638242, at *4, 2016 U.S. Dist. LEXIS 25003, at *10–11 (N.D.N.Y. Feb. 26, 2016), *adopted by*, 2016 WL 1639904, 2016 U.S. Dist. LEXIS 54634 (N.D.N.Y. Apr. 25, 2016), *affirmed in part and reversed and remanded in part, sub nom.*, *Brandon v. Kinter*, 938 F.3d 21 (2d Cir. 2019). The submission of the undated form to the Court is the subject of an Order to Show Cause that will be issued separately.

[9] Bedard acknowledged at trial that he was asked in an interrogatory during discovery: "When was Bedard or anyone with the kitchen staff notified that plaintiff was issued a religious diet?" and that he provided the following sworn response: "the kitchen staff was notified of plaintiff's religious diet from the booking officer on or about March 2, 2012." (T. 464). At trial, Plaintiff argued that "[p]er Defendant Bedard's interrogatory response" the kitchen staff was notified about his religious diet on March 2. (T. 514). However, there was no credible evidence presented at trial that Bedard or anyone in the kitchen knew of Plaintiff's religious diet before October 5.

served pork or pork products, (T. 469), stated that it was *not* the general practice for anyone at CCJ to tell him orally about an inmate's medical or religious restrictions, (T. 468), and that he received Plaintiff's religious diet notification on a *form*, (T. 470).

On or around September 27, Lt. Laurin went to Plaintiff's housing unit to discuss what was "going on, in terms of" Plaintiff's "religious diet." (T. 91, 97, 304). Lt. Laurin told Plaintiff he was aware Plaintiff is Muslim and that Plaintiff was receiving pork meals and acknowledged "it's wrong, but he said he's going to help." (T. 91). Lt. Laurin told Plaintiff he was "going to look into it and to address these matters." (T. 91–92).

On September 27, Lt. Laurin, as grievance coordinator, issued decisions regarding Plaintiff's September 15 and two September 24 grievances. (Pl.'s Exs. 14, 15, 16). As to the September 15 grievance, Lt. Laurin wrote: "Kitchen has been informed as of 9/27/2012 that you are low fat, low cholesterol, no tomatoes or tomatoe [sic] products, no fish or shellfish. They did not have that you were Muslim. You will get no pork or pork products." (Pl.'s Ex. 14). As to the first September 24 grievance, Lt. Laurin wrote: "As of 9/27/12 the kitchen was reviewed [sic] of your diet. Lowfat/low cholesterol, no tomatoes or tomatoe [sic] products, no shellfish or fish and that you are Muslim. Kitchen stated that the bacon is veggie bacon. We will furnish you with a copy of the ingredients." (Pl.'s Ex. 15). As to the second September 24 grievance, Lt. Laurin wrote: "Kitchen is aware of your diet. Bacon is veggie bacon. A copy of the ingredients will be provided to you. I have advised the kitchen that if you get a wrong meal that the whole meal will be redone." (Pl.'s Ex. 16). Plaintiff never received a copy of ingredients listing "veggie bacon" and did not recall ever seeing "veggie bacon" on the menu at CCJ. (T. 94).

On September 29, after issuing the above-referenced decisions, Lt. Laurin further investigated Plaintiff's September 15 and 24 grievances. (Pl.'s Exs. 14, 15, 16 ("Grievance

Investigation Form")). Lt. Laurin interviewed Plaintiff, Nurse Kinter, and Bedard. (Pl.'s Exs. 14, 15, 16). In his "Summary of findings," Lt. Laurin wrote: "Inmate Brandon's diets have been documented by medical and a copy of Brandon's special deit [sic] was given to the kitchen staff. Kitchen had not been notified he was Muslim. Kitchen staff has been advised to correct the diet." (Pl.'s Exs. 14, 15, 16). Under "List other relevant information/documentation," Lt. Laurin wrote: "A copy of special diets. Has been buying items in the commissary that he should not have with his diet." (Pl.'s Exs. 14, 15, 16).

### 5.    Plaintiff's Medical Diet Grievances – October 1–3, 2012

Plaintiff filed two grievances on October 1, 2012. In the first, Plaintiff wrote that he was "served a sandwich which had tomatoes in it." (Pl.'s Ex. 26). He explained that because of his "medical conditions, he cannot consume any tomatoes/tomatoes products." (*Id.*). In the second October 1 grievance, Plaintiff complained that he was "being denied a lunch tray" that complied with his medical special diet. (Pl.'s Ex. 27). Under "Summary of facility staff attempts to resolve" an officer wrote: "called kitchen – spoke with kitchen boss Bedard – new sandwich was being made . . . brought down to inmate." (*Id.*). Lt. Laurin subsequently wrote: "Had a meeting with the kitchen cook manager and explained no more mistakes if there are mistakes they are to be corrected." (*Id.*).

On October 3, Plaintiff filed a grievance stating that he "cannot eat/consume tomato or tomato products due to my medical conditions which was cleared by medical staff. I was served tomato soup in my lunch tray. Having been served tomato soup denies me a meal." (Pl.'s Ex. 28). The grievance's "Summary of facility staff attempts to resolve" stated that: "the tomato alternative soup was the 3 bean salad in a separate bowl on the meal tray. According to the

kitchen all contents of tray was compliant to the diets prescribed to inmate Brandon by medical."

(*Id.*).[10]

### 6.    Special Diet Notification Form for Religious Diet Filed with Kitchen – October 5, 2012

On October 5, 2012, Lt. Laurin "went down to booking, filled out the [religious meal]

slip [him]self, put the date on it, brought it down to the kitchen and had them put it right directly

in [Plaintiff's] file and mark him as a Muslim, no pork/no pork products." (T. 306; Pl.'s Ex. 8)

Lt. Laurin circled the section of the form for a "Religious" diet and wrote  "Muslim no pork or

pork products"; he signed the from and dated it "10/5/12." (Pl.'s Ex. 8); *see* Figure 1.

Figure 1: Defendants' Exhibit 21 – Dated Special Diet Notification Form



---

[10] In addition, on October 3, Plaintiff also filed two Prisoner Request Forms, both seeking "a copy of all past food grievances." (Pl.'s Exs. 29, 30). To the first, Lt. Laurin responded: "Copies are 25 cents per page. You will be issued a copy of grievance if accepted or appealed to the CPCRC at no charge." (Pl.'s Ex. 29). To the second, Lt. Laurin responded: "Previously answered." (Pl.'s Ex. 30). Further, on October 5, Plaintiff filed two Prisoner Request Forms. (Pl.'s Exs. 31, 32). One seeks the address for "Prisoner Legal Services," the "Attorney General Office of New York," and the "closest Legal Aid Society." (Pl.'s Ex. 31). The other seeks copies of "all" his food grievances. (Pl.'s Ex. 32). On October 9, Lt. Laurin responded with three addresses. (Pl.'s Ex. 31). Lt. Laurin's undated response to Plaintiff's request for all food grievances stated "[p]reviously answered." (Pl.'s Ex. 32).

Lt. Laurin testified that he did not know why he did not provide the "religious slip" earlier and instead waited until October 5. (T. 306). The Court finds that the kitchen was first notified about Plaintiff's religious diet on October 5, 2012, in this Special Diet Notification form. The Court further finds that from September 26 to October 5, Plaintiff continued to be served pork meals and received approximately six pork meals during that week-and-a-half time period. (Pl.'s Exs. 1, 2 (CCJ menus showing pork served two to four times weekly)).

### 7. Meal-Related Grievances – October 9–15, 2012

On October 9, 2012, Plaintiff filed a grievance regarding a meal he received in September:

> I've been served & have consume[d] food items I'm not suppose to consume due to religious beliefs. Through discussion on today's lunch trey [sic] with the shift officer "Coocher" about it containing a ham sandwich. The officer stated it is not ham it is turkey & continued to state, the only pork product served to inmates is the ham steak. He was told it contains pork from the kitchen staff. On September 9th, I was served ham steak for dinner. When I presented it to the shift officer he told me it was made of turkey and no pork/pork [products] . . . were included in the ham steak. He continued to state the kitchen doesn't use any pork products specifically because of the variety of inmates having religious constraints against pork/pork products.
>
> I need someone to get to the bottom of this. 2 different officers making 2 contrary statements.

(Pl.'s Ex. 18). Under "Summary of facility staff attempts to resolve" is written:

> I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that inmate Brandon was a no pork diet. So it is very likely that inmate Brandon recieved [sic] pork on Sept. 9. She also stated that inmate Brandon will no longer receive [sic] pork due to the fact that they now have documentation.

(*Id.*).

On October 10, at approximately 4:30 p.m., Plaintiff filed a grievance stating that he was "served a chef salad with strips of ham." (Pl.'s Ex. 20; Defs.' Ex. 9). The grievance's "Summary of facility staff attempts to resolve" states the corrections officer had the tray returned to the kitchen for replacement. (Pl.'s Ex. 20; Defs.' Ex. 9). Fifteen minutes later, at approximately 4:35 p.m., Plaintiff filed a second grievance stating that instead of replacing the tray in its entirety, the kitchen removed the strips of ham and sent back the same tray. (Pl.'s Ex. 19; Defs.' Ex. 8; Pl.'s Ex. 20; Defs.' Ex. 9). The second grievance's "Summary of facility staff attempts to resolve" states that "Sgt. Gregory" "went [to] the kitchen staff to discuss the tray and that no pork products were to be placed on or near the meal. The cook informed Sgt. Gregory the meat was turkey ham and a replacement tray would not be made." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin investigated these grievances and falsely responded: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin further stated that "the ham you receive is turkey ham sliced or cubed. Your Muslim diet is being served correct. I have included the ingredient label to you." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin made a copy of the turkey ham label to show Plaintiff "that it wasn't a pork product, even though it looks like pork." (T. 318; Defs.' Ex. 1).

On October 11, Plaintiff filed a grievance seeking copies of his food grievances.[11] (Pl.'s Ex. 34). Lt. Laurin's response stated: "The foil request I have given you should give you the information you are requesting." (*Id.*). In a decision dated October 25, Lt. Laurin stated that it

---

[11] On October 11, Plaintiff also filed a Prisoner Request Form stating that he was "still being served pork" and that he "need[ed] these issues addressed." (Pl.'s Ex. 21). Lt. Laurin again falsely responded: "You have not received pork or pork products since 9/9/12." (*Id.*). Because Plaintiff provided no testimony regarding the factual circumstances underlying this complaint, and the parties do not advance any arguments regarding this complaint, and given that Plaintiff submitted it the day after he filed his October 10 grievances, (Pl.'s Exs. 19, 20), to which Lt. Laurin had yet to respond, the Court concludes that Plaintiff was complaining about the meals he received on October 10 (rather than an additional pork meal).

"has always been the practice of the facility to charge 25 cents for any requested copies" and that Plaintiff would receive a copy of his grievances "at no charge when the grievance is accepted or is appealed." (*Id.*).

On October 14, Plaintiff submitted a second grievance seeking copies of past food grievances. (Pl.'s Ex. 35). On October 15, Plaintiff filed two grievances.[12] (Pl.'s Exs. 36, 38). One of the grievances sought copies of past food grievances[13] and the other complained that the peanut butter that was served with his breakfast was "high on cholesterol" and asserted that he needed his "restrictive diets to be followed." (Pl.'s Exs. 36, 38).

### 8.     Medical Diets Revoked – October 15–16, 2012

Lt. Laurin had noted during his September 29 investigation into Plaintiff's grievances that Plaintiff had "been buying items in commissary that he should not have with his diet." (Pl.'s Exs. 14, 15, 16). "[E]arly in October," after receiving "an awful lot of grievances from [Plaintiff] that just wouldn't even slow down," Lt. Laurin requested Plaintiff's commissary receipts. (T. 326–27 (explaining that the grievances "were just one right after another, so we have an issue"); *see also* Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Lt. Laurin testified that his purpose in requesting the receipts was "to look over the items [Plaintiff] was purchasing and to see if it was complying with his diet." (T. 327). Upon reviewing Plaintiff's commissary slips, Lt. Laurin noted that "[t]here was some items that [he] felt were contradictory

---

[12] On October 15, Plaintiff also filed a Prisoner Request Form seeking the address for the State Commission of Corrections. (Pl.'s Ex. 37).

[13] In a decision dated October 25, regarding the October 14 grievance regarding the lack of response to his prior food grievances, Lt. Laurin stated that three of Plaintiff's grievances had been "mailed" for further appeal, that four were with "the Jail Administrator," and there "were 13 others not counting this one" and that none of Plaintiff's grievances were "being ignored." (Pl.'s Ex. 35). The same day, Lt. Laurin issued a decision regarding the October 15 grievance seeking copies. (Pl.'s Ex. 36 (referring to Pl.'s Ex. 34))

to [Plaintiff's] low sodium/low fat diet," (*id.*), including "[r]amen [chili] soup," which contained tomato products; "squeeze cheese;" "mac and cheese;" and "nutty buddy bars." (T. 211, 327).

On October 15, Lt. Laurin went to Plaintiff's pod to speak with Plaintiff about his "various grievances" and commissary purchases. (T. 113–14, 328). Lt. Laurin "started . . . yelling" and asked Plaintiff "to explain" his commissary purchases—Lt. Laurin asked Plaintiff what the "sense" was of Lt. Laurin and other CCJ officials "putting in all this effort" to respond to "all [Plaintiff's] grievances" if Plaintiff was "turning around and purchasing" "oatmeal cream pies and nutty bars in commissary?" (T. 113–14, 328–29). Plaintiff responded that "sometimes I don't eat anything since I'm not fed anything, so I have to eat something." (T. 115). Lt. Laurin testified that he understood from their discussion of the commissary receipts that Plaintiff had "traded or bartered" commissary items; although Lt. Laurin acknowledged that Plaintiff did not expressly say so. (T. 328–29). Lt. Laurin testified that if Plaintiff had admitted this he would have been "written up" for violating CCJ rules. (*Id.*). Plaintiff had never been questioned about his commissary purchases before. (T. 115).

After speaking with Plaintiff, Lt. Laurin went to Nurse Kinter to show her the commissary receipts. (T. 329). Lt. Laurin wanted Nurse Kinter "to be aware that [Plaintiff] was purchasing these items and they weren't compliant with his low fat/low sodium diet." (*Id.*). Lt. Laurin explained that his job was "just to make" Nurse Kinter "aware" of the items Plaintiff had been purchasing, and that he had "done this before in the past" with other inmates. (*Id.*). When asked for examples, Lt. Laurin responded: diabetics, individuals who they had "to put . . . on a low sodium diet because they start retaining fluids," and "pregnant females," in an effort "to keep them on a good healthy diet." (T. 330). However, Lt. Laurin acknowledged on cross-

examination that CCJ would not revoke a diabetic or pregnant inmate's medical diet based on a review of commissary purchases. (T. 357–58).

The following morning, October 16, Plaintiff "was called to go to sick call." (T. 115).[14] Plaintiff was escorted to the medical ward, where he was seen by Nurse Kinter and Dr. Glen Schroyer, who is not a defendant in this case. (T. 116–17). Nurse Kinter told Plaintiff that they were "taking [Plaintiff's] . . . medical – – the dietary restrictions away" because Plaintiff was "not being compliant with [his] diet." (T. 118). Plaintiff "immediately" objected and began asking Dr. Schroyer why Nurse Kinter was "making these statements" and "how" he was "allowing this?" (*Id.*). Dr. Shroyer "didn't say anything" and "shrugged his shoulders." (*Id.*). Regarding the commissary purchases, Plaintiff told Nurse Kinter that "due to the past instances and continuous neglect of my dietary restrictions from the kitchen I never know whether or not I'll receive a meal let alone a meal I can eat." (Pl.'s Ex. 40). Plaintiff then said that if they removed his medical diets he was "not going to just eat anything" and that he could not eat a regular diet and that he was "going to write grievances." (T. 118–19).

Nurse Kinter testified that there were no medical concerns about removing Plaintiff's low fat/low cholesterol diet because "his labs had improved at the time when he was here at the jail" and as it "look[ed] like he wasn't being compliant with his meals . . . we had no concern with Mr. Brandon's diet at that time." (T. 437). The "coronary risk evaluation" labs in the record, however, do not support this testimony. (Pl.'s Ex. 66). For example, Plaintiff's cholesterol was 255 (high) in May 2012, 259 (high) in August 2012, and 249 (high) on October 3, 2012. (*Id.*). The other lab results—HDL, LDL, and triglycerides—showed similarly minor fluctuations and

---

[14] Plaintiff was "confused about" being called to go to sick call because typically, inmates were required to "fill out a form to go"—"they don't just call you." (T. 115–16).

all remained flagged as high or low. (*Id.*). Nurse Kinter was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can become ill if they eat foods with high acidity, like tomatoes, but had "[n]o concerns" about that. (T. 419–20, 440). After reviewing Plaintiff's commissary purchases, and finding that he "was buying everything that was against his medical diet," Nurse Kinter "did a new diet slip to start the regular diet, no fish, no shellfish diet," and she "sent it back down to the kitchen, and then that notification went into the doctor's folder." (T. 393). The "Diet Notification" Nurse Kinter sent to the kitchen is dated October 16, and directed the kitchen to "Cancel all previous slips" and place Plaintiff on the "Reg Diet" but "No Shellfish." (Pl.'s Ex. 41).

The same day, October 16, Plaintiff filed a grievance regarding Nurse Kinter's removal of his medical diet. (Pl.'s Exs. 39, 40). Lt. Laurin denied the grievance. (Pl.'s Ex. 40).

On October 17, 2012, Plaintiff submitted two Sick Call Requests. (Pl.'s Ex. 42; Defs.' Ex. 20). The first stated: "I do not eat tomatoes. Tomatoes causes me extreme acid reflux . . . yet I was served a dinner of pasta & tomato sauce. The restriction was taken out of my file." (Pl.'s Ex. 42). Plaintiff requested that the restriction be reinstated. (*Id.*). On October 18, Nurse Kinter responded: "This was discussed at visit with M.D. You decided not to follow doctor's recommendations!" (*Id.*). The second Sick Call Request stated that Plaintiff does not eat pork, he is Muslim, he has raised this issue on several occasions, and that his diet was "recently" changed under Nurse Kinter's "directive" and he "need[s] his religious diet reinstated." (Defs.' Ex. 20). Nurse Kinter investigated Plaintiff's request and on October 18, responded: "Your religious diet is still in effect. I checked with kitchen. I don't do anything with religion." (*Id.*; T. 414).

### 9.    Served Pork Meal – October 17, 2012

On October 17, Plaintiff received a pasta salad. (T. 136). It was labeled "meatless" or "vegetarian" but when Plaintiff "began to . . . dig in," he discovered the salad had pork in it.

(*Id.*). When Plaintiff compared his tray to that of another Muslim inmate he found his salad was different. (T. 137). When Plaintiff compared his tray to "the general population" trays, he found they were identical. (*Id.*). Plaintiff reported the tray to the officer on duty. (*Id.*). Plaintiff submitted a grievance on October 17 reporting that he had been served a "ham salad" despite having a Special Diet Notification in his inmate file. (Pl.'s Ex. 22). On the grievance, Sgt. Clancy wrote: "I replaced the meal and was given a non-pork meal. And as for the meal slip a new one was placed in file and kitchen was notified."[15] (*Id.*). Plaintiff checked the line next to "I do not accept this resolution and wish to file a formal grievance." (*Id.*). Under "Decision of the Grievance Coordinator," Sgt. Clancy wrote: "Spoke with kitchen @ 1835 [6:35 p.m.]. Was shown file that shows inmate Brandon no shellfish; No pork. Returned and spoke with inmate. Inmate Brandon refuses to accept @ 1844 [6:44 p.m.]." (*Id.*). The next day, Sgt. Clancy told Plaintiff she had investigated the matter and that "the staff chef had made a mistake," and had "put the pork meal on [Plaintiff's] tray instead of the non-pork meal." (T. 141–42; Pl.'s Ex. 22). When Plaintiff asked Sgt. Clancy if she would document that, Sgt. Clancy said "no," and that she was "going to leave it as she had it." (T. 143). Plaintiff testified that as Sgt. Clancy walked away from him, she said to Officer Blaise: "if he grieves another tray, she's going to lock" Plaintiff up. (*Id.*).[16] Lt. Laurin ultimately denied the grievance by attaching, without explanation, his October 12 investigation, which occurred five days before the incident at issue in the October 17 grievance. (Pl.'s Ex. 22).

---

[15] There was no evidence of a "new" "meal slip" presented at trial.

[16] Plaintiff testified that he thought he received a second pork meal later on that day but unlike his testimony about other pork meals, which detailed the type of pork and surrounding circumstances, his testimony was nonspecific and he seemed uncertain. (*See* T. 144 ("I think I received it later on that day - - or like, later on that day I believe I received another meal with pork")). The Court therefore declines to credit this testimony.

### 10.    Medical Diet Grievances – October 19–27, 2012

On October 19, 2012, Plaintiff submitted three grievances: the first stated that he had received a tray with "hot cereal & buttery toast," which did not comply with his "restrictive diet" for his "high cholesterol condition," (Pl.'s Ex. 43), the second stated that he was served tomato soup for lunch, which causes him "severe . . . acid reflux," (Pl.'s Ex. 44), and the third stated that he had been served a salad with tomatoes for dinner, which causes him "severe . . . acid reflux," (Pl.'s Ex. 45). Plaintiff filed similar grievances on October 20, 22, 24, 25, 27, 28, 29, 30, 31, and November 1. (Pl.'s Exs. 45–55). On November 2, after investigating, Lt. Laurin issued a decision denying Plaintiff's grievances, noting that "[t]he jails [sic] Health Coordinator and the Jail Physician has [sic] eliminated your diets consisting of low fat, low cholesterol, no fish and no tomatoes or tomato products" because the commissary items Plaintiff had purchased were not compliant "with the Physicians [sic] recommendations." (Pl.'s Ex. 56). Lt. Laurin noted that the "no shell fish" and "religious restrictions for Muslims" were intact. (*Id.*). Plaintiff filed additional grievances regarding his medical diet on November 2, 4, and 9. (Pl.'s Exs. 57, 58, 59).

By October 26, Lt. Laurin had received "several grievances" from Plaintiff, and he spoke with "medical and asked them if there was something we could do." (T. 335–36). Lt. Laurin's "focus was totally on answering his grievances and seeing if we couldn't get some kind of resolution." (T. 336). Lt. Laurin explained that resolving Plaintiff's grievances had "turned into a full-time job" and "was a little overwhelming." (*Id.*). Lt. Laurin estimated that Plaintiff had filed eighteen grievances. (*Id.*). Lt. Laurin also discussed with Nurse Kinter whether there was

"something we could do to get [Plaintiff] back on his diet because we needed to come to a conclusion of all this"—meaning that they "needed to make all parties happy." (T. 336–37).[17]

### 11. Served Pork Meal – Late October 2012

The following week, in late October, Plaintiff received a meal with "a label of vegetarian bean soup" that appeared to be "compliant." (T. 152). However, as Plaintiff started to eat, he noticed "small bits of ham chunks swimming in" the soup. (*Id.*). Plaintiff looked around and noticed that the others who received "non-pork meal[s]," had different meals than Plaintiff but that his was the same as "the general population meals." (T. 152). Plaintiff reported the meal to the officer on duty. (*Id.*). The officer "did his own investigation" by comparing Plaintiff's meal to the meals of the other inmates and concluded, like Plaintiff, that although Plaintiff's soup was labeled "vegetarian soup" it was ham soup. (T. 153). The officer "contacted the kitchen." (*Id.*). The officer reported that "Chef Bedard said that he mistakenly used the same ladle spoon to serve [his] tray with another tray," so he "mixed" up the soup on Plaintiff's tray. (T. 153–54). Plaintiff received a replacement meal. (*Id.*). As a result, Plaintiff "started combing through" his meals. (*Id.*).

### 12. Served Pork Meal – November 2012

In November 2012, Plaintiff received a meal with a pasta salad labeled "meatless salad" that contained pepperoni. (T. 155). Plaintiff "immediately" brought the pepperoni to the attention of Officer Webb, who was the corrections officer on duty. (T. 156). Plaintiff told Officer Webb that he did not eat pork and about "the last two instances when [he] received a meal that appeared to have a label that was compliant with [his] religious diet, but the meal itself wasn't,"

---

[17] On October 27, 2012, Plaintiff filed a "Prisoner Request Form." (Pl.'s Ex. 24). The top portion of the form is unreadable. (*Id.*). The response states: "Medical does not do religious diet. See security." (*Id.*). The form is signed by Nurse Kinter and dated October 29. (*Id.*).

and said, "this happened again and this is pepperoni." (*Id.*). Officer Webb, without looking at the

tray, immediately said "oh, that's turkey pepperoni." (*Id.*). Plaintiff explained that it was "pork

pepperoni" and "went on to say" that even it if it was "turkey," not only would everyone have

received it, but it was not "meatless" and the salad was labeled "meatless salad." (T. 155, 157).

Plaintiff asked Officer Webb to "[c]ontact the kitchen and just confirm," "[i]f it's turkey, then its

turkey. If it's not, then . . . [he] would like a replacement of some sort." (T. 157). Officer Webb

said he would call. (*Id.*).

After twenty minutes "went by," Plaintiff approached Officer Webb, who was on the

phone." (*Id.*). Officer Webb said "oh, so its turkey—turkey pepperoni." (*Id.*). "And then he told

[Plaintiff] that he spoke to somebody in the kitchen and he confirmed that it was turkey

pepperoni." (*Id.*). When Plaintiff asked who Officer Webb spoke to, Officer Webb said

something to the effect that he was not going to tell Plaintiff who it was. (T. 158). Plaintiff stated

that he wanted a name because he wanted to submit a grievance. (*Id.*). Officer Webb replied that

if Plaintiff grieved the meal, he would not get a replacement meal. (*Id.*). Plaintiff did not receive

a replacement meal and there is no evidence that Plaintiff filed a grievance. (T. 159). Defendants

did not present any evidence that the kitchen served turkey pepperoni. The Court finds that the

pepperoni served to Plaintiff that day contained pork and, crediting Plaintiff's testimony, finds

that Officer Webb did not call the kitchen to check whether the pepperoni in the salad was turkey

pepperoni.

### 13.    Medical Diet Reinstated – November 15–21, 2012

On November 15, Plaintiff submitted a "Sick Call Request" seeking to speak with Nurse

Kinter about the removal of his restrictive diets "because of a non-compliance of my diet she

said I committed through my commissary purchases." (Pl.'s Ex. 60). Plaintiff requested guidance

regarding appropriate commissary purchases "that won't be deemed as non-compliant so" that

his restrictive diets can be "reinstated." (*Id.*). Plaintiff asked if Nurse Kinter "could talk to him about his commissary purchases," and she did. (T. 394). Together, they "went through the commissary options to see what would be better options of what to buy." (T. 394–95). Nurse Kinter crossed off items from the commissary list "that were not recommended for him to purchase." (T. 401). On November 21, Nurse Kinter restored Plaintiff's diets and noted that Plaintiff could "purchase items from commissary that are highlighted." (Pl.'s Ex. 60).

### 14.    Assaulted by Another Inmate – November 17–18, 2012

On or about November 17, Plaintiff saw Sgt. Clancy and Officer Blaise in an observation housing unit where Plaintiff was confined. (T. 145). They were "escorting" another inmate, "Tiny," "into the cell next to" Plaintiff. (*Id.*). Plaintiff knew Tiny "had a reputation . . . for attacking other inmates," for throwing things at other inmates, including feces and urine, and for spitting.  (T. 145–46). As Sgt. Clancy and Officer Blaise were moving Tiny into his cell, Plaintiff heard Tiny and Sgt. Clancy arguing and then heard Sgt. Clancy say, "let's see if he tries this shit on Brandon." (T. 146). Plaintiff testified that after Sgt. Clancy and Officer Blaise left, Tiny began making "racial remarks" to Plaintiff, and that the two of them argued during the night. (T. 147).  When Officer Blaise returned the next day during mealtime, Officer Blaise asked Plaintiff to assist in carrying food trays (T. 148). Plaintiff agreed and began carrying trays. (T. 149). As Plaintiff stood up from his work in front of Tiny's cell, Tiny spit in his face. (*Id.*). Officer Blaise issued an incident report regarding Tiny's conduct. (Defs.' Ex. 23).

### 15.    Served Pork Meal – December 25, 2012

On December 25, there were two issues with Plaintiff's meals. (T. 494). At breakfast, Plaintiff told Officer Perry, the corrections officer on duty, that there was butter on his toast. (*Id.*). Officer Perry checked his file, which reflected a "low cal/low fat diet," and "called the kitchen and had his toast replaced." (*Id.*). At lunch, Plaintiff received a meal of barbeque ribs,

which he immediately brought to Officer Perry's attention. (T. 161–62). Officer Perry "smirk[ed] and said, come on Brandon . . . where's your holiday spirit." (T. 162). They "started arguing immediately." (*Id.*). Plaintiff "cursed at him" and "was combative" and "upset." (*Id.*). Plaintiff voiced his frustration of "an entire year of this nonstop" "like I'm a joke to these people." (T. 162–63). Plaintiff filed a grievance stating again that he is Muslim and that he was yet again served a meal with pork. (Pl.'s Ex. 25). Under "[s]ummary of facility staff attempts to resolve," the grievance states: "your meal was addressed and changed to address your needs." (*Id.*). On the grievance, Plaintiff checked the line next to "I do not accept this resolution and wish to file a formal grievance." (*Id.*). The grievance was never forwarded to the grievance coordinator and there is nothing in the record that suggests it proceeded beyond Officer Perry. Defendants provide no explanation for this.[18] Plaintiff testified that despite the statement on the grievance, his meal was not replaced. (T. 164). Having observed the testimony of Plaintiff and Officer Perry, and the credibility and demeanor of each witness on this issue, the Court credits Plaintiff's testimony that his meal was not replaced.

Plaintiff lost fifty pounds during the twelve months he was in the jail. (T. 166).

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard

"The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996); *see Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 731 (2d Cir. 2001).

---

[18] If an inmate checked the line next to "I do not accept this resolution and wish to file a formal grievance," it was deemed an appeal and sent to the grievance coordinator, who was required to respond to the grievance within five days. (T. 295). Once the grievance coordinator responded, the grievance was returned to the inmate, who then had two days to accept or appeal the response. (T. 295–96).

### B.      First Amendment Free Exercise of Religion

Like prisoners, pretrial detainees "have 'long been understood to retain some measure of' their rights under the Free Exercise Clause." *Brandon*, 938 F.3d at 32 (quoting *Ford v. McGinnis (Ford II)*, 352 F.3d 582, 588 (2d Cir. 2003)). "These rights, however, must be balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.'" *Id.* (quoting *Ford II*, 352 F.3d at 588). Thus, courts must "judge prisoners' free exercise claims 'under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" *Id.* (quoting *Ford II*, 352 F.3d at 588). This test requires a prisoner or pretrial detainee to "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* (quoting *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014)). If the prisoner or pretrial detainee "satisfies these threshold requirements, a defendant can still avoid liability by showing that his or her conduct is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Holland*, 758 F.3d at 222).

At trial, Plaintiff established by a preponderance of the evidence that he was entitled to receive a Muslim, no-pork, no pork products diet starting on March 2, 2012, the date he was re-booked into CCJ and listed his religion as Muslim. The importance of avoiding pork and pork products to the practice of Islam was undisputed at trial; the *Quran* prohibits the eating of pork and the eating of pork is considered "a high sin." (T. 38–39). It was also undisputed that Plaintiff's beliefs were sincerely held. (T. 55). Notwithstanding Plaintiff's entitlement to a religious diet, he was served pork meals two to four times weekly—between 62 and 124 pork meals—during the 31-week period from March 2, 2012 to October 5, 2012, the day a Special Diet Notification form directing the kitchen to provide a religious diet was placed in his inmate file. (T. 59–81; Pl.'s Ex. 1). Even after Lt. Laurin gave the kitchen written notice of Plaintiff's entitlement to a Muslim, no-pork, no pork products diet on October 5, Plaintiff was served pork

meals at least four times thereafter: on October 17, (Pl.'s Ex. 22); in late October, (T. 152–54);

once in November, (T. 155); and on December 25, (Pl.'s Ex. 25). The October meals were

replaced, (*see* Pl.'s Ex. 22  T. 154), but the November meal with pepperoni, and the December

25 BBQ pork ribs meal were not replaced.

Thus, Plaintiff has established that he was denied a religiously compliant diet from March

2 to October 5, 2012 and served a total of *at least* 66 pork meals from March 2 to December 25,

2012. The Court has no difficulty concluding that the denial of a religious diet for seven months

and the service of at least 66 pork meals substantially burdened Plaintiff's sincerely held

religious beliefs. *See Brandon*, 938 F.3d at 35–36 (observing that the Circuit previously found

the denial "of a single [religious] feast constituted a substantial burden" and concluding that the

denial of ten Muslim, no-pork meals "may constitute a substantial burden" (citing *Ford II*, 352

F.3d at 593)). Defendants presented no evidence at trial that the service of pork meals to Plaintiff

was reasonably related to a legitimate penological interest. Accordingly, the Court finds

Plaintiff's right to the free exercise of religion was violated.

### 1.     Personal Involvement[19] and Deliberate Indifference

The Second Circuit has instructed:

> [A]fter *Iqbal*, there is no special rule for supervisory liability.
> Instead, a plaintiff must plead and prove "that each Government-
> official defendant, through the official's own individual actions, has
> violated the Constitution." [*Ashcroft v.*] *Iqbal*, 556 U.S. [662,] 676
> [(2009)]. "The factors necessary to establish a [§ 1983] violation
> will vary with the constitutional provision at issue" because the

---

[19] Plaintiff argues that because Defendants did not argue personal involvement on summary judgment, the mandate rule bars "its consideration here." (Dkt. No. 247, at 68). The Court disagrees. "[T]he so-called mandate rule bars re-litigation of issues already decided on direct appeal" and also "prevents re-litigation in the district court" of matters expressly decided or impliedly resolved by the appellate court. *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). In reversing the district court's entry of summary judgment, the Second Circuit did not expressly or impliedly resolve the issue of personal involvement. Moreover, "[t]he role of the appellee is to defend the decision of the lower court. This Court has not held that an appellee is required, upon pain of subsequent waiver, to raise every possible alternate ground upon which the lower court could have decided an issue." *Brown v. City of New York*, 862 F.3d 182, 188 (2d Cir. 2017).

> elements of different constitutional violations vary. *Id.* The violation
> must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). "The focus is on what the supervisor

did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea*

required of him to be held liable, which can be no less than the *mens rea* required of anyone

else.'" *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (Gorsuch, J.)).

In this case, to prove the individual Defendants liable under the First Amendment for the

violation of his right to free exercise of religion, Plaintiff must also establish that they acted with

deliberate indifference.[20] "The 'deliberate indifference standard embodies both an objective and

a subjective prong.'" *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Hathaway v.

Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "First, the alleged deprivation must be, in objective

terms, sufficiently serious." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "Second, the charged official

must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway*, 37 F.3d at 66).

"Deliberate indifference requires more than negligence, but less than conduct undertaken for the

very purpose of causing harm." *Id.* (quoting *Hathaway*, 37 F.3d at 66). As to the second prong,

"the pretrial detainee must prove that the defendant-official acted intentionally to impose the

alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the

condition posed to the pretrial detainee even though the defendant-official knew, or should have

known, that the condition posed an excessive risk" to the right to free exercise. *Darnell v.

Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (explaining deliberate indifference in pretrial detainee

context); *see also id.* (explaining that "[i]n other words, the 'subjective prong' (or '*mens rea*

prong') of a deliberate indifference claim is defined objectively").

---

[20] The Second "Circuit has not stated whether a First Amendment free exercise claim requires more than negligence."
*Brandon*, 938 F.3d at 38. The parties here assume that it does and advance arguments concerning whether Defendants
acted with deliberate indifference in serving Plaintiff pork. (Dkt. No. 247, at 63–67; Dkt. No. 250, at 30–41).

### a.    Lt. Laurin

To establish a constitutional violation against Lt. Laurin, Plaintiff must show that Lt. Laurin, "through [his] own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618. Lt. Laurin was responsible for supervising the corrections sergeants and the day-to-day activities throughout CCJ, and for overseeing the grievance program at CCJ. (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)). However, there is no evidence in the record indicating that Lt. Laurin had any knowledge regarding, or involvement with, Plaintiff's requests for a Muslim diet before September 26. And because Lt. Laurin's supervisory responsibilities alone are insufficient to subject him to liability, *see Tangreti*, 983 F.3d at 619 (explaining that a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation"), the Court finds Plaintiff has failed to prove Lt. Laurin's liability for the service of pork meals, in violation of Plaintiff's free exercise rights, from March 2 to September 26. However, this does not end the inquiry as to Lt. Laurin's liability for it is undisputed that Lt. Laurin became involved on September 26.

When Lt. Laurin began handling Plaintiff's grievances on September 26, he learned that Plaintiff was Muslim, (T. 91 (Plaintiff testifying that Lt. Laurin told him that he was aware Plaintiff was Muslim)), and that he had been receiving noncompliant meals for many months, (*see, e.g.*, Pl.'s Ex. 15 (Plaintiff stating in grievance "I've been here for 250+ days and continuously receive food . . . which I can't eat")). When Lt. Laurin searched the kitchen's files, he found the kitchen did not have a religious diet form in Plaintiff's file. (T. 303, 306–07, 341). Lt. Laurin then went to Plaintiff and said he knew Plaintiff was Muslim, that Plaintiff receiving pork meals, that it was "wrong" and that "he's going to help." (T. 91, 304). On September 29, when Lt. Laurin issued a decision on Plaintiff's grievances, he noted that the "kitchen had not been notified he was Muslim" but that "kitchen staff has been advised to correct

the diet." (Pl.'s Ex. 15). This, of course, was untrue because Lt. Laurin had not yet filed a Special

Diet Notification form for Plaintiff. Despite personally assuring Plaintiff on September 27 that he

would no longer receive pork meals and representing that he had already "advised" the kitchen

"to correct the diet," Lt. Laurin did not complete a Special Diet Notification form until October

5—ten days, and thirty meals, later. (Pl.'s Ex. 8). Lt. Laurin had no explanation for not filing the

Special Diet Notification form until October 5, (T. 306, 351 (Lt. Laurin testifying that he did not

"know offhand" and speculating that he "probably got tied up in something")), and understood

such forms were to be filed the same day as booking, or shortly thereafter. (T. 293–94 (Lt.

Laurin testifying that "[o]nce that inmate was booked in," the booking officer "was supposed" to

physically bring the religious diet notification slip "down to the kitchen")). Based on this

evidence, the Court concludes that as of September 26, Lt. Laurin knew that Plaintiff was

entitled to a Muslim diet, and that without a Special Diet Notification form in his kitchen inmate

file, there was an excessive risk that Plaintiff would continue to receive pork meals in violation

of his religion. And yet, Lt. Laurin inexplicably waited ten days to file the Special Diet

Notification form. Therefore, the Court finds that Plaintiff has proven by a preponderance of the

evidence that Lt. Laurin recklessly failed to act with reasonable care to mitigate the risk that

remaining on a regular diet at CCJ posed to Plaintiff's right to free exercise of religion. *Darnell*,

849 F.3d at 35. Accordingly, Lt. Laurin is liable for the September 26 to October 5 violation of

Plaintiff's right to the free exercise of religion.[21]

Despite Lt. Laurin's filing of the Special Diet Notification form, Plaintiff was served four

pork meals between October 5 and December 25. However, Plaintiff has not shown Lt. Laurin's

---

[21] Defendants do not dispute that that this ten-day deprivation of a religious diet constituted a substantial burden. *See Brandon*, 938 F.3d at 36 (observing that "when Muslim inmates are served meals containing pork, they are faced with the choice of disobeying the commands of their faith or not eating").

"individual actions" with respect to these meals led to the violation of Plaintiff's First Amendment rights. Moreover, as the two pork meals Plaintiff was served in October were both replaced immediately, (Pl.'s Exs. 22; T. 154), the burden on Plaintiff's free exercise of religion may have been de minimis. *See Rutherford v. Westchester Cnty.*, No. 18-cv-4872, 2020 WL 433841, at *7, 2020 U.S. Dist. LEXIS 14113, at *19 (S.D.N.Y. Jan. 28, 2020) ("As Plaintiff alleges only a single incident of ham in his halal meal, and as he acknowledges that Defendants attempted to rectify (or at least ameliorate) the situation immediately, he has not alleged a constitutional violation."). But even assuming the service of two pork meals in October constituted a substantial burden, in both instances, the only evidence before the Court as to why Plaintiff was served pork meals suggests that it was due to a mistake in the kitchen. (T. 142, 153–54). While Lt. Laurin was responsible for the day-to-day supervision of the CCJ, and reviewed the grievance regarding the October 17 pork meal, (Pl.'s Ex. 22), there is no evidence connecting him to either meal. *See Tangreti*, 983 F.3d at 619 (explaining that a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation").

Plaintiff was also served a pasta salad with pepperoni in November, and barbeque pork ribs on December 25. (T. 155; Pl.'s Ex. 25). Neither meal was replaced. There is no evidence in the record indicating why Plaintiff received pork meals on these dates. The Court therefore has no basis for finding the service of pork on either date was an intentional act. Moreover, Plaintiff failed to present evidence showing that Lt. Laurin was personally involved in either meal. Therefore, the Court finds Plaintiff has not shown Lt. Laurin's liability for the four pork meals served to Plaintiff between October 17 and December 25.

Accordingly, the Court finds Lt. Laurin is liable for violating Plaintiff's First Amendment right to the free exercise of religion by failing to provide a Muslim diet from September 26 to October 5.

### b.   Nurse Kinter

There is evidence that Nurse Kinter knew of Plaintiff's efforts to obtain a religious diet as early as May 28. (*See, e.g.*, Pl.'s Exs. 9, 13). There is also evidence that Nurse Kinter directed Plaintiff to speak to a sergeant or lieutenant at CCJ and that she did not help Plaintiff obtain a religious diet. (Pl.'s Ex. 13). However, Plaintiff failed to prove by a preponderance of the evidence that Nurse Kinter had any authority to do more than direct Plaintiff's inquiries to those with authority to assist him and check to see what diets were on file with the kitchen. Nurse Kinter testified that the nurses at CCJ "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; T. 468 (Bedard testifying that he did not recall a nurse or anyone from the medical facility ever providing him with a religious diet restriction)). The evidence showed that only a booking officer, sergeant or lieutenant, or grievance coordinator could authorize a religious diet. (T. 293, 468; Pl.'s Ex. 8'; Pl.'s Ex. 13). In *Tangreti*, for example, the Second Circuit noted that where the defendant prison official "was not responsible for procuring cameras or for [the correctional facility's] camera policy[,] [t]he district court correctly concluded that apart from discussing this problem with other officials, [the defendant] had no further responsibility to resolve it." 983 F.3d at 619 n.7. Thus, the Court finds that apart from directing Plaintiff to the individuals at CCJ who could authorize religious diets, Nurse Kinter had no additional authority or responsibility to assist Plaintiff in obtaining a religious diet. *Jackson v. Sheehan*, No. 16-cv-6710, 2021 WL 795313, at *7, 2021 U.S. Dist. LEXIS 38947, at *19 (W.D.N.Y. Mar. 2, 2021) ("Jansen and Haimes, having performed their

functions with respect to Plaintiff's complaint to the limits of their authority, 'had no further responsibility to resolve it.'" (quoting *Tangreti*, 983 F.3d at 619 n.7)). Accordingly, the Court finds Plaintiff failed to prove by a preponderance of the evidence Nurse Kinter's personal involvement in the violation of his right to the free exercise of religion.

### c. Bedard

Plaintiff also failed to prove Bedard acted with deliberate indifference or was personally involved in the deprivation of his right to the free exercise of religion. Plaintiff established that Bedard was responsible for ensuring that meals were prepared in compliance with religious diets, and was aware, as of October 5, of Plaintiff's religious diet. (T. 459–60, 469–70; Pl.'s Ex. 8). To the extent Plaintiff seeks to hold Bedard liable for the period before the Special Diet Notification was placed in his inmate folder—March 2 to October 5—Plaintiff has presented no evidence that Bedard knew he was entitled to a no-pork diet during that time period. The Court therefore finds Plaintiff has failed to establish Bedard's liability for the noncompliant meals served from March 2 to October 5. However, as the kitchen served pork meals to Plaintiff four times *after* being notified in writing on October 5 of Plaintiff's no-pork diet, the Court must consider whether Plaintiff has proven Bedard's deliberate indifference and personal involvement in connection with these meals. (See Pl.'s Ex. 22 (served pasta salad with ham on October 17); T. 152–54 (served vegetarian bean soup "with small bits of ham chunks" in late October); T. 155 (served pasta salad with pepperoni in November); Pl.'s Ex. 25 (served barbeque pork rib sandwich on December 25)).

The evidence at trial showed that Bedard acted in a supervisory role with respect to meal service, and although there is some evidence that Bedard was aware Plaintiff was claiming that mistakes were being made with respect to his religious meals, *see* Dkt. No. 22 ("Grievance Investigation Form" dated October 15 indicating that Lt. Laurin interviewed Bedard with respect

to serving Plaintiff pork), there was little evidence connecting Bedard to the four pork meals

Plaintiff received after the Special Diet Notification was filed with the kitchen. There was no

evidence presented at trial that suggested Bedard was involved in preparing or serving Plaintiff's

meal tray on October 17. Indeed, the evidence in record shows that Sgt. Clancy spoke with the

"kitchen" about this incident and learned that a "staff chef had a made a mistake." (T. 141–42).

The Court therefore finds no basis for holding Bedard liable for this incident. With respect to the

soup with ham that Plaintiff was served in late October, Plaintiff testified that he was told that

Bedard "mistakenly used the same ladle spoon to serve [Plaintiff's] tray with another tray" which

resulted in Plaintiff receiving ham in his soup. (T. 153–54). However, even assuming Bedard

mistakenly served Plaintiff ham soup instead of vegetarian bean soup,[22] the Court finds no basis

for concluding Bedard acted with deliberate indifference. Indeed, the evidence that each time the

kitchen was made aware of a mistake (on October 17 and again in late October), a replacement

meal was sent undermines any suggestion of deliberate indifference to the violation of Plaintiff's

right to the free exercise of religion. *See*, *e.g.*, *Rangolan v. County of Nassau*, 217 F.3d 77, 79

(2d Cir. 2000) (finding no deliberate indifference when "the County took steps to protect" a

vulnerable inmate "but mistakenly failed to implement them"); *Vail v. City of New York*, 68 F.

Supp. 3d 412, 425–26 (S.D.N.Y. 2014) (finding that the plaintiff failed to adequately allege the

defendant acted with deliberate indifference because even if the defendant administered the

incorrect medication, they "acted quickly after Plaintiff became symptomatic, and therefore they

were not reckless"); *Ivey v. City of New York*, Nos. 12-cv-3580, et al., 2013 WL 6838954, at *3,

2013 U.S. Dist. LEXIS 175884, at *8–9 (S.D.N.Y. Dec. 12, 2013) (granting a motion to dismiss

---

[22] There was no corroboration of the report that Bedard mistakenly gave Plaintiff ham soup. Indeed, Bedard testified that it was the "cook's duty" on the food line to serve the main course, including the soup, (T. 444), that he was "not always on th[e] food line," but that when he was, he helped in small ways, such as placing condiments, crackers, or cookies on meal trays. (T. 451).

where it was "[im]plausible that [the] defendants [had] acted with 'deliberate indifference'" because "they appeared to have taken immediate steps to provide treatment" "almost immediately" after the plaintiff "was diagnosed with a serious . . . condition"). Finally, there is no evidence connecting Bedard, other than in a supervisory role as food service manager, to the third or fourth pork meals Plaintiff was served—pasta salad with pepperoni in November or the barbeque pork ribs on December 25. Accordingly, the Court finds Plaintiff has failed to prove, by a preponderance of the evidence, his free exercise of religion claim against Bedard.

### d.   Sgt. Clancy

Plaintiff asserts Sgt. Clancy was "personally involved and deliberately indifferent to Plaintiff's Free Exercise rights" because she refused to "record" her finding that Plaintiff had been served pork on Plaintiff's October 17 religious dietary grievance and threatened to "lock" Plaintiff up if he filed another grievance. (Dkt. No. 247 (citing Pl.'s Ex. 22; T. 142–45)). Although Sgt. Clancy did not explicitly state that Plaintiff received a pork meal on Plaintiff's October 17 grievance, Sgt. Clancy stated that she "replaced the meal" and that Plaintiff "was given a non-pork meal." (Pl.'s Ex. 22). Sgt. Clancy's statement implies that Plaintiff's original meal contained pork, and her efforts to have it replaced reflect Sgt. Clancy's acknowledgement that the original meal was improper and that Plaintiff was entitled to a no-pork meal. (*Id.*). The Court finds no deliberate indifference or personal involvement under these circumstances.

### e.   Officers Webb and Perry

Plaintiff's free exercise claim against Officer Perry arises from the pasta salad with pepperoni Plaintiff was served in November 2012. Plaintiff's free exercise claim against Officer Perry stems from Plaintiff's receipt of a meal of barbeque pork ribs on December 25. (T. 161–62). However, for the reasons discussed below, *see supra* Section III.B.2, because it was not "clearly established" in 2012 that the failure to replace a single meal would substantially burden

37

a Muslim inmate's First Amendment rights, *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)

(quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)), the Court finds Officer Webb

and Officer Perry are entitled to qualified immunity, and does not address the merits of

Plaintiff's constitutional claims against them, *see id.* at 140 (observing that courts, in their

discretion, may "proceed directly to step two of the [qualified immunity] analysis and, if they

find that qualified immunity applies, avoid the '[u]nnecessary litigation of constitutional issues'

at step one" (quoting *Pearson v. Callahan*, 555 U.S. 223, 237 (2009)).

## 2. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless [the]

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

(2) that the right was 'clearly established' at the time of the challenged conduct." *Francis* 942

F.3d at 139 (quoting *Ricciuti*, 834 F.3d at 167). Thus, even after a prison officer has been found

liable for a constitutional violation, "the doctrine of qualified immunity will shield that officer

from liability for damages if his [or her] 'conduct d[id] not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Outlaw v. City of*

*Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). A

court may grant qualified immunity after a finding of liability "if an officer has made a

reasonable mistake of law, i.e., if the constitutional violation he [or she] has committed was not a

'clearly established' violation." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 662 (E.D.N.Y. 2017).

"The qualified immunity standard is an objective standard, asking not whether the defendant

officer acted in good faith or what he himself [or she herself] knew or believed, but rather what

would have been known to or believed by a reasonable officer in the defendant's position."

*Outlaw*, 884 F.3d at 367. Qualified immunity is an affirmative defense that a defendant bears the

burden of proving. *Id.* "To the extent that a particular finding of fact [i]s essential to an

affirmative defense, . . . it [i]s incumbent on [the defendant] to request that the [factfinder] be asked the pertinent question." *Id.* (quoting *Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004)) (markings in original).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In making this determination, [courts] consider Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (citing *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). However, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (quoting *Garcia*, 779 F.3d at 92 (internal quotation marks, alterations, and citations omitted)).

### a.     Lt. Laurin

"We . . . have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford II*, 352 F.3d at 597 (citing *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975)). Lt. Laurin knew, as of September 26, that Plaintiff was entitled to a Muslim diet, that Plaintiff should have been receiving a Muslim diet since March 2, and that Plaintiff had been wrongfully denied a Muslim diet for approximately seven months. And yet, Lt. Laurin, inexplicably, left Plaintiff on a regular prison diet for ten more days before placing in Plaintiff's kitchen file a Special Diet Notification form advising the kitchen to provide Plaintiff a non-pork diet. Even assuming, as discussed below, that the "law was not clearly established as to how many religiously compliant meals must be denied before the prisoner' religious beliefs are substantially burdened," *Brandon*, 938 F.3d at 39, the Court finds that no reasonable officer, who

had no legitimate penological reason for withholding a religious diet, would have believed that allowing an inmate to remain on a regular diet for an additional ten days, during which time the inmate regularly received pork meals he could not eat,[23] was not a substantial burden. *See, e.g.*, *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (explaining that the principle that denying "prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights" was "established in our circuit at least as early as 1975" and that the district court improperly dismissed the plaintiff's claim that "the seven-day restrictive diet imposed upon him . . . impinged upon his observance of Ramadan" (citing *Ford II*, 352 F.3d at 597)). Notably, Lt. Laurin does not argue otherwise. Accordingly, Lt. Laurin is not entitled to qualified immunity.

### b.      Officers Webb and Perry

Officers Webb and Perry were each only involved in one incident. The Court finds that, even crediting Plaintiff's allegations, Officers Webb and Perry are entitled to qualified immunity for these isolated incidents. A reasonable officer would not necessarily have known that the failure to replace a single noncompliant meal imposed a substantial burden under existing precedent. Though there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 575 U.S. at 825 (internal quotation marks and citations omitted). It was not clearly established in 2012 that the denial of a single religious meal would substantially burden a plaintiff's First Amendment rights. *Compare Brandon*, 938 F.3d at 36 n.11 ("We express no opinion as to whether a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated

---

[23] Plaintiff estimated, based on the menu, that he received two to four pork meals per week while on a regular diet. (T. 49).

incidents, such that the burden they impose is de minimis."); *with Williams v. Does*, 639 F. App'x 55, 57 (2d Cir. 2016) ("The district court relied on non-binding case law when it determined that Williams's burden was *de minimis* because only a few of his meals were delivered prematurely; its reasoning is inconsistent with this Court's case law, which cautions against 'the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent.'" (quoting *Ford II*, 352 F.3d at 593)); *see also Wiley v. Baker*, No. 20-cv-154, 2022 WL 3045042, at *6, 2022 U.S. Dist. LEXIS 138684, at *15 (D. Vt. June 10, 2022) (declining to dismiss at the pleading stage because, "given that the case law is not clear on precisely how many missed or untimely meals during Ramadan would constitute a 'substantial burden' to a Muslim inmate, dismissal on 'substantial burden' grounds is inappropriate at this stage of the case"), *report and recommendation adopted*, 2022 WL 3042140, 2022 U.S. Dist. LEXIS 136972 (D. Vt. Aug. 2, 2022); *Brown v. Graham*, No. 07-cv-1353, 2010 WL 6428251, at *15, 2010 U.S. Dist. LEXIS 144188, at *56 (N.D.N.Y. Mar. 30, 2010) (holding that even assuming that the "plaintiff was approved to receive a kosher meal throughout his confinement . . . the withholding of a single noon meal constituted, at most, a de minimis burden on plaintiff's religious expression"), *report and recommendation adopted*, 2011 WL 1213482, 2011 U.S. Dist. LEXIS 34345 (N.D.N.Y. Mar. 31, 2011), *aff'd*, 470 F. App'x 11 (2d Cir. 2012) ("[T]here is nothing in this record that could support a reasonable jury conclusion that [the defendant's] failure to provide [Plaintiff] a kosher meal on a single occasion rose to the level of a substantial burden on [Plaintiff's] religious freedom."). Thus, Officers Webb and Perry are entitled to qualified immunity.

### C.     First Amendment Retaliation

Plaintiff brings three First Amendment retaliation claims: (1) that Lt. Laurin and Nurse Kinter retaliated against him for filing grievances by removing his medical diets; (2) that Sgt.

Clancy and Officer Blaise retaliated against him for filing a grievance on October 17 by exposing him to assault by another inmate; and (3) that Bedard retaliated against him for filing grievances by intentionally placing pork in his meals. Defendants argue that Plaintiff has failed to prove his claims by a preponderance of the evidence.

To prove First Amendment retaliation, Plaintiff must establish by a preponderance of the evidence: "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action.'" *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (alteration in original) (quoting *Holland*, 758 F.3d at 225).

### 1.    Removal of Medical Diets

Plaintiff filed his first meal-related grievance on May 28, (Pl.'s Ex. 10), and thirteen additional grievances from September 15 to October 15.[24] It is well settled that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988)); *see also Brandon*, 938 F.3d at 40 ("The filing of prison grievances is a protected activity." (citing *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003)). Thus, Plaintiff has proven the first element of his retaliation claims.

---

[24] (Pl.'s Ex. 14 (medical diet not followed, filed September 15); Pl.'s Ex. 15 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 16 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 26 (served tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 27 (served sandwich with tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 28 (served tomato soup in violation of medical diet and requests copies of food grievances, filed October 2); Pl.'s Ex. 18 (served ham or turkey ham for lunch on October 9 in violation of religious diet and received conflicting information about whether ham steak served on September 9 was turkey or ham, filed October 9); Pl.'s Ex. 19 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 20 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 34 (requests copies of food grievances, filed October 11); Pl.'s Ex. 35 (requests response to grievances about medical and religious diets, filed October 14); Pl.'s Ex. 36 (requests copies of food grievances and objects to charge for copies, filed October 15); Pl.'s Ex. 38 (served peanut butter in violation of medical diet, filed October 15)).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Id.* (quoting *Davis*, 320 F.3d at 353). "The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* (citing *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)). Thus, a retaliation claim may proceed "even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances." *Gill*, 389 F.3d at 381. Such a plaintiff may satisfy the adverse action element by showing that the conduct "would have deterred a similarly situated individual of ordinary firmness." *Brandon*, 938 F.3d at 40 (quoting *Gill*, 389 F.3d at 381).

Next, the plaintiff must "establish a causal connection between the defendants' actions and the adverse action." *Id.* at 40. To do so, a plaintiff must show "that the speech played a substantial part in the adverse action," *id.* (quoting *Davis*, 320 F.3d at 354), "in response to which the defendant official can then show that the [adverse] action would have occurred regardless," *Hayes*, 976 F.3d at 272 (citing *Holland*, 758 F.3d at 226). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

On October 16, Nurse Kinter issued a "Diet Notification" form to the CCJ kitchen regarding Plaintiff's "Medical" diet. (Pl.'s Ex. 41). The form, which is signed by Nurse Kinter, directed the "cancel[ation of] all previous slips" and placement of Plaintiff on a "Reg Diet"— "No Shellfish." (*Id.*). It canceled Plaintiff's low fat/low cholesterol, no tomato, no fish medical diet. The cancelation of Plaintiff's medical diet did not deter him from filing further grievances: he filed one the day his medical diet was canceled, (Pl.'s Exs. 39, 40), and seventeen grievances between October 17 and November 21, the day his medical diet was reinstated, (Pl.'s Exs. 22,

43, 44, 45, 45, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59). However, applying the objective

test, the Court finds Plaintiff has proved by a preponderance of the evidence that he suffered an

adverse action. Dr. Schroyer issued a medical diet, including a "no shellfish diet" on January 14

to address Plaintiff's shellfish allergies, a "no tomato or tomato products diet" on March 23 to

address Plaintiff's severe acid reflux, and a "low fat/low cholesterol diet" on May 21 to address

Plaintiff's high cholesterol. (Joint Pre-Trial Stipulation, ¶ 3(a)(xii)–(xiv); T. 45–46). At the time

Dr. Shroyer ordered Plaintiff's low fat/low cholesterol diet, Plaintiff's labs reflected high

cholesterol levels, which, Plaintiff understood, placed his health at risk. (T. 129). Plaintiff also

understood that the dietary restriction was important to reduce the risks to his health. (T. 129).[25]

Because tomatoes caused Plaintiff severe acid reflux, their removal from his diet was necessary

to avoid acid reflux. In this case, Plaintiff established that the removal of these diets had the

impact of depriving Plaintiff of portions of many of his meals. (*See, e.g.*, Pl.'s Ex. 46 (Plaintiff

grieving the removal of "restrictive status" and explaining that it directly exposed him "to foods I

can't consume")). Indeed, the grievances Plaintiff filed show that as a result of the revocation of

his medial diet, he was deprived of a full or partial meal at least fourteen times during a 21-day

period (Pl.'s Exs. 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 55, 57, 58, 59 (Grievances filed between

October 19 and November 9)). Thus, Plaintiff has established that the removal of his "low

fat/low cholesterol" and "no tomato" diet was an adverse action. *See, e.g.*, *Quezada v. Roy*, No.

14-cv-4056, 2017 WL 6887793, at *10, 2017 U.S. Dist. LEXIS 210539, at *29 (S.D.N.Y. Dec.

14, 2017) (finding, at summary judgment, that "removing Plaintiff from his therapeutic diet plan

constitutes an adverse action for purposes of a First Amendment retaliation claim"); *Davis*, 320

---

[25] Nurse Kinter explained at trial that "cholesterol can cause a lot of different problems in your body," including a stroke, a heart attack, and blocked arteries. (T. 396).

F.3d at 353 (finding, at pleading stage, that the plaintiff adequately alleged adverse action based on deprivation of "high fiber diet").

In addition, Plaintiff has proven by a preponderance of the evidence that his filing of grievances "played a substantial part" in the adverse action. Lt. Laurin investigated "what [Plaintiff was] doing with commissary" as part of his investigation into Plaintiff's grievances about his medical and religious diets. (T. 326). On September 29, Lt. Laurin noted, in investigating Plaintiff's September 15 and 24 grievances, that Plaintiff was "buying items in the commissary that he should not be with his diet." (Pl.'s Exs. 14, 15, 16). On or about October 2, Lt. Laurin had Plaintiff's commissary receipts printed. (Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Although he had that information on October 2, Lt. Laurin did nothing with it until October 15, when he angrily confronted Plaintiff, asking "[i]f we're getting all these grievances and you're turning around and purchasing these items," what is the "sense of us . . . putting in all this effort." (T. 328). Between October 2 and October 15, Plaintiff had filed seven grievances, five of which concerned the food he was being served. (Pl.'s Exs. 18, 19, 20, 34, 35, 36, 38). Although Lt. Laurin understood that Plaintiff was not eating all of what he was buying and that Plaintiff had been regularly receiving pork meals, no part of which he could eat during a significant part of the time period reflected in the commissary receipts, (*see* Defs.' Ex. 22 (receipts from purchases for July, August, and September 2012)), after speaking with Plaintiff, he went directly to Nurse Kinter to inform her about the commissary receipts, (T. 329). Nurse Kinter removed Plaintiff's medical diet the next day. Given the temporal proximity between Plaintiff's grievances and Lt. Laurin's conduct, Lt. Laurin's direct reference to Plaintiff's grievances, and his angry tone, Plaintiff has established his filing of grievances played a substantial role in the removal of his medical diets. Lt. Laurin's comments to Plaintiff on

45

October 15 directly implicated not only the fact that Plaintiff had engaged in protected speech—filing grievances—but also the content of that speech—seeking help ensuring he received meals consistent with his medical diet.

"The defendant official then bears the burden of establishing that the [adverse] action would have occurred 'even absent the retaliatory motivation.'" *Holland v. Goord*, 758 F.3d 215, 226 (2d Cir. 2014) (quoting *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir. 2002)). In *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994), the Second Circuit held that a retaliation defendant satisfies this burden when it is "undisputed that [plaintiff] had in fact committed the prohibited conduct."

Defendants have failed to prove that Plaintiff's medical diets would have been revoked absent the retaliatory motivation. There is no dispute that Plaintiff made the commissary purchases at issue. However, as Lt. Laurin knew, Plaintiff did not eat all the commissary purchases himself. In addition, Plaintiff testified that with respect to the chili ramen, about which Lt. Laurin and Nurse Kinter were purportedly concerned because it contained tomato powder, although he did eat the "noodles several times," that he "couldn't handle" and did not "[u]tilize the [seasoning] packet." (T. 211–12). Moreover, the evidence at trial established that the practice at the jail, in the case of an inmate making unhealthy commissary purchases, was to procure the medical staff's help in *placing them on* a medical or healthier diet; the practice was never to remove a medical diet of an inmate whose health depended on it. Indeed, Lt. Laurin asserted at trial that "[w]e've done this before in the past" and that it was his "job . . . to make" medical "aware" of the inmate's commissary purchases. (T. 329). He stated, for example he had "done this for" diabetics who were not paying "attention" and they have had "to put them on a low sodium diet because they start retaining fluids" and for "pregnant females," and explained that

"we try to keep them on a good healthy diet." (T. 330). This testimony might support the unilateral placement of an inmate on a medial diet as it would *benefit* the diabetic or pregnant inmate's health, but it in no way supports the *removal* of a medical diet necessary to an inmate's health, which could only be harmful. Moreover, to the extent it was Lt. Laurin's job to make medical aware, the only inference from the above testimony is that he had a duty to make medical aware that the inmate was eating products harmful to his health—and procure intervention that would help, not harm, the inmate. Lt. Laurin has identified no other reason for the removal of Plaintiff's medical diet other than Plaintiff's purchase of commissary items that did not comply with the "low fat/low sodium" diet, a reason he reaffirmed in personally denying Plaintiff's fifteen subsequent grievances, most of which complained that he was served spaghetti sauce, tomato soup, and tomato slices, which caused him acid reflux, and buttered toast, which was bad for his cholesterol. (Pl.'s Ex. 56). Therefore, Lt. Laurin has not met his burden of establishing as a matter of law that Plaintiff's medical diet would have been removed in the absence of a retaliatory motive.

Finally, to the extent Lt. Laurin argues he was not personally involved in this retaliatory act, because only medical staff could decide to remove a medical diet, the Court rejects that argument. (Dkt. No. 250, at 46). Lt. Laurin himself testified that he worked together with Nurse Kinter with respect to medical diets, (T. 329–30 (Lt. Laurin testifying that "[w]e've done this before in the past" and that "we have to put [diabetics] on a low sodium diet because they start retaining fluids" and "we try to keep [pregnant inmates] on a good healthy diet")), and that he brought the commissary receipts directly to Nurse Kinter for the purpose of showing Plaintiff's noncompliance with his medical diets, (T. 329 ("I wanted her to be aware that he was purchasing these items and they weren't compliant with his low fat/low sodium diet.")). In light of these

47

facts, the Court finds it of little consequence that Lt. Laurin could not sign the form removing the medical diet himself. Thus, for all these reasons, the Court finds that Lt. Laurin's "own individual actions," constitute First Amendment retaliation. *Tangreti*, 983 F.3d at 612 (quoting *Iqbal*, 556 U.S. at 676).

Plaintiff likewise established Nurse Kinter's liability and personal involvement. Nurse Kinter was aware of Plaintiff's grievances because Lt. Laurin interviewed her on September 29 as part of his investigations into Plaintiff's complaints that he was not receiving meals that complied with his medical diets, (*see* Pl.'s Ex. 14 (September 15 grievance: "My food trays are constantly either missing something or stocked with items I'm not supposed to consume due to medical conditions."); Pl.'s Ex. 15 (September 24 grievance: "I cannot eat . . . tomatoes."); Pl.'s Ex. 16 (September 24 grievance: "I was served a salad which had tomatoes."); *see also* Pl.'s Ex. 16 ("Grievance Investigation Form" for September 15 and 24 grievances noting that Nurse Kinter was interviewed as part of the investigation); T. 421 (Nurse Kinter testifying that she knew Plaintiff was grieving his meals)). On September 15, Lt. Laurin notified Nurse Kinter about Plaintiff's noncompliant commissary purchases. On September 16, Nurse Kinter summoned Plaintiff to the medical ward and informed him that his medical restrictions were being revoked due to his noncompliant commissary purchase. That same day, Nurse Kinter signed the "Diet Notification" form revoking Plaintiff's medical diets. (Pl.'s Ex. 41).

Nurse Kinter removed Plaintiff's medical diet less than three weeks after she was interviewed in connection with Plaintiff's medical diet related grievances. The close temporal proximity between Plaintiff's grievances and the revocation of Plaintiff's medical diets is circumstantial evidence of retaliatory intent and causal connection. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) ("We have held that the temporal proximity of an allegedly

retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."). In addition, there is a direct correlation between the subject matter of the protected conduct, the grievances complaining that Plaintiff's medical diet was not being followed and the adverse action, the removal of the medical diet. Finally, Nurse Kinter's inexplicable placement of Plaintiff on a regular diet that would do nothing to help, and could only, as she knew, further harm his cholesterol level and cause Plaintiff severe acid reflux, is evidence of retaliatory intent. (*See* T. 419–20 (Nurse Kinter testifying that she was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can get sick if they eat foods with high acidity)); *Burton v. Lynch*, 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009) (finding that, while the doctor's refusal to examine the plaintiff's elbow and comments that it "look[ed] fine" and that the plaintiff's "allergy to Motrin was Plaintiff's 'problem'" did not "explicitly state an intent to retaliate," they were "consistent with and imply a retaliatory motive," explaining that "[t]he facts corroborating the existence of Plaintiff's injuries and the failings of Dr. Supple's diagnosis and treatment, when taken in conjunction with Plaintiff's allegations of the brusque treatment he received from Dr. Supple, sufficiently allege a 'causal connection' between the filing of the grievance and the adverse action").

Further, Nurse Kinter has failed to show that she would have taken the same action in the absence of Plaintiff's grievances. Nurse Kinter testified that Plaintiff had a history of problematic cholesterol and triglyceride levels, (T. 396 (Nurse Kinter testifying that Plaintiff's "ADL's, HDLs, LDLs were a little bit out of whack and we wanted to get them better" and "we needed to . . . decrease his triglycerides and . . . cholesterol")), that cholesterol can cause, among other health problems, a stroke, heart attack, and blocked artery, and "if somebody has a history of that, we kind of want to get that under control." (T. 396). Nurse Kinter testified that had she felt

that removing the medical diet would "make that prisoner in worse condition, I would not have removed that diet" and that she had no concerns about removing Plaintiff medical diet because "his labs had improved." (T. 437). If true, this evidence might support a finding that Nurse Kinter would have removed the medical diets regardless of Plaintiff's grievance, but the evidence before the Court shows that Plaintiff's "labs" were largely the same at the time; they do not show improvement. In addition, as discussed above, there is no evidence that removal of a medical diet was ever used as a tactic for improving an inmate's health at CCJ. Accordingly, the Court finds Plaintiff has proven by a preponderance of the evidence that Nurse Kinter retaliated against him for engaging in conduct protected by the First Amendment.

### 2.     Exposing Plaintiff to Assault by Another Inmate

Plaintiff claims that Sgt. Clancy and Officer Blaise retaliated against Plaintiff for filing his October 17 grievance regarding a pork meal, (Pl.'s Ex. 22), by "exposing him to assault by another inmate" on November 18.

Even crediting Plaintiff's testimony that on October 17, Sgt. Clancy commented to Officer Blaise that she would lock Plaintiff up if he filed another grievance and that on November 17, as she was bringing Tiny into Plaintiff's housing unit, she wondered if Tiny would "tr[y] this shit on Brandon," Plaintiff's retaliation claim against Sgt. Clancy and Officer Blaise fails. By Plaintiff's own admission, he argued with, yelled at, cursed, and called Tiny names, and made racially prejudicial remarks to Tiny "*all night*," the night before the November 18 assault. (T. 147). The Court therefore finds that it was more likely than not Plaintiff's own conduct toward Tiny—not any actions Sgt. Clancy or Officer Blaise may have taken in placing Plaintiff near Tiny— that exposed Plaintiff to Tiny's assault. Accordingly, as Plaintiff failed to prove by a preponderance of the evidence a causal connection between Plaintiff's October 17

protected conduct of filing a grievance, and Tiny's November 18 assault, his retaliation claims against Sgt. Clancy and Officer Blaise are dismissed.

### 3.     Intentional Introduction of Pork Into Meals

Plaintiff claims CCJ Food Service Manager Bedard retaliated against Plaintiff for filing meal-related grievances "by introducing pork into meals otherwise labeled meatless." (Dkt. No. 247, at 61–62). Plaintiff filed twenty-nine grievances from May 28 to October 31, the majority of which were food-related. (Pl.'s Exs. 10, 14, 15, 16, 18, 19, 20, 22,  26, 27, 28, 34, 35, 36, 38, 39, 40, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54). Bedard was only aware of Plaintiff's no-pork diet as of October 5, 2012. In his post-trial briefing regarding his retaliation claim against Bedard, Plaintiff specifically refers to the "meals otherwise labeled meatless" he received on October 17, (*see* Pl.'s Ex. 22 (ham salad)), "and on other *dates* in October 2012," (Dkt. No. 247, at 61 (emphasis added)). However, the evidence showed that Plaintiff was served a pork meal on only *one* other occasion in late October—a vegetarian or "meatless" soup containing ham in late October. (T. 152–54).

Even assuming Bedard was aware of Plaintiff's grievances, because there is no evidence that Bedard had any part in the preparation of Plaintiff's tray on October 17, the Court finds Plaintiff's claim of retaliation as to that incident fails for lack of personal involvement. *See supra*, Section III.B.1.c. Bedard was responsible for supervising the cooks in the kitchen to make sure food was provided in compliance with an inmate's special diet, but his supervisory role, without more, is insufficient. *Tangreti*, 983 F.3d at 618. Plaintiff has introduced some evidence that Bedard was responsible for placing the soup that contained pork on Plaintiff's tray in late October. Although temporal proximity between Plaintiff's filing of grievances in September and October 2012 and the late October service of soup with pork may be circumstantial evidence of retaliatory intent, there is no evidence that shows that the placement of the soup with pork on

Plaintiff's tray was anything more than a mistake and the Court notes that this meal was immediately replaced. (T. 153–54). On this record, the Court finds that Plaintiff has failed to establish retaliatory intent. *See Lakram v. Coughlin*, 99 F.3d 402 (2d Cir. 1995) ("Although correctional officials now concede that Lakram's transfer was a mistake, a mistake is insufficient to support a claim of retaliation."). Thus, Plaintiff's First Amendment retaliation claim against Bedard is dismissed.

### 4.    Qualified Immunity

Lt. Laurin argues that he is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim because he had no authority to rescind medical diets, Plaintiff's claim of retaliation is unfounded, and Lt. Laurin spent time and effort following the removal of Plaintiff's medical diet addressing Plaintiff's grievances on that issue. (Dkt. No. 250, at 55). Nurse Kinter argues that she is entitled to qualified immunity because it was "the jail physician—and not Defendant Kinter who had the final decision as to which medical special diets would be . . . removed" and, in any event, one month later she recommended the reinstatement of Plaintiff's medical diet. (Dkt. No. 250, at 56).

These arguments principally concern the merits of Plaintiff's retaliation claim, which the Court has addressed above. The Court has found not only that Lt. Laurin had the authority to procure the revocation (or approval of) a medical diet, but that he procured the revocation of Plaintiff's medical diet in retaliation for Plaintiff's filing of multiple grievances complaining that his medical and religious diets were not being followed. The Court has also found that Nurse Kinter had the express authority to revoke a medical diet and that she revoked Plaintiff's medical diet with retaliatory intent. Nurse Kinter correctly notes that Plaintiff's medical diets were reinstated eventually—after Plaintiff asked for guidance on medically appropriate commissary purchases. But the eventual reinstatement of the medical diet does not undermine the Court's

determination that the revocation of that diet was retaliatory. It appears that the medical diet was reinstated to quell the increase in Plaintiff's grievances. (T. 336–37 (Lt. Laurin testifying that he discussed with Nurse Kinter whether there was "something we could to do get [Plaintiff] back on this diet because we needed to come to a conclusion of all this")). Although Defendants have not advanced any other arguments regarding their entitlement to qualified immunity, as the following analysis shows, qualified immunity is, in any event, inapplicable here.

First, the filing of grievances was clearly established as a constitutionally protected activity in 2012. *See Gill*, 389 F.3d at 384 (the "use of the prison grievance system" is a protected activity); *Franco*, 854 F.2d at 589 (holding that prisoner had constitutional right to petition government for redress of grievances, which included cooperating with state investigation of inmate abuse); *Graham*, 89 F.3d at 80 (filing of a grievance and attempt to find inmates to represent the grievants is constitutionally protected). Second, no reasonable prison official could have reasonably believed that it was not an adverse action to remove Plaintiff's medical diet which was in place to help get his cholesterol "under control" in order to reduce his risk of, among other things, heart attack and stroke, and without which he would experience "severe acid reflux." *See Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) (observing that denial of kosher diet is an adverse action that may support retaliation claim); *Davis*, 320 F.3d at 352–54 (holding inmate's claim that prison officials denied plaintiff his high fiber diet days after filing inmate grievances sufficiently alleged First Amendment retaliation claim); *Quezada*, 2017 WL 6887793, at *10, 2017 U.S. Dist. LEXIS 210539, at *30 ("[D]enial of a therapeutic diet is an adverse action sufficient to form the basis of a retaliation claim."). Finally, the Court has found that both Lt. Laurin and Nurse Kinter acted with retaliatory intent. "[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can

53

never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001).[26]

Accordingly, the Court finds that Lt. Laurin and Nurse Kinter are not entitled to qualified immunity.

### D.   Compensatory Damages

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), provides, in relevant part:

> (e) Limitation on recovery
>
> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). The PLRA's limitation on recovery "is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages." *Walker v. Schult*, 45 F.4th 598, 612 (2d Cir. 2022).[27] Here, Plaintiff alleges physical injury due to a fifty-pound weight loss, headaches, fatigue, hunger, and mental distress. (Dkt. No. 247, at 76). "[T]here is no statutory definition of 'physical injury' as used in section 1997e(e)." *Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999). However, the physical injury required under § 1997e(e) must be more than de minimis. *Id.* (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)). "Physical afflictions that courts have found de minimis include contracting a fungal infection from exposure to

---

[26] Defendants make no arguments and cite no case law to the contrary.

[27] Because Plaintiff was incarcerated at the time he commenced this action, (*see* Dkt. No. 1), this provision continues to apply. *Cf. Cano v. City of New York*, 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014) (explaining that "§ 1997e(e) does not bar Plaintiffs, who were *not incarcerated at the time they filed this action*, from seeking any category of damages"); *In re Nassau Cnty. Strip Search Cases*, No. 99-cv-2844, 2010 WL 3781563, at *5, 2010 U.S. Dist. LEXIS 99783, at *13 (E.D.N.Y. Sept. 22, 2010) ("PLRA's recovery limitation . . . does not apply to plaintiffs not incarcerated at the time the action is brought").

sewage and waste, skin rashes, and itching, soreness and cracked skin." *Hong v. Liburd*, 18-cv-7201, 2020 U.S. Dist. LEXIS 139145, at *30 (S.D.N.Y. Aug. 3, 2020) (internal citations omitted) (citing cases).[28] Even assuming Plaintiff established physical injury, because Defendants are liable for only limited time periods, September 26 to October 5, and October 15 to November 21, and Plaintiff has not presented specific evidence concerning his physical condition during these time period, the Court finds no basis for awarding compensatory damages based on physical, mental, or emotional injury.

Nonetheless, Plaintiff is entitled to compensatory damages for the injury resulting from Defendants' violation of his First Amendment rights. *Toliver v. City of New York*, 530 F. App'x 90, 93 n.2 (2d Cir. 2013) ("[E]ven if Toliver is unable to establish that any of the injuries complained of in this action stemmed from an incident in which he suffered physical injuries, Toliver may still recover damages for injuries to his First Amendment rights, as well as nominal and punitive damages for any other constitutional violations." (citing *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002)); *see also Ford v. McGinnis (Ford I)*, 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001) (explaining that the PLRA "does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself."). Where, as here, a plaintiff is "entitled to recover for the loss of intangible rights," although a jury, or, in this case, the Court, may "not . . . award 'speculative damages,'" the amount of monetary damages awarded is "*necessarily arbitrary and unprovable.*" *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004) (emphasis in original) (quoting *Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 39 (2d Cir. 1985)). In *Kerman*, the plaintiff prevailed on his Fourth Amendment unlawful seizure claim. 374 F.3d at 121. The Second Circuit held that the jury

---

[28] No Westlaw cite available.

should have been instructed that the plaintiff was entitled to compensatory damages for his loss

of liberty, and explained that: "The damages recoverable for loss of liberty for the period spent in

a wrongful confinement are separable from damages recoverable for such injuries as physical

harm, embarrassment, or emotional suffering; even absent such other injuries, an award of

several thousand dollars may be appropriate simply for several hours' loss of liberty." 374 F.3d

93, 125–26 (2d Cir. 2004); *see also Ford I*, 198 F. Supp. 2d at 366 (holding that the "plaintiff

may be awarded an amount to compensate him for the denial of his religious meal").

In this case, Plaintiff has proven that he was wrongfully served six meals containing pork

from September 26 to October 5, 2012, as a result of Lt. Laurin's failure to place a Special Diet

Notification in Plaintiff's inmate folder. Thus, not only was he deprived of six meals in a ten-day

period, but the service of each meal violated his First Amendment right to the free exercise of

religion. The Court awards Plaintiff $500 per meal for the violation of his First Amendment right

to the free exercises of religion, for a total of $3,000. *Cf.*, *Drayton v. City of New York*, No. 17-

cv-7091, 2022 WL 16948769, at *4–5, 2022 U.S. Dist. LEXIS 207165, at *12–15 (E.D.N.Y.

Nov. 15, 2022) (offering the plaintiff choice of new trial or accepting reduced compensatory

damages award of $10,000 for his loss of liberty during the "3 and 30 minutes" he was in

wrongful custody, observing that New York cases uphold awards of up to $10,000, in loss of

liberty cases, "even without proof of actual damages" (citing inter alia *Hallenbeck v. City of

Albany*, 99 A.D.2d 639 (3d Dep't 1984) ($10,000 for three hours); *Woodard v. City of Albany*, 81

A.D.2d 947 (3d Dep't 1981) ($7,500 for five hours)); *King v. Zamiara*, 788 F.3d 207, 215–16

(6th Cir. 2015) (affirming award of compensatory damages in the amount of $1,475, equally $5

per day for First Amendment retaliatory transfer to "more restrictive facility").

Plaintiff has also proven that Lt. Laurin and Nurse Kinter retaliated against him for filing grievances by revoking his medical diets from October 16, 2012 to November 21, 2012. During that thirty-seven-day period, Plaintiff regularly received meals, parts of which he could not eat because they were harmful to his cholesterol levels or would cause severe acid reflux. Accordingly, the Court awards Plaintiff $200 per day for each day his medical diets were revoked, for a total of $7,400. *Cf.*, *King*, 788 F.3d at 215–16.

### E.    Punitive Damages

"Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "The terms 'malice' or 'reckless indifference' pertain to the [defendant's] knowledge that [he or she] may be acting in violation of federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). "To be entitled to an award of punitive damages, a claimant must show a "positive element of conscious wrongdoing." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad*, 527 U.S. at 538). Further, punitive damages are appropriate when the defendant's actions call for "deterrence and punishment over and above that provided by compensatory awards." *Wade*, 461 U.S. at 54.

Here, Lt. Laurin acted recklessly and with callous indifference to Plaintiff's First Amendment right to the free exercise of religion when he waited ten days to implement a religious diet that he knew Plaintiff was entitled to and had been wrongfully denied for the past seven months. Lt. Laurin knew religious diet notification forms were to be filed with the kitchen on the same day as booking, but gave no explanation for waiting ten days after learning one had not been filed on Plaintiff's behalf to do so, speculating only that he may have gotten "tied up" in

something. The Court further finds that an award of punitive damages will serve the purposes of deterrence and punishment.

The Court further finds that Lt. Laurin and Nurse Kinter acted recklessly and with an evil motive and intent toward Plaintiff when they removed his medical diets—a particularly vicious action given that they were well aware how concerned Plaintiff was about his health and diet and that he had used commissary purchases, to eat or barter, in order to help make up for the many meals he could not eat because they contained pork. Indeed, they removed his medical meals less than two weeks after Plaintiff began receiving proper religious meals, placing him back in the position of regularly receiving meals he could not eat. The Court further finds that an award of punitive damages will serve the purposes of deterrence and punishment.

Accordingly, Plaintiff is entitled to punitive damages and the Court will hold a hearing to permit evidence regarding the financial conditions of Defendants Laurin and Kinter, and argument concerning an appropriate punitive damages award.

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin on his First Amendment free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin and Suzanne Kinter on his First Amendment retaliation claim; and it is further

**ORDERED** that Suzanne Kinter, Lawrence Bedard, Margaret Clancy, Robert Webb, and Thomas Perry are entitled to judgment in their favor on Plaintiff's First Amendment free exercise claim; and it is further

**ORDERED** that Lawrence Bedard, Margaret Clancy, and Eric Blaise are entitled to judgment in their favor on Plaintiff's First Amendment retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $3,000 on his First Amendment free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $7,400 on his First Amendment retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to an award of punitive damages against Kevin Laurin and Suzanne Kinter in an amount to be determined following a hearing on April 18, 2023, at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: <u>March 6, 2023</u>
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

59